# Appalachian
### FOR THE ECONOMY & THE ENVIRONMENT

P. O. Box 507
Lewisburg, WV 24901
ph: 304-645-9006
fax: 304-645-9008
e-mail: info@appalachian-center.org

www.appalachian-center.org

Honorable Randy C. Huffman
Cabinet Secretary
West Virginia Department of Environmental Protection
601 57th Street
Charleston, WV 25304

Dear Secretary Huffman:

Please find enclosed a *Petition to the Secretary of the West Virginia Department of Environmental Protection to Designate the Blair Mountain Battlefield As Unsuitable for Surface Coal Mining.* This petition is submitted on behalf of Sierra Club, Friends of Blair Mountain, National Trust for Historic Preservation, Ohio Valley Environmental Coalition, West Virginia Labor History Association, and West Virginia Highlands Conservancy pursuant to pursuant to the Surface Mining Control and Reclamation Act, 30 U.S.C. § 1272, the West Virginia Surface Coal Mining and Reclamation Act, W. Va. Code § 22-3-22, and the W. Va. Code R. § 38-2-3.17 and §38-2-19.7.

Thank you for your attention to this matter and please do not hesitate to contact me if you have any questions about the petition.

Sincerely,

Derek. O. Teaney
*Counsel for Petitioners*



# Petition to the Secretary of the West Virginia Department of Environmental Protection to Designate the Blair Mountain Battlefield As Unsuitable for Surface Coal Mining

Randy C. Huffman
Cabinet Secretary
Department of Environmental Protection
601 57th Street
Charleston, WV 25304
Phone: (304) 926-0440
Fax: (304) 926-0446
randy.c.huffman@wv.gov

**Submitted on Behalf of:**

**Sierra Club, Friends of Blair Mountain, National Trust for Historic Preservation, Obio Valley Environmental Coalition, West Virginia Labor History Association, and West Virginia Highlands Conservancy**

**TABLE OF CONTENTS**

INTRODUCTION

1. The Federal Surface Mining Control and Reclamation Act
2. The West Virginia Surface Coal Mining and Reclamation Act and Corresponding State Regulations

I.  IDENTIFICATION OF PETITIONED LANDS

II. ALLEGATIONS OF FACT WITH SUPPORTING EVIDENCE AND DESCRIPTION OF HOW MINING WOULD ADVERSELY AFFECT PEOPLE, LAND, AIR WATER AND OTHER RESOURCES

1. The Blair Mountain Battlefield possesses important cultural, scientific and aesthetic values and natural systems that are vulnerable to the impacts of surface coal mining.

   A. The Blair Mountain Battlefield is of state and national historic significance due to its compelling cultural, scientific, aesthetic and natural importance.
   B. The Blair Mountain Battlefield holds great archaeological significance, and important discoveries are still being made.
   C. The public's interest in protecting the Blair Mountain Battlefield dates back many years.

2. Surface coal mining would result in significant and irreparable damage to the Blair Mountain Battlefield and would adversely affect people, land, air, water and soil.

   A. Surface mining disrupts topsoil, which threatens to damage or destroy historic and cultural artifacts found on Blair Mountain.
   B. Surface mining permanently destroys forests and topographical features, which are integral to understanding the Blair Mountain Battlefield and to maintaining the site's historical integrity of feeling, setting, association, and context.
   C. Surface mining is a major source of water pollution, erosion and flooding, which would endanger artifacts and features of the battlefield at Blair Mountain.
   D. Surface mining would create noise and blasting impacts, which would inhibit historical interpretation and tourism at Blair Mountain.

3. The vast majority of Identified Lands are not exempt from designation as unsuitable for surface mining under W. Va. Code R. Section 38-2-19.9.

4. Reclamation is not technically feasible and could not repair or remediate the damage to unique historic resources from surface mining activities under W. Va. Code R. Section 38-2-19.7.a.

III. PETITIONERS' CONTACT INFORMATION

IV.     STATEMENT OF PETITIONERS' INTERESTS, AND DESCRIPTION OF
        HOW SURFACE COAL MINING WILL ADVERSELY AFFECT THOSE INTERESTS

1.  Petitioners and their Members Have a Legally Cognizable Interest in Protecting the
    Blair Mountain Battlefield from the Adverse Impacts of Surface Coal Mining

2.  Petitioners' Interests Would Be Sufficiently Threatened and Adversely Affected By
    Surface Mining Activities So As to Satisfy the "Injury in Fact" Test.

CONCLUSION

Table of exhibits

## INTRODUCTION

Petitioners Sierra Club, Friends of Blair Mountain, National Trust for Historic Preservation, Ohio Valley Environmental Coalition, West Virginia Labor History Association, and West Virginia Highlands Conservancy (collectively "Petitioners") are organizations and individuals who maintain an interest in protecting the historical integrity of Blair Mountain and who have ties to Blair Mountain, respectfully petition the Secretary of the West Virginia Department Environmental Protection (DEP) to designate the lands encompassing historic Blair Mountain Battlefield, as further described herein, as lands unsuitable for surface coal mining operations pursuant to the Surface Mining Control and Reclamation Act, 30 U.S.C. § 1272, the West Virginia Surface Coal Mining and Reclamation Act, W. Va. Code § 22-3-22, and the W. Va. Code R. § 38-2-3.17 and §38-2-19.7.

## 1.      The Federal Surface Mining Control and Reclamation Act

The Federal Surface Mining Control and Reclamation Act (SMCRA) was adopted by Congress in 1977 and established a regulatory structure to govern the surface effects of coal mining. *See* 30 U.S.C. § 1201(c). The statute requires that surface coal mining operations be conducted in a manner protective of the environment, and that surface areas damaged by coal mining operations be reclaimed. *Id.* § 1202(d)-(e). Where reclamation will not be possible or where lands may be better utilized for another purpose, Congress provided a mechanism by which such areas could be designated as unsuitable for surface coal mining. *Id.* § 1202(c) and § 1272.

Indeed, Congressional enactment of the "lands unsuitable" aspect of SMCRA was premised on "the notion that successful management of surface mining depends, in large part, on the application of rational planning principles."[1] In this regard, Congress expressed its intent regarding uses of land, and its recognition that some areas are not appropriate locations for coal mining, in this manner:

> While coal surface mining may be an important and productive use of land, it also involves certain hazards and *is but one of many alternative land uses*. In some circumstances, therefore, coal surface mining should give away (sic) to competing uses of higher benefit.

H.R. REP. NO. 95-218, at 94 (1977), *reprinted in* 1977 U.S.C.C.A.N. 630. (emphasis added)

Under SMCRA, a surface area may be designated unsuitable for surface coal mining operations if such operations will negatively impact historic lands. 30 U.S.C. § 1272(a)(3)(B).

SMCRA further provides that a state may be given the primary responsibility for regulating coal mining operations within its boundaries if the state can demonstrate that its

---

[1]  H.R. Rep. No. 95-218, at 94 (1977), *reprinted in* 1977 U.S.C.C.A.N. 630.

regulatory program carries out SMCRA's purposes. *Id.* §§ 1201(f), 1202(g), 1253. One requirement of a state program is that it allow for the "establishment of a process for the designation of areas as unsuitable for surface coal mining in accordance with section 1272 ...." *Id.* § 1253(a)(5). Therefore, to be an approved SMCRA program, state statutes and regulations must include a process by which lands can be designated as unsuitable for surface coal mining.

### 2. The West Virginia Surface Coal Mining and Reclamation Act and Corresponding State Regulations

The West Virginia Surface Coal Mining and Reclamation Act (WVSCMRA) received federal approval for its regulatory scheme in 1981 and includes a provision for designating lands as unsuitable for mining. *See* W. Va. Code § 22-3-22. Pursuant to WVSCMRA, any person with an interest "which is or may be adversely affected" can petition to have an area designated as unsuitable for mining. *See Id.* § 22-3-22(b).[2] Additionally, WVSCMRA provides that an area may be designated as unsuitable for surface mining operations under the following circumstances:

> (1) Upon petition pursuant to subsection (b) of this section, the director shall designate an area as unsuitable for all or certain types of surface-mining operations, if it determines that reclamation pursuant to the requirements of this article is not technologically and economically feasible.
>
> (2) Upon petition pursuant to subsection (b) of this section, a surface area may be designated unsuitable for certain types of surface-mining operations, if the operations: (A) Conflict with existing state or local land use plans or programs; *(B) affect fragile or historic lands in which the operations could result in significant damage to important historic, cultural, scientific and aesthetic values and natural systems*; (C) affect renewable resource lands, including significant aquifers and aquifer recharge areas, in which the operations could result in a substantial loss or reduction of long-range productivity of water supply, food or fiber products; or (D) affect natural hazard lands in which the operations could substantially endanger life and property. Such lands shall include lands subject to frequent flooding and areas of unstable geology.

W. Va. Code § 22-3-22(a) (emphasis added).

The corresponding state regulations offer more guidance on the process for petitioning that land be designated as unsuitable for mining, and provide the criteria to be used by the state in making such a determination. W. Va. Code R. § 38-2-19.7.b. reiterates the WVSCMRA provisions, found in W. Va. Code § 22-3-22, regarding lands unsuitable for mining:

---

[2]  W. Va. Code R. § 38-2-2.88 defines a person having an interest which is or may be adversely affected as one:

2.88.a.  Who uses any resource of economic, recreational, aesthetic, or environmental value that may be adversely affected by prospecting or surface mining and reclamation operations or any related action of the Secretary; or

2.88.b.  Whose property is or may be adversely affected by prospecting or surface mining and reclamation operations or any related action of the Secretary.

Upon petition, an area may be (but is not required to be) designated as unsuitable for all or certain types of surface mining operations, if the operations will:

19.7.b.1 Be incompatible with existing State or local land use plans or programs;

19.7.b.2 *Affect fragile or historic lands in which the operations could result in significant damage to important historic, cultural, scientific or aesthetic values or natural systems*;

19.7.b.3. Affect renewable resource lands in which the operations could result in a substantial loss or reduction of long range productivity of water supply or of food or fiber products (For the purposes of this section, the term "renewable resource lands" means geographical areas which contribute significantly to the long range productivity of a water supply, or food or fiber products); or

19.7.b.4. Affect natural hazard lands in which the operations could substantially endanger life and property. Such lands include areas subject to frequent flooding and areas of unstable geology.

(Emphasis added.) The definition of "historic lands" as used in this section is found in W. Va. Code R. § 38-2-2.62:

Historic Lands means *historic, archaeological, cultural,* and scientific areas. Examples of historic lands include archaeological sites, *sites listed on or eligible for listing on a state or national register of historic places*, national historic landmarks, sites having cultural significance to Native Americans, or religious significance to religious groups, and *sites for which historic designation is pending.* (emphasis added)

West Virginia law therefore allows historic lands—including a site that is listed on, eligible for listing on, or for which a historic designation is pending—to be designated as lands unsuitable for surface coal mining if the operations could result in significant damage to historic, cultural, scientific or aesthetic values or natural systems. *See* W. Va. Code § 22-3-22; W. Va. Code R. §§ 38-2-2.62; 38-2-19.7.b. As the following petition will demonstrate, the Blair Mountain Battlefield and viewshed constitute historic lands on which surface coal mining operations would result in significant damage to the historic, cultural, scientific, and aesthetic values and to natural systems.

Pursuant to the W.Va. Code of State Rules, the petitioner shall provide the following information in a petition for lands to be designated as unsuitable for mining:

1. A U.S.G.S. topographic map on which is noted the location and size of the area covered by the petition;

2. Allegations of facts and supporting evidence which would tend to establish that the area is unsuitable for all or certain types of surface coal mining operations;

3. A description of how mining of the area has affected or may adversely affect people, land, air, water or other resources;

4. The petitioner's name, notarized signature, address and telephone number; and

5. A statement which identifies the petitioner's interest which is or may be adversely affected, including how the petitioner meets an "injury in fact" test by describing the injury to his or her specific affected interests and demonstrates how he or she is among the injured.

W. Va. Code R. § 38-2-19.1.b(1)-(5).

As demonstrated below, this Petition contains all of the elements specified in Section 38-2-19.1.b. Part I identifies the area that this Petition requests to be designated as lands unsuitable for surface mining, and references an exhibit containing a U.S.G.S. map. Part II contains the allegations of fact and supporting evidence which establish that Blair Mountain Battlefield is unsuitable for surface coal mining, and a description of how mining there would adversely affect people, land, air, water and other resources. Part III includes the names, contact information and signatures of the petitioning groups and individuals. Part IV identifies the Petitioners' interests and how these interests would be adversely impacted by mining within the Blair Mountain Battlefield area. Accordingly, the Secretary should consider the Petition complete under W. Va. Code R. §§ 38-2-19.2.a and 19.2.c.

# I. IDENTIFICATION OF PETITIONED LANDS

This petition seeks to have the following lands within the Blair Mountain Battlefield designated as lands unsuitable for surface mining, which is the same area as included in the nomination to the National Register of Historic Places ("Nomination"), attached hereto as Ex. A:

The nominated site consists of approximately 1668 acres stretching approximately ten miles along the crest of Spruce Fork Ridge in Logan County, West Virginia. From the north, it extends from Mill Creek Gap southward to Crooked Creek Gap, Sycamore Creek, Beech Creek, and Blair Gap ending at White's Trace Branch to the southeast.[3]

This particular area of Blair Mountain was selected because it includes the line of battle defined by the coal company defensive forces and was where the most intense battle activity occurred, as noted in the Nomination:

The boundary of the district encompasses the area between the 1400-2073 foot elevations on either side of the ten-mile long Spruce Fork Ridge of the Blair Mountain in Logan County, which was the line of battle defined by the defenders when they erected armed pickets across the mountain at fifty yard intervals. The general area of the battle has been well documented in no less than four scholarly publications.... Archaeological findings throughout the ten-mile ridgeline and subsequent extrapolations indicate that the most intense activity occurred within the narrow, steep area encompassed by the proposed boundary.[4]

This area is identified on a U.S.G.S. topographic map pursuant to W. Va. Code R. § 38-2-19.b(1)-5), attached hereto as Ex. B.

---

[3] Official SHPO Nomination, Section 7, p. 1.

[4] Nomination, Section 10, p. 2.

## II. ALLEGATIONS OF FACT WITH SUPPORTING EVIDENCE AND DESCRIPTION OF HOW MINING WOULD ADVERSELY AFFECT PEOPLE, LAND, AIR WATER AND OTHER RESOURCES

1. **The Blair Mountain Battlefield possesses important cultural, scientific and aesthetic values and natural systems that are vulnerable to the impacts of surface coal mining.**

As the site of the largest civil uprising since the Civil War, Blair Mountain Battlefield is of national historic and archaeological significance and is part of the cultural roots of Appalachia. Surface coal mining would result in significant and irreparable damage to the Battlefield by destroying the topography of the area; disrupting the topsoil, including the destruction of original artifacts and features from the battle necessary to fully understand the conflict; creating detrimental water pollution; contributing to erosion and flooding; permanently demolishing forests; and creating blasting impacts and dust. Mining would adversely affect the people, land, air, water and soil on and around the Blair Mountain Battlefield.

### A. The Blair Mountain Battlefield is of state and national historic significance due to its compelling cultural, scientific, aesthetic and natural importance.

It is undisputed that Blair Mountain Battlefield in Logan County—as the site of the largest armed labor conflict in U.S. history—holds state and national significance for labor and coal mining history. Decades of dangerous working conditions in the mines, poverty, violence and problematic labor relations set the stage for the Battle of Blair Mountain.[5] Coal companies operated nearly without oversight, and often bribed or colluded with state and local government officials to control every aspect of life in the coalfields and to prevent workers from unionizing.

While the United Mine Workers of America's (UMWA) unsuccessful, three-year long struggle to unionize the coal miners of Logan, Mingo, McDowell, and Mercer counties set the stage for the Battle, it was ultimately the murder of Matewan Police Chief Sid Hatfield on August 2, 1921, that ignited the Battle of Blair Mountain. Hatfield had befriended miners when a coal company sought to evict striking workers from their homes, a common practice at that time. Hatfield was killed by C.E. Lively, an undercover investigator with the Baldwin-Felts detective agency who had spied on union miners and colluded with the coal companies.[6] Shortly after Hatfield's murder, on August 30, 1921, between 10,000 and 15,000 coal miners—many of whom were members of the UMWA—assembled in Kanawha County to arm themselves for a march over the mountains to avenge Hatfield's death and to free illegally imprisoned miners in Mingo County.[7]

---

[5] Brandon Nida & Michael Jessee Adkins, *The Social & Environmental Upheaval of Blair Mountain: A Working Class Struggle for Unionization & Historic Preservation*, at 5 (2010), attached hereto as Ex. C, referred to hereafter as ("Social & Environmental Upheaval of Blair Mountain").

[6] William C. Blizzard, When Miners March 123-28 (2004).

[7] Blizzard, at 208; Historical Overview, http://www.friendsofblairmountain.org/history/index.html.

As the miners' march moved to Logan County, the miners were met by the coal companies' defensive force—estimated around 3000, many of whom were on coal company payrolls.[8] These men established a defensive line along the southern terminus of Spruce Fork Ridge on Blair Mountain that stretched for ten miles, with two armed pickets stationed approximately every fifty yards. The companies' defensive forces dug trenches, blocked roads, felled trees, and dropped home-made bombs. An estimated one million rounds of ammunition were fired in the Battle along the ten-mile ridgeline. At least 16 men died in the fighting. The U.S. Army and Air Corps were eventually called in and ultimately ended the miners' rebellion without firing a shot. On September 5, 1921, the miners fled the Battle or surrendered rather than fire upon American soldiers.[9]

The insurrection severely weakened the UMWA's West Virginia presence in the short term. Leaders in the Battle were tried on treason charges in Charles Town, and the trials proved to be an enormous financial burden for the UMWA.[10] The Battle at Blair Mountain spurred a national public dialogue that set the stage for the 1933 passage of the National Industrial Recovery Act (Wagner Act), which allowed for the unionization of the southern coalfields.[11]

Many West Virginia residents have family members—fathers, grandfathers, uncles, cousins—and friends who fought in the Battle at Blair Mountain either on the side of the coal miners or for the companies. The legacy of this struggle to unionize the workers looms large still today, and is an important part of the cultural identity of all West Virginians, as well as union members and coal miners throughout the United States. Blair Mountain plays a critical role in the larger history of U.S. labor struggles and the plight of the workers in the southern coal fields.

With this significance in mind, the Battle at Blair Mountain has inspired several books, movies, articles, scholarship, archaeological investigation and historical research.[12] Many groups, including the petitioners, are fighting to preserve the area for current and future generations to enjoy.

In recognition of the threat to the cultural and historic values of the Blair Mountain Battlefield posed by surface coal mining, the National Trust for Historic Preservation identified Blair Mountain Battlefield as one of *America's 11 Most Endangered Historic Places* for the year 2006. In so naming Blair Mountain to this List, the National Trust noted:

The 1,600-acre Spruce Fork Ridge of Blair Mountain, about 90 minutes southwest of Charleston, W.Va., was the scene of the showdown in 1921 between a miners' army at least 7,000 strong and a 3,000-man defensive force headed by Logan County Sheriff Don

---

[8] Blizzard, at 267.

[9] Historical Overview, http://www.friendsofblairmountain.org/history/index.html

[10] Blizzard, at 288 and 300.

[11] Social & Environmental Upheaval of Blair Mountain, at 10.

[12] A sampling of works featuring the Battle at Blair Mountain include, but are not limited to: William C. Blizzard, When Miners March; Robert Shogan, The Battle of Blair Mountain: The Story of America's Largest Labor Uprising; Lon Savage, Thunder in the Mountains; Denise Giardina, Storming Heaven, and the movie Matewan, which was written and directed by John Sayles.

Chafin and other law officers, many of whom were on the coal companies' payrolls. The defensive force, bolstered by private planes that dropped homemade bombs on the miners, dug trenches, blocked roads, felled trees and mounted machine guns along the 15-mile ridgeline. The miners used natural pathways to mount the ridge and breach Chafin's line. The confrontation was the largest armed labor conflict in the nation's history, with miners seeking the right not only to unionize but also to exercise civil liberties such as freedom of speech and assembly.[13]

Additionally, a group of prominent historians and archaeologists who have authored or produced major works on labor, mining, and Appalachian history have all signed a letter in support of Blair Mountain's preservation.[14]

 

Views of Blair Mountain Battlefield in West Virginia
(Source: ilovemountains.org and Dr. Harvard Ayers, respectively)

Blair Mountain Battlefield is of undeniable historic and cultural significance to the residents of West Virginia and beyond.

---

[13] 11 Most Endangered Historic Places, Blair Mountain Battlefield, (2006), http://www.preservationnation.org/travel-and-sites/sites/southern-region/blair-mountain-battlefield.html.

[14] Group of Historians Petition National Park Service to Restore Blair Mountain Historic Status, History News Network, (October 6, 2010), http://hnn.us/roundup/entries/132196.html. *See also* An Open Letter to the U.S. National Park Service and the West Virginia State Historic Preservation Office, attached hereto as Ex. D.

**B.  The Blair Mountain Battlefield holds great archaeological significance, and important discoveries are still being made.**

Blair Mountain Battlefield contains numerous artifacts from the battle, and only preliminary archaeological investigation has begun. To date, it is estimated that less than 25 percent of the battlefield has undergone a systematic archaeological survey.[15] Dr. Harvard Ayers, a professor emeritus of Anthropology and Archaeology at Appalachian State University, led an initial archaeological field survey of the area in 2006 with Zan Rothrock and Kenny King. As further outlined in extensive detail in the Nomination, fourteen sites with contributing archaeological features were identified. The initial archaeological research conducted by Dr. Ayers, et al. recorded evidence of 24 weapon types, including 13 rifles, two shotguns and nine pistols as well as 1032 shell casings, 41 spent bullets, and 35 other artifacts, a total of 1108 artifacts.[16] A short narrative account written by Dr. Ayers about his 2006 research details finding thousands of artifacts across fourteen archaeological excavation sites found in the Battlefield:[17] *See also* Declaration of Dr. Harvard Ayers, ("Ayers decl."), attached hereto as Ex. E:

> We were able to document fourteen archeological sites from one end to the other of the ten mile long battle front from the Blair Crests in the south to Mill Creek Gap in the north. These sites ranged from huge sites with hundreds of artifacts to tiny sites that indicate where perhaps one combatant fired his rifle several times. The large majority of the artifactual evidence was in the form of shell casings from the rifles, pistols and even shotguns fired by the two sides. Less well-represented artifacts recovered by our survey included coins, batteries, and even a pistol.

> The archeological study by and large confirmed the historical record to a "T." History records that the two "hot-spots" over the several days of the battle were the area in and around the Blair Crests and the area near Crooked Creek Gap, which is in the center of the battle front. We documented hundreds of artifacts within a mile or so from each of these places. The major sites at the South and North Crests of Blair Mountain and the major sites above and in Crooked Creek Gap were impossible to study in their entirety in our time frame due to the massive areas covered by so many artifacts. Many more discoveries no doubt await future archeologists at Blair Mountain.

> History also records that the entire 10 mile battlefront was defended by various numbers of fighters for the Logan forces or coal industry. We found sites several miles from the hot spots in both directions. These sites were typically smaller and obviously less well

---

[15] Conclusion, Report on Disturbance at Blair Mountain Battlefield, (July 11, 2010), http://www.scribd.com/doc/34362818/Blair-Mountain-Disturbance-Report, attached hereto as Ex. F, referred to hereafter as ("Report on Disturbance")

[16] Nomination, Section 7, p. 2-6 (describing the 15 excavation sites).

[17] Archaeology and the Nomination, (May 1, 2007), http://www.friendsofblairmountain.org/archeology.html, referred to hereafter as ("Archaeology"). *See also* Harvard Ayers, et al., *Archaeological Investigations of the Battle of Blair Mountain: May 13 to November 19, 2006*, on file with the West Virginia State Historic Preservation Office.

defended, but they span the full ten mile battle area and are critical to understanding the strategy of the defenders.... [18]

Dr. Ayers' account also points to the need for professional archaeological investigation of the battlefield, and the integrity of the site itself.

Before we did our work last year, incredibly, no archeological sites had been professionally recorded for the battlefront. Investigations in the 90's by historians were tenuous at best ....

Much mythology has arisen over the years about the quality and quantity of archeological evidence of the battle. Much has been made of the disturbance of battle areas, such as the South Crest, and many areas along the Spruce Fork Ridge. Disturbance by artifact collectors, logging and gas roads, a fire lookout tower, and the Hatfield-McCoy Trail are all cited. But at every one of the fourteen sites we documented, there was sufficient intact evidence to understand the site. Indeed more than half of the sites studied to date had no subsequent disturbance at all. Over a thousand artifacts were found and documented by us that were as best we could tell, in the place where they fell to the ground in 1921. Contrary to the mythology, preservation of these sites is in most cases extraordinary.

Following the initial research of the 2006 trip, the Nomination outlined several areas for future research:

1. How intense were the hostilities at the Blair Crests as compared to Crooked Creek Gap?

2. What does the choice of sites beyond the two "hot spots" tell us about the strategy of both sides? By studying both the sites located by the 1991 survey and not studied by the 2006 survey, and the areas where neither went, we could gain a better handle on this important aspect of the battle. Presumably, these sites would represent ones that the miners chose to attack. But also, they reflect the ability of the defenders to maintain a continuous line of defense as the historical record indicates. These sites would be of lesser intensity than the Blair Crests and Crooked Creek Gap, but could allow this lesser known aspect of battle strategy to be delineated. For instance, a paucity of such sites might reflect the ability of the miners to concentrate their forces at the two hot spots.

3. What evidence of the historically-documented breakthrough at Crooked Creek Gap can be found further west of the current and previous surveys?

4. What would a complete investigation of the slopes surrounding 46LG209 show, especially indications of direction of fire in comparison to where the breakthrough(s) may have occurred?

5. How does the data confirm, disprove, or enhance information in the historic record? [19]

---

[18] *See* Archaeology.

In addition to Dr. Ayers, other researchers, such as University of California Berkeley doctoral candidate Brandon Nida, are currently undertaking new archaeological research in the area that will continue to shed light on the Battle. Mr. Nida is exploring areas of Blair Mountain that have never been surveyed in the past, including an attempt to locate tent colonies that housed striking miners, locating the approaches and positions of the miners, and focusing on under-explored battle hotspots like Crooked Creek. Additionally, Mr. Nida's research will incorporate Geographic Information Systems (GIS) software to model the topography, to analyze weaponry ranges and to pattern artifacts in order to obtain an accurate understanding of troop movements.[20] Some of this initial analysis of the data suggests that the miners were advancing – perhaps winning–before the federal troops arrived, an important part of the Blair narrative and one that archaeology is best positioned to explore.

Archeological research at Blair Mountain remains in only a nascent stage, with enormous potential for further study and new discoveries. If surface mining were conducted on the Battlefield, however, the potential for further work—and further understanding of what occurred during the Battle—would be permanently and irreparably destroyed.

## C. The public's interest in protecting the Blair Mountain Battlefield dates back many years.

Given the historic nature of the Blair Mountain Battlefield, and given its important place in the history of labor organizing and in the history of West Virginia, efforts to nominate the site for listing in the National Register of Historic Places (National Register) date back 25 years or more. In 1996, the National Park Service (NPS) asked the West Virginia State Historic Preservation Officer (WV SHPO) to assess the Battle of Blair Mountain Site for possible suitability as a National Historic Landmark due to its exceptional national significance.

While the WV SHPO initially declined to nominate the Blair Mountain Battlefield to the National Register due to concerns that surface mining activities had already altered some of the site's topographical features, particularly along the site's southern crest, the WV SHPO ultimately determined that the site as a whole retains its integrity of feeling, setting, location, and association, and was eligible for listing in the National Register. Accordingly, on July 21, 2005, the West Virginia Archives and History Commission voted unanimously to nominate Blair Mountain Battlefield for listing in the National Register. In order for an area to be listed on the National Register, a majority of property owners must not object to the listing, as stated in 16 U.S.C. § 470a(a)(6).

On March 30, 2009, the Keeper of the National Register of Historic Places listed Blair Mountain Battlefield on the National Register after finding that all of the conditions for listing the area had been met. Nine months later, on December 30, 2009, the Keeper removed Blair Mountain Battlefield from the National Register pursuant to 36 C.F.R. § 60.15(k), because of an

---

[19] Nomination, Section 8, p 22-24.

[20] *See* Social & Environmental Upheaval of Blair Mountain.

alleged "procedural error" in calculating the percentage of private property owners objecting to the National Register nomination.[21]

Currently, according to notices published by the Keeper in the Federal Register on January 8, 2010 and March 17, 2010, Blair Mountain Battlefield has been formally determined eligible for listing on the National Register of Historic Places, attached hereto as Ex. G. In addition, the removal of the Battlefield from the National Register has been challenged in a lawsuit, which could result in the re-listing of the site on the National Register. Finally, the WV SHPO is currently in the process of renominating the Battlefield for listing on the National Register of Historic Places. *See* Ex. H. All three of these actions independently qualify the Blair Mountain Battlefield as a site that is "listed on or eligible for listing on a ... national register of historic places" or for which "historic designation is pending" and that therefore meets the definition of a "historic land" under W.Va. Code R. § 38-2-2.62. The area may therefore be designated as an area that is unsuitable for surface coal mining under W.Va. Code R. § 38-2-19.7.b.2.

As the objective evidence presented in the following pages will reflect, the "higher benefit" to the public of protecting the cultural and historic integrity of the Blair Mountain Battlefield must be prioritized over the competing use of surface coal mining. Surface mining would degrade the integrity of the Battlefield, which still awaits further archaeological study, and which is an integral part of the history of the United States and West Virginia. Accordingly, we respectfully request that you designate the Blair Mountain Battlefield Nomination Area as unsuitable for surface coal mining.

**2. Surface coal mining would result in significant and irreparable damage to the Blair Mountain Battlefield and would adversely affect people, land, air, water and soil.**

Surface mining involves extensive ground disturbance activities for the purpose of obtaining coal from under the ground. As defined in the regulations implementing SMCRA, "surface coal mining operations" involve the following activities:

Such activities include excavation for the purpose of obtaining coal, including such common methods as *contour, strip, auger, mountain top removal, box cut, open pit, and area mining*; the use of explosives and blasting; in situ distillation or retorting; leaching or other chemical or physical processing; and the cleaning, concentrating, or other processing or preparation of coal. Such activities also include the loading of coal for interstate commerce at or near the mine site ... any adjacent land the use of which is

---

[21] On July 6, 2010, the National Trust for Historic Preservation, Sierra Club, and OVEC, submitted a petition for reconsideration to the Keeper and the WV SHPO pursuant to 36 C.F.R. § 60.15(a)(4), identifying legal errors in the Keeper's decision to remove Blair Mountain Battlefield from listing in the National Register. [In particular, the petition pointed out that the Keeper relied on an improper list of property owners, which was not compiled within 90 days "prior to" the public notice of the nomination, as required by 36 C.F.R. § 60.6(c). In a letter dated July 29, 2010, the Keeper of the National Register denied the petition for reconsideration. As a result, Sierra Club, OVEC, Friends of Blair Mountain and the West Virginia Labor History Association filed suit on September 9, 2010, to vacate the removal of the Blair Mountain Battlefield and to restore the site's listing on the National Register. Additionally, on September 4, 2010, the WV SHPO announced its intent to initiate a process to renominate the Blair Mountain Battlefield for listing on the National Register. *See* Ex. H (news article discussing SHPO's proposed relisting).

incidental to any such activities, all lands affected by the construction of new roads or the improvement or use of existing roads to gain access to the site of those activities and for haulage and excavation, workings, impoundments, dams, ventilation shafts, entryways, refuse banks, dumps, stockpiles, overburden piles, spoil banks, culm banks, tailings, holes or depressions, repair areas, storage areas, processing areas, shipping areas, and other areas upon which are sited structures, facilities, or other property or material on the surface, resulting from or incident to those activities. 30 C.F.R. § 700.5 (emphasis added).

The activities associated with surface mining—which includes the extremely destructive practice of mountain top removal mining—consist of a variety of physical land changes that are mutually exclusive to the preservation of the Blair Mountain Battlefield. Surface mining entails activities such as: using explosives to conduct excavation; constructing additional roads, stockpiles, dams, and the like; removing trees; contaminating streams; and, in cases of mountain top removal mining, creating large valley fills that dump the waste rock generated into the valleys and streams below, causing permanent and irreversible damage to the landscape. As of 2005, mountaintop removal mining in Appalachia had damaged or destroyed approximately 1,200 miles of streams, polluted drinking water supplies, flooded communities, damaged homes, eliminated forests, and jeopardized tourism and recreation.[22]

As outlined in the following sections, surface mining within or immediately adjacent to the Blair Mountain Battlefield would disrupt the topsoil containing the historic artifacts of the Battle; would destroy the topography and forests of the area, which are key to the mountain ecosystems and understanding the progress of the battle; would cause water pollution, erosion and flooding; and would create noise and blasting nuisances. All of these consequences would result in significant and irreparable damage to the Blair Mountain Battlefield, which is of important cultural, scientific and aesthetic value. Blair Mountain currently has the potential to play—and is already playing a role—in developing heritage tourism and a recreational tourism economy for southern West Virginia, but this potential could easily be destroyed through surface mining activities.

A. **Surface mining disrupts topsoil, which threatens to damage or destroy historic and cultural artifacts found on Blair Mountain.**

The artifacts on the Blair Mountain Battlefield are contained in the shallow topsoil along the mountain ridge. Surface mining is associated with any number of activities that destroy the fragile topsoil—excavation, bulldozing, the uprooting of trees, and the construction of roads, among other activities. Such activities threaten the ability of researchers to conduct archaeological studies and excavations in the area. A recent report by Friends of Blair Mountain documents the particular susceptibility of historic sites in the Blair Mountain area to even modest disturbances:[23]

---

[22] *See* U.S. Environmental Protection Agency, "Final Programmatic Environmental Impact Statement for Mountaintop Mining/Valley Fills in Appalachia" (Oct. 2005). *See also,* U.S. Environmental Protection Agency, IV Environmental Consequences of the Alternatives Analyzed, "Mountaintop Mining/Valley Fill DEIS" (2003), attached hereto as Ex. I. (referred to hereafter as "PEIS for Mountaintop Mining").

[23] Report on Disturbance, at p. 2.

The historical artifacts that relate to the battle are buried very shallow; usually within the first 5-6 centimeters of topsoil. Even the slightest disturbance has the potential to do great damage to the archaeological record.

Additionally, the Nomination provides further support for the notion that preserving the topsoil is of critical importance to preserving the artifacts found at Blair Mountain, which are shallowly buried at or near their original locations:

> All artifacts were located in the intact A Horizon within 10 cm of the surface. The burial of these artifacts is due to the natural process of leaves falling to the forest floor and becoming soil. This occurred over the 85 years since the battle. The location of the artifacts represents the approximate place where the shell casings and other artifacts fell over the several days of the battle.[24]

Surface mining activities would be disruptive to the fragile topsoil containing the historic artifacts of the Blair Mountain Battle, which are located in their approximate original locations. Data taken from the location of the artifacts will provide critical information about how the Battle progressed.[25] Allowing surface mining in the Battlefield would irreparably destroy the topsoil, which would permanently preclude the ability of researchers to study and interpret the historic artifacts found in the area, many of which have yet to be discovered.

In sum, surface mining activities within the battlefield would not only destroy the only remaining physical evidence of the Blair Mountain battle—physical evidence whose intact condition is "extraordinary"—but they would also irreparably foreclose the ability of the public to learn more about the battle through future archaeological research.

**B. Surface mining permanently destroys forests and topographical features, which are integral to understanding the Blair Mountain Battlefield and to maintaining the site's historical integrity of feeling, setting, association, and context.**

Surface mining would permanently destroy the mountains and forests found on the Blair Mountain Battlefield as the site existed in 1921 during the Battle. The rugged, densely forested mountain area where the Battle occurred is an integral part of understanding the events that took place at Blair Mountain, including an understanding of what it must have been like to defend or attack from a certain position given the tree cover and topography. The ability to appreciate these features is important for historians, archaeologists, and members of the public who wish to better understand the events of 1921. In the Nomination, the "feeling" and "setting" of the area are considered important components for the integrity of the site being nominated. In describing Blair Mountain, the Nomination noted:

> *Feeling:* The rugged nature of the ridgeline and its haunting remoteness convey the feeling of the area as it was when these events took place; it is steep, heavily forested, rugged and remote.

---

[24] Nomination, Section 7, p. 2.

[25] *See* Archaeology.

These physical features continue to express the historic character of Spruce Fork Ridge as it was in 1921. Ground and aerial photography support this conclusion and accompany this nomination. Additionally, comparisons of period topographic maps and modern ones reveal that there is little change in the remote nature of the place and the ruggedness of its terrain. The main topographical features of this area are intact. The site of the defenders' machine gun nest has been identified, and although it has been disturbed, it still retains archaeological evidence. More importantly, seeing this area provides a "feel" for the battle, giving an understanding of what it must have been like to defend or attack this position. [26]

Indeed, topographical features of the steep mountain helped spur the confrontation because the geography presented both an obstacle to the miners' army and a place for the coal company forces to secure a defensive position. To date, the geographic features of Blair Mountain have remained largely intact, as confirmed by the National Register nomination:

> *Setting:* Owing to the remote nature of the location, the setting has changed only slightly since the battle there. The rural, rugged mountain lent itself to the conflict because of its geographic features. Steep and nearly insurmountable, the slopes presented daunting obstacles to the rebels and afforded Chafin's forces a fairly secure defensive position. There has been no change in this topography that would degrade the integrity of the site. Spruce Fork Ridge, as a geologic feature, divides two watersheds and it divided the union miners from the non-union miners. Most of the passes and gaps across the ridge are still visible. From the air and on the ground, the ridge line continues to convey the aspects of topography and vegetation that drew the battle to this site in the first place. USGS aerial photography conducted in 1996 clearly shows this integrity. After a flyover in 2004, Alan Rowe, National Register Coordinator for the West Virginia State Historic Preservation Office, confirmed that little has changed since 1996. [27]

Across Appalachia, mountaintop removal mining and associated valley fills have destroyed 380,547 acres of forest (an area almost ten times larger than the District of Columbia). [28] The destruction of this forest ecosystem by mountaintop removal mining is profound and enduring:

> MTM/VF operations generally impact large areas of the forest community as the *development of an individual mine can result in disturbance or removal of a few hundred to a few thousand acres of forest cover.* The quality of the forest and the associated habitat impacted by a mine can vary depending on a number of factors such as extent of previous mining, past logging activities, other mineral extraction activities such as oil and gas, previous land management practices, etc. Regardless of the type or quality of forest cover that existed prior to mining, certain impacts can be generalized in association with any mine or any activity that disturbs large areas of forest. For example, unlike traditional logging activities associated with

---

[26] Nomination, Section 8, p 24-25.

[27] Nomination, at p 25.

[28] PEIS for Mountaintop Mining, p. IV.C.1.

management of a hardwood forest, when *mining occurs, the tree, stump, root, and growth medium supporting the forest are disrupted and removed in their entirety.*

The likelihood of natural regeneration within the mine site is contingent upon the reclamation practice and post-mining land use chosen … In this type of ridge line mining and reclamation environment, for a number of years to come, the forest is replaced by a grassland and/or herbaceous/shrub vegetative community with different topographic and hydrologic conditions than those that existed prior to mining.[29]

Surface mining would permanently destroy the mountains and forests that helped shape the course of the Battle at Blair Mountain, and play a crucial role in its integrity of setting. Mining would irreparably change the character of the Battlefield and would make it impossible for researchers to gain a better understanding of the Battle of Blair Mountain.

### C. Surface mining is a major source of water pollution, erosion and flooding, which would endanger artifacts and features of the battlefield at Blair Mountain.

Surface mining on Blair Mountain would cause significant water pollution and erosion and would irreparably damage the Battlefield by endangering artifacts found in the topsoil, impacting wildlife, and impacting aesthetics. The area sought to be protected in this petition is described in the Nomination as "a unique geographical barrier that divides the Guyandotte River and the Little Coal River watersheds, running in a southeast to northwesterly course."[30] In describing the contributing resources to the Battlefield, the Nomination further states that "the alluvial valleys below [the nominated ridge] are tightly etched by small, meandering streams."[31] The Guyandotte River and the Little Coal River watersheds are divided by the ridge where the Battle took place, which the Nomination describes as forming the divider between the two forces: "Spruce Fork Ridge, as a geologic feature, divides two watersheds and it divided the union miner from the non-union miners." The waters within the petition area served as an integral part of the Blair Mountain battle.

These waters would likely be destroyed if surface mining were to be allowed within the nomination area. In general, strip mining contributes to water degradation and flooding by "strip[ping] away forest vegetation, causing erosion and attendant stream sedimentation and siltation, accompanied by negative impacts on aquatic life and drinking water supplies."[32] Mountaintop removal mining in particular creates additional impacts on water bodies through the use of valley fills that bury streams, including headwater streams. The Programmatic

---

[29] PEIS for Mountaintop Mining, p. IV.C.1. (emphasis added).

[30] Nomination, Section 7, p. 1.

[31] Nomination, Section 7, p. 2.

[32] Patrick C. McGinley, From Pick and Shovel to Mountaintop Removal: Environmental Injustice in the Appalachian Coalfields, 34 Envtl. L. 21, 48 (2004), attached hereto as Ex. J, referred to hereafter as ("Pick and Shovel").

Environmental Impact Statement (PEIS) on mountaintop mining prepared by the U.S. Army Corps of Engineers (COE), the U.S. Environmental Protection Agency (EPA), the U.S. Department of Interior's Office of Surface Mining Reclamation & Enforcement (OSMRE) and Fish and Wildlife Service (FWS), and the West Virginia Department of Environmental Protection (WVDEP), states that valley fills have the following adverse effects on downstream waters, including changing the stream flow:

> MTM/VF [mountain top removal/valley fill mining] has the potential to alter the chemistry, water temperature, flow regime and geomorphological features downstream .... The EPA Water Chemistry Report found elevated concentrations of sulfate, total and dissolved solids, conductivity, selenium and several other analyses in stream water at sampling stations below mined/filled sites.[33]

Mining directly contributes to erosion and flooding, as well as the degradation of streams and other water bodies, all of which would irreparably destroy the features of the Battlefield by burying the streams and destroying the watersheds that played an important role in the Battle, by degrading the setting and aesthetics of the area, and by causing erosion that would destroy the topsoil that encases and protects the Battle's artifacts. The negative water impacts serve as yet another independent reason that the Blair Mountain Battlefield should be designated as lands that are unsuitable for mining.

### D. Surface mining would create noise and blasting impacts, which would inhibit historical interpretation and tourism at Blair Mountain.

Mountaintop removal mining generates large amounts of noise, blasting impacts, and community disruption, activities that would disturb the Blair Mountain Battlefield and inhibit visits and future tourism. Visitors with an interest in historic preservation would not visit a mountain that no longer existed. In addition to the residents of the surrounding towns being harmed, no tourist would be attracted to the Battlefield if the mountain were overrun with mining machinery creating constant noise and excessive amounts of dust:

> Loud noise and dust from blasting and earth-moving activities disturb nearby communities and wildlife. During mining, dust and debris often fill the air as soil and underlying rock strata are blasted apart, earth is moved, and coal extracted. Landslides caused by indiscriminate dumping of mine spoil downslope on steep Appalachian mountainsides [have] buried cars, homes, and sometimes killed people.[34]

Blasting and other aspects of mountaintop removal mining can cause a significant disturbance for neighboring communities and properties:

> [W]hen mountaintop mining operations are near residences and populated areas, complaints, particularly those related to noise and vibration of homes (nuisance

---

[33] PEIS for Mountaintop Mining, p. IV.B-4.

[34] Pick and Shovel, at 49.

impacts), may still occur in relatively high numbers. Although regulations provide a limited ability to control nuisance impacts (for example blasting may typically occur only between sunrise and sunset), these nuisance-type concerns will continue to have periodic adverse effects on the quality of life of residents living in close proximity to the mine sites.. . .[35]

Tourism at Blair Mountain is a growing industry, and one that mining—with its attendant noise, dust and blasting—would negatively impact. For example, Coal Country Tours is a company that is beginning to offer tours of the Blair Mountain Battlefield and other associated historic sites like the Jefferson County jail and courthouse.[36] The Jefferson County courthouse was the site of the trials of William Blizzard, a coal miner and union official, and Walter Allen, individuals who were both connected to the battle of Blair Mountain.[37] Tours to the Blair Mountain area mean additional local revenue of approximately $8-10,000 per day for each such trip. These tours would likely be discontinued were mining at Blair Mountain to occur, and the local economy and tourism operators would suffer an economic loss. *See* Declaration of Doug Estepp, attached hereto as Ex. K, referred to hereafter as ("Estepp decl.").

Additionally, the tourism opportunities that have arisen at other historic sites associated with the Battle at Blair Mountain—such as the Jefferson County Jail—suggest that if Blair Mountain is designated as an area that is unsuitable for surface mining, the potential to maintain and increase tourism exists.

The combined mining effects of topsoil destruction, water degradation, erosion, deforestation, and the blasting, noise, and dust would permanently alter Blair Mountain Battlefield. Mining would destroy Blair Mountain and render it unusable for future historic and archaeological research, let alone for visits or tourism. It would be a national tragedy to mine a Civil War battlefield like Harpers Ferry, and Blair Mountain is no different. For these reasons, Blair Mountain Battlefield should be designated as lands unsuitable for surface coal mining.

---

[35] PEIS for Mountaintop Mining, p. IV.H-2 - I-1.

[36] West Virginia Public Broadcasting, *Tours Will Feature Coal Country*, (December 20, 2010), http://www.wvpubcast.org/newsarticle.aspx?id=18116; Save the Jail, http://www.savethejail.org/history.html (noting that the famous treason trial of abolitionist John Brown was also held here), referred to hereafter as ("Save the Jail"); The inaugural West Virginia mine war tour featuring Blair Mountain will be held June 16-18, 2011. http://coalcountrytours.com/wv_mine_war_tour.html

[37] Save the Jail, (noting that the famous treason trial of abolitionist John Brown was also held here). http://coalcountrytours.com/about_us.html. William Blizzard, Frank Keeney, Fred Mooney, Walter Allen, and the Reverend John Wilbur were all held in the jail during the 1922 treason trial connected to Blair Mountain.

**3.  The majority of Identified Lands are not exempt from designation as unsuitable for surface mining under W. Va. Code R. § 38-2-19.9.**

The surface mining statutes and regulations provide a limited exemption for some lands from designation as lands unsuitable for surface mining, but this exemption is inapplicable to the majority of Blair Mountain. W.Va. Code R. §§ 38-2-19.9 provides that lands on which surface mining operations were being conducted prior to August 3, 1977, lands covered by currently valid permits issued after that date, or lands where substantial legal and financial commitments were in existence prior to January 4, 1977, may not be designated as unsuitable for surface mining. Here, the vast majority of the lands that comprise the area nominated for the National Register, and the area that this Petition seeks to have designated as lands unsuitable for surface coal mining, are not within the scope of any existing permits. [38] As such, for the majority of the land at issue, this exemption does not apply.

Second, the mere issuance of a permit does not create an automatic exemption from a land unsuitable for mining designation. [39] It would also be necessary to have all requisite state and federal permits in place to mine and substantial financial commitments in order to construe an exemption. The case law and legislative history in the passage of this exemption to SMCRA at the federal level indicates that a desire or intent to mine, by itself, does not preclude designation:

> Mere ownership of the coal resource with the intent to surface mine would not qualify for the exemption from designation as unsuitable for surface mining….In order to preclude designation, it must be established that specific plans and specific contracts for sale of coal and purchase of necessary equipment for an actual mining operation were in existence on the date of enactment. *See* S. Rep. No. 93-402, at 68 (1973).

Moreover, the exclusion for existing permits only pertains to mines in active operation—i.e., those mines that are fully permitted—not merely any permit in existence: "The exclusion for existing mines, permit or renewals thereof after the date of enactment was also agreed to by the Conferees who desired to *assure continued operation of ongoing mines*." H.R. Conf. Rep. No. 95-493, at 105 (1977)(emphasis added).

The requirement in the §22-3-22 of the W. Va. Code is substantially identical to the federal SMCRA § 522(a)(6), 30 U.S.C. § 1272, and state courts have looked to the federal law

---

[38]  The Impact of Surface Mining Permits on the Archaeological Resources at Blair Mountain, Friends of Blair Mountain, (September 8, 2010), p. 3, attached hereto as Ex. L, referred to hereafter as ("Impact of Surface Mining Permits"); *See also* Report on Disturbance.

[39]  *See Cogar v. Faerber,* 179 W. Va. 600, 371 S.E.2d 321 (1988)(discussing valid existing rights and the first and third prongs of the lands unsuitable exemptions and holding that with regard to the first and third exemptions that an operator must have completed its application process for all the necessary state and federal permits to conduct surface mining or have completed substantial financial commitments to mine)

and regulations to interpret similar provisions.[40] . Additionally, any exemption to the statute should be construed narrowly.[41]

Of the areas under current permit to conduct surface mining that touch in part on the Blair Mountain Battlefield, such as the Adkins Fork, Camp Branch and Bumbo No. 2 mines, damage is starting to occur.[42] Petitioners ask that these areas be included within the Petition with respect to areas that are under current permit but have not yet been mined, and future mining under new or amended permits. Furthermore, if no Clean Water Act Section 404 permit has yet been issued by the Army Corps of Engineers, these disturbances, even within DEP-permitted areas, can be considered anticipatory demolition under the National Historic Preservation Act if the appropriate Section 106 review has not yet occurred. These areas have sustained damage in the form of topsoil destruction from tree clearing and bulldozing, although the site as a whole retains its archaeological integrity. Indeed, if this type of activity continues to occur, damage can become permanent. The National Register Nomination elaborates that certain areas in the proximity of Blair Mountain could not be included in the Nomination due to degradation by mining activities:  for instance, the headwaters of Beech Creek have been compromised by coalmine operations and were not included in the Nomination.[43]

Despite the damage that has occurred, the Blair Mountain Battlefield is extraordinarily intact. As detailed in the nomination, the site currently retains its integrity to such a great extent that it can still reveal valuable information about the Battle:

> Even though there have been some disturbances, the property clearly retains significant data that is sufficiently intact to yield expected important information.[44]

The vast majority of the Blair Mountain Battlefield is not within the scope of existing permits, and there is still time to designate Blair Mountain as unsuitable for surface mining. Allowing additional mining permits to be issued could endanger the overall integrity of the Battlefield.

4.     **Reclamation is not technically feasible and could not repair or remediate the damage to unique historic resources from surface coal mining activities.**

Another independent ground upon which an area *shall* be designated as unsuitable for surface mining is if reclamation is not technologically or economically feasible. *See* W.Va. Code § 22-3-22(a)(1), W. Va. Code R. § 38-2-19.7a (emphasis added).

---

[40] *Id.* at 602 (looking to federal SMCRA code, corresponding case law and federal regulations to interpret concept of valid existing rights).

[41] *See also id.* at 324 (noting that court should construe exceptions to the WVSCMRA narrowly because the "first purpose of the surface mining statute [was] to expand the regulatory program involving surface mining and to protect the public and the environment from the adverse effects of surface mining operations.")

[42] *See* Impact of Surface Mining at p. 18, 27, and 30.

[43] Nomination, Section 7, p. 2.

[44] Nomination, Section 8, p. 25-6.

As the Petition describes throughout, surface mining would irreparably destroy the Blair Mountain Battlefield by destroying the topsoil, forest and topographic features. These actions would endanger artifacts and inhibit the ability of archaeologists and historians to continue research. The destruction of a historic site like the Blair Mountain Battlefield is by its very nature irreparable in a manner that does not make the Battlefield technologically or economically feasible to repair. The Battlefield contains a wealth of yet to be excavated information about the Battle. There is no substitute for the authenticity of a historic artifact, feature or place. This concept is supported by several courts.[45] Reclamation of the Blair Mountain area would not restore it to its original character, and the area should be designated and land unsuitable for surface mining on the grounds that such reclamation is not technologically feasible.

---

[45] *See, e.g., Boston Waterfront Residents' Ass'n v. Romney*, 343 F. Supp. 89 (D. Mass. 1972); *Save the Courthouse Comm. v. Lynn*, 408 F. Supp. 1323 (S.D.N.Y. 1975).

## III. PETITIONERS' CONTACT INFORMATION

**Sierra Club**
Contact Person: Charles William Price
922 Quarrier St, Suite 304
Charleston, WV 25301
Tel: 304-342-3182

_____        _____
Signature                      Notary

_____
    5-31-2011
Date

**ROSLYN E JONES, Notary Public**
State of Ohio
Recorded in Cuyahoga County
My Commission Expires 02/20/2012

25

**National Trust for Historic Preservation**
Contact persons:  Nell Ziehl
1785 Massachusetts Ave. NW
Washington, DC 20036
Tel:  202-588-6040

_____
Signature

_____
Notary

6 / 1 / 11
Date

Alison D. Hinchman
Notary Public, District of Columbia
My Commission Expires 8/14/2011

Signed before me on June 1, 2011, by Nell Ziehl.

26

**Ohio Valley Environmental Coalition (OVEC)**
Contact Person: Regina Hendrix
1101 Sixth Avenue, Suite 222
Huntington, WV 25701
Tel: 304-725-0223

_____
Signature

_____                    _____
Notary

_____
Date

OFFICIAL SEAL
NOTARY PUBLIC
STATE OF WEST VIRGINIA
PATRICIA CROUSHORN
280 N. CHILDS ROAD
KEARNEYSVILLE, WV  25430
My commission expires December 4, 2012

27

**Friends of Blair Mountain**
Contact Persons: Barbara Rasmussen
224 Wilson Avenue
Morgantown, WV 26501
Tel: 304 292 7652

_Barbara Rasmussen_
Signature

_5|31|11_
Date



Notary

Official Seal
Notary Public, State of West Virginia
Shelia J. Porter
182 Bruce Bigger Road
Morgantown, WV 26508
My commission expires October 9, 2016

**West Virginia Labor History Association**
Contact Person: Gordon Simmons
PO Box 5156
Charleston WV 25361
Tel: 304-395-6294

_____
Signature

_____
Date

STATE: WEST VIRGINIA
COUNTY: KANAWHA

_____
Notary

5/31/2011
DATE

OFFICIAL SEAL
RUSSELL J. BONASSO
NOTARY PUBLIC
STATE OF WEST VIRGINIA
1625 Washington Street East
Charleston, WV 25311
My Commission Expires March 8, 2018

**West Virginia Highlands Conservancy**
Contact person: Julian Martin
PO Box 306
Charleston, WV 25321
Tel: 304-342-8989

_[signature]_
Signature

5-28-2011
Date

_[signature]_
Notary   28 May 11

EMILY M. MOCK
Notary Public - Arizona
Maricopa County
My Commission Expires
November 11, 2011

## IV. STATEMENT OF PETITIONERS' INTERESTS, AND DESCRIPTION OF HOW SURFACE COAL MINING WILL ADVERSELY AFFECT THOSE INTERESTS

**1. Petitioners and their Members Have Legally Cognizable Interests in Protecting the Blair Mountain Battlefield from the Adverse Impacts of Surface Coal Mining.**

Petitioner Sierra Club ("Sierra Club") is a national, non-profit corporation incorporated in California with more than 625,000 members nationwide. Of these members, more than 2,000 live in West Virginia and belong to its West Virginia Chapter, including members who reside near Blair Mountain and who have visited and intend to continue visiting the battlefield. The Sierra Club is dedicated to exploring, enjoying and protecting the wild places of the earth; to practicing and promoting the responsible use of the Earth's resources and ecosystems; to educating and enlisting humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these objectives. The Sierra Club's concerns encompass the exploration, enjoyment and protection of surface waters in West Virginia. The West Virginia Chapter of the Sierra Club has been involved in efforts to protect Blair Mountain for many years, participating in earlier campaigns to nominate the site, and providing grants to local residents and organizations to support their work at the site. Approval of this petition would allow Sierra Club members to enjoy this valuable resource and protect it for future generations. Sierra Club brings this petition on behalf of itself and its adversely affected members.

Petitioner Ohio Valley Environmental Coalition ("OVEC") is a nonprofit environmental organization with approximately 1,500 members located in Huntington, West Virginia. Its mission is to organize and maintain a diverse grassroots organization dedicated to the improvement and preservation of the environment through education, grassroots organizing, coalition building, leadership development, and media outreach. OVEC has members whose forefathers battled for the mine workers union at the Blair Mountain uprising. OVEC members have worked for close to a decade to try to protect and preserve Blair Mountain, including joining in efforts to have the site listed in the National Register of Historic Places. OVEC petitions on behalf of itself and its adversely affected members.

Regina Hendrix, a board member of OVEC and a political chair of the West Virginia Sierra Club, was born in the Kanawha Valley, which is close to Blair Mountain, and still has family and friends in that area. From 2001 until 2006, Ms. Hendrix was employed at the West Virginia State Historic Preservation Office where she first became aware of the historical significance of Blair Mountain and the 1921 Battle because the Battle was not adequately covered while she was in school. Ms. Hendrix believes that, as the site of the 1921 battle between miners and the U.S. government, Blair Mountain holds local, regional and national historical significance. Due to the historic significance of the site, Ms. Hendrix spearheaded efforts to list Blair Mountain on the National Register of Historic Places starting around 2004, and has made at least 5 visits to the Blair Mountain Battlefield to use and enjoy the Battlefield with plans to return in the future. Specifically, Ms. Hendrix has plans to take part in the re-enactment of the miners' march this June 2011. Ms. Hendrix's use and enjoyment of the Blair Mountain Battlefield would be adversely impacted by surface coal mining operations occurring

31

in the Blair Mountain Battlefield because it would destroy the site's integrity and limit her ability to visit.

Petitioner Friends of Blair Mountain was incorporated on August 2, 2010, in the state of West Virginia to protect the historic attributes of the 1600 acre Blair Mountain Battlefield in Logan County, West Virginia. Friends of Blair Mountain has undertaken efforts to educate the public and policymakers about the history and significance of Blair Mountain Battlefield and has supported the effort to secure National Register listing for the site. Friends of Blair Mountain brings this petition on behalf of itself and its adversely affected members.

Brandon Nida is an officer of Friends of Blair Mountain and a resident of Salt Rock, WV. He is a doctoral candidate who is completing an archeological study of the Blair Mountain Battlefield. Mr. Nida uses and enjoys the Blair Mountain Battlefield for his professional work as an archaeologist and as a West Virginia resident. Surface mining of the Blair Mountain Battlefield would negatively impact Mr. Nida's dissertation work because it would disrupt the very objects he is studying. Additionally, mining would negatively impact his personal use and enjoyment of the Battlefield.

Dr. Harvard Ayers is a founder of the Friends of Blair Mountain. He is a Professor Emeritus of Anthropology and Archaeology at Appalachian State University. Dr. Ayers uses and enjoys the Blair Mountain Battlefield for his professional work as an archaeologist and surface mining of the Battlefield would negatively impact Dr. Ayers' work as it would disrupt the topsoil in which the artifacts that he studies are found. Dr. Ayers has plans to return to the Battlefield this June 2011. See Ayers decl.

Dr. Barbara Rasmussen is a founder of the Friends of Blair Mountain. She is a West Virginia historian and a retired West Virginia University faculty member. Dr. Rasmussen studies the history of the events at Blair Mountain to further understand the relationship between extractive industries and land. She served as the lead historian for the most recent submission. She is a lifelong West Virginian with deep roots in the state. Her work as a historian that studies Blair Mountain would be adversely impacted by surface coal mining operations occurring there.

Doug Estepp is a member of the Friends of Blair Mountain, a West Virginia non-profit organization that was formed to protect the historical and archaeological resources of the Blair Mountain battlefield. He is also a member of the Jefferson County Preservation Alliance, a local organization dedicated to stopping the demolition of the Jefferson County Jail, which is where the miners were tried after the 1921 Blair Mountain Battle. He is also the owner of a tour company that focuses on historical tourism in the West Virginia coalfields. See Estepp decl.

Petitioner West Virginia Labor History Association ("WVLHA") is a nonprofit, tax exempt organization founded in 1976 to promote research, preservation and dissemination of West Virginia's labor history. WVLHA has approximately 100 members. WVLHA was an original supporter of listing Blair Mountain in the National Register. WVLHA petitions on behalf of itself and its adversely affected members.

Gordon Simmons is the President of the WVLHA and has been an active member for at least 15 years, dating back to the mid-1990s. The WVLHA was involved with the initial efforts to nominate Blair Mountain to the National Register of Historic Places because Blair holds local and national historic significance for the labor movement. Mr. Simmons has personally visited Blair Mountain at least 6 times over the years. Several of these visits have been with the entire board of the WVLHA. He was most recently there approximately four months ago, in the late fall of 2010, and has plans to return for the re-enactment of the miners' march in June 2011. Mr. Simmons fears that if Blair Mountain is not designated as lands unsuitable for surface mining, the area would be mined. He has seen mountain removal mining sites in the past, and believes they are not tourist destinations—they are moonscapes. Mr. Simmons' ability to visit and enjoy the battle sites at Blair Mountain and surrounding areas would be adversely impacted by not designating the Blair Mountain Battlefield as lands unsuitable for surface coal mining because the historic Battlefield would remain vulnerable to these destructive activities.

Petitioner West Virginia Highlands Conservancy ("Conservancy") is a non-profit environmental organization that was formed in 1965. The Conservancy is dedicated to protecting West Virginia's environment from destructive coal mining, conserving the forests, preventing the fragmentation of the mountainous highlands, and preserving West Virginia's resources for the enjoyment by its residents. The Conservancy has approximately 1,700 members, most of whom reside in West Virginia. Several Conservancy members have family members who fought in the Battle of Blair Mountain. The Conservancy petitions on behalf of itself and its adversely affected members.

Julian Martin is the Vice President for State Affairs of the Conservancy and is also a member of the Sierra Club. Mr. Martin is a lifelong West Virginia resident whose grandfather and uncle were coal miners and members of the United Mineworkers of America who fought in the 1921 Battle of Blair Mountain. Mr. Martin frequently visits the Blair Mountain Battlefield with his family, taking visitors there at least three times. He has visited a friend across the road from the Battlefield and has attended meetings concerning Blair Mountain in Sharples on more than four occasions. Additionally, he has driven through the general Blair Mountain Battlefield area more than 20 times over the past several years, and has plans to continue his visits to the Battlefield because they hold special significant for him and his family. Mr. Marin has plans to retrace his grandfather's footsteps and participate in the re-enactment of the miners' march this June 2011. Mr. Martin has a significant interest in protecting the area from surface coal mining, which would adversely impact his ability to visit the area and to pass down an important part of his family history because future generations would not be able to visit the area where their relatives fought for the right to organize. As the site of the largest civil insurrection in the United States since the Civil War, Mr. Martin considers the site to be virtually a holy place that is sacred in terms of his family history and the larger state and national historical significance. Protecting the Blair Mountain Battlefield by designating the area as lands that are unsuitable for surface coal mining would serve to reassure Mr. Martin that the battle sites remain intact for his future visits and enjoyment, as well as his family's future visits and enjoyment.

Petitioner National Trust for Historic Preservation in the United States (National Trust) is a private charitable, non-profit corporation that Congress chartered in 1949 to protect America's historic resources, to further the historic preservation policy of the United States, and to facilitate

public participation in the preservation of our nation's heritage. *See* 16 U.S.C. § 468. With headquarters in Washington D.C., the National Trust has 29 historic sites open to the public and has nine regional and field offices around the country, including the Southern Field Office which is responsive to historic preservation issues in West Virginia. The National Trust has nearly 200,000 individual members across the country, including over 500 individual members in West Virginia. The National Trust has been intensively involved in the effort to preserve Blair Mountain Battlefield since the site was included on the National Trust's 2006 list of "America's 11 Most Endangered Historic Places." The National Trust has provided technical assistance to grassroots advocates, undertaken efforts to educate the public and policymakers about the history and significance of Blair Mountain Battlefield and the threats to Blair Mountain from surface mining, and has supported the effort to secure National Register-listing for the site. National Trust petitions on behalf of itself and its adversely affected members.

Nell Ziehl is a Program Officer in the Southern Field Office of the National Trust for Historic Preservation and is an individual member of the organization. She has worked in the Southern Field Office of the National Trust for seven years. As a Program Officer, Ms. Ziehl is responsible for advancing the National Trust's mission in Virginia, Maryland, West Virginia, and the District of Columbia. The National Trust has been intensively involved in the effort to preserve the Blair Mountain Battlefield since the site was included in the National Trust's 2006 list of *America's 11 Most Endangered Historic Places*, although National Trust's advocacy related to preservation of the mountain predates the listing. Ms. Ziehl has personally visited Blair Mountain to gather information and better understand the site on at least two occasions, and intends to visit the site for educational and advocacy purposes at least once in the coming year. In 2005, she accompanied Southern Field Office director Robert Nieweg, Kenny King, and staff of the West Virginia Division of Culture and History to the battlefield to examine the topography, earthworks and defense locations, and archaeological artifacts. Following the announcement of Blair Mountain's inclusion on the list of *America's 11 Most Endangered Historic Places* in 2006, Ms. Ziehl visited Blair with National Trust Vice President Greg Coble. Ms. Ziehl has a background in archaeology and a particular personal interest in archaeological sites and cultural landscapes that tell important stories about America's under-represented history. Ms. Ziehl hopes to continue visiting the Blair Mountain Battlefield area in the future, but would be unlikely to do so if Blair Mountain is destroyed or significantly damaged by mining or other activities. Designating Blair Mountain as lands unsuitable for surface coal mining would reassure Ms. Ziehl that the mountain would remain intact for her future visits and enjoyment.

## 2. Petitioners' Interests Would Be Sufficiently Threatened and Adversely Affected By Surface Mining Activities So As to Satisfy the "Injury in Fact" Test.

Surface coal mining operations conducted within the petitioned areas will adversely affect Petitioners' interests by significantly damaging or destroying the cultural and historic values of the Blair Mountain Battlefield, and preventing or hindering further archaeological research and historical interpretation. Activities associated with surface coal mining include, but are not limited to: 1) excavation; 2) road construction and use; 3) timber clearing; 4) increased flow from water runoff diverted around the disturbed area; 5) sedimentation; 6) acid mine drainage; and 7) release of heavy metals, as further outlined below. Most importantly, these activities involve bulldozing, excavation, and other surface disturbances which are destructive to

the topsoil and any historic artifacts that may be contained therein. The first 5-6 mm of the topsoil at the site contains the majority of the artifacts that have yet to be excavated. "Even the slightest disturbance has the potential to do great damage to the archaeological record." *See* Report on Disturbance.

Petitioners and their members use, enjoy, study and appreciate the historic resources of Blair Mountain Battlefield, as described throughout this petition. The interests of the Petitioners and their respective members would be threatened and adversely affected by surface coal mining of these areas. These members would thus have standing to petition in their own right for designation of the site as unsuitable for mining. The Petitioners' interests are within the zone of interests that Congress and the West Virginia Legislature sought to protect in enacting 30 U.S.C. §§ 1202(a) and 1271, and W.Va. Code § 22-3-1 *et seq.* There is a direct causal link between the threatened harm to the Petitioners' interests and the remedy sought with this petition. The interests of the Petitioners fall within the ambit of cognizable legal interests under the applicable legal tests. *See, e.g., Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 517 (4th Cir. 2003). Thus, Petitioners satisfy the standing test set forth under W.Va. Code R. § 38-2-19.1.b.5.

## CONCLUSION

The Blair Mountain Battlefield is an area that is of important historical, archaeological and cultural significance at the state and national level. Surface mining activities would cause irreparable damage to the area by removing and destroying the topsoil, causing water pollution, erosion, and flooding, destroying forests and creating blasting and dust impacts. All of these impacts would physically damage or destroy thousands of intact historical artifacts remaining from the Battle of Blair Mountain, and would also damage or destroy the very landscape, setting, and topographic features of the battlefield itself. Reclamation of this historic battlefield is, by its very nature, technologically infeasible, because the destroyed artifacts and landscape could not be recreated, and would have no historic integrity or value even if they could be recreated. For the above-stated reasons, Petitioners respectfully urge that this petition be accepted as complete and that the petitioned areas be designated as unsuitable for surface coal mining operations.

Respectfully submitted,

Derek Teaney, esq.
WV Bar No. 10223
Appalachian Center for the Economy and the Environment
P.O. Box 507
Lewisburg, WV 24901
Phone: (304) 645-9006
Fax: (304) 645-9008
dteaney@appalachian-center.org
*On behalf of Sierra Club, National Trust for Historic Preservation, Friends of Blair Mountain, Ohio Valley Environmental Coalition, West Virginia Labor History Association, and the West Virginia Highlands Conservancy*

Jessica Yarnall, esq.
Sierra Club Environmental Law Program
85 Second St, Second Floor
San Francisco, CA 94110
Phone: (415) 977-5636
Fax: (415) 944-5793
Jessica.yarnall@sierraclub.org

June 2, 2011

## TABLE OF EXHIBITS

| | |
|---|---|
| Exhibit A | 2009 SHPO Blair Nomination |
| Exhibit B | Blair Mountain Battlefield NRHP nomination boundary |
| Exhibit C | The Social and Environmental Upheaval of Blair Mountain: A Working Class Struggle for Unionization and Historic Preservation. Brandon Nida and Michael Jessee Adkins (2010) |
| Exhibit D | An Open Letter to the U.S. National Park Service and the West Virginia State Historic Preservation Office, (November 3, 2010) |
| Exhibit E | Declaration of Dr. Harvard G. Ayers |
| Exhibit F | Conclusion, Report on Disturbance at Blair Mountain Battlefield, (July 11, 2010) |
| Exhibit G | Federal Register /Vol. 75, No. 5 / Friday, January 8, 2010 /Notices |
| Exhibit H | News article discussing SHPO's proposed relisting, WV Gazette, (September 4, 2010) |
| Exhibit I | U.S. Environmental Protection Agency, "Final Programmatic Environmental Impact Statement for Mountaintop Mining/Valley Fills in Appalachia" (Oct. 2005), U.S. Environmental Protection Agency, IV Environmental Consequences of the Alternatives Analyzed, "Mountaintop Mining/Valley Fill DEIS" (2003) |
| Exhibit J | Patrick C. McGinley, From Pick and Shovel to Mountaintop Removal: Environmental Injustice in the Appalachian Coalfields, 34 Environmental Law 21 (2004) |
| Exhibit K | Declaration of Doug Estepp |
| Exhibit L | The Impact of Surface Mining Permits on the Archaeological Resources at Blair Mountain, Friends of Blair Mountain, (September 8, 2010) |

# Exhibit A

NPS Form 10-900
Oct. 1990)

OMB No. 10024-0018

0 8 0 5 0 0 4 8 6

RECEIVED 2280

JAN 16 2009

NAT. REGISTER OF HISTORIC PLACES
NATIONAL PARK SERVICE

United States Department of the Interior
National Park Service

# National Register of Historic Places
# Registration Form

## 1. Name of Property

historic name    Blair Mountain Battlefield

other names/site number    Spruce Fork Ridge of Blair Mountain

## 2. Location

street & number    Spruce Fork Ridge between Rt. 17 at Blair Gap and CR 8 at Mill Creek Gap    ☒ not for publication

city or town    Logan    ☒ vicinity

state    West Virginia    code    WV    county    Logan    code    045    zip code    25601

## 3. State/Federal Agency Certification

As the designated authority under the National Historic Preservation Act, as amended, I hereby certify that this ☒ nomination ☐ request for determination of eligibility meets the documentation standards for registering properties in the National Register of Historic Places and meets the procedural and professional requirements set for in 36 CFR Part 60. In my opinion, the property ☒ meets ☐ does not meet the National Register criteria. I recommend that this property be considered significant ☒ nationally ☐ statewide ☐ locally. (See continuation sheet for additional comments.)

Signature of certifying official/Title    _SHPO_    1/13/09    Date

West Virginia State Historic Preservation Office
State or Federal agency and bureau

In my opinion, the property ☐ meets ☐ does not meet the National Register criteria. (☐ See Continuation sheet for additional comments.)

Signature of certifying official/Title    Date

State or Federal agency and bureau

## 4. National Park Service Certification

I hereby certify that the property is:    Signature of the Keeper    Date of Action

☒ entered in the National Register.
    ☐ See continuation sheet
☐ determined eligible for the
    National Register.
    ☐ See continuation sheet    3/30/09
☐ determined not eligible for the
    National Register.
☐ removed from the National
    Register.
☐ other, (explain:) _____

Blair Mountain Battlefield
Name of Property

Logan County, WV
County and State

## 5. Classification

Ownership of Property

☒ private
☐ public-local
☐ public-State
☐ public-Federal

Category of Property

☐ building(s)
☒ district
☐ site
☐ structure
☐ object

Number of Resources within Property

| Contributing | Noncontributing | |
|---|---|---|
| | 1 | buildings |
| 16 | | sites |
| | 7 | structures |
| | | objects |
| 16 | 8 | Total |

Name of related multiple property listing

N/A

Number of Contributing resources previously listed
in the National Register

N/A

## 6. Function or Use

Historic Functions

Defense: Battlefield

Current Functions

Landscape: Natural Feature

## 7. Description

Architectural Classification

N/A

Materials

foundation    N/A
walls    N/A

roof    N/A
other    N/A

Narrative Description
See Continuation Sheets

Blair Mountain Battlefield

Logan County, WV
County and State

## 8. Statement of Significance

**━icable National Register Criteria**

☒ **A** Property is associated with events that have made a significant contribution to the broad patterns of our history.

☐ **B** Property is associated with the lives of persons significant in our past.

☐ **C** Property embodies the distinctive characteristics of a type, period, or method of construction or represents the work of a master, or possesses high artistic values, or represents a significant and distinguishable entity whose components lack individual distinction.

☒ **D** Property has yielded, or is likely to yield, information important in prehistory or history.

**Criteria Considerations**

Property is:

☐ **A** owned by a religious institution or used for religious purposes.

☐ **B.** removed from its original location.

☐ **C.** birthplace or grave of a historical figure of outstanding importance.

☐ **D** a cemetery.

☐ **E** a reconstructed building, object, or structure.

☐ **F** a commemorative property

☐ **G** less than 50 years of age or achieved significance within the past 50 years.

**Levels of Significance** (local, state, national)

National

**Areas of Significance**

Politics/Government

Social History

Other: Labor History

Archaeology: Historic – Non-Aboriginal

**Period of Significance**

1921

**Significant Dates**

August 31-September 5, 1921

**Significant Person**

N/A

**Cultural Affiliation**

Appalachian

**Architect/Builder**

N/A

**Narrative Statement of Significance**
See Continuation sheets

## 9. Major Bibliographical References

Bibliography: See Continuation Sheets

**Previous documentation on file (NPS):**
☐ preliminary determination of individual listing (36 CFR 67) has been requested
☐ previously listed in the National Register
☐ Previously determined eligible by the National Register
☐ designated a National Historic Landmark
☐ recorded by Historic American Buildings Survey
 # _____
☐ recorded by Historic American Engineering Record # _____

**Primary location of additional data:**
☒ State Historic Preservation Office
☐ Other State Agency
☐ Federal Agency
☐ Local Government
☐ University
☒ Other
Name of repository: WVU Libraries, Logan County Public Library
WV State Archives, Kanawha County Public Library

AR00184

Blair Mountain Battlefield
Name of Property

Logan County, WV
County and State

## 10. Geographical Data

—eage of Property    Approximately 1668.25

UTM References:  See Continuation Sheets

⊠ See continuation sheet

**Verbal Boundary Description**
See Continuation Sheets

**Boundary Justification**
See Continuation Sheets

## 11. Form Prepared By

name/title    Frank Unger, Kenny King, Harvard Ayers, Ph.D., Barbara Rasmussen, Ph.D., Chad N. Proudfoot, MA, MPA,
              Larry N. Sypolt, MA, MLIS

organization    Multiple                                        date    December 2008

street & number    Multiple                                     telephone

city or town                                        state              zip code

perty Owner
Multiple

NPS Form 10-900

United States Department of the Interior
National Park Service

NATIONAL REGISTER OF HISTORIC PLACES
CONTINUATION SHEET

Blair Mountain Battlefield                                    Logan County West Virginia
Name of Property                                             County and State

Section number  7_                    Page  1_____

## LOCATION & SETTING

     The nominated site consists of approximately 1668 acres stretching approximately ten miles along the crest of Spruce Fork Ridge in Logan County, West Virginia. From the north, it extends from Mill Creek Gap southward to Crooked Creek Gap, Sycamore Creek, Beech Creek, and Blair Gap ending at White's Trace Branch to the southeast. The terrain is rugged and remote, served only partially by State Rt. 17. The southeast end of the site is located near the community of Blair and is in West Virginia's Third Congressional District.

     The topography of the area is characterized by steep mountains joined by spiny ridges, with sandstone outcroppings and shale-clay based soils on 70 percent slopes. Spruce Fork Ridge is an undulating ridge approximately fifteen miles long when traveled by foot from the south crest of Blair Mountain to Mill Creek Gap. The peaks along the ridge vary in elevation from 1,809 feet at the head of the left fork of Beech Creek to a height of 2,045 feet at the twin peaks of Pine Mountain. The alluvial valleys below are tightly etched by small, meandering streams.

     The Battle of Blair Mountain was fought between August 30, 1921 – September 4, 1921 along the crest of Spruce Fork Ridge, beginning at White's Trace Branch in the southeast, to the Mill Creek Gap area in northwest Logan County. The ridge is a unique geographical barrier that divides the Guyandotte River and the Little Coal River watersheds, running in a southeast to northwesterly course. This nomination includes a section of this terrain encompassing the territory where encounters between Chafin's Army and the miners – led by members of the United Mine Workers of America – took place. The ridge line itself, and the defensive positions on the upper slopes of the ridge were established by Sheriff Don Chafin of Logan County. Chafin's forces were arrayed at strategic points linked by a continuous sentry line along the ridge. The nominated area was the location of the hostilities between the two groups, reflecting the miners' selection of natural pathways up and over the ridge to breach Chafin's line. The topography of the region dictated the course of the confrontation, and as such is extremely significant.

     The miners assembled at the mouth of Lens Creek in Marmet in southern Kanawha County. Gaining supporters as they advanced, they marched toward Big Coal River, to Peytona, and up Drawdy Creek. They continued up Rock Creek to Little Coal River, following that stream into Danville and Madison. At Madison, their march turned up Spruce Fork to the communities of Jeffrey, Sharples, and Blair, where they established bases in preparation for an assault on Chafin's forces defending the ridge. At the time of the battle, little more than a dirt path was available for most of the march. Few paved highways had come to Logan County. Steep mountains, narrow valleys, and small coal company towns characterized the area. A few farmers still held on to their small mountain lands.

     Non-contributing elements on the south crest of Blair Mountain are a small concrete block building and metal shed. Two modern gas wells at Crooked Creek Gap are within the boundary. Additionally, there are rights

NPS Form 10-900

United States Department of the Interior
National Park Service

NATIONAL REGISTER OF HISTORIC PLACES
CONTINUATION SHEET

Blair Mountain Battlefield                           Logan County West Virginia
Name of Property                                     County and State

Section number  7                    Page  2

---

of way for telecommunications, high voltage electric lines and towers, and remnants of an underground mine ventilation shaft at White's Trace Branch.  The headwaters of Beech Creek have been compromised by coal mine operations and are not included in this nomination.  Three roads and/or trails within the boundary are counted as noncontributing structures.

Fifteen contributing battle related archeological features have been identified within the Battle of Blair Mountain site boundaries.  Archeological investigations in 2006 recorded evidence of 24 armaments, including 13 rifles, two shotguns and nine pistols. This evidence included 1032 shell casings, 41 spent bullets, and 35 other artifacts from the 14 battle features in the district for a total of 1108 artifacts.  All artifacts were located in the intact A Horizon within 10 cm of the surface.  The burial of these artifacts is due to the natural process of leaves falling to the forest floor and becoming soil.  This occurred over the 85 years since the battle.  The location of the artifacts represents the approximate place where the shell casings and other artifacts fell over the several days of the battle.

## CONTRIBUTING SITES/RESORCES

Blair Mountain Battlefield.  The battlefield site consists of approximately 1,600 acres stretching approximately ten miles along the crest of Spruce Fork Ridge in Logan County, West Virginia.  From the north, it extends from Mill Creek Gap southward to Crooked Creek Gap, Sycamore Creek, Beech Creek, and Blair Gap ending at White's Trace Branch to the southeast.  The terrain is rugged and remote.  The topography of the area is characterized by steep mountains joined by spiny ridges, with sandstone outcroppings and shale-clay based soils on 70 percent slopes.  Spruce Fork Ridge is an undulating ridge approximately fifteen miles long when traveled by foot from the south crest of Blair Mountain to Mill Creek Gap.  The peaks along the ridge vary in elevation from 1,809 feet at the head of the left fork of Beech Creek to a height of 2,064 feet at the twin peaks of Pine Mountain. The alluvial valleys below are tightly etched by small, meandering streams.  The ridge is a unique geographical barrier that divides the Guyandotte River and the Little Coal River watersheds, running in a southeast to northwesterly course.
**One contributing site**

Site 46LG61. This battle feature consists of a scatter of battle-period shell casings and live shells that measure 60 by 90 meters.  It is located about 300 meters southeast of Crooked Creek Gap, and overlooks the Craddock Fork approach to Spruce Fork Ridge.  During recent field investigations, 118 artifacts were collected, mostly .30-06s.  All these artifacts were in the top 10 cm of the intact soils.  Key terrain features were large rock outcroppings that likely provided cover for the defenders.  Most of the artifacts were collected near these outcroppings.  Although this feature had been disturbed by collectors, the artifacts documented were intact and

NPS Form 10-900

United States Department of the Interior
National Park Service

NATIONAL REGISTER OF HISTORIC PLACES
CONTINUATION SHEET

Blair Mountain Battlefield                              Logan County West Virginia
Name of Property                                        County and State

Section number __7__                     Page __3____

---

were sufficient to gain a good understanding of the locations from which the defenders fired and the caliber of weapons used.[1]
**One contributing site**

Site 46LG200. This battle feature consists of a scatter of battle-period shell casings and live shells, and measures 10 by 35 meters. It is situated just south of Mill Creek Gap, and as such anchors the northern-most part of the nomination boundary. Twenty one battle-period shell casings and live shells were found during the recent field investigations. These included rifle, shotgun and pistol casings. All these artifacts were located in the top 10 cm of the intact soils. This feature had no signs of disturbance. This lack of disturbance is supported by the clustering of shell casings of like calibers. In one case, five .38 Smith and Wesson Special casings were tightly grouped and in another, two .25-20 casings were found near one another.
**One contributing site**

Site 46LG208. This battle feature consists of a scatter of battle-period shell casings and live shells that measures ■by 90 meters. It is situated in a small gap just south of the larger Crooked Creek Gap. During the 2006 field ■estigations, 153 artifacts were documented, of which 117 were .30-06 casings and 19 were stripper clips for .30-06 bolt-action rifles. All these artifacts were located in the top 10 cm of the soils intact soils. While a newly constructed natural gas access road cut through a portion of the feature, most of it is intact. This large undisturbed area allowed the survey to determine information about the types of armaments involved and the defenders' locations.
**One contributing site**

Site 46LG209. This battle feature consists of a scatter of battle-period shell casings and live shells that measures 20 by 210 meters. It is situated on a ridge just above the Crooked Creek Gap, and offers an excellent view of the approach to the gap from Craddock Fork. During the recent field investigations, 379 artifacts were documented at this feature. Based on a controlled sample of the feature, it was estimated that the feature as defined (basically the ridge top) would yield 1331 artifacts had the full 0.38 hectares been fully investigated. These artifacts were mostly shell casings and some spent shells, the most abundant caliber being .30-06s. All of these artifacts were recovered from the top 10 cm of the intact soils. Although portions of the feature have been disturbed by collectors, the documented artifacts were intact, allowing determination of both the calibers involved and the defenders' locations.
**One contributing site**

Site 46LG210. This battle feature consists of a scatter of battle-related shell casings and live shells that measures 25 by 70 meters. It is situated on a ridge top at the head of Sycamore Branch, a tributary of Craddock Fork, and is about 3000 meters east of Crooked Creek Gap. The recent field investigations documented 31

---

[1] should be noted that this is the only feature of the battle that was assigned a site number previous to the recent field investigation, as it has some prehistoric remains. Prehistoric remains were not located during 2006 survey efforts, because the survey did not do any testing, and the surface of the area was covered with leaves.

NPS Form 10-900

United States Department of the Interior
National Park Service

NATIONAL REGISTER OF HISTORIC PLACES
CONTINUATION SHEET

Blair Mountain Battlefield                           Logan County West Virginia
Name of Property                                     County and State

Section number   7                  Page   4

artifacts, most of which were .30-06 shell casings. All these artifacts were in the top 10 cm of the intact soils. No signs of disturbance were present.
**One contributing site**

Site 46LG211. This battle feature consists of a scatter of battle-related shell casings, live shells, spent bullets, and two pennies, and measures 40 by 400 meters. It is situated in a long narrow gap about 800 meters northwest of Crooked Creek Gap. As such, it overlooks an approach to Spruce Fork Ridge up a small tributary of Craddock Fork. The recent field investigations located 119 artifacts scattered over several small concentrations along the long axis of the battle feature. All of these artifacts were in the top 10 cm of the intact soils. These artifacts were characterized by a large number of .45 casings fired from a Thompson sub-machine gun. Several tight groupings of these .45 casings were documented, indicating the intact nature of the particular portion of the feature. Another characteristic of the artifacts documented here was the large number of spent bullets (27). This was a higher percentage and higher absolute number of spent bullets documented by the recent field investigations. This feature contained a natural gas access road along its main axis. However, the artifacts ▭ted were in protected places, and were intact. This allowed the determination of the nature of the ▭aments, the locations from which the defenders fired their weapons, and the likelihood that close-in combat was indicated. One terrain element was present in the form of a large rock outcropping. A large concentration of shell casings was documented around this rock outcrop.
**One contributing site**

Site 46LG212. This battle feature consists of a scatter of battle-related shell casings and measures 25 by 75 meters in extent. It is situated on the north slope of a descending ridgeline, and overlooks a small tributary of Craddock Fork. It is about 1000 meters north of Crooked Creek Gap. During the recent field investigation, 53 shell casings representing 11 different armaments were documented. These included several relatively rare calibers for this survey, such as .45/70s, .250-3000s, and .22 high powers. All these artifacts were recovered from the top 10 cm of the intact soils. No signs of any disturbance were present.
**One contributing site**

Site 46LG213. This battle feature consists of a scatter of battle-period shell casings and is 20 by 25 meters. It is situated in a gap above Beech Creek, and is about 4000 meters east of Crooked Creek Gap. During the recent field investigation, 13 artifacts were documented, most of which were .30-06s. These artifacts were located all around a key terrain feature, a large rock outcropping which could have provided cover for the defenders. All artifacts were located in the top 10 cm of the intact soils. 46LG213 has been disturbed by collectors over some of its extent. However the artifacts documented were intact, allowing the determination of the types of armaments fired by the defenders and the location of those armaments.
**One contributing site**

▭ 46LG214. This battle feature consists of a scatter of battle-related shell casings and live shells and measures 25 by 70 meters in extent. It is situated near the top of a ridge about 800 meters south of Crooked

NPS Form 10-900

United States Department of the Interior
National Park Service

TIONAL REGISTER OF HISTORIC PLACES
CONTINUATION SHEET

Blair Mountain Battlefield                                    Logan County West Virginia
Name of Property                                             County and State

Section number  7                          Page  5

Creek Gap. During the recent field investigation, 42 artifacts were documented, most of which were .30-06s.
All these were located in the top 10 cm of the intact soils. No signs of disturbance were present.
**One contributing site**

Site 46LG215. This battle feature consists of a scatter of battle-period shell casings and spent bullets and is 20
by 65 meters in extent. It is situated on a hill top overlooking a small tributary of Craddock Fork. It is located
about 1200 meters north of Crooked Creek Gap. A total of 21 artifacts was documented, all from the top 10 cm
of the intact soils. 46LG216 contains a recent natural gas access road, but most of it is intact. Despite the
disturbance, the types of armaments present and the location of those armaments were determined.
**One contributing site**

Site 46LG216. This site is 20 by 15 meters in size and is located on ridgeline north to northwest of the Crooked
Creek Gap. It consists of two trenches, one unfired .45 caliber bullet from the battle period, and five batteries,
which may date to the period of the battle. The trenches run north to south and are approximately 4 x 2 meters
in size. They are lined at the top with stacked rocks. The site was possibly used as an observation and
communication post for the Logan defenders. If the batteries date to the battle, they may have been used for
operating field radios.
**One contributing site**

Site 46LG218. This battle feature consists of a scatter of battle-period shell casings and is 20 by 70 meters in
size. It is situated on a ridge top near the head of Sycamore Branch, a tributary of Craddock Fork. It is located
about 2200 meters east of Crooked Creek Gap. The recent field investigation documented 22 artifacts, including
a mix of rifle, shotgun, pistol casings and stripper clips. Most of the artifacts were .30-06s. All of these artifacts
were found in the top 10 cm of the intact soils. No disturbance was present.
**One contributing site**

Site 46LG219. This battle feature consists of a scatter of battle-period shell casings and is 10 by 40 meters in
extent. It is situated along a westward-trending ridge overlooking the northern-most tributary of Crooked Creek.
It is located about 600 meters west of Crooked Creek Gap which makes it the western-most battle feature
located by the survey. The recent field investigation documented 10 shell casings, nine of which were .30-30s.
These artifacts were all located in the top 10 cm of the intact soil. No disturbance was present.
**One contributing site**

Site 46LG220. This small battle feature (five by 12 meters) consists of a scatter of battle-period shell casings. It
is situated in a gap at the head of a tributary of Craddock Fork to the south and Butch Fork to the north. It is
located about 1500 meters north of Crooked Creek Gap. Four shell casings were documented from three
different rifles all in the top 10 cm of the intact soils. No disturbance was present.
**One contributing site**

NPS Form 10-900

United States Department of the Interior
National Park Service

NATIONAL REGISTER OF HISTORIC PLACES
CONTINUATION SHEET

Blair Mountain Battlefield                                    Logan County West Virginia
Name of Property                                             County and State

Section number  7                        Page  6

---

Site 46LG221. The portion of this large battle feature that was investigated consists of a scatter of battle-period shell casings and possibly battle-related trenches. It is part of the well-known South Crest of Blair Mountain, which is near the southern end of the nomination boundary. 46LG221 is huge, covering many hectares, but the recent field investigation documented only two small concentrations of artifacts. The northern most of these two clusters is about 200 meters from Blair Mountain Gap and measures five by 10 meters in extent. It yielded 54 casings, which were closely packed into clusters. They represented a mix of calibers, including .30-06s and .30-30s. All were located in the top 10 cm of the intact soil. The southern-most cluster yielded 57 artifacts, again mostly .30-30s and .30-06s. It is 20 by 25 meters in size, and is about 350 meters from the Blair Mountain Gap. Again all these artifacts were located in the top 10 cm of the intact soil. The trenches in the southerly cluster were about five meters long by 1.5 meters wide. Their current depth is about 0.5 meters. Artifacts were located on all sides of these trenches, some being found in the trenches. These two clusters were not in any way disturbed. Disturbance is scattered across this large feature, but intact areas over much of its extent will certainly allow investigators to determine the nature and size of this resource.
**One contributing site**

## NON-CONTRIBUTING RESOURCES

1 - Small cinder-block building on the south crest of Blair Mountain. This building has one bay, a flat roof, and no windows. Formerly a communications relay hut for the State of West Virginia, this building is now abandoned.
**Circa 1960**
**One non-contributing building**

2 - Abandoned coal mine ventilation shaft with exhaust fan which was formerly owned by the Boone County Coal Corporation.
**Circa 1960**
**One non-contributing structure**

3 - Modern gas well head of standard construction near Crooked Creek Gap. Located at UTM 17S 0417737E / 4196080N (1983 datum).
**Circa 2000**
**One non-contributing structure**

4 - Modern gas well head of standard construction near Crooked Creek Gap. Located at UTM 17S 0417000E / 4195800N (1927 datum).
**Circa 2000**
**One non-contributing structure**

NPS Form 10-900

United States Department of the Interior
National Park Service

___TIONAL REGISTER OF HISTORIC PLACES
CONTINUATION SHEET

Blair Mountain Battlefield                                    Logan County West Virginia
Name of Property                                             County and State

Section number _7_                          Page _7____

---

5 - Large metal high-voltage power transmission line of standard construction.  This power transmission line runs ENE by WSW approximately 300 meters north of Site 46LG221 on Blair South Crest.
**Circa 1980**
**One non-contributing structure**

6 - State Route 17 runs through the southern boundary at Blair Mountain for approximately one-half mile and was originally part of US 119 before that alignment was moved in 1976.  The road is paved and is approximately 16 feet wide.  It is labeled as a "secondary highway" on the USGS topographic map.
**Circa 1926**
**One non-contributing structure**

7 - County Route 119/7 extends south from SR 17 approximately one-half mile.  The roadway is dirt and is approximately 10-16 feet wide.  It is labeled as a "light duty road" on the USGS topographic map.
**Circa 1926**
**One non-contributing structure**

8 - Jeep trails meander in and out of the boundary and are counted as one resource.  The trails are dirt and measure 8-10 feet in width.  They are depicted on the submitted USGS topographic maps as a single or double dashed line and are considered "unimproved."  While many of the roadways and trails within the boundary may have existed prior to 1921, the exact locations are likely to have changed.
**Circa 1920**
**One non-contributing structure**

INPS Form 10-900

United States Department of the Interior
National Park Service

___TIONAL REGISTER OF HISTORIC PLACES
CONTINUATION SHEET

Blair Mountain Battlefield                                            Logan County, West Virginia
Name of Property                                                                   County and State

Section Number ___8___                                      Page ___1___

___

## NARRATIVE STATEMENT OF SIGNIFICANCE

Spruce Fork Ridge of Blair Mountain in Logan County, West Virginia, is historically significant at the national level under Criterion A for its association with broad trends in politics/government, Social History, and other: Labor History. It is also significant at the national level under Criterion D because it has yielded, and is likely to yield, important information concerning the largest organized armed uprising in American labor history. The ridge was the site of the 1921 Battle of Blair Mountain that ended an unsuccessful three-year struggle to unionize the coal miners of Logan, Mingo, McDowell, and Mercer counties. Recent archaeological investigations have explored fifteen locations of battle-related artifacts that attest to the ferocity and magnitude of the battle. Ten of the sites were archaeologically unknown until ground work was conducted in 2006. More than one thousand artifacts have now been documented. Interpretation of these artifacts has shed new information about the direction of fire, the amount of ammunition used, and the types of weaponry that were involved in the battle. The events at Blair Mountain are overwhelmingly significant to the history of labor in the United States because they were an integral part of structured efforts to bring the benefits of unionism to working people.

## HISTORY

The unsuccessful campaign by the United Mine Workers of America (UMWA) was a long and bloody affair that arose only after decades of exploitation at the hands of industries that absolutely ruled the southern coal fields of the state, manipulated politicians, and terrorized miners and their families. The needs and wants of the coal industry defined politics and government in West Virginia. Blair Mountain is the place where union miners took a stand against the low wages, poor conditions, and corporate abuses that characterized coal mining in those days. During their assault they tried to breach a defensive line along Spruce Fork Ridge that stretched for ten miles and included two armed pickets stationed every fifty yards.

Logan County Sheriff Don Chafin established that line to block the march, which began one week after the Aug. 1, 1921, murder of Matewan, West Virginia, Police Chief Sid Hatfield. Already frustrated by fifteen months of martial law in Mingo County that was invoked by the coal autocracy, miners viewed Hatfield's death as the final outrage that drove them to confrontation. The battle for Spruce Fork Ridge was the dramatic finale to the episodic mine wars in southern West Virginia's coalfields. This battlefield is the most important historic resource associated with the miners' rebellion,

2NPS Form 10-900

United States Department of the Interior
National Park Service

NATIONAL REGISTER OF HISTORIC PLACES
CONTINUATION SHEET

Blair Mountain Battlefield                                          Logan County, West Virginia
Name of Property                                                    County and State

Section Number ___8___                                        Page ___2___

and should be listed in the National Register of Historic Places, just as the Aracoma Hotel, Don Chafin's home, and the Matewan Historic District have been.[1]

West Virginia contained one fourth of all bituminous coal miners in the nation. By 1919, organizing the southern coal fields became essential to the survival of the UMWA. The northern coal fields were unionized much earlier, but the non-union southern fields produced the nation's best specialty coal. Low in sulfur, it burned with a high BTU and produced very little smoke. At the time, coal alone fueled the American industrial machinery, so southern coal was in great demand and the non-union workers who produced it were grievously exploited. Unable to join the UMWA because of the "yellow-dog" contracts they were forced to sign by their employers, non-union miners in southwestern West Virginia threatened the union's existence by producing coal during strikes.

According to David Alan Corbin, "During the 1919 miners' strike in Mingo County, Logan and McDowell counties worked at full production and broke the back of the strike." The common belief was that if Logan County's mines were unionized, the rest of the state would follow suit.[2] The actual number of protesting miners in the 1921 war has never been unequivocally ascertained, nor has there been a definitive casualty count. Sixteen men died in the fighting, but no one knows how many others died in the march. Perhaps as many as four miners who objected to the strike were slain to silence their opposition.[3] Some sources estimate that a million rounds of ammunition were fired by the opposing groups. Archaeological discoveries lend much weight to this estimation.

The Battle of Blair Mountain took place between Aug. 30 and Sept. 4, 1921. However, the confrontation had been brewing for several months. Southern West Virginia's coal fields had become accustomed to labor strife, and West Virginia's governors had become accustomed to federal military assistance to resolve it. At the time of the march, the Mingo County coal fields were under martial law that was imposed in 1919. Earlier, during 1912-13, martial law was imposed in Kanawha County to quell unrest that arose with initial attempts to organize mines along Paint Creek. Although the events were separated by eight years, the miners marching to Mingo County remembered the Paint Creek strife

---

[1] Efforts to preserve the battle field as a signal resource in American labor history began twenty-five years ago, and included many of the affected property owners and the United Mine Workers of America. Representatives of the principal property owners, the Dingess Rum Coal Company, participated in a field survey during the summer of 1991. The principal coal operators, Dal-Tex Coal Corporation and the Sharples Coal Corporation, along with the UMWA, signed an agreement in 1992 to create a foundation that would preserve six sites associated with the battle, including the South Crest of Blair Mountain and a part of the Spruce Fork ridge. However, that did not occur.

[2] David Alan Corbin, *The West Virginia Mine Wars: An Anthology*, (Appalachian Editions, 1999), 98.

[3] Lon Savage, *Thunder in the Mountains: The West Virginia Mine War of 1920-21*, (Charleston, WV: Jalamap Publications, 1984), 59.

3NPS Form 10-900

United States Department of the Interior
National Park Service

TIONAL REGISTER OF HISTORIC PLACES
CONTINUATION SHEET

Blair Mountain Battlefield                                          Logan County, West Virginia
Name of Property                                                    County and State

Section Number ___8___                                     Page ___3___

that had included attempts to court-martial Mother Jones, a powerful supporter of organized labor who was placed under house arrest in the town of Pratt for several months.[4]

On the eve of the battle in early August 1921, more than half of West Virginia's one hundred thousand miners were organized, but they were in the northern coal fields. The northern mine operators earlier recognized the UMWA and agreed to deduct dues from miners' pay checks on the condition that the union also would organize the southern fields. The northern companies wanted to equalize the wages between the two coal fields so that southern coal was not cheaper than northern coal. Competition from the southern coal fields threatened the UMWA's national survival, so West Virginia represented the logical place to make a final stand for unionism.[5] The resulting confrontation on Blair Mountain was "the largest armed uprising on American soil since the Civil War," according to historian Robert Shogun.[6] A National Park Service theme study concluded that, "the violence of the West Virginia coal-mining war of 1920-21 reach[ed] a level unparalleled in U.S. history."[7]

With the financial support of the northern mine operators, the UMWA prepared for a long struggle in the southern counties.[8] The unionizing campaign had been sporadic, and included the shoot-out in Mingo County that resulted after Matewan police chief Sid Hatfield and Mayor Cabell Testerman refused to help the Stone Mountain Coal Company evict miners from company owned houses on May 19, 1920. That event left seven Baldwin Felts mine guards and two miners dead. Cleared of wrongdoing in this incident, Hatfield and his deputy Ed Chambers were later charged with illegal unionizing activity in McDowell County. When they arrived at Welch, the county seat, to answer those trumped up charges, they were gunned down in cold blood in broad daylight on the courthouse steps by C.E. Lively, a company spy who betrayed the miners in Matewan. Their bullet riddled bodies were then planted with guns – a ruse that was sufficient later on to acquit Lively of murder. The McDowell County Courthouse was listed in the National Register of Historic Places in 1979.

Coal miners were devastated by the deaths and enraged by Lively's villainy. They vowed revenge. Led by Bill Blizzard, Frank Keeney, and Fred Mooney of the UMWA, the miners assembled at Lens Creek in Kanawha County and planned their march on Mingo County to demonstrate their solidarity, hoping to gather miners to their cause as they advanced. They knew that they would face

---

[4] Her "jail" there was a National Historic Landmark until its demolition in the 1990s.

[5] Winthrop D. Lane, *Civil War in West Virginia*, (B.W. Heubsch, Inc., 1921), 42-3.

[6] Shogun, *The Battle of Blair Mountain*, 199.

   eme Study: American Labor History, U.S. Department of the Interior, National Park Service.

[8] Carl C. Dickey, "Must Murder Be the Price of Coal?" 1919.

4NPS Form 10-900

United States Department of the Interior
National Park Service

NATIONAL REGISTER OF HISTORIC PLACES
CONTINUATION SHEET

| Blair Mountain Battlefield | Logan County, West Virginia |
|---|---|
| Name of Property | County and State |

Section Number ___8___                                    Page ___4___

strong resistance in Logan County, but they likewise believed that if Logan County fell to the union, Mingo would not be far behind. Thus, they planned to traverse Logan County, and hopefully win miner recruits to the cause.

Martial law was often used to quell labor unrest in America in the early twentieth century, but the practice drew criticism from the military as well as from the U.S. Congress.[9] Federal officials observed that if states rightly formed their National Guard units, federal force would not be required in times of civil unrest. Yet, guard units required funding, which would require tax hikes – something that West Virginia mine operators vehemently opposed. Thus, West Virginia did not re-establish its National Guard after it was federalized for World War I.[10] Without the military power of a National Guard, the governors of West Virginia were forced to plead with the federal government for troops to police the coal fields every time there was labor unrest. When the federal government did not respond as quickly as he wanted in the face of this rebellion, Governor Ephraim Morgan authorized Logan County Sheriff Don Chafin to assemble a civilian posse to defend the town of Logan from potentially violent miners. Forty of these "deputies" were paid by the coal operators. Morgan cautioned Chafin not to attack the miners, but that warning eventually got lost in the confusion of the battle. Nevertheless, these "deputies," who called themselves "defenders" of Logan, were a major contending force in the unfolding events associated with the miners' march to Mingo County.

Chafin was experienced in the matter of thwarting miners. He was paid $32,700 annually by coal operators to keep his county non-union.[11] Hundreds of volunteers from all across southern West Virginia flocked to Logan town to "do their patriotic duty" and help stop the rebellion. Chafin, in the style of a potentate, vowed that no armed mob would cross Logan County. Soon, his deputies and his volunteers arrayed themselves across Spruce Fork Ridge to block the impending assault. The murky legality of such a situation, coupled with the national phobia about Bolshevism, is another facet of the historic significance of the Blair Mountain episode, linking these remote mountain hollows and valleys to the major geopolitical events of the day. The coal field labor strife also threatened the steel industry and the railroads, the twin pillars of American industrial might at the time. Thus, this battle and its associated work stoppages extended their influence far beyond southern West Virginia. The federal government came under extreme pressure from these industries to lend its force and authority to restore order in the coal fields.

---

[9] Clayton D. Laurie, "The U.S. Army and the Return to Normalcy in Labor Dispute Intervention: The Case of the West Virginia Coal Mine Wars, 1920-21," in *West Virginia History* 50 (1991); 1-24.

Shogun, *The Battle of Blair Mountain*, 69.

[11] Chafin's salary was more than $300,000 in 2005 dollars when calculated for inflation using the formula available at http://www.westegg.com/inflation/.

5NPS Form 10-900

United States Department of the Interior
National Park Service

NATIONAL REGISTER OF HISTORIC PLACES
CONTINUATION SHEET

Blair Mountain Battlefield                                          Logan County, West Virginia
Name of Property                                                            County and State

Section Number __8__                                          Page ___5___

When President Warren G. Harding proclaimed during the battle that "all persons engaged in said unlawful and insurrectionary proceedings to disperse and retire peaceably by noon of Thursday, September 1," it was the first such proclamation since the U.S. entered World War I. Throughout the early twentieth century, labor strife at many mining operations was often quieted by federal troops, but West Virginia alone bears the distinction of having been the focus – and potential target – of military aircraft. Air Service Commander Billy Mitchell wanted to use the insurgency to demonstrate the efficiency of air power, saying planes could "go wherever there is air."[12]

The National Park Service observed that the fight for control of the southern West Virginia coalfields

> centered less on economics than on civil liberties – freedom of speech and assembly, freedom from the industrial feudalism of company towns, and freedom from the terrorism inflicted by the operators hired gunmen. The struggle that began in 1912 and culminated in the 1921 armed miners' march to liberate Logan County, West Virginia, from the company rule shows that labor history is part of a larger historical theme, the struggle for liberties promised in the Bill of Rights.[13]

Spiny Spruce Fork Ridge separated unionized coal miners in the north from non-union coal miners in the south, thus it was both the symbolic and real hurdle that confronted miners wishing to bring the protection of unionism to the miners of Mingo, Logan, Mercer, and McDowell counties. Rising as high as 2,064 feet, the rugged mountain has slopes as steep as 70 percent. It was a daunting barrier for miners to face, because in 1921, there were no roads to speak of in Logan County. Before the march was done, miners even commandeered locomotives and coal cars to reach their destination. The ridge was a logical line of defense. It was a barrier between the two opposing forces, offering only the most inhospitable of conditions for a march: steep slopes, heavy timber, and rocky terrain. The ridge divided the county into union territory north of its peaks between Blair Mountain and the Boone County line, and the far larger non-union section to the south, which Chafin controlled. It also afforded high points that were good outposts for scouts. Massive rock formations along the ridge top provided strong defensive positions. According to Historian John Bond, the most direct route from the Kanawha River, where most of the miners began their march, to Logan was by way of Blair Mountain.[14] A branch of the Chesapeake and Ohio Railroad came to the mining community of Blair, at the foot of the mountain. From there, miners walked, rode horses, or took wagons over the mountain, using

---

[12] Lon Savage, *Thunder in the Mountains*, 128.

[13] NPS, "American Labor History Theme Study."

[14] NPS, "American Labor History Theme Study."

6NPS Form 10-900

United States Department of the Interior
National Park Service

NATIONAL REGISTER OF HISTORIC PLACES
CONTINUATION SHEET

Blair Mountain Battlefield                                                    Logan County, West Virginia
Name of Property                                                              County and State

Section Number ___8___                                              Page ___6___

crude dirt roads that cut through the pass between the north and south crests of Blair Mountain. Not really a road in the modern sense, this passage forded creeks and used dry stream beds. Serving the few farmers of the area, it was never intended for vehicular traffic, and so was nearly impassable other than by foot. Logan also was served by rail from Charleston, via Huntington, but the Huntington - Logan leg took three hours.

Many scholars contend that the Battle of Blair Mountain evidenced a political failure to allow the miners the right of association and to secure the benefits of collective bargaining. Frustration over the point was exacerbated by the U.S. Supreme Court's ruling that labor did not possess the right to organize, even by peaceful means. In upholding the lower courts who agreed with the Hitchman Coal Company that unions violated the Sherman Anti-trust Act, the court's decision rankled unions even further. West Virginia's courts implemented this decision through the tool of injunctions, which prohibited organizers and employees from breaking their employment contracts.[15] Before this court decision, both union and company had only violence and coercion as tools to advance their interests. The court, in ruling for the companies, effectively outlawed unions.

Most of the coal lands in West Virginia were mapped and acquired by speculators or industrialists in the eighteenth and nineteenth centuries, establishing a long history of absentee control of West Virginia's natural resources, and later, West Virginia's government. U.S. Steel Corporation operated captive mines in the region, and was known for its anti-union sentiment. A single railroad, The Chesapeake and Ohio, monopolized coal shipments out of Logan County.[16] Thus, powerful out of state corporate investors worked hard to acquire considerable political power that they could wield to achieve their industrial goals. By financing a system of deputizing citizens to enforce "civil law," Logan operators triggered questions about the justness of the administration of public affairs in the nation.[17]

Class conflict and the armed revolution that accompanied the unionizing efforts in the southern coal fields did not eclipse the law, nor did it threaten the authority of the federal government. Rather, the marchers revealed a conflict between patriotism and allegiance to the American dream of economic and social betterment. Their challenge was to the corporate autocracy present in the coal fields, not to the government. In fact, the most poignant aspect of the miners' ultimate surrender was their abiding patriotism. Many of them were veterans of the Great War. As such, they would not shoot at a U.S. soldier. Far from considering the U.S. Army as an enemy, the miners considered the soldiers to be brothers. Surrender would be preferable to harming them. In surrender, the miners placed their faith in

---

[15] Lane, *Civil War in West Virginia*, 70.

[16] Lane, "Who Owns the Coal Lands?"; Barbara Rasmussen, *Absentee Landowning and Exploitation in West Virginia 1760-1920*, (Lexington: University Press of Kentucky, 1994); NPS, "American Labor History Theme Study."

[17] Lane, *Civil War in West Virginia*, 57.

7NPS Form 10-900

United States Department of the Interior
National Park Service

NATIONAL REGISTER OF HISTORIC PLACES
CONTINUATION SHEET

Blair Mountain Battlefield                                    Logan County, West Virginia
Name of Property                                                            County and State

Section Number ___8___                                      Page ___7___

the ultimate justice of the American democratic process. They even waved small American flags as they marched off in defeat.[18]

As with other wars, this battlefield must be considered as an important part of a larger effort; it should not be viewed as the lone site of an isolated event. The battle for Spruce Fork Ridge was the cataclysmic finale of a failed unionization attempt that affected the direction of American labor history. The miners' insistence upon a union, and the long struggle for recognition of collective bargaining led to violence that drew the attention of the nation to remote, rural West Virginia and exposed the shameful excesses of political fervor that supported the coal industry's rapid growth at the expense of an entire class of citizens.

The UMWA fielded a strong and successful effort in the late winter of 1919 and the spring of 1920 to unionize the southern West Virginia coalfields. UMWA President John L. Lewis' commitment to the union members in the Midwest and other parts of the nation depended on organizing West Virginia's southern counties in order to settle a nation-wide strike. Coal miners in the Williamson coal field, which included Mingo County, called a strike of their own on July 1, 1920. That strike was not settled until October 1922.

Private police forces (such as the Baldwin-Felts Detective Agency) ignored the Bill of Rights as they ruthlessly protected coal operators from criticism or scrutiny. The agency had long been the target of miners' wrath because it was law unto itself as it carried out the wishes of coal operators. The "company thugs," as miners called them were resisting unionizing efforts in the mines in Mingo County by all means fair or foul. Martial law was imposed in Mingo County for the next fifteen months. It was enforced exclusively against miners, including occupation by federal troops on several occasions.

Miners were incensed by Governor Morgan's unwillingness to do anything about the situation in Mingo County, except to continue martial law. The miners had presented resolutions to the governor, asking him to establish a joint commission to bring the Mingo miners and operators together for the purpose of adjusting wages and other disputes. Realizing that the situation in Mingo was not going to be improved by anything the governor was doing, the miners took matters into their own hands. An aborted march on Logan County in September 1919 was now a reality. However, the miners did not intend to stop with Logan. They were determined to march on to Mingo to free their fellow union men from unwarranted imprisonment and to avenge Sid Hatfield's murder. This march and the battle of Blair Mountain comprised the greatest domestic armed conflict in American labor history. The revolt ended only after the intervention of 2,100 federal troops, sent to the area at the direction of President Warren G. Harding.

---

[18] Shogun, *The Battle of Blair Mountain*, 224-5; see also Jerry Bruce Thomas, *An Appalachian New Deal: West Virginia in the Great Depression*, (Lexington: University Press of Kentucky, 1998).

AR00199

3NPS Form 10-900

United States Department of the Interior
National Park Service

NATIONAL REGISTER OF HISTORIC PLACES
CONTINUATION SHEET

Blair Mountain Battlefield                                    Logan County, West Virginia
Name of Property                                                    County and State

Section Number ___8___                                      Page ___8___

_____

The "On to Mingo" drive began on Aug. 20, 1921, when six hundred armed miners answered a call to arms and assembled at Lens Creek, near Marmet in Kanawha County. Their numbers grew daily. By August 23 there was an armed camp of four thousand angry miners. By Wednesday, August 24, estimates of the miners' strength ranged from five thousand to thirteen thousand men. The miners gave no appearance of being organized, except around their local unions, or having anyone in charge, yet they were held together solidly by their anger over what had happened to Sid Hatfield. They also were united in the firmness of their intention to march to Mingo County, overrun the entire southern quarter of the state, drive out the thugs (Baldwin-Felts detectives), and free the miners who were illegally imprisoned there.[19]

To get to Mingo County, the miners had to cross Logan County first. That would not be easy considering the level of control Chafin wielded. He even approved or disapproved teachers hired by the public schools. Still, miners boasted that they were going to "go clean through to Mingo and kill Don Chafin on the way." Chafin kept the union out of Logan County with his "army" of deputies and the use of force. He was determined that "no armed mob [would] cross Logan County."[20] The miners were equally determined to reach Mingo County. As the miners were mobilizing on Lens Creek, Chafin immediately began organizing volunteers to stop the march. Hundreds of volunteers, from all walks of life and from throughout southern West Virginia came forth to perform their "patriotic" duty of stopping the rebellious miners. The "Czar" of Logan County, as Chafin was called by his enemies, shaped an army and established the same defensive line he had planned in September 1919, when union miners first threatened a march. That march had hardly started when then-Governor John J. Cornwell met with miners on September 5, and promised that he would investigate conditions in Logan County. At the same time, Cornwell telegraphed the War Department to put federal troops on alert. His threat to have federal troops in the area within hours and persuasion from UMWA District President Frank Keeney caused the miners to abandon that march. Union miners marching toward Logan in August 1921 angrily remembered Chafin's many previous injustices to union organizers, at the behest of coal operators, in prior years.

Chafin's line of defense was a logical one. He chose Spruce Fork Ridge because it provided a stretch of mountainous country that would be difficult to cross. The most direct route from the Kanawha River, where most of the miners had begun their march to Logan, was by way of Blair Mountain. A branch of the Chesapeake and Ohio Railroad came to the mining community of Blair, at the foot of Blair Mountain. From there, they walked, rode horseback, or took wagons over the mountain using a dirt road that cut through the pass between the north and south crests of Blair Mountain.

_____

[19] Savage, *Thunder in the Mountain*, 58..

[20] Savage, *Thunder in the Mountain*, 58.

9NPS Form 10-900

United States Department of the Interior
National Park Service

NATIONAL REGISTER OF HISTORIC PLACES
CONTINUATION SHEET

Blair Mountain Battlefield                                    Logan County, West Virginia
Name of Property                                                        County and State

Section Number __8__                                        Page ___9___

As the march south gathered momentum, the miners overran the towns of Danville and Madison in Boone County on the afternoon of August 24. They cut telephone and telegraph lines and emptied the stores of food, shoes, and ammunition as they waited for trains to take them to Blair Mountain.

Chafin was kept well informed of the miners' movement through his use of reconnaissance planes. When an advance group of miners reached the foot of Blair Mountain early on the morning of Thursday, August 25, Chafin's men were already in position on the ridge and a pitched battle broke out. The miners retreated. The main body of the march was about fifteen or twenty miles behind. They were an odd looking bunch of men. There was no uniform. Some were dressed in their World War I uniforms; many were in blue bib overalls. They wore red bandannas around their necks as their union symbol, and called themselves "red necks." Some of them carried banners, which read "On to Mingo." Their firearms varied from machine guns to old flintlock mountain rifles.

On Friday, August 26, miners arriving at Blair commandeered a train and directed the engineer ⸻back it up fifteen miles to Madison. By this time, there was panic in Charleston and Logan. Governor Morgan, who took office March 4, 1921, telegraphed President Harding to ask for one thousand federal troops and military aircraft armed with machine guns. A favorable response from President Harding seemed to be the governor's only hope in stopping the march. He had been keeping most of the recently doubled contingent of one hundred state policemen in Mingo County, citing a "state of war" there.

Secretary of War John W. Weeks responded immediately to Governor Morgan's request by sending Brigadier General Harry H. Bandholtz to Charleston to meet with the governor and to make a first hand assessment of the situation. As the former provost marshal general of the American Expeditionary Force, Bandholtz was known for his ability to handle tasks requiring a diplomat's tact and a soldier's firm hand. General Bandholtz arrived in Charleston by train at 3:00 a.m. on August 26. By 4:00 a.m. he was in the governor's office getting a report from the state's chief executive. Morgan told the general that he faced a full-fledged insurrection; Sid Hatfield's death had maddened the state's miners; they were killing [sic] and looting; he had no soldiers, little power. He had to have federal troops. Within the hour, Bandholtz summoned UMWA District 17 President Frank Keeney and Secretary Fred Mooney to the capitol and told them that the miners' march had to be stopped and they, as union leaders, were to do so.

By 6:00 a.m., Keeney and Mooney were on their way to meet with the miners. After traveling six hours by taxi they arrived at Madison. Keeney called a 2:00 p.m. meeting with the miners at the town's ballpark. There, he told the angry miners, "A lot of you men are going to disagree with me, but don't interrupt. I am telling you facts, and you will find that this is not the time to argue." Keeney related what had happened so far. He reported his meeting with Bandholtz and the position of the governor. He told the crowd that Bandholtz was acting on orders from President Harding and that the general was holding the union and its leaders responsible if things got out of hand. "There is no question," Keeney told them. "Bandholtz will see that the march is ended; he will use the entire might

10NPS Form 10-900

United States Department of the Interior
■—onal Park Service

NATIONAL REGISTER OF HISTORIC PLACES
CONTINUATION SHEET

Blair Mountain Battlefield
Name of Property

Logan County, West Virginia
County and State

Section Number ___8___                                    Page ___10___

___

of the national government and the United States Army if necessary, to stop it." If the miners continued, Keeney said, they would not be fighting Governor Morgan, Don Chafin, or the Baldwin-Felts "thugs;" they would be up against the United States Army, the same army in which many of the miners had served in France. "Return to your homes," Keeney urged.[21]

By 2:30 p.m., Keeney had an agreement from the miners that they would abandon the march. Many started back home or waited for the special trains Keeney had promised would take them home. All of the miners, however, did not agree to stop the march. Ed Reynolds was among those unconvinced that Keeney was leveling with them. His band of three hundred miners walked out of Madison on the road to Logan with their rifles in hand and bandannas around their necks.

Although all of the miners were not convinced that the march was over, word quickly spread that the march had ended. Chafin got the word almost as soon as the ballpark meeting was over. At 3:00 ▮▮▮▮., he began recalling his troops from the front, where more than one thousand men waited in trenches ▮▮▮▮ barricades. That evening, the first contingent of defenders arrived back in Logan, with many of them making their way from the courthouse to the Aracoma Hotel where Logan's ladies pushed quantities of food on them. From the time defenders first went out from Logan to the front, the Aracoma Hotel, located in downtown Logan, was designated a food distribution center that fed the troops in the hotel and sent rations to those on the front.

The lull did not last long. Late in the evening Chafin learned that the miners commandeered a train at Clothier and resumed the march on Mingo to avenge Hatfield's death and to free several unjustly jailed Mingo County miners from detention. Shortly after midnight on August 27, Logan's fire siren screamed out, summoning to arms those who had just arrived home. By 8:00 a.m., Chafin had eight hundred men back on the front, manning machine guns and rifle emplacements.

General Bandholtz was not entirely convinced that the miners' insurrection had ended, despite Keeney's and Mooney's report. He and his Chief of Staff, Colonel Stanley H. Ford, decided to make a personal inspection. They traveled to the town of Racine on the Coal River on the morning of August 27. There, General Bandholtz spoke to a group of miners who were returning to their homes, telling them:

> I don't want martial law here. Neither do you. I've seen enough men killed. I don't want to see any more die. But if it must be, then we will go under martial law. I don't want it, but I must obey orders. They tell me you men are going home. I'm glad. It's the right thing to do. Let law and order take their course. Are you all going home?[22]

___

[21] Savage, *Thunder in the Mountains*, 68.

[22] Savage, *Thunder in the Mountains*, 92.

11NPS Form 10-900

United States Department of the Interior
National Park Service

NATIONAL REGISTER OF HISTORIC PLACES
CONTINUATION SHEET

Blair Mountain Battlefield                                    Logan County, West Virginia
Name of Property                                                      County and State

Section Number ___8___                                       Page ___11___

---

Bandholtz was reassured by his visit with the miners and reported to Washington, D.C. that the miners were returning home. He said that the federal troops being held in readiness would not be required immediately, but they should be "earmarked for the purpose, in case an emergency arose." The two officers left Charleston for Washington by train on the evening of August 27, believing that the insurrection was over.

Governor Morgan, however, was unconvinced. He still felt that Sheriff Chafin should be reinforced, and he wanted to demonstrate to the miners that he was in control of southern West Virginia. He thought this could best be done by having Captain J. R. Brockus, head of the state police, move from Mingo County to Logan County. There, he and twenty officers joined Chafin's men as they tried to arrest miners in the Sharples-Clothier area for capturing two state policemen on August 12. They met up with Chafin at his field headquarters at Ethel on the western base of Blair Mountain. At 6:00 p.m. on Saturday, August 27, Brockus led nearly three hundred men toward Sharples and Clothier. During the night they crossed over Blair Mountain on a rough horse trail, arriving at Beech Creek before dawn. At Montclo, Brockus and his men were surprised to come upon a group of armed union men who were still in the area. In the pitched battle that immediately broke out, two miners were killed and a third miner was critically wounded, but survived. Brockus' forces captured ten prisoners, but five escaped. The miners captured four of Brockus' deputies. All of this happened before daybreak on Sunday, August 28.

Word of the killings at Montclo was relayed as the "Sharples Massacre" where women and children allegedly were being "slaughtered." The story spread quickly and soon grew to fantastic proportions. Miners likened the event to Hatfield's murder. Word of what happened, and much of what didn't, reached miners in Boone and Raleigh Counties, along the Kanawha River, and in the mining camps of Cabin Creek and Paint Creek where miners were returning home from the previous week's march. At the news of the massacre, miners furiously resumed their march.

Suddenly, the miners' rebellion, which Keeney had largely defused, was reignited. What was anger over Sid's death became a raging fury. Men who had put away their guns on Saturday took them out again Sunday. This time, the miners did not assemble on Lens Creek. They moved straight through, along Spruce Fork to Sharples and Blair to the foot of Blair Mountain, ready to attack Chafin's army. The miners wanted to get to Blair Mountain as quickly as possible. They commandeered every kind of transportation; automobiles, trucks, teams of horses, mules, and trains. Hundreds of miners arrived at Blair, on Sunday on regular passenger trains, but there were not enough. More miners commandeered both passenger and freight trains so frequently that regular train runs were discontinued.

In the meantime, General Bandholtz had returned to Washington with a report which said that the march had ended and that the miners were returning to their homes. The report did not get to President Harding and Secretary Weeks until Monday, August 29. Back in Charleston, Governor Morgan reportedly was "beside himself." On Sunday evening he had sent John Charnock, his new

12NPS Form 10-900

United States Department of the Interior
National Park Service

NATIONAL REGISTER OF HISTORIC PLACES
CONTINUATION SHEET

Blair Mountain Battlefield                                    Logan County, West Virginia
Name of Property                                                         County and State

Section Number ___8___                                      Page ___12___

Adjutant General, and A.C. Porter of the UMWA, to the Sharples area to investigate conditions after the early morning so-called "massacre." Alarmed, Charnock and Porter returned to Charleston on Monday, reporting to the governor what they had seen. Porter's evaluation of the situation was that it was like "a monster powder keg awaiting only the smallest of sparks to launch one of the bloodiest industrial wars in the history of the world." Morgan telegraphed the President and the Secretary of War, pleading for federal troops immediately, saying that delay "would be most disastrous." That telegram reached Washington on Tuesday morning. To reinforce the Governor's telegram, former West Virginia Governor, W. A. McCorkle, and other prominent West Virginians met with Secretary Weeks and General Bandholtz then went directly to the White House to confer with President Harding. While the meeting with the president was in progress, the governor called saying that "conditions were still worse, far beyond state control." In further contacts Morgan had with Washington that day, he emphasized the continuing deterioration of the coal fields and promised that he would organize a National Guard within days. [23]

By this time, officials in Washington agreed to intervene to get things in West Virginia under control. Accordingly, Weeks prepared a proclamation for President Harding's signature. Harding signed the proclamation on the afternoon of August 30, finally putting the power of the federal government in motion. Citing the President's authority to suppress insurrection, the proclamation gave the miners less than forty-eight hours to disband.

His proclamation said, "Now, therefore, I, Warren G. Harding, President of the United States, do hereby make Proclamation and I do hereby command all persons engaged in said insurrection to disperse and retire peacefully to their respective abodes on or before 12 o'clock noon, of the first day of September, 1921, and hereafter abandon said combinations and submit themselves to the laws and constituted authorities of said State." Harding then ordered Bandholtz back to West Virginia to observe the extent to which the proclamation was followed and to determine how many federal troops should be sent if the miners refused to disperse. Two federal units, the Twenty-Sixth Infantry at Camp Dix, New Jersey, and the Nineteenth Infantry at Camp Sherman, Ohio, were alerted for duty in West Virginia on September 1 if the miners did not cease and desist.

As the miners' rebellion intensified, there was a strong sense of a full-fledged civil war. Many young men came forward as volunteers to help Logan County fight off the invading rednecks. As reinforcements rolled into Logan on special trains, there was excitement about being able to participate; some young men saw it as an adventure. There was an almost continuous flow of newly arrived volunteers moving through the streets of Logan, with many stopping at the Aracoma Hotel.

---

[23] Shogun, *The Battle of Blair Mountain*, 188.

13NPS Form 10-900

United States Department of the Interior
National Park Service

TIONAL REGISTER OF HISTORIC PLACES
CONTINUATION SHEET

Blair Mountain Battlefield                                    Logan County, West Virginia
Name of Property                                             County and State

Section Number ___8___                          Page ____13____

---

Chafin moved his headquarters from the courthouse to the Aracoma so that he would be nearer the men who were joining his army. From his office in the hotel, Chafin could also keep an eye on reporters, such as Boyden Sparkes of the *New York Tribune*. Chafin's censor, Major Tony Gaujot, insisted that Sparkes and the numerous other reporters writing about what was happening in Logan County submit all news articles to him for approval.

The Aracoma became the headquarters for W. E. Eubanks, who was commissioned a colonel in the newly established West Virginia National Guard on August 29. Thus, the governor made good his promise to President Harding to re-establish the National Guard in West Virginia. Eubanks set up his headquarters on the hotel's fourth floor during the action. On August 30, Morgan relieved Chafin as commander of the Logan defenders and appointed Eubanks to head up the Logan army, presumably to clothe it with state authority. However, none of the participants in Logan's defense force had been organized into the National Guard at the time of the battle. Eubanks, a native of Welch, West Virginia, a veteran of the World War, brought with him 250 American Legion volunteers from Welch. Altogether, his defensive army amounted to 2,800 men.

Immediately after arriving in Logan on August 30, Eubanks went into conference with Charnock and Chafin to plan their strategy. They knew they had to fight a defensive battle, because the governor ordered them to hold their positions and not to counterattack. Therefore, they decided to concentrate their forces at the gaps of Spruce Fork Ridge: Mill Creek, Crooked Creek, Beech Creek, and Blair Mountain. Machine gun nests were placed at these key points and telephone wire was strung from them to the George's Creek company store. There, a telephone line connected with the headquarters of the "whites," as the defenders now called themselves, in the Aracoma Hotel. Additionally, they established two-man picket posts at fifty-yard intervals along Spruce Fork Ridge for approximately ten miles from Crooked Creek to Blair Mountain.

The miners' strategy was developed by Ed Reynolds and sub-district UMWA president, Bill Blizzard, who was recognized more than any other person as the single most important of the miners' leaders. *Tribune* reporter Sparkes, when comparing Blizzard with Don Chafin, said, "If there is a king in Boone County I should say it is Bill Blizzard." Reynolds and Blizzard split the miners and made a two-pronged attack, with one force advancing up Hewitt Creek and across Spruce Fork Ridge, and the other moving up White's Trace Branch and pushing across Blair Mountain. This pincer movement would bring them together at Logan. The towns of Jeffrey, at the mouth of Hewitt Creek, and Blair, at the foot of Blair Mountain, were the main assembly points. At Blair, the miners established their headquarters in the Blair schoolhouse.[24]

---

[24] This building no longer exists.

14NPS Form 10-900

United States Department of the Interior
National Park Service

NATIONAL REGISTER OF HISTORIC PLACES
CONTINUATION SHEET

Blair Mountain Battlefield
Name of Property

Logan County, West Virginia
County and State

Section Number ___8___

Page ___14___

The first organized assault on Blair Mountain got underway during the evening of Tuesday, August 30, when John E. Wilburn, a Baptist minister and miner from Blair, declared: "The time has come for me to lay down my Bible and pick up my rifle and fight for my rights.[25]" He told a group of miners assembled at the Blair schoolhouse that he would lead them to meet the enemy. By nightfall, he had seventy armed miners, black and white, including two of his sons, following him up the north slope of Blair Mountain. A second group of about seventy-five men under the leadership of "Red" Thompson, a black miner from Blair, moved out up White's Trace Branch toward the gap between the two crests of the mountain. Both companies camped out on the mountainside that night.

It was obvious from all indications that the miners did not intend to stop their movement, despite the presidential proclamation. Copies of the proclamation were dropped from the three biplanes that Chafin's pilots flew over the miners' territory. The miners paid no attention to them.

Now, the miners were unchallenged in their control of five hundred square miles in southern Kanawha, Boone and northern Logan counties. Their fighting force consisted of about 2,500 to 3,000 men at Blair. Approximately four thousand men were stationed at Jeffrey and on Hewitt Creek, while a smaller group guarded the head of Beech Creek. Others guarded roads and commandeered the trains that would be needed to bring U.S. troops to the fronts. The miners were confident that they were strong enough to push through to Logan and on to Mingo.

When Major Charles F. Thompson, accompanied by A. C. Porter of the UMWA, read the proclamation to miners at Blair on the morning of August 31, he did so under considerable threat from the armed miners. Thompson reported that the vehement miners were absolutely in no mood to accept the proclamation.

Wilburn and his men awoke that day to gunshots from along the ridge top of the mountain. Marching around the hillside through the woods, they kept moving toward the sound of the shooting. After reaching the top of the mountain, they followed a little road along a sag in the ridge. They continued for about a mile when they saw three men standing on the hill just ahead, cradling rifles across their arms. They were deputies in Chafin's defense force. Initially, neither side recognized the other. After asking for their passwords, "I come creeping" for the miners and "Amen" for the Logan defenders, and receiving them, the two groups knew that they were enemies. Firing broke out and immediately the three deputies, John Gore, John Cofago, and Jim Munsie, fell fatally wounded. One of Wilburn's men, a black man named Eli Kemp, was shot in the back and a short time later died at Dr. I. F. Milliken's office in Blair. After this encounter, fighting broke out all along the line. Blair Mountain is actually a twin-crested mountain with a graded road running through the pass between the crests.

---

[25] Savage, *Thunder on the Mountain*, 110.

15NPS Form 10-900

United States Department of the Interior
National Park Service

NATIONAL REGISTER OF HISTORIC PLACES
CONTINUATION SHEET

Blair Mountain Battlefield                                              Logan County, West Virginia
Name of Property                                                              County and State

Section Number ___8___                                          Page ___15___

___

Fighting erupted on both sides of the road. The steep mountain was so heavily covered with trees and underbrush that visibility was barely twenty feet.

Captain Herman Leroy McNulty of Huntington was the defensive commander of the Blair Mountain sector. He had positioned a machine gun nest at the south crest and rows of breastworks between it and the road. A second defensive position was on the north crest. That was maintained by about two hundred "Bluefield Boys," the Mingo Militia of about 130 men under the command of Captain L. E. Lawson, and a contingent of state police and Chafin's deputies, led by Eli Gore, brother of the slain John Gore. While Eli Gore was intent upon avenging his brother's death, the defenders' goal was to prevent the miners from getting through.

The miners approached Blair Mountain by way of White's Trace Branch toward the southwest from Blair and Trace Branch directly west, advancing in groups of from thirty to forty men. In addition Red Thompson and John Wilburn, they were led by Alva Estep and Jim Morrison. At the Blair Mountain breastworks, a machine gun erupted, and several hundred deputies and volunteers maintained a steady rifle fire. The fighting became increasingly heavy. Rather than make a frontal attack on the strongly fortified defensive positions on both crests of Blair Mountain, the miners, in their small groups, tried to sneak behind the "whites," taking advantage of the rocks and underbrush for cover. The West Virginia mine war was fully engaged with ten thousand men arrayed along a ten mile front. The "reds" continued toward their prime objective, a breakthrough at Crooked Creek Gap. Success there, they believed, would give them easy access to Logan. It was less than six miles into town by way of a rough trail through the gap and a road which ran along Crooked Creek. The major assault on Crooked Creek Gap got underway on Wednesday evening when Ed Reynolds, with the assistance of a local school teacher Early Ball, who knew every crook and turn in the mountain, started moving three to five hundred miners, armed with rifles and a 111-shot Gatling gun up Sycamore Branch of Craddock Fork. They continued to move up to Sycamore Mountain, and there they camped on the right side of the defenders' position at Crooked Creek Gap. On Friday morning, September 1, the "reds," under Reynolds' leadership, were ready to attack at Crooked Creek Gap, which was the most serious threat to the town of Logan. They chose this position because they believed the other likely target, Mill Creek Gap defense on the extreme left, was more heavily fortified.

Crooked Creek Gap was defended by approximately three hundred Logan deputies, under the command of Captain Ivan Hollandsworth who had at least two machine guns in position. One of these guns was operated by an expert gunner, "colonel" Gaujot, the media censor. Reynolds' forces worked their way over the ridge until they were on the defenders' right flank. What followed was a three hour battle where the defenders' machine gun jammed and the "reds" broke through the defensive line at the gap and advanced as far as Elkins Field on the left fork of Crooked Creek. Captain Hollandsworth prevented any further advance of the miners by retreating about one-half mile and repositioning his machine gun. The breakthrough caused great concern in the town of Logan. Chafin and Eubanks were concerned as well. The defense command, however, had kept a large reserve in Logan to deal with such

16NPS Form 10-900

United States Department of the Interior
National Park Service

NATIONAL REGISTER OF HISTORIC PLACES
CONTINUATION SHEET

Blair Mountain Battlefield                                    Logan County, West Virginia
Name of Property                                                        County and State

Section Number ___8___                                          Page ___16___

an emergency. A convoy of trucks carried deputies, machine guns, and munitions up Crooked Creek to reinforce Hollandsworth. Part of the six hundred McDowell County volunteers at Mill Creek under Sheriff Bill Hatfield was ordered to move to the left side [Mill Creek side] of Crooked Creek Gap. The "whites" organized a second line of defense encircling Logan. Despite almost continuous firing at Blair Mountain, Beech Creek, Crooked Creek and Mill Creek, the defensive line held and the miners who had broken through were forced to retreat.

Eubanks resorted to another strategy to stop the miners. He ordered Chafin's reconnaissance planes to begin dropping homemade bombs on miners' positions. During the preceding week, Chafin got chemists in Charleston to make a number of explosive and gas bombs. Eubanks later testified at the miners' treason trials that, "I had reports that a number of men, from three to five hundred, were coming up certain roads to attack my position, and as I wished to stop them, and as I could not advance by order of the Governor, I dropped those bombs." Eubanks explained further that, "when they hit if anyone got the cloud or the gas they would be made very sick -- they would vomit-- it would cause extreme sea." He said of the other bombs, "if any part of it hit them it would hurt them very badly. They were made out of six inch pipe nipples with union joints, filled with black powder and nuts and bolts and any kind of scraps like that."

Eubanks was not altogether truthful in his explanation for why bombs were dropped, as indicated by the actual places where they were dropped. Planes dropped one regular explosive bomb near one of the miners' headquarters, Sanders Schoolhouse, on Craddock Fork, creating a small crater, but injuring no one. Another explosive bomb barely missed two women washing clothes in the miners' encampment at Jeffrey. Planes dropped one gas bomb at Blair and three at Bald Knob in Boone County, where defenders thought miners were massing for an attack on Buffalo Creek.

By Thursday evening, (September 1) the defenders had regained full confidence. Chafin issued an "official communiqué" to the press, exulting in the success in maintaining the defense line. He said, "At all points our forces succeeded at driving back the invaders and in each instance regaining lost territory."

In the meantime, the miners failed to comply with President Harding's proclamation. Actually, they ignored the noon Thursday, September 1, deadline to "disperse and retire peacefully to their respective abodes." It was Bandholtz's responsibility to determine if the president's ultimatum was being obeyed. Bandholtz and his staff had arrived in Charleston at 11:30 a.m., thirty minutes before the deadline. He held an immediate conference with Governor Morgan. He tried to see Frank Keeney and Fred Mooney of the UMWA, but they "fled the state after being indicted in Mingo County for complicity . . . in the Three Days Battle of May." Instead, Bandholtz met with Philip Murray, international vice-president of the UMWA. The general directed his chief of staff, Colonel Stanley H. Ford, and Major C. F. Thompson to go to the battle zone for first hand impressions. Upon their return to Charleston, they reported to Bandholtz that the miners had not obeyed the president's proclamation, nor

17NPS Form 10-900

United States Department of the Interior
    ional Park Service

NATIONAL REGISTER OF HISTORIC PLACES
CONTINUATION SHEET

Blair Mountain Battlefield                              Logan County, West Virginia
Name of Property                                        County and State

Section Number ___8___                        Page ___17___

did they intend to do so. Bandholtz called another hasty conference with the governor shortly after
midnight on Friday morning. He told the governor that he had no alternative but to call in federal
troops. Accordingly, at 2:00 a.m. on Friday, Sept. 2, 1921, General Bandholtz telegraphed the Adjutant
General of the Army that, "The invaders have not obeyed the President's proclamation and there is no
apparent intention to do so. It is therefore recommended that the troops now held in readiness be sent to
West Virginia without delay." Bandholtz announced the news to reporters, who then turned to the
governor for a response. Morgan said, "I have nothing to say. I am through."[26]

Bandholtz asked the War Department immediately to send the entire Twenty-sixth Infantry
regiment of one thousand men from Camp Dix, the Nineteenth Infantry regiment from Camp Sherman,
Ohio, the Fortieth Infantry regiment from Camp Knox, Kentucky, portions of the Tenth Infantry
Regiment, and a detachment from the Columbus Barracks in Ohio. Altogether, he requested two
thousand soldiers and 106 officers. Accompanying the troops would be camp kitchens, mules, horses,
ssons, mortars, and baggage wagons.

Word that federal troops were coming was not long in reaching the miners. In anticipation of
their arrival, the "reds" unsuccessfully attempted to dynamite a Chesapeake and Ohio Railroad bridge on
the Guyan Division at Big Creek in order to prevent reinforcements from getting to the "whites." In the
meantime, Bandholtz ordered an air reconnaissance by the 88th Air Squadron, commanded by Brigadier
General William (Billy) Mitchell, the nation's famous airman and Assistant Chief of U. S. Air Service.
Mitchell saw in the West Virginia mine war an opportunity to demonstrate the effectiveness of air power
in quelling civil disturbances in remote locations. He had just shown the ability of aircraft in sinking the
German battleship (prize of war) *Ostfriesland* off the Virginia coast. Mitchell's pilots made several
flights over the war zone for Bandholtz, but they fired no shots and dropped no bombs because the
planes were unarmed. In later years, the 88th Air Squadron claimed to be the only Air Corps unit ever to
have participated in a civil disturbance.

Seemingly undeterred by the impending arrival of federal troops, the miners did not let up in
their efforts to get through to Mingo County. Heavy fighting continued at Blair Mountain and Crooked
Creek Gap. Shots were exchanged at the head of Beech Creek on Friday, September 2. A concerted
attack was made by the miners at Blair Mountain during the morning. The miners faked an assault in
the center, then switched to the flanks, where they tried to take the machine gun positions. The *Bluefield
Daily Telegraph* described how the attack looked to the "Bluefield boys" defending Blair Mountain:

In the early morning hours, an alarm went off that the miners were attacking the outpost at
the top of the hill. Things were quiet, however, until about nine, when a machine gun and
automatic peppered the Bluefielders' position from the mountain slope across the valley. The

---

[26] Savage, *Thunder on the Mountain*, 117.

18NPS Form 10-900

United States Department of the Interior
National Park Service

NATIONAL REGISTER OF HISTORIC PLACES
CONTINUATION SHEET

Blair Mountain Battlefield                                    Logan County, West Virginia
Name of Property                                                     County and State

Section Number ___8___                               Page ___18___

skirmishing in the valley below was a ruse, for the attackers came from the left and right sides of the mountain." The miners pushed the attack desperately; they had no sense of fear. They advanced over the crest of the hill in the face of machine gun and rifle fire. After two and one-half hours of fire, the affair died down. A Cabin Creek miner told a Huntington, West Virginia reporter, "We couldn't fire a shot but what they would rake our line from top to bottom." He said they must have had carloads of ammo on that hill "for they fired hundreds of rounds for every one that we sent in their direction." Friday night the miners sent a small party on a charge up the slope. The defenders in the first line of trenches fled and miners dropped into the trench. "No sooner had the last man got in, than the trench was raked by a hidden machine gun located not more than fifty yards away," he said. "And they had one machine gun nest that we never could have dislodged, unless we had some of the one-pounders the troops brought up with them. He was setting in a rock cliff with great barricades all about. He could fire in just one direction, but brother, I'm a telling you he sure gave us hell on several occasions.[27]

Finally, the defensive line held. Both sides were convinced that casualties were high on the other side. Highly exaggerated accounts were given to reporters. Chafin told a reporter from Huntington on September 2 that at least fifty miners had been killed. The *Charleston Daily Mail* quoted Chafin as saying that the miners had buried fifty of their men near Blair on September 2. The *Logan Banner* reported on the same date that "many lives have been lost and quite a few prisoners taken." The same issue of the Logan paper noted that fighting on all sectors was at its worst on Thursday afternoon. "Two men were reported wounded from Logan's forces, but not seriously, while many miners are known to have been killed in this spurt to capture Logan City." The casualty figures apparently were much lower than the sensational reports, whether by the "reds," "whites" or newspaper reporters. Most of the fighting was done at a distance, and in underbrush and woods so heavy that the combatants could hardly see each other. Reliable accounts do indicate, however, that five miners were killed and at least five wounded on Thursday and Friday, the two days of heaviest fighting. The defenders brought in eighteen prisoners of war from the miners' army on Friday afternoon and placed them in the Logan jail, there joining thirty other men, who were mostly prisoners of war. Even the Aracoma hotel was used as a temporary holding place for prisoners until they could be moved to the jail. The *Logan Banner* reported on September 2, that, "One prisoner tried to get away from the Aracoma Hotel where he had been held pending his delivery to the jail last night. Owing to the crowded condition of the street with defenders of Logan it was not necessary to shoot after him, for he got no further than in front of the *Banner* building, before being retaken."[28]

---

*Bluefield Daily Telegraph.*

[28] *The Logan Banner.*

19NPS Form 10-900

United States Department of the Interior
National Park Service

NATIONAL REGISTER OF HISTORIC PLACES
CONTINUATION SHEET

Blair Mountain Battlefield                                    Logan County, West Virginia
Name of Property                                                        County and State

Section Number ___8___                                    Page ___19___

By Friday evening federal troops were beginning to arrive in the battle zone. From his new offices in the Chesapeake and Potomac Telephone Company building in Charleston, Bandholtz provided overall planning and direction for involvement of the 2,100 men under his supervision. The general divided the war zone into three districts and planned a pincer movement.

The Nineteenth moved up Coal River from Saint Albans to Madison, Danville, Sharples, Jeffrey and Blair, behind the miners' lines; the Fortieth Infantry from Camp Knox moved to Logan to relieve the Chafin-Eubanks army and the Twenty-Sixth from New Jersey reinforced the Nineteenth around Madison, with additional companies stationed along the Kanawha at Marmet, Lens Creek, and Montgomery. The Nineteenth Infantry arrived in Madison around 10:00 p.m. on Friday.

There, Captain John Wilson met with now returned Bill Blizzard, who was the miners "field commander," if they had one. "We was just all leaders," was the general opinion of the miners. Yet, Blizzard, sub-district president of District 17, UMWA, was so closely identified with the miners' cause when Captain Wilson asked him if he was the general of the miners' army, Blizzard replied: "What army?" then added "I guess the boys will listen to me all right." He told Wilson that if he would send a squad up the line with him, "I can get all of our fellows out of the hills by daylight." Saturday morning, (September 3), Blizzard appeared again, after having spent several hours at Jeffrey and at the fighting front. He reported to Wilson that, "The miners have withdrawn their lines," and are awaiting the arrival of the troops. When Blizzard arrived with the federal troops at Jeffrey later that morning, he made good his promise: he persuaded four hundred miners to surrender. The soldiers proceeded to set up posts at Jeffrey, with twenty-four officers and 753 men distributed among the different posts.

Even with federal troops to their rear, other contingents of miners continued the fight on Saturday at Crooked Creek and Blair Mountain. The "whites" were getting perilously low on ammunition. An airplane was sent to Charleston Saturday morning, however, and returned with thirty thousand rounds of Springfield ammunition. Now, the defenders were able to protect their position. One miner was killed at Blair Mountain and two "whites" were slightly wounded at Crooked Creek Gap before the fighting ended.

Joe Savage, a college student from Charleston, who had signed up to join the Logan defenders after hearing the governor plead for volunteers on Thursday evening, was in the Crooked Creek Gap area since Friday morning, and reported that on Saturday morning, "just like the morning before, we heard the tat-tat-tat-tat-of a machine gun from the opposite ridge. . ." The defenders all along Crooked Creek Mountain had opened up and a real battle was in progress. Savage continued, "Colonel Gaujot still on the job; up on the ridge his machine gun was barking in angry spurts. We took turns

20NPS Form 10-900

United States Department of the Interior
National Park Service

NATIONAL REGISTER OF HISTORIC PLACES
CONTINUATION SHEET

Blair Mountain Battlefield                                    Logan County, West Virginia
Name of Property                                             County and State

Section Number __ 8 __                                  Page ___20___

manning our parapet and kept steady fire for at least two hours. Bullets spattered all around us, but we were fairly safe in our natural redoubt."

As the morning progressed, firing on both sides became intermittent, and by 11:00 a.m., the miners had stopped firing altogether. Three companies of the Fortieth Infantry from Camp Knox, Kentucky, arrived in Logan by train at 1:00 p.m. Saturday, bringing machine guns, trench mortars, 37-millimeter guns, a radio outfit, wagons, and fifty mules. Logan townspeople and volunteers gave the troops a hearty welcome. When the soldiers entered the Aracoma Hotel lobby the women and ministers serving food broke out in applause. After being fed, the soldiers went about setting up communication equipment atop the Aracoma Hotel.

Major C. F. Thompson and Colonel G. A. Shuttleworth, the unit commander, began to assess Logan situation, beginning with a visit to Eubanks, The West Virginia National Guard officer in charge of the defending forces. What they found, Major Thompson later reported, was that Eubanks and his staff were "so unmistakably under the influence of liquor as to render them unfit in our opinion for an orderly transaction of business." The state of intoxication had endured for most of the preceding twenty-four hours, Major Thompson believed. Federal forces were soon on their way to the front at Crooked Creek Gap and Blair Mountain to relieve the defenders. As the defenders watched the troops ascending Crooked Creek Mountain, Savage said, "Pandemonium began to spread all along the ridge." The troops were "toiling up the mountain, accompanied by big, muscular Army mules drawing light artillery field guns." "We all jumped up on the parapet and cheered." "The long crest of the mountain rang with tumultuous shouts of welcome." He noted, "Old Warren G. Harding hadn't forgotten us after all." Savage continued, "The troops toiled upward and were soon with us . . . Many of the soldiers were young boys, grinning and asking what happened to the war . . . A corporal barked authoritatively at several men who were handling pack mules; the field guns had already been moved farther up to the right, where the crest was higher."

By mid-afternoon, Savage and his fellow defenders had been relieved by the soldiers from Camp Knox and were working their way down the pathways from the ridge and into the main trail to a road leading to Logan. Taxicabs and private vehicles were at the main road to take the defenders back into town. Savage and a friend from Charleston rode with a "horse doctor," who told them that "Billy" Blizzard was about to attack federal troops with grenades, then chided them for not knowing that "Billy Blizzard commanded the miners' army." It was already dark when Savage and his friend, Grant Hall, were dropped off at the Aracoma Hotel. The entrance had arms stacked all about the entrance and a guard was at the door. The guard asked for the password, but neither could remember it. He still let them in. The military use of the Aracoma was readily apparent to Savage. "The lobby of the Aracoma Hotel was like a military headquarters," he said. "An Army colonel and several lesser officers were

21NPS Form 10-900

United States Department of the Interior
National Park Service

____TIONAL REGISTER OF HISTORIC PLACES
CONTINUATION SHEET

Blair Mountain Battlefield                                                                 Logan County, West Virginia
Name of Property                                                                                                County and State

Section Number ___8___                                                                         Page ___21___

moving about, talking with deputies and state police officers. They all said the Mine War was over. There was a news bulletin that the miners had begun evacuating the disturbed area about noon."

Savage recalled that there was a Red Cross booth in the Aracoma lobby, "and after cleaning up in the washroom," he said, "we paid it a visit. The lady in charge was very solicitous of our welfare and advised us that efforts were being made for a special train to take the Kanawha County men back to Charleston." After being filled with sandwiches and hot coffee, Savage and Hall set out to see Logan, now overrun with defenders.

All weekend, the rebelling miners surrendered to the United States Army in large numbers. Many, however, hid their guns in the mountains and simply made their way home. They were not going to fight federal troops, for "when the moment came that they must fight federal troops, who were serving in the same army in which they, the miners, had served, there was no question in their minds." All of the injustices they had endured "paled into insignificance when compared with shooting soldiers of the United States. The miners knew this so well they did not need to talk about it . . .They would not, could not, make war against their own country."

The miners' march "On to Mingo" ended without meeting its objective. Hatfield's murder was not avenged and Mingo's miners were still in jail. But, it had taken the federal government, not "Czar" Chafin and his deputies or the state government to stop their march. Bandholtz felt good about what his soldiers had been able to accomplish: they made no arrests, fired no shots, and dropped no bombs. Yet, they had stopped the rebellion. The general was able to telegraph the War Department on Sunday, September 4, that, as of noon, "Federal troops had replaced both state and county forces and the invading miners throughout the disturbed area. Up to the present time there has been no hostile act on the part of anybody toward the United States troops." Additionally, Bandholtz did not need to use the martial law proclamation that President Harding had signed.

While the miners failed to achieve what they had set out to do, they did achieve victory in that they had gotten the nation's attention, and "had made the people of America a little more aware of the conditions of life of the Appalachian miner." Lives were lost on both sides, but not nearly as many as was expected or was reported by both sides and the newspapers. When the fighting ended and federal soldiers moved in to take control, soldiers with miners as guides searched through the hills looking for bodies, but none were found. From the time the march started on Lens Creek and the fighting stopped on September 3, 1921, sixteen persons were confirmed dead, all but four of them from the miners' army.

The consequences of the miners' rebellion did not end with the miners' surrender to federal troops. Soon after the Battle of Blair Mountain there were 1,217 indictments for complicity in the insurrection, including 325 murder charges and 24 indictments for treason against the state of West Virginia. Hundreds of union miners were jailed, with many of the cases transferred to Charles Town in West Virginia's eastern panhandle – in the same courthouse where John Brown had been convicted of

22NPS Form 10-900

United States Department of the Interior
National Park Service

TIONAL REGISTER OF HISTORIC PLACES
CONTINUATION SHEET

Blair Mountain Battlefield                                    Logan County, West Virginia
Name of Property                                                        County and State

Section Number ___8___                                    Page ___22___

treason in 1859.  It was there that Bill Blizzard was acquitted of charges that he committed treason after
a 30-day trial in April and May of 1922.  Reverend J. E. Wilburn and his son were convicted of the
murder of Deputy John Gore and sentenced to 11 years in the state penitentiary, but were pardoned after
serving three years.  Some of the cases were assigned to Fayette County – where the population
sympathized with the miners, resulting in acquittals.  Eventually, all remaining indictments were
dismissed.

UMWA membership suffered a rapid decline after the march.  However, the National Industrial
Recovery Act (NIRA) legalized unions in 1933, and the coal fields then organized very rapidly.
Although the NIRA was ruled unconstitutional by the U.S. Supreme Court in 1935, no effort was ever
made to derail unions, and organized labor soon spread to many other industries, protected by the
National Labor Relations Act of 1935 (commonly known as the Wagner Act).  Workers began
demanding the right to unionize, invoking the power of the federal government to protect that right.  Led
—the UMWA, labor gains realized after 1933 spread to many workers in other industrial occupations,
il, by the 1950s, labor was one of the most powerful political forces in America.  Yet, at the time of
the Battle of Blair Mountain, many Americans equated unionism with communism.  After 1918, when
Bolsheviks commandeered the Russian revolution and called on workers the world over to rise up
against their capitalist oppressors to end the Great War, many people believed that union organizers
were Bolsheviks, which heightened apprehension about collective bargaining and unionism in general.
Although there was an extreme leftist wing of the labor movement that watched the West Virginia
struggle closely, it played no part in the mine wars.[29]

The miners' rebellion and the Mingo strike, which had started in July 1920 and did not end until
October 1922, cost the UMWA more than the bankruptcy it brought to District 17.  Membership in the
United Mine Workers in West Virginia slumped from its peak of 50,000 in 1920 to about 600 in 1929.
For all intents and purposes, the UMWA had been killed in West Virginia.  In fact, the continued
existence of the miners' union nationally was questionable.  However, when Congress passed the
National Industrial Recovery Act in June 1933, the feeble organization recovered quickly and firmly re-
established itself in America's coalfields, finally avenging Sid Hatfield and bringing the advantages of
organized labor to America's coal miners.

### ARCHAEOLOGY
A professional archaeologist investigated the site in 2006 documenting fourteen battle sites.[30]
This investigation was conducted to investigate, assess, and explore site's significance under Criterion

---

[29] Robert Shogun, *The Battle of Blair Mountain: The Story of America's Largest Labor Uprising*, (Boulder, Colo.: Westview Press,
1), 222-3.

[30] Harvard Ayers, Zan Rothrock, & Kenny King, "Archaeological Investigation of the Battlefield," on file, West Virginia State
Historic Preservation Office.

23NPS Form 10-900

United States Department of the Interior
National Park Service

NATIONAL REGISTER OF HISTORIC PLACES
CONTINUATION SHEET

Blair Mountain Battlefield                                    Logan County, West Virginia
Name of Property                                             County and State

Section Number ___8___                          Page ___23___

D, within the cultural context of United States and Appalachian labor history, and to assess integrity issues under the same criterion. Access to potentially significant areas was sometimes limited by terrain and vegetation, but 1,008 artifacts were located and documented. They supply conclusive evidence that the Blair Mountain Battlefield has important information that contributes to the understanding of human history for this period of significance.

The archaeological investigation indicates that the focuses of the battle were near Crooked Creek Gap and the Blair Mountain Crests. Based upon artifact counts and directions of fire, two tributaries to the north and one tributary to the south of Crooked Creek Gap saw major action. Some smaller sites were found slightly east of the main gap. This evidence shows that the Logan forces defended the entire fifteen kilometer length of Spruce Fork Ridge from Blair Mountain to Mill Creek Gap.

The data recovered from the archaeological sites provides a better understanding of the battle than is provided by the historical record alone. The findings show that at least five approaches to Spruce Fork Ridge from Craddock Fork and its tributaries were attacked. Also evidence now indicates a possible breakthrough of Crooked Creek Gap at the first Craddock Fork tributary north of the main gap. Hostilities were present around two kilometers from Crooked Creek Gap, but not nearly at that level closer to the gap.

The 2006 archaeological investigation indicates that the potential for further archeological research is great, and could lead researchers to answer significant research questions regarding the battle. The 2006 report of the investigation suggests five research questions that may be addressed with data recovered from contributing archaeological sites:

1. How intense were the hostilities at the Blair Crests as compared to Crooked Creek Gap?
2. What does the choice of sites beyond the two hot spots tell us about the strategy of both sides? By studying both the sites located by the 1991 survey and not studied by the 2006 survey, and the areas where neither went, we could gain a better handle on this important aspect of the battle. Presumably, these sites would represent ones that the miners chose to attack. But also, they reflect the ability of the defenders to maintain a continuous line of defense as the historical record indicates. These sites would be of lesser intensity than the Blair Crests and Crooked Creek Gap, but could allow this lesser known aspect of battle strategy to be delineated. For instance, a paucity of such sites might reflect the ability of the miners to concentrate their forces at the two hot spots.
3. What evidence of the historically-documented breakthrough at Crooked Creek Gap can be found further west of the current and previous surveys?

24NPS Form 10-900

United States Department of the Interior
National Park Service

⊞ATIONAL REGISTER OF HISTORIC PLACES
CONTINUATION SHEET

Blair Mountain Battlefield                                                    Logan County, West Virginia
Name of Property                                                                          County and State

Section Number ___8___                                            Page ___24___

---

4.  What would a complete investigation of the slopes surrounding 46LG209 show,
    especially indications of direction fire in comparison to where the breakthrough(s) may
    have occurred?
5.  How does the data confirm, disprove, or enhance information in the historic record?

---

## INTEGRITY

The historic integrity of the nominated portions of the Blair Mountain battle site remains remarkably intact, due mostly to its geologic form, its ruggedness, and its isolation. Within the nomination boundary, some archaeological sites have been lost or compromised. Monclo, the site of the first clash between miners and a force of state police and Logan County deputies led by Captain Brockus, (the "Sharples Massacre"), has been disturbed by surface mining, as has Trace's Fork, where John Wilburn led the miner's first assault on Blair Mountain that resulted in four fatalities. The South Crest of Blair Mountain, which is the area most viewed by casual surveyors, has been partially disturbed by roads. The South Crest is the most compromised part of the nominated area, but does retain sufficient integrity. However, new information acquired by aerial surveillance conducted by the State Historic Preservation Office and close scrutiny of recent aerial and satellite photography make it clear that the integrity of this site is not unduly compromised. Archaeological field work in 2006 further confirmed the high degree of integrity of the nominated area.[31]

The pertinent aspects of integrity that apply to Blair Mountain Battlefield are feeling, location, setting, and association.

*Feeling:* The rugged nature of the ridgeline and its haunting remoteness convey the feeling of the area as it was when these events took place; it is steep, heavily forested, rugged and remote. These physical features continue to express the historic character of Spruce Fork Ridge as it was in 1921. Ground and aerial photography support this conclusion and accompany this nomination. Additionally, comparisons of period topographic maps and modern ones reveal that there is little change in the remote nature of the place and the ruggedness of its terrain. The main topographical features of this area are intact. The site of the defenders' machine gun nest has been identified, and although it has been minimally disturbed, it still retains intact archaeological evidence. More importantly, seeing this area provides a "feel" for the battle, giving an understanding of what it must have been like to defend or attack this position.

---

[31]. West Virginia State Historic Preservation Office, "National Register Nomination Comment and Recommendation Sheet," prepared for the West Virginia Archives and History Commission. Spring 2005.

25NPS Form 10-900

United States Department of the Interior
National Park Service

TIONAL REGISTER OF HISTORIC PLACES
CONTINUATION SHEET

Blair Mountain Battlefield                                   Logan County, West Virginia
Name of Property                                                    County and State

Section Number __8__                                   Page ___25___

---

*Location*:  The location of the battle has been established.  At least three scholarly works have documented the ridge as the site of the battle.[32] Most recently, a qualified professional archaeologist has identified fifteen sites that closely delineate many aspects of the battle's progression.  Spruce Fork Ridge, which was the point of contact between Chafin's forces and the miners is intact.  The ridgeline is the location of the core battle because it was the dividing line between union and non-union territory.  It offered Chafin a superb defensive position, and it was remote from population centers.

*Setting:*  Owing to the remote nature of the location, the setting has changed only slightly since the battle there.  The rural, rugged mountain lent itself to the conflict because of its geographic features.  Steep and nearly insurmountable, the slopes presented daunting obstacles to the rebels and afforded Chafin's forces a fairly secure defensive position.  There has been no change in this topography that would degrade the integrity of the site.  Spruce Fork Ridge, as a geologic feature, divides two watersheds and it divided the union miners from the non-union miners.  Most of the passes and gaps across the ridge are still visible.  From the air and on ground, the ridge line continues to convey the aspects of topography and vegetation that drew the battle to site in the first place.

*Association:*  The association is clearly evident.  Participant narratives, scholarly studies, field investigations, and news reports establish clearly that Spruce Fork Ridge was the core of the Battle of Blair Mountain.  Because of its geologic and geographic attributes, as described above, Spruce Fork Ridge is inextricably associated with the historic events that took place there.

There are also several aspects of integrity which must be addressed under Criterion D.

*Criterion D*:  Within the parameters of Criterion D, there have been some disturbances of the battlefield.  However, the 2006 professional archeological investigation clearly indicates that enough integrity remains for the property to be considered significant under Criterion D.

Because of the nature of the artifacts, and their location near the surface, metal detectors can easily locate such items.  However, looting has not resulted in a complete loss of integrity throughout the entire battlefield.  The report states, "We found that all four of the sites we studied that had been documented by the 1991 report have been looted, while the other ten have not."

Despite this, many intact sources of potential information still exist.  Every one of the sites studied in the 2006 investigation contains intact deposits.  Site 46LG211 is a good example: "This long (400 meters) site is spanned by a gas access road for its full length, wiping out probably 80% of the site. one particular area that is protected by a massive rock outcrop is intact.  Small parts of the site on other side of the road are still intact as well."  The report also goes on to say that, "For each of the

---

[32]. Shogun, *The Battle of Blair Mountain*; Lane, *Civil War in West Virginia*; Savage, *Thunder on the Mountain*.

26NPS Form 10-900

United States Department of the Interior
National Park Service

TIONAL REGISTER OF HISTORIC PLACES
CONTINUATION SHEET

Blair Mountain Battlefield                                    Logan County, West Virginia
Name of Property                                              County and State

Section Number ___8___                                       Page ___26___

looted sites, while we will never know how many artifacts were removed, we have in each case been able to document a significant intact sample."

Thus, based upon the guidelines for Criterion D, the Blair Mountain Battlefield retains enough integrity to be nominated under this criterion. Even though there have been some disturbances, the property clearly retains significant data that is sufficiently intact to yield expected important information.

**SUMMARY**
The miner's rebellion of 1921 in southern West Virginia, which led to the armed confrontation on top of Blair Mountain at Spruce Fork Ridge, was the largest civil insurrection in the United States since the Civil War. It triggered congressional investigations into conditions in the coal fields and it brought national attention to the plight of coal miners in West Virginia. The event required the presence of the U.S. Army before peace was restored. These events are overwhelmingly significant to the history of the American labor movement and are directly associated with the rise of organized labor after 1933. Archaeological evidence has shown lines of fire, locations of gun emplacements, and the likelihood that much fire took place at very close range. If the site is preserved it will provide much more information about this chapter in American history.

AR00218

United States Department of the Interior
National Park Service

___TIONAL REGISTER OF HISTORIC PLACES
CONTINUATION SHEET

Blair Mountain Battlefield                                              Logan County, West Virginia
Name of Property                                                                  County and State

Section number ___9___     Page ___1___

BIBLIOGRAPHY

Adams, R.B. "Blair Mountain from the Other Side." *Goldenseal Book of the Mine Wars*: State of West
      Virginia, Division of Culture and History, 1991.

Ayers, Harvard, et al. "Archaeological Investigation of the Battlefield." on file, West Virginia State Historic
      Preservation Office, 2006.

*Bluefield Daily Telegraph.*

Bond, John. "Battle of Blair Mountain Sites," National Historic Landmark Nomination. National Park Service,
      1994.

*The Charleston Gazette.*

Clarkson, Roy. *Tumult on the Mountains*. McClain Printing Company, 1964.

Corbin, David Alan. *The West Virginia Mine Wars: An Anthology*. Appalachian Editions, 1990.

Department of the Interior, National Park Service. *American Labor History Theme Study*, 2003.

Dickey, Carl C. "Must Murder be the Price of Coal?" 1919.

Institute for the History of Technology and Industrial Archaeology. *Technical Report Number 2 – The Battle of
      Blair Mountain: Cultural Resource Survey and Recording Project*. West Virginia University, 1992.

Lane, Winthrop D. *Civil War in West Virginia*. B.W. Huebsch, Inc., 1921.

Laurie, Clayton D. "The U.S. Army and the Return to Normalcy in Labor Dispute Intervention: The Case of
      The West Virginia Coal Mine Wars, 1920-21," in *West Virginia History* 50 (1991); 1-24

*The Logan Banner.*

Meador, Mike. "Mine Wars of West Virginia." *Goldenseal*: State of West Virginia, Department of Culture and
      History, April-June 1981.

Rasmussen, Barbara. *Absentee Landowning and Exploitation in West Virginia 1760-1920*. Lexington:
      University Press of Kentucky, 1994.

United States Department of the Interior
National Park Service

NATIONAL REGISTER OF HISTORIC PLACES
CONTINUATION SHEET

Blair Mountain Battlefield                                    Logan County, West Virginia
Name of Property                                             County and State

Section number __9__     Page __2__

Savage, Joe. "Stopping the Armed March – The Nonunion Resistance." *Goldenseal*: State of West Virginia,
        Department of Culture and History, 1987.

Savage, Lon. *Thunder in the Mountains*. Pittsburgh: University of Pittsburgh Press, 1990.
NPS Form 10-900

Shogun, Robert. *The Battle of Blair Mountain – The Story of America's Largest Labor Uprising*. Boulder:
        Westview Press, 2004.

Stevens, Kristen. Interview. National Park Service, 2004.

Thomas, Jerry Bruce. *An Appalachian New Deal: West Virginia in the Great Depression*. Lexington:
        University Press of Kentucky, 1998.

West Virginia State Historic Preservation Office. "Nomination Comment and Recommendation Sheet – Blair
        Mountain Nomination," 2005.

ADDITIONAL DOCUMENTATION

**Maps**
United States Geological Survey. 7.5 Minute Series Topographic Maps. Amherstdale, Clothier, and
        Henlawson, West Virginia, 1996, 1996, 1976.

United States Department of the Interior
National Park Service

\_\_TIONAL REGISTER OF HISTORIC PLACES
CONTINUATION SHEET

Blair Mountain Battlefield                                          Logan County, West Virginia
Name of Property                                                            County and State

Section number __10__      Page __1__

---

**UTM REFERENCES**

AMHERSTDALE QUAD:  ZONE 17
**(UTM CORDINATES CALCULATED IN NAD 27 – MAPPED IN NAD 83)**

| 11. | 425965 | 4191434 |
| 12. | 426247 | 4190519 |
| 13. | 423826 | 4189847 |

CLOTHIER QUAD:  ZONE 17
**(UTM CORDINATES CALCULATED IN NAD 27 – MAPPED IN NAD 83)**

| 10. | 424127 | 4194218 |
| | 423826 | 4193288 |
| 14. | 423565 | 4192605 |

HENLAWSON QUAD:  ZONE 17
**(NAD 27)**

| 1. | 417586 | 4200141 |
| 2. | 419350 | 4198436 |
| 3. | 418416 | 4195623 |
| 4. | 419748 | 4196735 |
| 5. | 420464 | 4196071 |
| 6. | 421411 | 4198049 |
| 7. | 422778 | 4197289 |
| 8. | 421763 | 4195439 |
| 15. | 422543 | 4193039 |
| 16. | 419748 | 4195318 |
| 17. | 417821 | 4194085 |
| 18. | 416487 | 4196122 |
| 19. | 417907 | 4197330 |

NPS Form 10-900

United States Department of the Interior
National Park Service

|||TIONAL REGISTER OF HISTORIC PLACES
CONTINUATION SHEET

Blair Mountain Battlefield                                    Logan County, West Virginia
Name of Property                                                          County and State

Section number ___10___   Page ___2___

---

VERBAL BOUNDARY DESCRIPTION

The boundary of the nominated property is enclosed by the polygon whose vertices are marked by the above UTM reference points, and shown on the enclosed USGS maps. This polygon covers portions of the Amherstdale, Clothier, and Henlawson quadrangles.

BOUNDARY JUSTIFICATION

The boundary of the district encompasses the area between the 1400-2073 foot elevations on either side ═he ten-mile long Spruce Fork Ridge of the Blair Mountain in Logan County, which was the line of battle ─ined by the defenders when they erected armed pickets across the mountain at fifty yard intervals. The general area of the battle has been well documented in no less than four scholarly publications, which are included in Section 9 of this document. Archaeological findings throughout the ten-mile ridgeline and subsequent extrapolations indicate that the most intense activity occurred within the narrow, steep area encompassed by the proposed boundary. Although archaeological investigations were not conducted over the entire battlefield area, the inclusion of the setting around where events occurred is significant to understanding what the participants experienced.

Beginning within the 1400 foot contour at White Trace Branch at the southern tip of the mountain, near the town of Blair in the Amherstdale Quadrangle, the elevation of the battlefield ascends above 1700 feet rapidly. As the ridgeline meanders and folds back upon its northwest-southeast orientation, the elevation of the ridge quickly rises to 1900 feet, and ultimately reaches a height of 2073 feet in the Henlawson and Clothier quadrangles. The area encompasses approximately 1,600 acres. Fingerlike projections of the battlefield trace the convolutions of the mountain ridge and contain archaeological evidence of the course of the battle and the direction of fire. Since the topography determined the course of action, the boundary corresponds to contour lines.

The boundary encompasses, but does not exceed, the full extent of the battle area and excludes the route taken to the battle area where no encounters took place. Finally, the boundary was drawn based on historic significance and integrity as required. The significance of the area encompassed by the boundary is provided in Section 8 and the area retains excellent integrity. Existence of noncontributing resources within the boundary, ─h as gas wells and power lines, do not affect the resource's ability to convey significance under the selected ■ional Register Criteria.

United States Department of the Interior
National Park Service

TIONAL REGISTER OF HISTORIC PLACES
CONTINUATION SHEET

Blair Mountain Battlefield                                                    Logan County, West Virginia
Name of Property                                                                        County and State

Section number __Photos_____Page __1__

___

**Aerial Photos**
Photographer: Chuck Wyrostok, 2005

| | |
|---|---|
| Photo 1 of 36 | Blair Mountain looking NW from SE end of proposed boundary |
| Photo 2 of 36 | Blair Mountin looking E |
| Photo 3 of 36 | Blair Mountin looking SW |
| Photo 4 of 36 | Blair Mountin looking SW |
| Photo 5 of 36 | Blair Mountin looking SW |
| Photo 6 of 36 | Blair Mountin looking SW |
| Photo 7 of 36 | Blair Mountin looking SW |
| Photo 8 of 36 | Blair Mountin looking SW |
| Photo 9 of 36 | Blair Mountin looking SW |
| Photo 10 of 36 | Blair Mountin looking SW |
| Photo 11 of 36 | Blair Mountin looking SW |
| Photo 12 of 36 | Blair Mountin looking S |
| Photo 13 of 36 | Blair Mountin looking S |
| Photo 14 of 36 | Blair Mountin looking S |
| Photo 15 of 36 | Blair Mountin looking S |
| Photo 16 of 36 | Blair Mountin, Crooked Creek Gap looking SW |
| Photo 17 of 36 | Blair Mountin, NW end of Crooked Creek Gap looking W |
| Photo 18 of 36 | Blair Mountin looking NW |
| Photo 19 of 36 | Blair Mountin looking SE |
| Photo 20 of 36 | Blair Mountin looking SE |
| Photo 21 of 36 | Blair Mountin looking SE |
| Photo 22 of 36 | Blair Mountin looking E |
| Photo 23 of 36 | Blair Mountin looking NE |
| Photo 24 of 36 | Blair Mountin looking NE |
| Photo 25 of 36 | Blair Mountin looking N |
| Photo 26 of 36 | Blair Mountin looking NE |
| Photo 27 of 36 | Blair Mountin looking NE |
| Photo 28 of 36 | Blair Mountin looking NE |
| Photo 29 of 36 | Blair Mountin looking NE |
| Photo 30 of 36 | Blair Mountin looking NE |
| Photo 31 of 36 | Blair Mountin looking E |
| Photo 31A of 36 | Blair Mountain looking E |
| Photo 32 of 36 | Blair Mountin looking E |
| Photo 33 of 36 | Blair Mountin looking E |
| Photo 34 of 36 | Blair Mountin looking E |
| Photo 35 of 36 | Blair Mountin looking W |

**United States Department of the Interior**
National Park Service

# National Register of Historic Places
# Continuation Sheet

Section number _____    Page _____

---

### SUPPLEMENTARY LISTING RECORD

NRIS Reference Number:    08000496                Date Listed: 3/30/09

Blair Mountain Battlefield                        Logan          West Virginia
Property Name                                     County         State

N/A
Multiple Name

-----------------------------------------------------------------------------------------------

This property is listed in the National Register of Historic Places in accordance with the attached
nomination documentation subject to the following exceptions, exclusions, or amendments,
notwithstanding the National Park Service certification included in the nomination documentation.

_____                _3/30/09_____
Signature of the Keeper                           Date of Action

=============================================================================

Amended Items in Nomination:

The nomination is amended to change the number of contributing sites to 1.  The property is simultaneously one
large archeological site/battlefield. This amendment has been discussed with the West Virginia SHPO on
3/25/09 and with the American Battlefield Protection Program on 3/30/09 who both concur with this assessment.

_____

DISTRIBUTION:
      National Register property file
      Nominating Authority (without nomination attachment)

AR00224

# Exhibit B

# Blair Mountain Battlefield
# NRHP nomination boundary



**Legend**

○ **UTM marker points**

— **NHRP boundary**

USGS topographic maps
NAD 1983   7.5 minutes
Amherstdale
Henlawson                    Created Nov. 11, 2010
Clothier
Logan          0   312.5 625    1,250    1,875    2,500
                                                  Meters



# Exhibit C

# The Social and Environmental Upheaval of Blair Mountain: A Working Class Struggle for Unionization and Historic Preservation

**Brandon Nida**
**And**
**Michael Jessee Adkins**

**2010**

**Introduction**

Armed miners gathered by the thousands in the late autumn of 1921, streaming out of the hills and hollows of West Virginia. Many wore blue overalls and tied red bandanas around their necks as a uniform, while others were dressed in their military gear from the recently ended First World War. They were a mixture of Appalachian hill folk from Scots-Irish ancestry, African-Americans who had migrated out of the Deep South, and emigrants from Italy, Wales, Poland, and other European countries.  This coalminer army was assembling to confront a severely oppressive social and economic system maintained by coal operators in the region. After a generation of labor conflict in the West Virginia coalfields, mining communities erupted in the largest open class war in US history (Savage 1990: 3-6). Their struggle culminated on the ridges surrounding Blair Mountain in a fierce five-day battle against a private army backed by coalmine owners.

This conflict occurred in a larger international context where labor movements were gaining momentum worldwide.  Workers' councils in Germany seemed on the cusp of obtaining political control during 1917-1918. The 1919 General Strikes in Barcelona, Winnipeg, Seattle and Belfast symbolized a growing solidarity and militancy among the industrial world's workers. In Britain, a general strike originating with coal miners brought the United Kingdom to a grind for ten days in May of 1926. Most significantly, the Bolshevik Revolution installed a socialist government in Russia through violent revolution. Labor struggles in the US were no less significant, although this heritage is often

**Biography**

Brandon Nida is a native West Virginian, a graduate of Marshall University at Huntington, West Virginia, and is currently a doctoral student in archaeology at UC Berkeley.  His interests are in social inequality, political economy, archaeology of labor conflict, and hunter-gatherer archaeology. He can be reached at nida13@berkeley.edu, and welcomes any communication.

Michael Jessee Adkins holds a B.A. in Humanities and M.A. in Sociology from Marshall University. He is a military combat veteran, scholar, and member of the National Anthropology Honor Society (Lambda Alpha, Beta Chapter). His research interests include social conflict theory, archaeology, Appalachian studies, and working class social movements.

marginalized in American historical discourse (Durrenburger 2006; McGuire 2008: 107).  The history of violent labor struggles such as the Ludlow Massacre and the Haymarket Affair contradict Americanist narratives of enterprise, individuality, and a classless society that help maintain, reinforce and mask power structures and inequalities (Foote 2003: 7, 134; Hamilakis and Duke 2007; McGuire and Reckner 2003: 84; McGuire and Walker 1999: 159; Shackel 2001: 657; Smith 2006).

Blair Mountain is one such episode of violent labor conflict that raises discomforting issues about the industrialization of America. The coal industry was central to the growth of American prosperity in that it supplied the 'cheap energy' essential for the foundries and factories that propelled the industrial revolution.  But the workers often toiled in poverty and brutal conditions, and they paid the true cost of this prosperity while receiving the least of its benefits. The insurrection was an attempt to gain basic human rights, and it was open class warfare at the heart of American state capitalism. It is where the collective might of unionized power struck hardest, and only the federal government could halt it. The miners seized territory and property, at one point controlling and managing over 500 square miles (Savage 1990: 130). Although this conflict was the second largest rebellion in America, next to the Civil War, this battle has been largely forgotten.

Today, a different conflict is being waged at Blair Mountain, and this time it is for the life of the mountain itself. Coal companies are attempting to conduct an extremely destructive form of coal extraction called mountaintop removal (MTR) at the site.  This process would literally 'obliterate' the mountain and all traces of the miners' rebellion from the surrounding landscape (Foote 2004: 7). Archaeology has been an important tool in the efforts to preserve the battlefield, through both research and political action. Surveys undertaken by Dr. Harvard Ayers of Appalachian State University highlighted the archaeological significance and integrity of the site, which was crucial in the site's nomination to the National Register of Historic Places (NRHP). Although being listed on the register

does not entirely protect the battlefield, it was a significant step in securing the mountain's future. Unfortunately, the site was recently delisted due to a coal-operator backed opposition, a decision that a group of concerned citizens and academics are currently challenging.

Since the story of Blair Mountain is largely unknown, our purposes in writing this chapter are to introduce the topic and raise awareness of the site's threatened status. To accomplish these goals, we focus on four elements of our research at the site. First, we describe the historical context of the labor insurrection in order to deconstruct narratives that have served to marginalize the battle in national discourse. Second, we discuss the actual battle while incorporating initial archaeological analysis of the battlefield. The third section examines the way in which the heritage of Blair Mountain is currently being reinterpreted and asserted in the contemporary struggle against mountaintop removal. Finally we explore the ways in which an engaged archaeology can be utilized in contemporary political struggles such as labor and environmental justice movements.

## HISTORICAL BACKGROUND

The Battle of Blair Mountain was the culmination of more than forty years of class struggle and social transformation within West Virginia. It is best understood within this context, although traditional narratives have often constructed it within negative stereotypes associated with central Appalachia. The region gained notoriety when the Hatfield-McCoy feud broke out in Mingo County along the West Virginia and Kentucky border during the 1870s and 1890s. This conflict quickly became fodder for national newspapers and pulp fiction of the day, which caricaturized it as a blood feud between two fierce and backward mountain clans. In reality, the 'feud' was a political and economic contest between two competitors in the lumber trade (Bailey 2001: 25). Regardless, the sensational stories sold print and the negative stereotypes were perpetuated.

Accounts of labor struggle in the West Virginia coalfields are usually constructed from similar stereotypical conceptions of Appalachian culture. Labor strikes were seen as being violent because the people were backwards, irrational, lawless, and militant (Corbin 1981: xiv; Wheeler 1976: 83). Blair Mountain was largely portrayed in the national press as that of a feud between hotheaded mountaineers, instead of an economic or class conflict (Blizzard 2004: 115; Bailey 2001: 25). Rather than relying on stereotypes, we will explore the historical context in order to deconstruct these narratives.



**Figure 1:** State of West Virginia. The distance from Charleston to Blair Mountain was roughly 50 miles. The miners' ultimate goal was to reach Matewan and liberate Mingo County from martial law that was enacted by the state to break an ongoing strike in the county.

**Why the Miners Marched**

While the coal industry as a whole was notorious for its dangerous work conditions and problematic labor relations in the early twentieth century, these issues were often at their worst in the southern coalfields of West Virginia (Shogan 2004: 32-38). The coal industry operated with near impunity in the southern coalfields, under a system where local and state government officials were either in the pay or influence of coal operators (Blizzard 2004; Savage 1990; Wheeler 1976). One primary mechanism of operator control was through the company-town system (Shogan 2004: 9; Wheeler 1976: 85). These towns were justified by operators as providing basic necessities to their workers in an isolated region. But the company-owned towns allowed coal operators to exert an immense degree of control over the miners' social, political, economic, and personal lives (Wheeler 1976: 84).

The company store was a major instrument through which coal operators maintained these feudal conditions. Miners were paid in company money called 'scrip' which was redeemable only at the company store, allowing the operators to have an enormous degree of economic leverage. When wages rose, so would the prices at the company store. The operators' influence also reached beyond the economic sphere – children attended company schools, company doctors provided medical care, and company preachers preached the gospel of the coalmine owners. Most significantly, the company owned the houses in which the mining families lived. If a miner was injured, killed or joined the union, the company would force the family out, often at gunpoint (Fishback 1992: 348; Wheeler 1976: 81). In addition, mining families lived under constant threat from Baldwin-Felts detectives and other coal company agents who used terror, murder, and espionage to thwart pro-union activity. Continual harassment and violence by the detective agents created an atmosphere of fear and charged emotions

(Wheeler 1976: 81-82). Complete disregard by the state and federal government of their grievances frustrated the miners even further (Blizzard 2004: 161; Fishback 1995: 439).

**The Gathering Storm**

In the midst of these conditions, The United Mine Workers (UMW or UMWA) gained a foothold within the southern coalfields in Mingo County beginning in the spring of 1920. The UMW's organizing effort promptly led to a bitter 28 month long strike of which the Blair Mountain battle was part. Coal operators used every means available to block unionization, and leading the coal operators' offensive were the Baldwin-Felts detectives (Blizzard 204: 109; Savage 1990: 18). This inflammatory situation set the stage for a gunfight in the town of Matewan on 19 May 1920.  When a group of Baldwin-Felts agents arrived in Matewan and evicted striking miner families from their company houses, the pro-union sheriff and mayor questioned the legality of the evictions. After a few tense moments, gunfire erupted between the two groups. The mayor was shot first, and then Sheriff Sid Hatfield killed Albert Felts, the brother of the agency's founder Thomas Felts. Seven detectives in all were killed including Albert and Lee Felts in what became known as 'The Matewan Massacre' (Savage 1990: 21). This episode garnered national attention, and with a Hatfield from West Virginia involved the press once again cast the story as that of feuding mountaineers (Blizzard 2004: 116).

In the coalfields, Sid Hatfield gained heroic status among the miners and provided momentum to the organizing efforts. Throughout 1920 and into 1921 the union gained strength in Mingo County, as did the resistance of the coal operators. Each side bolstered their arsenals, and miners began waging guerilla warfare after the mines were reopened with armed guards and replacement workers (Blizzard 2004: 135; Shogan 2004: 114). On the first of August in 1921, Sid Hatfield was called to the McDowell County Courthouse to answer an indictment for allegedly dynamiting a coal tipple the prior spring. As

Hatfield, his friend Ed Chambers, and their wives walked up the courthouse steps, a group of Baldwin-Felts agents gunned down the two unarmed men.

Word of the slayings spread quickly as Sid and Ed's bodies returned to Matewan. The news outraged the miners and they began to pour out of the mountains to take arms (Savage 1990: 73; Blizzard 2004: 239). Talk began to spread of a march to Mingo County to end the martial law that had been declared in the area, free imprisoned miners, and organize the county. However, the anti-union Sheriff Don Chafin of Logan County, his private army, and Blair Mountain stood directly in the miners' way (Shogan 2004: 166). Logan County was a major coal operator stronghold, and Don Chafin was the main agent of operator control in the county. Operators paid Chafin fees for his deputies, and the Logan County law enforcement in turn prevented union organizers from entering the county through intimidation, beatings, and murder (Wheeler 1976: 79; Blizzard 2004: 226).

Miners began gathering near the state capitol of Charleston around 7 August 1921, and by the 24th had grown into a force of roughly 10,000  (Blizzard 2004: 200). The type of march that the miners planned to engage in had a long tradition in Appalachian labor movements (Blizzard 2004: 208). Miners would congregate and hold rallies and speeches for a number of days. They would then march through the countryside proselytizing about the union, much in the same manner as the great tent revivals in frontier America during the 1800s. But with the coal operators' increasing use of violence, these marches became militarized. By 1921, both sides had accumulated a large store of weaponry including machine guns and high-powered rifles (Blizzard 2004: 208).

The miners moved out from Charleston on the 24th of August toward Mingo County (Savage 1990: 79).  Before the marchers travelled very far, the leaders of the regional UMW District 17 overtook the advancing army. They persuaded the miners to stop the march after conveying messages from Washington that the repercussions would be harsh if the insurrection continued (Wheeler 1976: 80). The

miners grudgingly turned back and waited for trains that had been arranged to move them out of the area (Savage 1990: 86-9). But the trains arrived late, and in the meantime the shaky truce was shattered by a deadly night incursion of Sheriff Chafin's men into union territory (Blizzard 2004: 256). The march was back on, and the miners were even more determined break Don Chafin's defenses and reach Mingo (Savage 1990: 107).


## THE BATTLE

### On to Mingo

By the 28th of August, skirmishes between scouting parties of the enclosing forces began to break out in the area around Blair Mountain (Associated Press 29 Aug. 1921:1). The first day of open war began on the morning of the 31st, with the miners starting their assault on the entrenched defenses of Don Chafin's army (Wheeler 1976: 81). The most intense fighting was reported to be concentrated at Blair Gap, Crooked Creek Gap and Beech Creek Gap (Savage 1990: 117). An Associated Press correspondent observed some of the action at the center of the three-mile defensive line at Crooked Creek (AP 1 Sept. 1921:1). This line was linked to other defensive positions stretched over ten miles along the ridges, with machine guns overlooking the hollows that rose to the gaps (see figure 2) (Ayers *et al.* 2006:13). Miners attempted numerous times to assault these strongholds, but heavy machine gun fire held them back (AP 1 Sept. 1921:1).

On September 1st, a force of roughly 500 miners assaulted Craddock Fork, a hollow that runs to Crooked Creek Gap. Three hours of constant fire resulted in one of the Logan defender's machine guns jamming. With this lull, the miners rushed and broke through the lines (Shogan 2004: 197). Before sunrise on the 2nd of September it was reported that the miners were less than a mile from Logan (Savage 1990: 137). This crucial part of the battle remains murky due to the fact that until recently the

only evidence about the battle was historical documents, which had inherent biases within them. The

miners would not speak to reporters or allow them into the territory they controlled. This meant that the

Logan defenders controlled information coming out of the region, and they heavily censored it to

downplay the miners' success (Savage 1990: 137).



**Figure 2:** Unscaled map of the Blair Mountain Battlefield, redrawn and modified from Meador 1991:60.
The defensive lines from Blair Gap to Mill Creek extended over ten miles, with the gaps fortified the
heaviest.

On the 2nd of September, federal troops were mobilized into West Virginia and began moving

into position behind both armies (Wheeler 1976: 81). By the fifth of September, the whole warfront was

quiet (Associated Press Sept. 6 1921: 13). During the roughly five days of fighting, it is estimated that

over one million rounds were fired (Ayers *et al*. 2006: 2). A search for bodies and cached weapons

began soon after the shooting ceased, but these efforts were fruitless because the miners had carried

away all their casualties. Estimates put the number of miners killed during the battle at an exceptionally

low number at around 20 people. The true number of casualties remains unknown due to the miners'

continued silence regarding their dead and wounded (Blizzard 2004: 269).

In the aftermath of the insurrection, the UMW was severely weakened in West Virginia. Coal

operators and the state of West Virginia felt they could deal a deathblow to the union, and they took

advantage of the situation (Blizzard 2004: 288). Leaders of the strike were tried on charges of treason

against the state, and the lengthy trial drained the UMW's funds (Blizzard 2004: 300). By the end of the

1920s only 512 union miners remained in West Virginia, a drop that was part of an overall nationwide

decline in labor (Blizzard 2004: 343). But after the passage of the National Industrial Recovery Act in

1933, the southern coalfields rapidly organized and became a stronghold of union working class culture

throughout the twentieth century.


**CONTEMPORARY CONFLICTS IN THE COALFIELDS**

Today, the Blair Mountain battlefield is the site of new conflicts due to proposed mountaintop

removal operations (MTR) at the site. Because of the imminent threat from MTR, Blair Mountain's

historical significance as a place of resistance is being reinterpreted in the contemporary struggle against

MTR. The red bandanas worn by the union miners in 1921 have reemerged, this time tied around the

necks of anti-MTR activists. With this 'rediscovery' of Blair Mountain, community activists are

transforming their understanding of their own struggle and its historical contextualization. In the

process, they layer new meaning and remembrance to the site, and are involved in "active placemaking"

through the creation of a "rallying point" in the fight against MTR  (Badcock and Johnson 2009: 139;

Foote 2003: 32).  Archaeological work has been a crucial part of the preservation and reinterpretation of the mountain.

**Blair Mountain's Nomination to the National Register**

Until recently there has been a relative lack of archaeological interest in Blair Mountain except for Kenneth King – a local resident, self-trained archaeologist, and grandson of a union miner that fought in the battle. King has spearheaded the preservation efforts since 1991, and has initiated and participated in most of the archaeological research undertaken at Blair Mountain. In 2006 Dr. Harvard Ayers conducted an archaeological survey at the site in cooperation with King. The survey has served to clarify the historic record, promote awareness of the site, and advance the movement for preservation. Fifteen sites were located in the survey and the investigators concluded that the overall battlefield has a high degree of integrity for 14 out of the 15 sites surveyed (Ayers *et al.* 2006: 14). Ayers and King, along with Dr. Barbara Rasmussen from West Virginia University, led the effort to nominate Blair Mountain to the National Register of Historic Places (NHRP) in 2005. Their efforts resulted in the mountain's placement on the NHRP on 30 March 2009.

This victory was shattered on 7 July 2009 when local newspapers announced that Massey Energy Company was challenging the nomination to the National Register. On 10 January 2010, the site was officially taken off the list. The coal operators' opposition was based on objections of property owners to the listing, for which a simple majority was needed for the site to be removed. The initial vote was 35 owners in favor of listing and 22 objectors. But immediately after the listing the West Virginia State Historic Preservation Officer found that eight letters had been miscounted. After the changes were made, the final count became 30 objectors against the listing to only 27 in favor. This resulted in the process of delisting beginning in July of 2009.  Dr. Harvard Ayers and an attorney investigated these objector

claims and discovered that five were not legal objectors (Ayers pers. comm. Jan. 10 2010). In fact,

Ayers and his attorney found that two of the objectors were dead –– one person for over 27 years!

Even with these findings, the WV SHPO refused to reevaluate the listing on grounds that it fell

outside of their duties as pertained to federal code 36 CFR 60, which regulates the NHRP.  The National

Park Service and Keeper of the Register strongly recommended the WV SHPO to investigate Ayers'

claims and resubmit the listing, but could not force the state agency to do so. On December 30, 2009, the

site was delisted and returned to eligible status on Section 106 regulation. While this affords the

battlefield certain protections, in the southern coalfields of West Virginia where coal owners still wield

enormous influence, Blair Mountain's future is now precarious. This next part discusses in more detail

the threat to both the mountain and the heritage it embodies, as well as its reinterpretation in the context

of a grassroots social movement.


**Mountaintop Removal**

Mountaintop removal is an extremely destructive form of coal extraction employed primarily in

impoverished regions of central Appalachia. Large swaths of forest are cleared, and the entire soil

surface is stripped to the bedrock (House and Howard 2009:1). Explosives are then used to blast the rock

until a coal seam is exposed, and the mountain overburden is pushed into surrounding valleys, known as

valley fill (Palmer 2010:148). The entire coal extraction process, including washing the coal to make it

'clean', creates a large amount of toxic residue that is disposed of throughout the Appalachian landscape

in large earthen dams or abandoned mines. As a result, serious health issues linked to the toxicity of the

groundwater are prevalent throughout the region (Palmer 2010: 148). The scale of MTR operations is

huge; the EPA calculates that over 1.4 million acres of land will be destroyed by the end of 2010 (House

and Howard 2009: 2).

The largest conductor of MTR mining, Massey Energy Company, is also the primary foe of the UMWA due to the company's vehement anti-union position (Burns 2007: 27; UMW Journal May/June 2009: 12). Overall the southern coalfields of West Virginia, which were bastions of union solidarity from the 1930s through the 1990s, are turning anti-union with the increase in MTR operations (Burns 2007: 27). The majority of mountaintop removal operations are non-union; many union deep-shaft miners grumble about losing jobs to what they consider the 'heavy equipment operators' on surface mines.  MTR, coupled with increasing mechanization of the coal industry, has caused a precipitous drop in mine employment in West Virginia. In 1970, there were 45,261 miners employed in the state. In 2002, that number was 15,377 and declining (Burns 2007: 13). All the while, coal production during this time increased from 143 million tons to 163 million tons of coal mined annually (13).

The impact of MTR on Appalachian life and culture is one of the most important aspects of the MTR issue. There is a strong tie of Appalachian people to the land – the mountains are the backbone of our culture. Denise Giardinia, a writer of Appalachian life, best expresses what the mountains and their destruction mean to many of us:

> In the hundred odd years since the coal industry came to this part of West Virginia, land has been taken, miners have been worked to death, streams have been polluted, piles of waste have accumulated, children have grown up in poverty. But throughout all the hardships…the mountains have essentially remained. They were symbols of permanence, strength, hope. No more. Nothing worse can be taken from mountain people than mountains. The resulting loss is destroying the soul of the people.
>
> (Giardinia 2005)

This statement expresses the sense that many local residents, some of whose families have lived in the area for up to ten generations, feel about the destruction of a landscape that is richly embedded with history and meaning (Anschuetz *et al.* 2001: 173; Ballard 2002: 19-22; Foote 2003: 32; Johnson 2007; Wilson and David 2002). The important interrelationships between memory, identity, and place in Appalachian social construction are being unraveled with the destruction of the mountains.

**Placemaking and Resistance at Blair Mountain**

Kenneth Foote notes that four modes of commemoration exist for sites of tragedy or violence –

sanctification, designation, rectification, and obliteration (2003: 7). While the dynamics of the Blair

Mountain site contains elements of all four of these modes, the most significant is that of 'obliteration'.

For in a very literal and irreversible sense MTR operations would completely erase the landscape of

Blair Mountain and its inscribed meaning. The threat from MTR at Blair Mountain has caused the site

and its historical significance to be thrust back into remembrance in a context where community

activists are once again contending against the power of the coal industry. As Foote notes, this

"emergence often spurs extensive public debate over the meaning and significance of the original

tragedy and, as a consequence, lends insight into the sentiments and social forces that shape landscape"

(Foote 2003: 32-33). Although West Virginia has a long and rich tradition of activist movements, this

history is mostly absent in West Virginian education and discourse. Appalachians' activist streak may be

one of our most valuable hidden treasures, and we intend for our work at Blair Mountain to expose this

aspect.

An interesting example of how Blair Mountain is drawn upon by the activist community is seen

in an article from the Ohio Valley Environmental Coalition's newsletter *Winds of Change*. Terry and

Wilma Steele, a union mining family who are prominent activists in the anti-MTR movement, wrote a

recent article titled 'United against MTR: red bandanas, dreadlocks, clean-cut, old folks and young'

(2009:25). In this piece, the Steeles explain how Blair Mountain intersects environmental and labor

issues (Steele and Steel 2009: 25).  The Steeles discuss two Labor Day events from the summer of 2009

– one sponsored by the UMW near Racine, WV (to the east of Blair Mountain), and the second held by

Massey in Logan County (just west of Blair Mountain). Terry and Wilma state that directly between stands Blair Mountain, both spatially and metaphorically.

In the article, the authors use the name Don interchangeably to discuss both Don Blankenship (CEO of Massey Energy Company) and Don Chafin in the context of past and present conflicts,

> On the right is Don standing at Logan…with his bought judges, DEP [Department of Environmental Protection] agents and many misled souls. Don stands with promises of jobs and security. In one hand, is a new mining permit, and in the other is dynamite. In his heart and mind is power to put down the UMWA, the environmentalists, and to mine coal his way: nonunion, unregulated, any way he wants!" (25).

They continue:

> Eighty-eight years ago in the months of August and September another Don, backed by big coal and Gov. Morgan, rained down explosives on Blair Mountain and the union miners. There were many red bandanas streaked with blood and sweat but redeemed by honor and courage….Now, another Don, backed by big coal and Gov. Manchin, is trying to remove Blair Mountain from the Historic Register. Don has it in his crosshairs and armed with explosives, he plans to blast it away (25).

Terry and Wilma then go on to directly call upon the history of Blair Mountain, describing the anti-MTR movement in a merging of past and present, "Standing up to these giants is a ragtag, multicultural, red bandana army made up of old UMWA miners, their families and environmentalists...Their mission: stop MTR!"  In all this, concerned citizens such as the Steeles are drawing on and adding to a rich history of activism in Appalachian culture. They are producing their own conceptions of their history that is prideful and meaningful to them based upon traditional themes important in Appalachian life, and containing information about the past that can be used in today's struggles.  In this process they layer new meaning onto Blair Mountain and are involved in "active placemaking" (Badcock and Johnson 2009).

## ARCHAEOLOGY AND POLITICAL ACTION

### Don't Spend Time Mourning…Organize!

It may seem that the situation in West Virginia is overly bleak, but there is much to be optimistic about. Communities are fighting back, coalitions are being formed and attention is beginning to be drawn to the situation in the coalfields regarding MTR. Blair Mountain is starting to move from obscurity into potentially transformative historical remembrance. We intend for our research to advance both causes, because we see them as interlinked.  Our overall research is not limited to investigating the archaeology of Blair Mountain; it also involves community engagement and political action.  For us it is necessary to stand on the picket lines, attend the meetings, and work closely with communities to best address their concerns. These actions are not undertaken just for academic purposes, but rather because issues such as MTR affect ourselves and people we care about.

### Emancipatory Archaeology

Research for our archaeological work at Blair Mountain is framed by "an emancipatory theory for the working class" (Duke and Saitta 1998; McGuire and Reckner 2003; McGuire and Walker 2003; Wood 2002). This activist theory builds upon innovations from feminist, Indigenous, African-American, and Marxist standpoints to construct archaeological research that engages working or lower class families (Blakey and LaRoche 1997; Conkey and Spector 1984; Conkey 2005; Franklin 2001; Harding 2004; McGuire 1992, 2008; Watkins 2000; Zimmerman 2005). The overarching concerns of a working-class archaeology are to analyze, illustrate, and discuss the experiences of workers in the past in order to facilitate social change and understanding in the lives of workers today (Duke and Saitta 1998:1). It is at core collaborative and seeks to engage community members and other stakeholders in the process of knowing and writing their history (Duke and Saitta 1998: 6).

Emancipatory archaeology begins from the understanding that knowledge production, such as the construction of historical narratives, is itself a process of social construction (Conkey and Spector 1984; Fowler 1987; Hamilakis and Duke 2007: 25; Harding 2004: 1; McGuire 2008: 14; Shackel 2001: 656-7). Archaeology is political, and archaeological methods and interpretations have often bolstered inequalities and asymmetrical social relationships (Conkey and Spector 1984; Trigger 2006; McGuire and Walker 1999: 159; Smith 2004: 1; Wobst 2005: 18). But archaeology also has the power to be transformative or emancipatory for marginalized people around the world. In recent years, many scholars have worked to realize this potential by building an engaged archaeology (Blakey 1997; Colwell-Chanthaphonh and Ferguson 2006; Conkey 2005; Faulkner 2000; Green *et al*. 2003; Hamilakis 2005; McGuire 2008; Shackel 2004; Smith 2007: 160). Part of this shift is to look at the practical applications of archaeology to the lives of subordinate peoples and constructing alternate ways of engaging with various communities.

The base of our activist research is long-term commitment to local communities, and our research at Blair Mountain is being developed with short and long term goals in mind (Harris 2005; Zimmerman 2005; Wobst 2005). These objectives are drawn from engagement with multiple groups including descendants of combatants, labor organizations, local residents, and community organizations. From our initial discussions, we have identified three goals that various stakeholders have expressed interest in – preservation of the battlefield, building a museum or center at the site (as per McGuire and Reckner 2003), and developing it in a commemorative way such as an interpretive hiking trail (as per Gonzalez 2007).

Tied into these goals are research questions drawn from the various stakeholders. Some questions relate to the military movements of the combatants and the locations where heavy fighting occurred. Other local residents have expressed interest in the common, everyday aspects of mining life –

the 'what was it like back then for my grandma or grandpa' question. This is something to which

historical archaeology is well suited to answer due to its ability to combine documentary evidence with

material culture studies. Another area of interest for local community members and activists is the larger

political context of the miners' struggles and its relation to contemporary social problems in Appalachia.

For this concern, we utilize the materialist dialectic as a metaphor to explain social change and to link

the historical processes between past and present struggles. In addition we utilize a Gramscian-style

(1971) analysis of hegemony in order to examine the way in which the power of the coal operators was

maintained and contested. By understanding the above three areas of interest as a nestled hierarchy, we

can move from the particulars of the battle to the everyday conditions of the mining families, and then to

the larger process and institutions underlying the labor conflict. Tracing these institutions and structures

historically through time in a dialectic framework will allow us to situate the political struggles in the

coalfields today.

    The process of building an emancipatory archaeological program at Blair Mountain is still in its

initial stages. The primary focus of this beginning phase is identifying and engaging possible

stakeholders.  Because we are native West Virginians and activists within the anti-MTR movement,

certain social networks are open to us that we can draw upon in our organizing efforts.  This has enabled

us to meet and collaborate with key community members in the immediate locale of Blair Mountain, as

well as local historians, descendants of the combatants, modern day union members, and environmental

groups.

    We are currently developing networks between various stakeholders to establish a base of

support for preservation and commemoration efforts. This summer (2010), we will begin giving

informal tours of the site to UMW miners and local community members. Additional commemorative

and educational events are being planned such as a march and rally for the 90th anniversary of Blair

Mountain in 2011. This event will involve a variety of academic, labor, community, environmental, and historical preservation groups. Blair Mountain is particular in the aspect in that it is a major labor heritage site that has become significant for a grassroots environmental movement that is largely working class. This intersection of concerns that the mountain embodies has enormous potential to further dialogue between labor and environmental groups.

Currently, avenues to cultivate heritage tourism at the site are being discussed, such as developing ecologically low-impact hiking trails with educational markers that describe the history of the battle (as per Gonzalez 2007). Additionally, Kenneth King has long been a proponent of a museum or tourism center near the mountain that discusses the history and labor struggles of the region. This is one of the long-term goals of our involvement, and we are attempting to lay the groundwork for a major investment such as a museum. We are also currently in the process of gathering and archiving key documents and artifacts regarding the miners' insurrection in 1921, with plans to curate them within the community. In addition, the data from the archaeological surveys as well as historical documents are being digitized and entered into a central database, with the intention of giving this to the WV State Historic Preservation Office to be stored for future scholars. These projects will serve to educate the public about Blair Mountain and its role in local history, and work to preserve its significance for future generations.

**Future Archaeological Work**

Archaeological work at Blair Mountain will continue with collaborative and collectivist methods. We are building upon the work of Ayers and King in exploring and documenting more sections of the battlefield. The ongoing archaeological research of the site is tied directly to the preservation of Blair Mountain, the betterment of the surrounding community and facilitating discussion of labor history.

Future archaeological investigations promise to be exciting and rich with large areas of the battlefield yet to be examined. In addition, we are currently attempting to locate contextual tent colonies that housed striking miners in order to broaden the social dimension of our research.  This will allow us to look at aspects of mining community life such as racial, ethnic and gender dynamics (Ludlow Collective 2001; Wood 2002).

Currently, we are surveying and locating the approaches and positions of the miners, which has had relatively little prior investigation. Archaeological investigations have just begun to shed light on the heavy fighting along Crooked Creek.  From the survey conducted in 2006, the large quantity of bullets, short-range casings, and evidence of close-quarter fighting behind the defensive line suggests this location was the site of a break through (Ayers *et al*. 2006: 7). In addition, this location may have been only one of multiple instances of breakthroughs of the defensive lines due to similar evidence at other hotspots (Ayers *et al.* 2006:15-16). Current archaeological research is focusing on these locations in order to analyze the timeline and movements of the attackers.  Our analysis utilizes Geographic Information Systems software to model the topography and analyze viewsheds, line of sight, weaponry ranges, and artifact patterning across the battlefield to more accurately understand troop movement.


**CONCLUSION**

Blair Mountain is a standing reminder of the long struggle for labor rights in West Virginia. Central Appalachia has for generations been a central battleground between owners and workers, even though the region has largely been decentered in both labor and American history.  We intend for this article to illustrate the fact that West Virginians have struggled for generations for the basic human rights to live and work in decent conditions. Especially important is the understanding that the conflicts of the early twentieth-century are not detached from present struggles. While the issues and conditions

may have changed, they are still instances in a steady stream of exploitation and resistance that continues today.

The issues discussed in this chapter are found not only in Appalachia. The deep structural problems we face are ones that many people globally are contending with – from indigenous peoples to inner city youth to factory workers in China. Activist research can and should be part of their struggle, serving to illuminate, connect, and improve the lives of people living in systems of exploitation and domination. We hope this chapter demonstrates some ways in which collaborative efforts between academics, environmentalists, labor unions, social justice advocates, and other community organizations can be used in the betterment of workers lives today.

## BIBLIOGRAPHY

Anschuetz, K.F., Wilshusen, R.H. and Scheick, C. (2001) 'An archaeology of landscapes: perspectives and directions'. *Journal of Archaeological Research*, 9(2): 157-211.

Associated Press (29 August 1921) 'Mingo Marchers Fight With Police; Five Miners Fall', *New York Times*: 1.

--- (6 September 1921) 'Policing by the Army', *New York Times*: 13.

Ayers, H., Rothrock, Z. and King, K. (2006) *Archaeological Investigations of the Battle of Blair Mountain: May 13 to November 19, 2006*, on file (unpublished), West Virginia State Historic Preservation Office.

Badcock, A. and Johnston, R. (2009) 'Placemaking through protest: an archaeology of the Lees Cross and Endcliffe protest camp, Derbyshire, England'. *Archaeologies*, 5(2): 306-322.

Bailey, R. (2001) *Matewan before the Massacre*, dissertation. Morgantown, WV: West

Virginia University.

Ballard, C. (2002) 'The signature of terror, violence, memory, and landscape at Freeport.

In B. David and M. Wilson, eds. *Inscribed Landscapes: Marking and Making*

*Place*. Honolulu: University of Hawaii Press: 13-24.

Blakey, M. and LaRoche, C. (1997) 'Seizing intellectual power: the dialogue at the New

York African-American Burial Ground', *Historical Archaeology* 31: 84-106.

Blizzard, W.C. (2004) *When Miners March*. Gay, WV: Appalachian Community

Services.

Burns, S.S. (2007) *Bringing Down The Mountains,* Morgantown: West Virginia

University Press.

Colwell-Chanthaphonh, C. and Ferguson, T.J. (2006) 'Memory pieces and footprints:

multivocality and the meanings of ancient times and ancestral places among the Zuni

and Hopi'. *Current Anthropology* 108: 148-162.

Corbin, D.A. (1981) *Life, Work, and Rebellion in the Coal Fields,* Chicago: University of

Illinois Press.

Conkey, M. (2005) 'Dwelling at the margins, action at the intersection? Feminist and

Indigenous Archaeologies', *Archaeologies* 1: 9-59.

Conkey, M. and Spector, J. (1984) 'Archaeology and the study of gender', *Advances in*

*Archaeological Method and Theory* 7: 1-29.

Duke, P., and Saitta, D.J. (1998) 'An emancipatory archaeology for the working class',

*assemblage* 4. Online journal. Available HTTP: http://ads.ahds.ac.uk/catalogue/

_adsdata/assemblage/html/4/4duk_sai.html (accessed 11 July 2009).

Durrenburger, Paul (2006) 'On the invisibility of class in America'. *Anthropology News*

47: 9-10.

Faulkner, N. (2000) 'Archaeology from below'. *Public Archaeology* 1(1): 21-33.

Fishback, P.V. (1995) 'An alternative view of violence in labor disputes in the early

   1900s: the bituminous coal industry, 1890-1930'. *Labor History*, 36(3): 426-456.

Foote, K.E. (2003) *Shadowed Ground: America's Landscapes of Violence and Tragedy*

   2nd ed., Austin: University of Texas Press.

Fowler, F. (1987) Uses of the past: archaeology in service of the state. *American*

   *Antiquity* 52(2): 229-248.

Franklin M. (2001) 'A black feminist inspired archaeology?' *Journal of Social*

   *Archaeology* 1: 108-125.

Giardina, Denise (June 2005) 'The Battle of Blair Mountain….revisited', *Appalachian*

   *Voices*. Online Journal.  Available HTTP: http://www.appvoices.org/index.php?/

   _site/ voice_stories/the_battle_of_blair_mountainrevisited/issues/29 (accessed

   13 September 2009).

Gonzalez, Sara (2007) 'Making pathways through traditions: an update on the Kashaya

   Pomo Interpretive Trail Project.  *Society for California Archaeology Newsletter*

   41(1): 42-3.

Gramsci, A. (1971) *Selection from the Prison Notebooks of Antonio Gramsci*, ed.

   by Q. Hoare and G.N. Smith, New York, NY: International Publishers.

Hamilakis, Yannis (2005) 'Whose world and whose archaeology? The colonial present

   and the return of the political'. *Archaeologies: Journal of the World Archaeological*

   *Congress* 1(2): 94-101.

Hamilakis, Y. and Duke, P. (2007) 'Archaeology and Capitalism'. *Left Coast Press*,

Walnut Creek, CA.

Harding, S. (2004) 'Introduction: standpoint theory as a site of political, philosophical,

and scientific debate, in S. Harding (ed.) *The Feminist Standpoint Theory Reader*. New

York, NY: Routledge: 1-15.

Harris, H. (2005) 'Indigenous worldviews and ways of knowing as theoretical and

methodological foundations for archaeological research', in C. Smith & H. M. Wobst,

(ed.) *Indigenous Archaeologies: Decolonizing Theory and Practice*.  New York, NY:

Routledge: 33-41.

House, S. and Howard, J. (2009) *Something's Rising: Appalachians Fighting*

*Mountaintop Removal*. Lexington, KY: The University Press of Kentucky.

Johnson, M. (2007) *Ideas of Landscape*, Malden, MA: Blackwell Publishing.

LaRoche, C., and Blakey, M. (1997) 'Seizing intellectual power: the dialogue at the New

York African Burial Ground. *Historical Archaeology* 31(3): 84–106.

Little, B., and Shackel, P. (2007) *Archaeology as a Tool of Civic Engagement*, Lanham,

MD: AltaMira Press.

Ludlow Collective, The (2001) 'Archaeology of the Colorado Coal Field War 1913-

1914', in V. Buchli and G. Lucas, (eds.) *Archaeologies of the Contemporary Past*, New

York, NY: Routledge: 94-107.

McGuire, R.H. (1992*) A Marxist Archaeology*, Academic Press, Orlando, Fla.

--- (2008) *Archaeology As Political Action*, Berkeley: University of California Press

McGuire, R.H. and Reckner, P. (2003) 'Building a working-class archaeology: the

Colorado Coal Field War Project', *Industrial Archaeology Review* 25: 83-95.

McGuire, R.H. and Walker, M. (1999) 'Class confrontations in archaeology. *Historical*

*Archaeology* 33: 159-183.

Meador, M. (1991) 'The Redneck War of 1921: the Miner's March and the Battle of

    Blair Mountain, in *The Goldenseal Book of the West Virginia Mine Wars*, edited by K.

    Sullivan, Charleston, WV: Quarrier Press.

Palmer, M. A., E. S. Bernhardt, W. H. Schlesinger, et al. (2010) 'Mountaintop mining

    consequences'. *Science* 327: 148-149.

Savage, L. (1990) *Thunder in the Mountains: The West Virginia Mine War 1920-21*,

    Pittsburgh, PA: University of Pittsburgh Press.

Shackel, P.A. (2001) *Myth, Memory, and the Making of the American Landscape*.

    Gainesville: University Press of Florida.

Shogan, R. (2004) *The Battle of Blair Mountain: The Story of America's Largest Labor*

    *Uprising*. Boulder, Colorado: Basic Books.

Smith, L. (2004) *Archaeological Theory and the Politics of Cultural Heritage*. London:

    Routledge.

--- (2006) *Uses of Heritage*. London: Routledge.

--- (2007) 'Empty Gestures? Heritage and the politics of recognition', in *Cultural*

    *Heritage and Human Rights*: 159-171.

Steele, T. and Steele, W. (2009) 'United against MTR: Red bandanas, dreadlocks, clean-

    cut, old folks and young', *Winds of Change*, newsletter of the Ohio Valley

    Environmental Coalition, October 2009, Huntington, WV.

Trigger, B. (2006) *A History of Archaeological Thought*, 2nd ed. Cambridge: Cambridge

    University Press.

United Mine Workers (May/June 2009) 'Don's World: Massey Energy's CEO defines a

rogue coal company, *United Mine Workers Journal* 120(3): 10-13.

Watkins, J. (2000) *Indigenous Archaeology: American Indian Values and Scientific Practice*. Walnut Creek, CA: Alta Mira Press

Wheeler, H.N. (1976) 'Mountaineer Mine Wars: an analysis of the West Virginia Mine Wars of 1912-1913 and 1920-1921', *The Business History Review*, 50(1): 69-91.

Wilson, M. and David, B. (2002) 'Introduction', in B. David and M. Wilson (eds.) *Inscribed Landscapes: Marking and Making Place*.  Honolulu: University of Hawaii Press: 1-9.

Wobst, H.M., (2005) 'Power to the (indigenous) past and present! Or: The theory and method behind archaeological theory and method', in C. Smith & H. M. Wobst, eds. *Indigenous Archaeologies: Decolonizing Theory and Practice*.  New York, NY: Routledge: 17-32.

Wood, M.C. (2002) Women's work and class conflict in a working-class coal-mining community, in M. O'Donovan (ed.) *The Dynamics of Power*, Occasional Paper 30. Center for Archaeological Investigations, Southern Illinois University Carbondale: 66-87.

Zimmerman, L.J. (2005) 'First, be humble: working with Indigenous Peoples and other descendant communities', in C. Smith and H.M. Wobst (eds.) *Indigenous Archaeologies: Decolonizing Theory and Practice*. London: Routledge: 301-314.

# Exhibit D

TO:
Hon. Ken Salazar
Secretary, US Department of Interior
1849 C. Street, N.W.
Washington, D.C. 20240
kensalazar@ios.doi.gov

AND:
Ms. Carol D. Shull
Keeper of the National Register of Historic Places
and Chief of the National Historic Landmarks Survey
National Park Service
1201 Eye St., NW
Washington, D.C. 20005
carol_shull@nps.gov

AND:
Ms. Susan Pierce
Director, State Historic Preservation Office
West Virginia Division of Culture and History
The Culture Center
Capitol Complex
1900 Kanawha Boulevard East
Charleston WV 25305-0300
susan.m.pierce@wv.gov

---

# An Open Letter to the
# U. S. National Park Service and the
# West Virginia
# State Historic Preservation Office

_____

As citizens concerned with the faithful representation of America's rich and often
turbulent national history, and as scholars and artists whose work has touched upon
the history of coal mining labor in West Virginia and beyond, we write to express our
strong opposition to the National Park Service's de-listing of Blair Mountain as a site

of national historic significance, and to support the legal challenge to that decision launched by the Sierra Club, the Ohio Valley Environmental Coalition (OVEC), Friends of Blair Mountain and the West Virginia Labor History Association. Many of us have worked productively with the Park Service in public history and heritage preservation projects in the past, and are hopeful that this mistaken decision can be quickly reversed.

As you are no doubt aware, Blair Mountain is the site of the largest armed insurrection on U.S. soil since the Civil War, and one of the most significant events in American labor history. In 1993 a Congressionally-mandated 'Labor History Theme Study' by ten historians for the National Landmarks Program recommended Blair Mountain as a landmark site. Both the site's importance in our national history and the urgency of adopting energetic measures to preserve it were recognized again in 2006, when the National Trust for Historic Preservation designated Blair Mountain one of America's 11 Most Endangered Historic Places. The National Park Service seemed to accept that logic when, in March 2009, it included Blair Mountain in the National Register of Historic Places. We are deeply concerned at the reversal of that decision in the face of pressure from coal companies eager to strip mine the area, and alarmed by very recent reports that mining equipment is already being moved onto the site. We therefore respectfully urge the National Park Service to immediately re-list Blair Mountain on the National Register of Historic Places.

Signed,

Thomas G. Andrews
Assistant Professor of History, University of Colorado at Denver
Author, , 'Battle of Blair Mountain'—featured on West Virginia Public Television

Harvard Ayers
Professor Emeritus of Anthropology, Appalachian State University
Principal Investigator, Blair Mountain Archaeological Project

Stephen Brier
Professor in Urban Education, City University of New York
Co-author, *Who Built America? Working People and the Nation's Economy, Politics,*Culture and Society

Colin J. Davis
Professor of History, University of Alabama at Birmingham
Co-editor, *'It is Union and Liberty': Alabama Coal Miners and the UMW*

Alan Derickson
Professor of Labor Studies and American History, Penn State University
Author, *Workers' Health, Workers' Democracy: The Western Miners' Struggle, 1891-1925*

Hazel Dickens
Singer and Songwriter from Mercer County, West Virginia; National Heritage Award Recipient; Inducted into the West Virginia Music Hall of Fame
Writer, "West Virginia, My Home"

Traci JoLeigh Drummond

Archivist, Southern Labor Archives at Georgia State University Library

William Ferris
Joel R. Williamson Eminent Professor of History, University of North Carolina at Chapel Hill
Senior Associate Director, Center for the Study of the American South

Leon Fink
Distinguished Professor of History, University of Illinois at Chicago
Editor, *Labor: Studies in Working-Class History of the Americas*

Kenneth Fones-Wolf
Professor of History and Stuart and Joyce Robbins Chair, West Virginia University
Author, *Glass Towns: Industry, Labor and Political Economy in Appalachia, 1890-1930s*

Denise Giardina
American Book Award-Winning Novelist born in Bluefield, West Virginia
Author, *Storming Heaven.*

James Green
Professor of History and Labor Studies, University of Massachusetts at Boston
Associate Producer, Out of Darkness: The Mine Workers' Story
Author, *'The Devil is Here in These Hills': The West Virginia Mine Wars and the Meaning of Freedom in Industrial America* (forthcoming, Pantheon)

Cindy Hahamovitch
Professor of History, College of William and Mary
President, Southern Labor Studies Association

Jacquelyn Dowd Hall
Julia Cherry Spruill Professor of History, University of North Carolina at Chapel Hill
Director, Southern Oral History Program

Wess Harris
President, Appalachian Community Services; 2009 West Virginia History Hero
Editor and Publisher, *When Miners March*

Brian Kelly
Reader in US History, Queen's University Belfast (N. Ireland); Fellow of the W. E. B. Du Bois Institute, Harvard University, Author, Race, Class and Power in the Alabama Coalfields, 1908-1921

Kevin Kenny
Professor of History, Boston College
Author, *Making Sense of the Molly Maguires*

Barbara Kopple
Independent Filmmaker, Cabin Creek Films
Producer and Director, Harlan County USA

Robert Korstad

Professor of Public Policy and History, Duke University
Co-author, *To Right These Wrongs: The North Carolina Fund and the Battle to End Poverty and Inequality in 1960s America*

John H. M. Laslett
Professor Emeritus of History, University of California at Los Angeles
Editor, *The United Mine Workers: A Model of Industrial Solidarity?*

Daniel Letwin
Associate Professor of History, Penn State University
Author, *The Challenge of Interracial Unionism: Alabama Coal Miners, 1878-1921*

Ronald L. Lewis
Professor Emeritus of History, West Virginia University
Author, *Transforming the Appalachian Countryside: Railroads, Deforestation, and Social Change in West Virginia, 1880-1920*

Alex Lichtenstein
Associate Professor of History, Florida International University
Author, *Twice the Work of Free Labor: The Political Economy of Convict Labor in the New South*

James W. Loewen
Visiting Professor of African American Studies, University of Illinois
Author, *Lies Across America: What Our Historic Sites Get Wrong*

Scott Reynolds Nelson
Legum Professor of History, College of William and Mary
Author, *John Henry: Steel Drivin' Man—The Untold Story of an American Legend*

Brandon Nida
Doctoral Candidate in Archaeology, University of California Berkeley
Project Partner, Blair Mountain Archaeological Project

Kimberley L. Phillips
Frances L. and Edwin L. Cummings Associate Professor of History, College of William and Mary
President, Labor and Working-Class History Association

Barbara Rasmussen
Lead Historian for the National Register of Historic Places Nomination for Blair Mountain
Author, *Absentee Landowning and Exploitation in West Virginia, 1760-1920*

David Rovics
Singer and SongwriterAuthor, 'Battle of Blair Mountain'—featured on West Virginia Public Television

John Sayles
Screenwriter and Independent Film Director
Producer and Director,M a t ew a n

Karin A. Shapiro
Visiting Associate Professor of History, Duke University
Author, *A New South Rebellion: The Battle Against Convict Labor in the Tennessee Coalfields, 1871-1896*

Joe Trotter
Giant Eagle Professor of History and Social Justice, Carnegie Mellon University
Author, *Coal, Class and Color: Blacks in Southern West Virginia, 1915-1932*

Carl R. Weinberg
Editor, Organization of American Historians Magazine of History
Author, *Labor, Loyalty and Rebellion: Southwestern Illinois Coal Miners and World War I*

Robert H. Woodrum
Assistant Professor of History, Georgia Perimeter College
Author, *'Everybody Was Black Down There': Race and Industrial Change in the* Alabama Coalfields

# Exhibit E

## DECLARATION OF DR. HARVARD G. AYERS

I, Dr. Harvard G. Ayers, declare and have personal knowledge of the following matters:

1. My name is Harvard Ayers and I reside in Boone, North Carolina. I am an emeritus professor in the Department of Anthropology, Appalachian State University, 431 Sanford Hall, Boone, NC 28608.

2. I am a founding member of the Friends of Blair Mountain, a group that I started approximately three years ago and that was recently incorporated in August, 2010 in West Virginia as a non-profit organization. The Friends of Blair Mountain was formed to protect the historical and archaeological resources of the Blair Mountain battlefield.

3. Petitioner Friends of Blair Mountain was incorporated on August 2, 2010, in the state of West Virginia to protect the historic attributes of the 1600 acre Blair Mountain Battlefield in Logan County, West Virginia. Friends of Blair Mountain has undertaken efforts to educate the public and policymakers about the history and significance of Blair Mountain Battlefield and has supported the efforts to protect Blair Mountain.

4. Additionally, I am a current member of the Sierra Club and of its North Carolina Chapter's Blue Ridge Group, a local and national environmental and educational organization. I have been a member at various points since 1977. During my time as a Sierra Club member, I helped found the Blue Ridge Group and served as the state vice chair of the North Carolina chapter. The Sierra Club and its state chapters work to protect the environment, including areas of importance to Appalachian communities.

5. Petitioner Sierra Club is a national, non-profit environmental and conservation organization incorporated under the laws of the State of California, which maintains an office in the District of Columbia. The Sierra Club has more than 622,500 members nationwide, 2,000 of whom live in West Virginia and belong to its West Virginia Chapter, including members who reside near and are directly affected by the decision to remove the Blair Mountain site from the National Register of Historic Places. The Sierra Club is dedicated to exploring, enjoying, and protecting the wild places of the Earth; to practicing and promoting the responsible use of the Earth's resources and ecosystems; to educating and enlisting humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these objectives. The West Virginia Chapter of the Sierra Club has been involved in efforts to protect Blair Mountain for many years, participating in earlier campaigns to nominate the site, and providing grants to local residents and organizations to support their work at the site. Listing of the site in the National Register would allow Sierra Club members to enjoy this valuable resource and protect it for future generations. Sierra Club brings this action on behalf of itself and its adversely affected members.

6.  For approximately 40 years, I have been involved in the fields of anthropology and archaeology. As a professor, my work has focused on archaeology in the Southeastern United States and, in particular, the Southern Appalachians. I first became aware of the Blair Mountain site in 1999 through my contact with Kenny King, an area resident, which prompted further research.

7.  Beginning in 1999 and continuing to the present day, I have made several research trips to Blair Mountain. I intend to continue these trips in the future. Over the course of the past 11 years, I have made more than 15 trips to the area. I conducted an initial study of the area in 1999. In 2006, I undertook an extensive month-long archaeological study of the Blair Mountain battle sites. I was most recently in the area about one month ago. I currently have plans to return to the Blair Mountain area in June 2011 for a Blair Mountain rally. I have also taken students to the Blair Mountain site to conduct research, and have given tours to those individuals interested in Blair Mountain's history.

8.  In addition, along with Kenny King, I was filmed doing field archeology at the site of the Battle of Blair Mountain in 2007 by a TV crew shooting footage for the History Channel's "Hillbilly, the Real Story." That feature, which includes our work along with other broad-ranging topics on Appalachia, has been aired dozens of times over the last several years. In fact, I am now talking with the producers of that feature about doing an hour-long special focused just on the Battle of Blair Mountain, again for the History Channel. Further, on March 23, 2011, I was filmed by a CNN TV crew near Blair Mountain telling them about my involvement in Blair Mountain archeological research. They are making an hour-long feature on the Battle of Blair Mountain issue which is expected to be aired in late July of this year.

9.  During my 2006 research trip, I documented 14 archeological sites along a 10 mile battle front, stretching from Blair Crest to the Mill Creek Gap. Many of these sites contained hundreds of artifacts. Remarkably, until this 2006 study, none of the Blair Mountain archaeological sites had been professionally recorded. Previous research in the area was tenuous and largely hampered by the coal industry.

10. More archaeological work remains to be done at Blair Mountain—we have literally and figuratively only scratched the surface of the secrets of the battle that only the ground can reveal. I continue to work on Blair Mountain, and am in contact with other researchers who are undertaking studies in the area.

11. In addition to my professional work at the Blair Mountain site, I feel a personal connection to the site and the mountain itself. Much of the surrounding area has been destroyed by coal mining. It upsets me to think that Blair Mountain could similarly be destroyed. I hope to continue visiting the area in the future, but would be unlikely to do so if Blair Mountain is not designated as lands unsuitable for surface coal mining and is destroyed by mining or other activities.

12. In their current state, the battlefields maintain a high level of archeological integrity. However, activities like bulldozing have occurred where there are some mining permits.

2

Barring greater protection of the Battlesite through designating the lands there as unsuitable to surface coal mine, I fear that the battlefield sites at Blair Mountain will eventually be destroyed.

13.   Bulldozing this area to mine destroys the topsoil in which the artifacts are located. If continued and the site is not designated as land unsuitable for surface coal mining, these activities would compromise the integrity of these archaeological sites and would inhibit my ability to conduct future research at Blair Mountain. It would also inhibit my ability to visit and enjoy these sites, and would be like ripping pages out of the only history book on Blair Mountain.

14.   The archeological evidence that I have documented through my research at Blair Mountain tells a story of this battle that is incredibly important to labor history. From a historical and archeological perspective, it would be a travesty if this site were not preserved. If the Blair Mountain Battlefield is designated as land unsuitable for surface coal mining, it will be reassuring to me to know that this important historical, archaeological and cultural site will be preserved for myself and future generations alike and will not undergo surface coal mining.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct. Executed this ___6___ day of ___May___, 2011.

Dr. Harvard G. Ayers

# Exhibit F

**Report on Disturbance at the Blair Mountain Battlefield**
**Prepared by The Friends of Blair Mountain**
**July 11, 2010**

**Introduction**

The Blair Mountain Battlefield is the location of the 1921 industrial conflict between pro-union coal miners and anti-union coal operators and their agents. The battlefield stretches over eight miles as a bird flies, and roughly 14 miles following the ridges of the battlefield (see image 1 at the end of this report). The battlefield can be divided into four major sections, from north to south; Mill Creek, Crooked Creek, Beech Fork, and Blair Gap (see image 2). The Crooked Creek (CC) and Blair Gap (BG) areas, according to an archaeological survey undertaken in 2006, have evidence of heavy fighting. The Mill Creek (MC) area had some signs of conflict, and although this evidence was relatively small compared to CC and BG, the survey was preliminary and more work is needed in this area. The Beech Fork area is mostly unsurveyed. This report focuses on recent disturbance at the Blair Gap area.

The historical artifacts that relate to the battle are buried very shallow; usually within the first 5-6 centimeters of topsoil. Even the slightest disturbance has the potential to do great damage to the archaeological record. Five locations in the BG area have been impacted by bulldozing activity, including one previously documented site (46LG205) on file at the West Virginia State Historic Preservation Office, one previously unsurveyed site that shows evidence of being part of the 1921 defensive front, and two undocumented sites that have not been surveyed but which have great potential for being significant elements in the defensive line and overall battle.  Disturbance at all areas, except for the last one discussed in this report is thought to be from the same events that are estimated to have occurred 3-6 months ago, with the earliest they could have occurred being after last fall. This conclusion is based on the observations of local citizens and monitors as well as the lack of growth in the beginning of this summer (with most sprouts being 3-4 inches), and then a comparison one month later where the sites were found to have shown growth with grasses, weeds and other small plants standing roughly a foot tall. The

last site discussed in this report seems to be from a different event, one that is estimated to be from as late as this winter or spring. This is based on observation of monitors, and the freshness of the cut tree stumps at the site which have not shown quite as much signs of weathering as at the other sites.

**Disturbed Site 1**

The first location that disturbance was disovered at is a site in the Blair Gap area. This site was previously documented by Kenneth King in 1999, with a site report turned in to the WV SHPO.  It is within the battlefield boundaries, which has been declared eligible for listing on the National Register of Historic Places. It is located on a knoll that is roughly 400 meters northwest of the site called North Crest 1a. This site is near a gravel road that is the main access route in the northern part of the BG area. A smaller dirt access road runs from the gravel road, directly by Site 1, actually crosscutting the eastern part of the knoll upon which Site 1 is located. Artifacts have been found on both sides of the dirt road (see image 3).

The knoll has two spines running from it, one in a westerly direction, and the other in a north-north east direction. To the southeast of the knoll is the head of a hollow that runs down to White Trace Branch. This head of the hollow splits in two directions leading to the knoll – with one hollow leading to a gap to the north of the knoll (perpendicular to the north spine). The second leads to a gap south of the knoll, and then to a hollow that runs parallel to the westerly-running spine.

As documented by the 1999 site report submitted by Kenneth King, numerous artifacts relating to the battle were discovered at the site. Mr. King uncovered, recorded, and put back six of these artifacts, and left the rest undisturbed. Of these six artifacts, all were 30-06 rounds; five were spent casings while the other was a live round. All had the headstamp REM-UMC 1906.  As described by King in the site reports, this location was "covered in very thick vegetation, mostly huckleberry bushes, mountain laurel, greenbriers, and young hardwood trees…", and at the time of this survey, the knoll was undisturbed.

But in the last 3-6 months, this undisturbed site has been bulldozed through the middle, leading from the above-mentioned dirt road. This bulldozed section is

approximately 28 meters in length and 4 meters in width. Midway through this section, another section is disturbed, departing from the main disturbed area and running 12 meters north and with an approximate 3 meters width. This disturbed area runs directly on top of the center of the knoll, and directly through the coordinates taken from the 1999 site report. The disturbance consists of the removal of the topsoil and the uprooting of trees.  Now, there are a few green shoots 6-12 inches tall (as of July 2010), with only 3-6 inches growth in early June of 2010. Overall, very little new vegetation has came back, leading our monitors to believe it has happened since this previous fall, after last years growing season (see image 4).

While this removal of the topsoil may seem superficial, the archaeological record of the battle is contained within the top 5-6 centimeters of the topsoil, and so any disturbance can destroy the artifacts and the information that can be gained from scientific investigation. Although this bulldozing has destroyed some of the site, the rest of the knoll almost certainly contains more artifacts, and this site should be protected so that more of the archaeological record is not destroyed. Overall, this site still has a high degree of integrity. This and the next three areas described below are outside of any known existing mining permit.


**Disturbed Site 2**

Directly down the hill to the south of Site 1 is a gap that forms one part of the head of White Trace Branch hollow. A previous archaeological survey documented the miners' approach as following this hollow to the north of Blair Gap, instead of running straight through Blair Gap where machine guns were emplaced on North and South Crest.  Both branches of the hollow head run to Site 1, with each forming the southern and northern gaps surrounding the knoll. If the miners did attempt an assault near here, it would have most likely occurred at this point. Therefore, this site, as well as Site 1, are extremely significant in understanding the dynamics of the battle.

But this gap has been disturbed recently, most likely at the same time as Site 1. A logging road runs over the hill to the west, where the miners possibly could have made a breakthrough. This is in accordance with the patterning of bullets

found at 46LG205, which were discovered mostly on the westward spine that runs along this gap toward Logan.  The fresh-cut road is directly in the lowest point of the gap, and so has seriously impeded researchers' ability to test the hypothesis of this area being a breakthrough point for the assaulting miners.

The road is 2-3 meters wide, and has gouged a trough roughly 30 centimeters deep. The immediate area around it for 1-2 meters has also been disturbed. After running down the hill 18 meters, the road splits in two directions. The first split cuts to the south and runs down the hill eventually leading to Route 17. The second road follows the contour of the hill, and opens up to 3-4 meters wide, suggesting that this road may be designed to be a haul road for MTR operations planned in the area.

**Disturbed Site 3**

Following the dirt road southward approximately 270 meters from Site 1, another potential historic location has been disturbed. This is a relatively low-lying flat area that the archaeological team believed could have served as the bivouac point. The site is centered between both Site 1 and North Crest, and is protected by the surrounding ridges and high points. Upon inspection, this location has been seriously disturbed with logging roads crisscrossing an area roughly 60 meters long and 40 meters wide. Once again, the topsoil has been seriously disturbed, and even in portions of the area that are not roads, the majority of the topsoil has been disturbed and dirt pushed around (see image 5).

**Disturbed Site 4**

Beyond the site previously discussed above, the road continues and bends to the west.  Approximately 710 meters beyond Site 1, the road ends at the highest point in the Blair Gap area. This location is almost directly west of the North Crest of Blair Gap, and so is opposite the miners approach. As the highest point in North Crest area, this knoll might have served a strategic function for the defenders, such as a lookout point or even as a backup defensive position for the North Crest.

But, this site was also disturbed, with the whole top of this knoll bulldozed in a 3-4 meter-wide swath. Again, the disturbance involved the removal of topsoil, and

therefore any archaeological remains from the battle have also been eradicated. Some trees have been cut in this location, with discarded tops littering and blocking access to some of the area.

**Disturbed Site 5**

This site is to the north of Site 1. Taking the dirt road north from Site 1, and then getting on the main gravel access road, and then following it for roughly 1700 meters (a little over one mile), you will come to a knoll that overlooks the Left Fork of Beech Creek hollow, and the head of the hollow runs directly past this knoll.

Historical sources discuss this route (Left Fork) as being a main approach of the miners (Meador 1991). On the side of the knoll facing this approach, a series of trenches were discovered. These rectangular featured measured between 1 to 2.5 meters long, and were all oriented roughly facing 60 degrees (east-northeast). These trenches were discovered along the military crest of the hill, or in other words 3-4 meters below the true crest.

But at this site, monitors and archaeologists discovered the worst destruction yet. From the gravel road, an access road has been cut leading to the top of the knoll. The disturbance on top runs roughly 100 meters along the knoll ridge, and is 3-10 meters in width at different points. One large extension runs to the east, extending approximately 25 meters with a width of 18 meters at its widest. Below the hill, an extensive area has been logged, with access roads running roughly 30 meters or so down the hill. Unlike he previous four sites discussed, this site is within an existing mining permit.

**Conclusion**

As written in this report, there have been five major areas of disturbance discovered at Blair Mountain. While one site has had a preliminary survey undertaken at it, archaeologists fear that the undocumented sites may have lost irreplaceable archaeological information pertaining to the battle. But, it must be stressed, that although the disturbance has destroyed some parts of these sites, there may still be archaeological remains in the other portions of the sites which are

undisturbed. A full archaeological investigation is needed at each of these sites in order to better understand the remaining archaeological record.

Within the boundary of the proposed battlefield eligible for listing under the National Register of Historic Places, 27 archaeological sites have been discovered. With less than 5 percent of the battlefield having had systematic survey undertaken, many more sites await discovery. The disturbance discussed above in no way impacts Dr. Harvard Ayers' conclusion in his 2007 report based on archaeological survey in 2006 that the overall battlefield has a high degree of integrity (Ayers *et al*. 2007:4).

Currently, the conclusion of Dr. Ayers still remains true, that many of the sites are undisturbed, and even ones that are disturbed have some significant portions intact. Overall, the battlefield retains a high degree of archaeological integrity, but this may not remain if more destruction allowed at the site. In addition to these five sites in this report, Ayers noted that five other sites are threatened by the construction of gas and lumber access roads (Ayers *et al*. 2007:5).  Due to the rural nature of the area, and the lax enforcement of environmental regulations and laws, the Blair Mountain battlefield is at a very precarious place. To preserve the battlefield for future generations, mechanisms must be developed or some sort of status conferred (such as becoming a state or national park) in order to prevent further destruction by activities such as logging and gas drilling.

Ayers, H., Rothrock, Z. and King, K.
  2006   *Archaeological Investigations of the Battle of Blair Mountain: May 13 to November 19, 2006*, on file (unpublished), West Virginia State Historic Preservation Office.


Meador, Michael M.
  1991   'The Redneck War of 1921: The Miners' March and the Battle of Blair Mountain'. Pp. 57-63 in *The Goldenseal Book of the West Virginia Mine Wars: articles reprinted from Goldenseal Magazine, 1977-1991*. Charleston, WV: Quarrier Press.

**Maps and Images**

Image 1: Blair Battlefield stretches over 14 miles. The clear area inside the polygon
is the area eligible for listing on the National Register of Historic Places.



Image 2: The four main areas of the battlefield; Mill Creek, Crooked Creek Gap, Beech Creek and Blair Gap.



Image 3: Map showing the knoll at Site 1. The sandy colored polygon is the disturbance, and the points are artifacts. For measurement, the disturbed zone is 28 meters in length.



Image 4: At Disturbed Site 1, looking west.



Image 5:  Showing disturbance at Site 3



Image 6: Disturbance at Site 3



# Exhibit G

moist-soil habitat would include developing complete water control capability on all moist-soil acres and use of periodic disturbance to set back succession. Further, the Service would pursue cooperative projects to improve habitat quality on 500 acres of open water. Waterfowl usage and shorebird response to habitat management would be monitored.

The two significant enhancements in the public use program would be development of an environmental education center on the refuge and the addition of a park ranger (visitor services) to the staff. These enhancements would greatly increase our capability and opportunity to conduct environmental education and interpretation programs, and to better utilize qualified volunteers in support of Holla Bend NWR's mission and objectives. One responsibility of the park ranger would be to develop a plan for recruiting and effectively managing volunteer support. Wildlife-dependent recreation activities would be the same as under Alternative A.

This alternative would include the construction of a fishing pier at Lodge Lake to be accessible by disabled individuals; development of a bird observation trail north of the refuge office; improvements to the Lodge Lake Trail and the loop to the Levee Trail; and selective vegetation management along refuge roads to improve wildlife viewing opportunities. Information kiosks, direction signs, parking lots, and other visitor use facilities also would be improved to the extent feasible. We would determine the maximum number of archery hunters that refuge resources could support, and we would evaluate the feasibility of adding a dove season.

We would pursue opportunities to purchase or exchange priority tracts within the refuge acquisition boundary, which includes 1,703 acres in private ownership distributed in numerous small tracts around the perimeter of the refuge.

The staff would include a refuge manager, deputy refuge manager, heavy equipment operator, and office assistant, and would be increased to also include a biologist and biological science technician, a park ranger (visitor services), a park ranger (law enforcement), an operations specialist, and a heavy equipment mechanic.

## Next Step

After the comment period ends, we will analyze the comments and address them.

## Public Availability of Comments

Before including your address, phone number, e-mail address, or other personal identifying information in your comment, you should be aware that your entire comment—including your personal identifying information—may be made publicly available at any time. While you can ask us in your comment to withhold your personal identifying information from public review, we cannot guarantee that we will be able to do so.

## Authority

This notice is published under the authority of the National Wildlife Refuge System Improvement Act of 1997, Public Law 105–57.

Dated: October 15, 2009.

**Jacquelyn B. Parrish,**

*Acting Regional Director.*

[FR Doc. 2010–101 Filed 1–7–10; 8:45 am]

**BILLING CODE 4310–55–P**

## DEPARTMENT OF THE INTERIOR

### National Park Service

### National Register of Historic Places; Weekly Listing of Historic Properties

Pursuant to (36 CFR 60.13(b,c)) and (36 CFR 63.5), this notice, through publication of the information included herein, is to apprise the public as well as governmental agencies, associations and all other organizations and individuals interested in historic preservation, of the properties added to, or determined eligible for listing in, the National Register of Historic Places from October 19 to October 23, and on December 30, 2009.

For further information, please contact Edson Beall via: United States Postal Service mail, at the National Register of Historic Places, 2280, National Park Service, 1849 C St., NW., Washington, DC 20240; in person (by appointment), 1201 Eye St., NW., 8th Floor, Washington, DC 20005; by fax, 202–371–2229; by phone, 202–354–2255; or by e-mail, *Edson_Beall@nps.gov.*

Dated: January 4, 2010.

**J. Paul Loether,**

*Chief, National Register of Historic Places/ National Historic Landmarks Program.*

KEY: State, County, Property Name, Address/ Boundary, City, Vicinity, Reference Number, Action, Date, Multiple Name

### AMERICAN SAMOA

#### Western District

Kirwan, Michael J., Educational Television Center, Route 118, N. side of Utulei, Utulei vicinity, 09000842, LISTED, 10/23/09

### ALABAMA

#### Russell County

Hurtsboro Historic District, 308–905 Church St., 508 Daniel St., 303–407 Dickinson St., 302–802 Goolsby St., 402–502 Lloyd St., 242–282 Long St., Hurtsboro, 09000001, LISTED, 10/19/09

### FLORIDA

#### Hernando County

Spring Lake Community Center, 4184 Spring Lake Hwy., Brooksville vicinity, 09000843, LISTED, 10/20/09 (Florida's New Deal Resources MPS)

### FLORIDA

#### Orange County

Rosemere Historic District, Roughly by E. Harvard St., N. Orange Ave., Cornell Ave. & E. Vanderbilt St., Orlando, 09000844, LISTED, 10/21/09

### GEORGIA

#### Muscogee County

Thomas, Alma, House, 411 21st St., Columbus, 09000270, LISTED, 10/20/09

### NEVADA

#### Clark County

Berkley Square, Area bounded by Byrnes Ave., D St., Leonard Ave., and G St., Las Vegas, 09000846, LISTED, 10/23/09

### NEW YORK

#### Chenango County

Mathewson, Holden B., House, 1567 NY 26, South Otselic, 09000860, LISTED, 10/23/09

### NEW YORK

#### Columbia County

Van Rensselaer, Conyn, House, 644 Spook Rock Rd., Claverack vicinity, 09000861, LISTED, 10/20/09

### NEW YORK

#### Dutchess County

Mt. Beacon Fire Observation Tower, S. Beacon Mtn., Beacon vicinity, 09000862, LISTED, 10/23/09

### NEW YORK

#### Onondaga County

Barber, Peale's, Farm Mastodon Exhumation Site, Rt. 17K, Montgomery vicinity, 09000863, LISTED, 10/20/09

### NORTH CAROLINA

#### Dare County

Midgett, Rasmus, House, 25438 NC Hwy 12, Waves, 09000847, LISTED, 10/21/09

### OHIO

#### Erie County

Feick Building, 158–160 E. Market St., Sandusky, 09000848, LISTED, 10/22/09

### OHIO

#### Geauga County

ASM Headquarters and Geodesic Dome, 9639 Kinsman Rd., Materials Park, 09000849, LISTED, 10/22/09

**WEST VIRGINIA**

**Logan County**

Blair Mountain Battlefield, Address Restricted, Logan vicinity, 08000496, REMOVED/DETERMINED ELIGIBLE, 12/30/09

**WISCONSIN**

**Jefferson County**

North Washington Street Historic District, N. Church St. generally bounded by O'Connell and N. Green St., N. Washington St. bounded by O'Connell and Elm Sts., Watertown, 09000850, LISTED, 10/23/09

**WISCONSIN**

**Milwaukee County**

Pittsburgh Plate Glass Enamel Plant, 201 E. Pittsburgh Ave., Milwaukee, 09000851, LISTED, 10/21/09

[FR Doc. 2010–49 Filed 1–7–10; 8:45 am]

**BILLING CODE P**

---

## DEPARTMENT OF THE INTERIOR

### Minerals Management Service

### Outer Continental Shelf Civil Penalties

**AGENCY:** Minerals Management Service (MMS), Interior.

**ACTION:** Notice summarizing review of the maximum daily civil penalty assessment.

**SUMMARY:** The Outer Continental Shelf Lands Act requires the MMS to review the maximum daily civil penalty assessment for violations of regulations governing oil and gas operations in the Outer Continental Shelf at least once every 3 years. This review ensures that the maximum penalty assessment reflects any increases in the Consumer Price Index as prepared by the Bureau of Labor Statistics, U.S. Department of Labor. After conducting the required review in August 2009, the MMS determined that no adjustment is necessary at this time.

**FOR FURTHER INFORMATION CONTACT:** Joanne McCammon, Safety and Enforcement Branch at (703) 787–1292 or e-mail at *Joanne.McCammon@mms.gov.*

**SUPPLEMENTARY INFORMATION:** The goal of the MMS Outer Continental Shelf (OCS) Civil Penalty Program is to ensure safe and clean operations on the OCS. By assessing and collecting civil penalties, the program is designed to encourage compliance with OCS statutes and regulations. Not all regulatory violations warrant a review to initiate civil penalty proceedings; however, violations that cause injury, death, or environmental damage, or pose a threat to human life or the environment, will trigger such review.

The Oil Pollution Act of 1990 (OPA 90) (Pub. L. 101–380) expanded and strengthened MMS's authority to impose penalties for violating regulations promulgated under the OCS Lands Act. Section 8201 of OPA 90, which amended section 24(b) of the OCS Lands Act, 43 U.S.C. 1350(b), directs the Secretary of the Interior to adjust the maximum civil penalty amount at least once every 3 years to reflect any increases in the Consumer Price Index (CPI). The purpose of this adjustment is to ensure that punitive assessments keep up with inflation. If an adjustment is necessary, MMS informs the public through publication in the **Federal Register** of the new maximum amount. The MMS uses Office of Management and Budget (OMB) guidelines for determining how penalty amounts should be rounded.

The MMS published regulations adjusting the civil penalty assessment to $25,000 per violation per day on August 8, 1997 (62 FR 42667); to $30,000 on October 29, 2003 (68 FR 61622); and to $35,000 on February 28, 2007 (72 FR 8897). In August 2009, MMS performed computations to determine if it should increase the current maximum civil penalty amount of $35,000 per violation per day. After running the computations, the MMS determined that the CPI did not increase enough to warrant raising the maximum civil penalty amount at this time. The MMS will monitor the CPI, and when the computations justify raising the maximum civil penalty amount, the MMS will publish a Notice in the **Federal Register** to notify the public of the increase.

**Authority:** 43 U.S.C. 1350.

Dated: January 4, 2010.

**Chris Oynes,**

*Associate Director for Offshore Energy and Minerals Management.*

[FR Doc. 2010–119 Filed 1–7–10; 8:45 am]

**BILLING CODE 4310–MR–P**

---

## DEPARTMENT OF THE INTERIOR

### Bureau of Land Management

**[LLWY–920000–L143000000–ET0000; WYW 109115]**

### Notice of Proposed Withdrawal Extension and Opportunity for Public Meeting; WY

**AGENCY:** Bureau of Land Management, Interior.

**ACTION:** Notice.

**SUMMARY:** The Assistant Secretary of the Interior—Land and Minerals Management proposes to extend the duration of Public Land Order (PLO) No. 6797 for an additional 20-year term. PLO No. 6797 withdrew 9,609.74 acres of public mineral estate from location or entry under the United States mining laws (30 U.S.C. Ch.2), to protect the Whiskey Mountain Bighorn Sheep Winter Range in Fremont County. This notice also gives an opportunity to comment on the proposed action and to request a public meeting.

**DATES:** Comments and requests for a public meeting must be received by April 8, 2010.

**ADDRESSES:** Comments and meeting requests should be sent to the BLM Wyoming State Director, P.O. Box 1828, Cheyenne, Wyoming 82003–1828.

**FOR FURTHER INFORMATION CONTACT:** Janelle Wrigley, BLM Wyoming State Office, 307–775–6257, or at the above address.

**SUPPLEMENTARY INFORMATION:** The withdrawal created by PLO No. 6797 (55 FR 37878 (1990)) will expire September 13, 2010, unless extended. PLO No. 6797 is incorporated herein by reference. The BLM has filed a petition/application to extend PLO No. 6797 for an additional 20-year term. The withdrawal was made to protect the bighorn sheep winter range and capital investments on the land described in the PLO at 55 FR 37878 (1990). The area aggregates 9,609.74 acres in Fremont County, Wyoming.

The purpose of the proposed extension is to continue the withdrawal created by PLO No. 6797 for an additional 20-year term to protect the Whiskey Mountain Bighorn Sheep Winter Range and capital investments in the area.

The use of a right-of-way, interagency, or cooperative agreement would not adequately constrain nondiscretionary uses which could result in the permanent loss of significant values and irreplaceable resources of the range.

There are no suitable alternative sites since the lands described herein contain the area that has historically been used as bighorn sheep winter range, due to its physical characteristics, and because of the local weather conditions.

No water rights would be needed to fulfill the purpose of the requested withdrawal extension.

Records relating to the application may be examined by contacting Janelle Wrigley at the above address or by phone at 307–775–6257 or by contacting the BLM Field Manager, Lander Field Office, 1335 Main Street, Lander, Wyoming 82520 or by phone at 307–332–8400.

# Exhibit H




GET CONNECTED

September 4, 2010

State to reapply for historic designation at Blair Mountain

By Paul J. Nyden

CHARLESTON, W.Va. -- State officials plan to renominate the site of the Battle of Blair Mountain, the site of the largest armed confrontation in American labor history, for a place on the National Register of Historic Places.

"The Division of Culture and History, through the Office of Historic Preservation, is initiating a process to renominate Blair Mountain to the National Register of Historic Places," Jacqueline Proctor, the division's deputy commissioner, said Friday afternoon.

"We don't have a timeline," she said. "We are initiating this. It involves many, many people. It will not be done by the end of the year.

"But it is being initiated. That should make some folks happy," Proctor said.

In July, Carol D. Shull, keeper of the National Register of Historic Places in Washington, D.C., urged state officials to renominate the site, saying that was the best way to quell controversy surrounding the site and its place on the National Register.

The area was placed on the National Register in March 2009, then removed from the register nine months later, after a new list of landowners at the site seemed to indicate that a majority of the landowners wanted the historic site to be opened to coal mining. Massey Energy and Arch Coal are among the companies that have indicated some interest in developing mining operations in the area.

Supporters of the site's place on the National Register say the new list was invalid.

"This second list turned out to have some dead people on it," said Gordon Simmons, president of the West Virginia Labor History Association. "We believed there was no adequate basis on which to revisit the issue."

The Battle of Blair Mountain was fought for five days, in late August and early September 1921, along the 15-mile ridge separating Boone and Logan counties.

At least 7,500 coal miners marched south from Marmet to Blair Mountain, planning to continue into Logan County to organize nonunion mines. The miners confronted a force of 3,000 law officers, many of whom worked directly for coal companies.

It was the largest armed confrontation in U.S. labor history.

Earlier this year, the National Trust for Historic Preservation, Sierra Club and Ohio Valley Environmental Coalition filed another petition to save the historic site from possible mining operations. The groups told the Division of Culture and History that they would sue in federal court if the site was not returned to the National Register.

Simmons praised the Division of Culture and History for renominating the site. "It is nice to see a state agency owning up to its responsibilities to the public interest," he said. "I hope it is not too late."

Also, state Highways Commissioner Paul A. Mattox Jr. has been considering a request to abandon a road often used by archaeologists and historians to get to the Blair Mountain site. The request involves 3.9 miles of County Route 119/7, near the town of Sovereign, known locally as the Old Fire Tower Road.

"No decision has been made. It is still being considered," Transportation spokesman Brent Walker said Friday.

"There is no immediate reason to make the decision, except to put minds at ease," Walker said. "Nobody is on standby. The landowners are not waiting with trucks to begin mining operations.

"We are very sensitive to the debate. We are still trying to figure out how we can make this a win-win situation."

Walker said the official comment period to the DOH has ended, but that agency officials regularly read any letters or e-mails sent to them.

*Reach Paul J. Nyden at pjny...@wvgazette.com or 304-348-5164.*

# Exhibit I

**United States**
**Environmental Protection**
**Agency**

**EPA Region 3**
**Philadelphia, PA**
**EPA 9-03-R-05002**

# Mountaintop Mining/Valley Fills in Appalachia Final Programmatic Environmental Impact Statement






**October 2005**

**Introduction, Comment Summaries, Responses, and Errata**

# IV.  ENVIRONMENTAL CONSEQUENCES OF THE ALTERNATIVES ANALYZED

## A.  INTRODUCTION

Chapter IV describes the effects on the human environment of the no action and proposed action alternatives described in Chapter II.  Chapter III provides a detailed discussion on the affected environment of the study area and results of technical studies of environmental effects of mining, including MTM/VF operations.  Technical information gathered for this EIS assists in delineating consequences and may also be a useful tool in the regulatory decision making process on a case-by-case basis.  To give proper context to the discussion of consequences of the alternatives in this chapter, each section of this chapter sets out additional information on the consequences of MTM/VF activities.

The information on consequences of the alternatives includes the benefits of the alternatives, anticipated outcomes of proposed actions, and available  information on the impacts of  proposed activities regulated by the programs analyzed in this EIS.  This programmatic EIS is necessarily broad given its purpose of addressing policies, guidance, and coordinated agency decision-making processes to minimize the adverse environmental effects from MTM/VF and the size and location of excess spoil disposal sites in valleys.  The proposed actions and alternatives consist of many potential changes to data collection and analysis protocols, guidelines for best management practices, regulations, and mitigation requirements for MTM/VF operations.  They are aimed at improving agency efficiency and effectiveness, increasing consistency within and between agencies, and meeting other public policies.

The proposed action alternatives are largely administrative and as a result, accurately projecting their environmental consequences is difficult.  All three action alternatives share the goal of a better regulatory process and improved environmental protection.  Therefore, projections of the positive and negative consequences of the action alternatives and the No Action Alternative must be made to compare the alternatives, even though accurately projecting impacts of administrative measures is difficult.

Environmental consequences can be categorized and presented in many ways, including the following:

- Direct effects of implementing an action
- Indirect effects, occurring in combination with other influences, that may occur at a later time or at some distance from the activity
- Short term or temporary effects
- Long-term or permanent effects
- Adverse effects
- Beneficial effects
- Cumulative effects
- Economic or social effects

This chapter discusses environmental consequences in these various ways.

**IV.  Environmental Consequences of the Alternatives Analyzed**

b.    Indirect Stream Impacts

The consequences of direct stream loss and energy transport reductions, discussed above, also indirectly affect downstream stream reaches.  MTM/VF has the potential to alter the chemistry, water temperature, flow regime and geomorphological features downstream.  Stream chemistry showed increased mineralization and a shift in macroinvertebrate assemblages from pollution-intolerant to pollution-tolerant species.  Water temperatures from valley fill sites exhibited lower daily fluctuations and less seasonal variation than water temperatures from reference sites.  Daily stream flows from studied valley fill sites exhibited greater base flow than reference sites.  Smaller sediment particle sizes were found in downstream substrate.  [Chapter III.D; Appendix D]

Scientists postulate that stream thermal regimes, which can influence microbial activity, invertebrate fauna, fish egg development, larval growth, and seasonal life cycles, may be affected by valley fills and sedimentation ponds at the base of the valley fills.  Scientists also theorize that, as mining or other human development practices eliminate first order streams,  unique biological diversity may be affected, especially if rare species occur in only one or two spring or seepage areas and are impacted. [Chapter III.D; Appendix D]

Headwater stream systems do not have a tremendous capacity to provide purification functions.  Although these ecological processes are not one requiring protection, the absence of streams to provide this function reflects the sensitivity of the system to inputs of a variety of potentially toxic materials.  As groundwater and infiltration move through surface coal mining operations a variety of potentially toxic materials are released into the environment, including metals and mineral constituents such as sulfates which, if at high enough levels, may act by altering physical characteristics of water (e.g. pH or specific conductance).  Headwater streams, with their innately limited buffering capacity and lack of ability to sequester and precipitate out contaminants, tend to be at risk from any input of toxic materials exceeding the streams limited capacity to assimilate. [Chapter III.D.]

The EPA Water Chemistry Report found elevated concentrations of sulfate, total and  dissolved solids, conductivity, selenium and several other analytes in stream water at sampling stations below mined/filled sites [Appendix D; USEPA, 2002b].  Other studies found elevated concentrations of sulfates, total and dissolved solids, conductivity, as well as other analytes in surface water downstream from MTM/VF sites.

Studies conducted as part of this EIS show that aquatic communities downstream from MTM/VF differ from unmined headwater streams in several ways.  In most cases, there were differences in biological assemblages.  Generally, macroinvertebrate communities below mined areas were more pollution tolerant than those below unmined watersheds.  However, biological conditions of filled sites represented a gradient of conditions from poor to very good, demonstrating a wide range of conditions that may be found in aquatic communities downstream from MTM/VF or other human disturbances [Appendix D; USEPA, 2000 (Green, et. al.)].

The Aquatic Impacts Statistical Report indicated that ecological characteristics of productivity and habitat are easily disrupted in headwater streams [Appendix D; USEPA, 2003)].  Accepted indices and comparisons correlated chemical and biological (macroinvertebrates and fish) parameters in unmined, filled, filled/residential and mined sites.  The analysis indicated that biological integrity

# C.    SOILS & VEGETATION

Chapters III.B. and III.F, of this EIS describe the existing Appalachian forest environment (vegetation and soils) and the importance of this forest environment in helping to define the ecosystem as it exists today.  As indicted in Chapter III.F., the vast majority (approximately 92%) of the study area is forest land.  Mixed mesophytic hardwoods, predominantly comprised of various oaks, maples, yellow poplar, beech, white basswood, and other species, are the dominant forest cover type within the study area.

This EIS contemplates two actions specifically related to deforestation.  These actions are identified and described in Chapter II.C.8.b. as Action 13 and Action 14.  Action 13 includes the cooperative development and identification of state-of-the-science BMP's for enhancing establishment of forests as a post-mining land use.  Action 14 states that if legislative authority were established on either a Federal or state level, reclamation with trees could be required as a post-mining land use.  The benefits these actions would provide to the successful establishment of forests on reclaimed mine sites are described in the Chapter II.C.8.b discussion of the actions.  These two actions are incorporated in Alternatives 1, 2, and 3.

MTM/VF operations generally impact large areas of the forest community as the development of an individual mine can result in disturbance or removal of a few hundred to a few thousand acres of forest cover.  The quality of the forest and the associated habitat impacted by a mine can vary depending on a number of factors such as extent of previous mining, past logging activities, other mineral extraction activities such as oil and gas, previous land management practices, etc.  Regardless of the type or quality of forest cover that existed prior to mining, certain impacts can be generalized in association with any mine or any activity that disturbs large areas of forest.  For example, unlike traditional logging activities associated with management of a hardwood forest, when mining occurs, the tree, stump, root, and growth medium supporting the forest are disrupted and removed in their entirety.

The likelihood of natural regeneration within the mine site is contingent upon the reclamation practice and post-mining land use chosen.  Given that MTM/VF occurs along the ridge tops, reclaimed mines, when the post-mining land use is a category other than forest, typically create large expanses of open area devoid of seed source trees.  Seed source trees in adjacent unmined areas are typically at an elevation below the reclaimed ridge top, limiting natural succession of forest cover from adjacent areas [Appendix E (Handel, 2002)].  In this type of ridge line mining and reclamation environment, for a number of years to come, the forest is replaced by a grassland and/or herbaceous/shrub vegetative community with different topographic and hydrologic conditions than those that existed prior to mining.

The Landscape Scale Cumulative Impact Study modeled terrestrial impacts based on past surface mine permit data [Appendix I; EPA, 2002].  Tables IV.C-1 through IV.C-4  were developed from these data and provide a retrospective of the impacts to forest that occurred over the 10-year period from 1992 to 2002.  The tables estimate impact to the forest environment (vegetation and soils) in the study area from surface mining during this period at 380,547 acres or 3.4 % of the forest area that existed in 1992.  When adding past, present and future terrestrial disturbance, the study area estimated forest impact is 1,408,372 acres which equates to 11.5% of the study area.  This number is derived by adding grassland as an indicator of past mining, barren land classification, forest lost

environmental affects of flooding are described in Chapter III.G., and the air quality impacts can be found in Chapters III.V. and III.W. and Appendix G.

While company towns existed in many parts of the United States in the first half of the 20th century, the effects of coal company towns in the Appalachian Mountains were more far reaching.  The mining company controlled nearly every essential aspect of community life, from work, to shopping, education, retail merchandising, and medical care.

The social structure of these company towns was impacted by the paternalistic nature of the relationship between the company and the residents, resulting in a highly dependent relationship for the residents.  Research indicates that this typical company town relationship has both psychological and physical manifestations. The nature of company towns has been documented across numerous industries; however, the relative isolation of the communities, the predominance of the coal industry and the relative poverty of the region prior to industrialization all arguably contribute to a more pronounced community structure based on company paternalism.

The economic dependence of the region on its exhaustible coal resources, its need to diversify, and its need to further develop the human resources and infrastructure to support economic development are widely recognized.  Most leaders are also keenly aware that its coal resources are its best source of leverage for investments needed to build an economy that can continue to flourish after the inevitable decline of coal mining [Chapter III.R.].

Two of the factors most often cited as hindering economic development in Central Appalachia are the rugged terrain and the poor access.   The steep slopes and the narrow, flood-prone river valleys severely constrain the available supply of developable land.  The use of land after coal mining has been completed may include residential and/or commercial development.  Building on and use of this relatively rare flat land could provide jobs from construction, service and commercial industries, and tourism. Changes in land uses not only affect the local social climate and tax base, but affect private property rights as lands are developed and sold.

Changes in terrestrial and aquatic habitats will affect activities such as hunting, fishing, and bird watching.  The recreation use of the area by residents and tourists is discussed in Chapter IV.J.

## 1.    Impacts Common to the No Action and Alternatives 1, 2 and 3

The environmental consequences discussed throughout Chapter IV would have an effect on the social conditions of the area.  Impacts to aquatic resources affect drinking water and fisheries, impacts to terrestrial resources affects land use and development, viewsheds, wildlife use and recreation which all have a bearing on social and cultural impacts.  Requiring avoidance of high quality aquatic habitats and adequate mitigation, will improve water quality in the watersheds. Mining practices affect the local culture and directly impact the economy through employment opportunities.  The number of mining jobs is related to the amount of coal produced.  Coal-related jobs will likely be lost as the existing coal reserves are depleted and/or if coal mining productivity increases. [Appendix G; Chapter III.P-Q]

The agencies recognize that, in spite of enforcement of the existing regulations and implementation of the recent program improvements, blasting concerns/complaints will continue.  Concerns and

subsequent complaints are likely to decrease as a result of the identified recent program improvements.  However, when mountaintop mining operations are near residences and populated areas, complaints, particularly those related to noise and vibration of homes (nuisance impacts), may still occur in relatively high numbers.  Although regulations provide a limited ability to control nuisance impacts (for example blasting may typically occur only between sunrise and sunset), these nuisance-type concerns will continue to have periodic adverse effects on the quality of life of residents living in close proximity to the mine sites.  The regulations were designed to minimize damage potential and only indirectly address nuisance; however, citizens may exercise their right to take civil action against a mining operation for nuisance-related concerns.  There have been court cases in the coalfields where mining activities have been ordered to adjust operational procedures (i.e., above-and-beyond existing regulatory program controls) to reduce nuisance.

## 2.  Impacts Common to Alternatives 1, 2, and 3

The actions in the three action alternatives are projected to have positive social benefits through the improved regulatory processes and coordinated public  participation.  All three action alternatives would facilitate a better understanding by the public of the regulatory process and therefore facilitate their input regarding social concerns that should be factored in permit decision making. This improved efficiency would result in mining companies having more predictability in their planning processes, resulting in reduced costs and time.  The No Action Alternative would continue the existing regulatory framework.

Additional water quality data collection and analysis may result in new water quality standards, if necessary.  Development of BMPs to centralize the best technical information for aquatic mitigation and reforestation [Chapters II.C.6 and II.C.8.], as well as the two actions discussed below, will provide predictability and better understanding for residents in the area of the effects of MTM/VF.

Implementation of Action 15 [Chapter II.C.9.] to evaluate and coordinate current programs for controlling fugitive dust and blasting fumes from MTM/VF operations, and develop BMPs and/or additional regulatory controls to minimize adverse effects, as appropriate. Under this action, EPA, OSM, state air quality agencies, and state mining agencies would identify 1) meteorological and physical conditions which can exacerbate dust or blasting fumes; 2) state-of-the-art techniques currently used in the mining industry to control dust and fumes; and 3) appropriate regulatory improvements to minimize adverse affects, as appropriate.  This action could result in positive changes in operations to control air quality impacts near MTM/VF that may address social concerns.

Implementation of Action 16 [Chapter II.C.10.b.] would result in the identification of guidelines and methodologies for calculating peak discharges and evaluating downstream flooding risk.  Modeling and other recommended approaches for peak runoff determinations could be discussed and the proper design storm event for evaluation could be suggested.  This action would result in improved designs to reduce the risk of flooding to homes and businesses downstream of MTM/VF operations.

Since all of these actions would be implemented in Alternatives 1, 2, or 3, no distinction can be made between and among these alternatives as they affect social impacts.

# I.  ECONOMIC CONDITIONS

## 1.  The Role of Coal in the Economy

# Exhibit J



34 ENTL 21                                                                                                            Page 1
34 Envtl. L. 21

Environmental Law
Winter 2004

Essays

**\*21 FROM PICK AND SHOVEL TO MOUNTAINTOP REMOVAL: ENVIRONMENTAL INJUSTICE IN THE APPA-
LACHIAN COALFIELDS**

Patrick C. McGinley [FNa1]

Copyright (c) 2004 Environmental Law; Patrick C. McGinley

In this Essay, Professor McGinley examines a century of conflicts between the coal mining industry and the people of the "billion dollar coalfield" communities of southern West Virginia whose labors provided fuel for the industrial revolution, two world wars, and the energy demands of the nation. The Essay identifies a troubling paradox: Highly efficient new mining technologies, including so-called "mountaintop removal" strip mining, have resulted in the loss of tens of thousands of well paying jobs while coal production has reached record levels and many coalfield communities remain mired in economic stagnation and poverty.

The Essay identifies provisions of the Surface Mining Control and Reclamation Act of 1977 (SMCRA) that require commercial, residential, and industrial development as a prerequisite to permitting the radical alteration of the environment occasioned by mountaintop removal mining. Professor McGinley makes the case that government regulators missed the opportunity to bring permanent economic benefits to coalfield communities by refusing to enforce this economic development mandate of SMCRA. Instead, the Essay contends, regulators often choose to align themselves with coal industry interests while turning a blind eye to the adverse environmental impacts and property damage visited by mountaintop removal and other modern mining methods on those who still live in the old company towns or "coal camps" of the region.

The Essay exposes the plan and motive of some coal companies to target for extinction some communities located near modern large-scale mining operations.  The plan was simple--conduct high intensity mining operations in close proximity to remote communities. When the \*22 nuisance conditions created by the mining became difficult to bear, the belief was that those affected would choose to sell out to the coal companies and move away from communities that had been family home-places for decades. In at least one area, a major national coal company conditioned its purchase of such homes on the sellers' agreement to move away and never return to the area for the rest of their lives.

The Essay concludes by identifying a movement among some influential West Virginia interests "to let natural selection play out." In synch with the coal companies' desire to eliminate rural coalfield communities near mountaintop removal mines, this Darwinian view envisions nonviable communities becoming "ghost towns." The conclusion observes that the century-long struggle of coalfield communities for environmental, economic, and social justice is likely to continue and that those who would destroy these communities in the name of eliminating "rural sprawl" or maximizing profits may be surprised at their resilience. Steeled by a century of oppression, the Essay suggests that the people of coalfield communities are likely to fight back.

| I. Introduction | 23 |
| --- | --- |
| | |

34 ENTL 21
34 Envtl. L. 21

| | |
|---|---|
| II. Coal Mining and Appalachian Communities: A History as Dark as the Mines Themselves | 24 |
| A. Union Battlefields in Appalachia | 28 |
| 1. The Mine Wars: 1900-1932 | 28 |
| 2. The New Deal and the Rise of the UMWA: 1932-1941 | 30 |
| 3. The Second World War: 1940-1945 | 32 |
| 4. Postwar Economic Decline in the Appalachian Coalfields: 1946-1960 | 33 |
| B. The Coal Camps After World War II | 34 |
| 1. The Coal Bust of the 1960s: New Relationships Between Coal Camp Residents and the Companies | 35 |
| 2. The 1970s Coal Boom | 42 |
| 3. The Coal Camps: 1980 to Present | 43 |
| III. Regulation of the Adverse Impacts of Coal Mining | 47 |
| A. Historical Overview of the Pre-SMCRA Period | 48 |

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

34 ENTL 21                                                                    Page 3
34 Envtl. L. 21

B. SMCRA's Cooperative Federalism Approach to Regulation ... 51

C. Coal Industry and State Opposition to Implementation, Administration, and Enforcement of SMCRA ... 53

IV. "Almost Level, West Virginia": Mountaintop Removal Strip Mining ... 54

A. Description of Mountaintop Removal Mining Methods ... 56

B. SMCRA' s Strict Limits on Mountaintop Removal Mining ... 58

C. Media Exposé of Mountaintop Removal Impacts ... 59

1. State Mountaintop Removal Permitting Receives Scrutiny ... 61

2. State Mountaintop Removal Permitting Decisions Questioned by Environmental Protection Agency ... 62

3. Coal Industry's Initial Response to Media Investigations of Mountaintop Removal ... 64

D. Lawlessness: Regulators Ignore SMCRA's "Approximate Original Contours" Mandate ... 64

1. The Response of Industry and Regulators to the Revelation that AOC Requirements Had Been Ignored for Two ... 68

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Decades

2. A Promise Broken: Systemic Waiver of Mountaintop Removal Requirements Negate SMCRA's Economic Development Goal ... 69

a. Newspaper Investigation Discloses Agency Misfeasance ... 69

b. The Response of Industry and Regulators to the Lack of Economic Development ... 71

E. Judicial Review: Coalfield Residents Turn to the Courts ... 72

V. Coalfield Environmental Injustice Takes a New Form ... 76

A. Paradox in the Coalfields: Coal Production Booms While New Mining Technology Alters the Environment and the Economy Stagnates ... 78

B. Targeting Coalfield Communities for Destruction ... 79

C. Mountaintop Removal at Blair Mountain: A Case Study of Environmental Injustice in the Coalfields ... 85

1. The Dal-Tex Mountaintop Removal Complex and Neighboring Communities ... 85

2. Mountaintop Removal Mining ... 87

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Impacts Stir Community Resistance

| | |
|---|---|
| 3. National Attention Is Drawn to Mountaintop Removal Mining at Blair Mountain | 91 |
| 4. Facts Emerge About the Coal Company's Plan for "Working with the Community to Minimize Its Temporary Presence There" When Citizens Seek Relief in Court | 92 |
| 5. A Plan for "Working with the Community" Is Developed at the Beginning | 94 |
| 6. Option to Purchase Agreements | 96 |
| 7. Bogus Dust Monitoring Program | 98 |
| VI. Conclusion | 101 |

**\*23** I. Introduction

Travelers entering Williamson, the county seat of Mingo County, West Virginia, pass a faded roadsign that reads: "Welcome to the Billion Dollar Coalfields." The irony of the greeting is hard to escape. Driving into the town which lies in the heart of central Appalachia's coal-producing region, one sees boarded-up stores and vacant and dilapidated buildings. Discouraging economic data and high unemployment in Mingo and other coal counties of southern West Virginia confirm what the eye sees: The billions of dollars of coal reserves mined from the region have only marginally benefited local people. After a century of mining in the "billion dollar coalfields," local **\*24** communities lack funds to upgrade aging schools; tens of thousands live below the federal "poverty line"; and public services such as fire, police, sewage treatment, and libraries struggle to survive on "bare-bones" budgets.

While the economic stagnation of coalfield communities continues, highly efficient coal mines have revolutionized coal mining in Appalachia. Coal production largely from giant "mountaintop removal" [FN1] strip mines and highly mechanized underground "longwall" [FN2] mines approaches record levels. How does one account for the pervasive dismal economic condition in a region which could aptly be called the "Saudi Arabia of coal" ?

The answer lies in an understanding of the various forces that have shaped the history of the region. For better or worse, those forces--the coal industry and those who directly profit from mining, state and local politicians, and the United Mine

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Professor Williams's prediction that environmental controversies would come to the fore as the twentieth century came to a close was not based on gut instinct or crystal-ball gazing. Rather, as a historian, Williams based his predictions on an appreciation of the policies, politics, and players that had shaped West Virginia's past and his recognition of the old and new forces that were then in motion vying for control of the extraction of Appalachia's vast coal wealth. [FN134]

As students of history are aware, most of the enterprises of the Industrial Age created significant adverse externalities. [FN135] For example, effluent from steel and chemical manufacturing poisoned thousands of miles of the nation's streams and air pollution from the same plants clouded urban skies. For the better part of a century, the nation's polluting industries were given a free pass by Americans who agreed with industry's plea--"where there's smoke there's jobs."

It was not until the mid-1960s that people in the United States began to appreciate the extent to which industrialization had externalized costs to their own communities. Citizens' demand for pollution cleanup and regulation of the adverse effects of industrial activities spurred Congress to enact the National Environmental Policy Act of 1969 [FN136] and reached its apogee in 1977 with passage of the federal Surface Mining Control and *48 Reclamation Act. No other federal environmental regulatory statute contains as many opportunities for citizen involvement nor grants to citizens such a broad array of statutory rights that may be used to influence the law's administration and enforcement than does SMCRA.

To understand the current struggle of the people of the coalfields for economic and environmental justice, one must understand how SMCRA came to be law and the way in which its strict mandate has been administered and enforced. The following discussion begins with an examination of SMCRA's origins in the oppressed and poverty stricken Appalachian coal camps in the 1960s. SMCRA's history is then traced from enactment through criticism of state and federal enforcement to the current extraordinary controversy over enforcement of SMCRA's so-called "mountaintop removal" regulatory regime.

A. Historical Overview of the Pre-SMCRA Period

Prior to the enactment of SMCRA in 1977, unregulated surface and underground coal mining created enormous environmental harm throughout the Appalachian coalfields. [FN137] These externalities created disincentives for local economic development as well as other adverse social and economic consequences. Generally, local people experiencing these costs of mining also enjoyed the benefits of jobs created by mining. The adverse environmental impacts of mining received scant notice in the Appalachian coal camp struggle for survival during the first half of the twentieth century. Like the pervasive pollution that accompanied steel mills and chemical plants, coal mining's adverse impacts were seen as part and parcel of the industrialization.

The most visible adverse impacts of coal strip mining were the scars gashed in Appalachian mountainsides. Surface mining strips away forest vegetation, causing erosion and attendant stream sedimentation and siltation, accompanied by negative impacts on aquatic life and drinking water supplies. [FN138] In some coalfield regions, iron-laden sulphuric acid mine drainage pollution from underground mining produces red-orange stained stream beds and renders watercourses ecologically sterile. [FN139] Underground *49 and strip mining contaminated or depleted underground aquifers that provide domestic and farm water supplies to many coalfield families. [FN140] Loud noise and dust from blasting and earth-moving activities disturb nearby communities and wildlife. [FN141] During mining, dust and debris often fill the air as soil and underlying rock strata are blasted apart, earth is moved, and coal extracted. [FN142] Landslides caused by indiscriminate dumping of mine spoil downslope on steep Appalachian mountainsides buried cars, homes, and sometimes killed people. [FN143]

State legislatures made some early ineffective attempts to ameliorate the harm caused by unregulated stripping. The first state to regulate surface mining was West Virginia, which enacted legislation in 1939. [FN144] A handful of states followed West Virginia's lead, but the resulting state legislation has been characterized as "mild" and merely an attempt by politicians and the mining industry to make it appear to concerned communities that steps were being taken to safeguard the environment and limit the effects of mining. [FN145]

*50 From the beginning of these efforts to regulate strip mining, the coal industry cooperated with local and state politi-

# Exhibit K

## DECLARATION OF DOUG ESTEPP

I, Doug Estepp, declare and have personal knowledge of the following matters:

1.      My name is Doug Estepp and I currently reside in Toms Brook, Virginia, where I have
         lived for the past nine years. I was raised in Mingo County, West Virginia, and obtained a
         History degree from West Virginia University. I come from a West Virginia family with
         three generations of coal miners.

2.      I am a member of the Friends of Blair Mountain, a West Virginia non-profit organization
         that was formed to protect the historical and archaeological resources of the Blair
         Mountain battlefield. Friends of Blair Mountain have undertaken efforts to educate the
         public and policymakers about the history and significance of Blair Mountain Battlefield
         and have supported the effort to secure National Register-listing for the site. I have been
         an active member of the organization since January 2011.

3.      Additionally, I am a current member of the Jefferson County Preservation Alliance, a
         local organization dedicated to stopping the demolition of the historic Jefferson County
         Jail, which is where the miners were tried after the 1921 Blair Mountain Battle. I have
         been a member since 2002, and currently act as an Executive Board Member. Over the
         course of my involvement, I have studied the history of Blair Mountain to gather
         information and better understand the site, and have presented to audiences several times
         on the West Virginia Mine Wars, including the Battle at Blair Mountain. The Jefferson
         County Preservation Alliance works to protect and preserve local heritage in Jefferson
         County communities.

4.      I am the owner of a tour company that focuses on historical tourism in the West Virginia
         coalfields. For the last year or so, I have been involved in developing and expanding Coal
         Country Tours, the purpose of which is to provide visitors with an opportunity to tour the
         southern coalfields and to learn about labor and mining history. Coal Country Tours
         emphasizes the use of local guides, restaurants and accommodations, all while providing
         a unique and rewarding experience to visitors interested in the colorful past of the
         Southern Appalachians. Special attention is also paid to the important role that Blair
         Mountain played in the movement to bring unionization and reasonable working
         conditions to the American people, both in the coal mines and in the broader U.S.
         context.

5       I have made several trips to Blair Mountain, and intend to continue these trips in the
         future. Over the course of the past several years, I have made about 5 trips to the area. I
         was most recently at Blair Mountain in March 2011. Coal Country Tours currently has
         four scheduled tours to Blair Mountain in 2011, with the most recent planned for June 16,
         2011. I also have plans to return to the Blair Mountain in early June 2011, for the
         commemoration of the 1921 march on Blair Mountain.

6.      With a knowledgeable local guide, a visitor to Blair Mountain is able to appreciate and understand the events that took place in way that is impossible any other way. Participants are educated on the historical facts of the 1921 battle that took place, look at artifacts and have the opportunity to speak with locals who live in the area and who have grandfathers who fought in the battle. I estimate that each one of the tours brings in approximately $8,000 to $10,000 a day to the local economy in southern West Virginia, an area of the state that is economically depressed.

7.      If Blair Mountain is not designated as lands unsuitable for surface coal mining, I fear that my business would simply not survive. A trip to Blair Mountain is the highlight of any tour conducted by Coal Country Tours, and if the location is no longer in its current state, which is relatively well-preserved, I would not be able to bring visitors there. No one wants to visit a desolate flatland left behind by mountaintop removal mining. Not only will the mountain have physically been destroyed, but it will also loose any tangible historical relevance. Surface mining and other activities the disturb the topography of the mountain would destroy its archaeological record, deprive Appalachian residents of further knowledge, and completely destroy or severely damage the ability for any participant on a Coal Country Tour to experience, first hand, this historically significant site. If this were the case, Coal County Tours and any of its patrons would have little or no reason to return to the site.

8.      In addition to my professional work at the Blair Mountain site, I feel a strong personal connection to the site and the mountain itself. The destruction from mountain top removal mining has already destroyed much of the surrounding area, and is visible during the drive to Blair Mountain. It upsets me to think that Blair Mountain could similarly be destroyed. I plan to continue visiting the area in the future, but surface mining at Blair Mountain would directly and indirectly harm my ability to use, enjoy and appreciate the historic Battlefield and its landscape. If Blair Mountain is not designated as lands unsuitable for surface coal mining and is destroyed by mining, it is unlikely that I would ever return.

9.      My own grandfather was an underground coal miner in Logan County, West Virginia, and was ordered by the mining company to fight in the historic 1921 battle. Refusing to oblige, he was fired on the spot and returned to working on the family farm. Numerous other families in the region have similar stories and I fear that if greater protection of the Battlefield through designating the lands there as unsuitable to mining is not granted, this history will inevitably be destroyed. If activities such as blasting and bulldozing were allowed, it would inhibit my ability to visit and enjoy these sites, destroy a site that means so much to people to in this region, and would eliminate the history behind one of the greatest demonstrations of human, constitutional and civil rights in America.

10.     I feel that Blair Mountain tells a story of a battle that is an incredible high point in the labor history of America, and is a nationally important site for commemorating the struggles of working people in the early twentieth century. From a historical perspective, it would be a travesty if this site were not preserved.

11.     If the Blair Mountain Battlefield is designated as lands unsuitable for surface coal mining, it will be reassuring to me to know that this important historical, archaeological and cultural site will be preserved for myself and future generations alike, and I will be able to continue my visits there. I will also be reassured that my economic interests in operating Coal Country Tours will be preserved, and that my company will still be able to serve historic tourists desiring to visit Blair Mountain, a main attraction in the area.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct. Executed this  4  day of  May          , 2011.


Doug Estepp

# Exhibit L

# The Impact of Surface Mining Permits on the Archaeological Resources at Blair Mountain

## Sept. 8, 2010

**Friends of Blair Mountain**
**www.friendsofblairmountain.org**



# Table of Contents

**Introduction and background**..............................................................1

**O502990 – Piney Fork Slurry Impoundment**...............................4

**O505692 – Adkins Fork Haul-Road and Conveyor**....................7

**P072900**.............................................................................................10

**S500189**.............................................................................................13

**S500503 Adkins Fork Surface Mine**.............................................16

**S500591**.............................................................................................19

**S501188**.............................................................................................21

**S501390 – Camp Branch**................................................................24

**S504991 Bumbo No. 2 Mine**..........................................................27

**S505286**.............................................................................................29

**S508187**.............................................................................................31

**Conclusion**........................................................................................33

**Work Cited**........................................................................................34

**Appendix 1 – Explanation of Metadata**......................................35

**Appendix 2 – Permit raw data**.....................................................37

This document contains sensitive information regarding the location of archaeological resources. Please do not under any circumstances distribute or make this document available to the public domain.  This is only a preliminary report, and should not be treated as a comprehensive coverage. A more complete and up to date report will be forthcoming. No reproduction may be made without written permission from the Friends of Blair Mountain.

## Introduction

The Blair Mountain battlefield, location of the 1921 labor conflict in Logan, WV, is currently in the process of being nominated to the National Register of Historic Places, and its current status is that of eligible.  The battlefield itself is threatened by surface mining, also known as mountaintop removal. There are 11 surface mining permits in all, and which are in various stages of the planning, active, and reclamation process (See map 1 on page 3). This report discusses surface mining permits that are either directly in or adjacent to the area deemed eligible for listing on the National Register of Historic Places (NRHP), and the permits' relationship to the archaeological resources within the battlefield.  The permits that most endanger the mountain are O505692, P072900, S500503, S501390, S504991, and S508187. The permits that directly relate to the abandonment of right away for County Route 119/7 are 0505692 and S500503.

## Background

The battlefield stretches from north to south over eight miles in a straight line, but it is roughly 14 miles following the ridges of the battlefield. The battlefield can be divided into four major sections, from north to south: Mill Creek, Crooked Creek, Beech Creek, and the Blair Gap area (see image 1). The Crooked Creek (CC) and Blair Gap (BG) areas, according to an archaeological survey undertaken in 2006, show evidence of heavy fighting. Some signs of fighting were found in the Mill Creek (MC) area, and although this evidence was relatively small compared to CC and BG, the survey was preliminary and more work is needed in this area. The Beech Creek area, which is mentioned in historical documents as an area where fighting took place, is mostly unsurveyed and needs significant archaeological survey.

Data from this report was gathered from the United States Geological Service (USGS), the West Virginia Department of Environmental Protection (WV DEP), the WV State Historic Preservation Office (SHPO), and from archaeological survey.  Data from the DEP, which includes the surface mining permit shapefiles and metadata, are from 11/03/09 or before (as taken from the most current date from the

1

metadata supplied by the DEP, specifically the Mdate or the last inspection date). The interpretation of the data categories and labels is included in the appendix of this report. The base maps are collarless topographic maps retrieved from the USGS website and include the Henlawson, Logan, Clothier and Amherstsdale 7.5 minute quadrangles, from the NAD 1983 datum.  Maps were made with the software ArcGIS version 9.3

   As a note for the maps, the battlefield area eligible for listing on the NRHP is shown on the map in the form of a gray polygon, with an area inside that is clear. It is the clear area that is the battlefield, the polygon is used to highlight the area and to present a clear view of the battlefield area.  Surface mining sites are in red, and selected sites are shown in black. All measurements are in meters. It also should be noted that there are two levels of permits that are needed for surface mining operations to occur, one from the WV DEP and another from the US Corps of Engineers. This report only covers the permits from the WV DEP.



This map shows the Blair Mountain Battlefield, with surface mining permits and archaeological sites. Surface mining permits are in red and orange (no difference between colors, this is an earlier map that needs to be redone), the sites are the black circles with blue crosses inside, and everything inside the beige polygon is the battlefield. Beech Creek area is not labeled on this map; it is the area between Blair Gap and Crooked Creek Gap. The battlefield has three extensions of land jutting off to the north between BG and CC.

3

These are ridgelines that intersect the main ridgeline of Spruce Fork Ridge, which is the ridgeline of the battlefield running north to south the length of the battlefield. These extensions will be designated in this report as, running north to south, the Crooked Creek extension, the Beech Creek extension, and the Left Fork extension. The Beech Creek area is between the Beech Creek (middle) and Left Fork (southern) extensions.

**O502990 – Piney Fork Slurry Impoundment**

**Threat Level: MODERATE**

**Permit Status: Completely Released, Expired**

Permit O502990 is a slurry impoundment to be constructed in Ethel Hollow area, specifically a branch of Ethel Hollow named Pine Fork. The majority of the permit is not in the eligible area, but is directly adjacent to the boundary, meeting right to the battlefield boundary for the majority of the northern edge of the permit area. The general boundary parameters for the battlefield in this area are the 1600-meter lines along the Spruce Fork Ridge, with elevation above 1600 meters being within the battlefield. For the most part, the O502990 permit runs to the 1580-meter line, with some of the permit boundary meeting and overlapping the 1600 meter line. In places.

The data as retrieved from the WV DEP lists this application as having an unknown use, but as the name suggests, the permit is for a slurry impoundment. The permit was issued to the Aracoma Coal Company Inc., without an identified operator, due to the fact this is a slurry impoundment rather than a surface mine application (as will be seen in later permits, there is both a permittee and an operator given for most other permits). The permit was issued on 5/12/1990, and expired 5/12/2005. As of November 03, 2009, this permit has not been renewed, although it is listed as being 'completely released' in the permit process. The area encompassed by this permit is 332 acres, with a perimeter of 9208 meters.

The area of the battlefield that this permit would impact is the Beech Creek (BC) area. This is one of the historically documented areas of the battle (Meador 1991; Blizzard Trial Transcripts 1922), but has had almost no systematic archaeological survey undertaken in the area. On the ridgeline above the permit runs a main gravel road that gives access to the battlefield from Route 17, from the Blair Gap area to near Crooked Creek. Along with another permit, S500189, this whole area of the battlefield would be destroyed. Although no known sites have as

4

yet been discovered in the O502990 permit boundary, this area deserves protection and extensive archaeological investigations due to the high potential of archaeological resources being in the area.

# O502990
# Piney Fork Slurry Impoundment



**LEGEND**

NAD 1983 datum
7.5 minute quadrangles
Amherstdale
Henlawson
Logan
Clothier

O502990
MTR permits
boundary donut

Surface Mining Permits
O502990, O505692, P072900, S500189,
S500503, S500591, S501188, S501390,
S504991, S505286, S508187

N

Created by
Friends of Blair Mountain
www.friendsofblairmountain.org
July 24, 2010

0   500 1,000   2,000   3,000   4,000
Meters

# O502990 Piney Fork
## Close-up



**LEGEND**

MTR permits

boundary donut

Surface Mining Permits
O502990, O505692, P072900, S500189,

NAD 1983 datum
7.5 minute quadrangles
Amherstdale
Henlawson
Logan

Created by
Friends of Blair Mountain
www.friendsofblairmountain.org
July 24, 2010

0    100  200        400        600        800

7

**O505692 – Adkins Fork Haul-Road and Conveyor**
**THREAT LEVEL: Moderate**
**PERMIT STATUS: Granted, Not Yet Active**

This permit is for a haul-road and conveyor track for the Adkins Fork Surface Mine. It is located in the far southern end of the battlefield, near the White Trace Ridge and the South Crest areas of the Blair Gap section. It connects to and overlaps part of Route 119/7, a road which the state of WV is considering abandoning the right-of-way to.  This permit would serve as the primary vector for the extracted coal from the Adkins Fork Surface Mine (permit S500503).  Although this permit does not directly encompass any known site, it is roughly 92 meters from site 46LG202 on White Trace Ridge.  It connects Route 119/7 with Adkins Fork hollow on the south side of White Trace Ridge.

This permit was first issued in 1993, and was renewed through 7/16/2013. It is classified as an A4 site, meaning that its permit status is active, but with no coal removed as of yet.  The original permit was for 80 acres, the current permit is for 102 acres, with a perimeter of 30,995 meters.  The permit is granted to the Mingo Logan Coal Company.  This site has had 13 total violations of its permit since it has been issued, although the information on what these violations consist of is missing from the WV DEP data.

# O505692
# Adkins Fork Haulroad



| | |
|---|---|
| ■ | O505692 |
| ■ | MTR permits |
| ☐ | boundary donut |

Surface Mining Permits
O502990, O505692, P072900, S500189,
S500503, S500591, S501188, S501390,
S504991, S505286, S508187

N

**LEGEND**

NAD 1983 datum
7.5 minute quadrangles
Amherstdale
Henlawson
Logan
Clothier

Created by
Friends of Blair Mountain
www.friendsofblairmountain.org
July 24, 2010

0   500 1,000   2,000   3,000   4,000
Meters

# O505692
# Close-up



**LEGEND**

O505692

MTR permits

boundary donut

N

Surface Mining Permits
O502990, O505692, P072900, S500189,
S500503, S500591, S501188, S501390,
S504991, S505286, S508187

NAD 1983 datum
7.5 minute quadrangles
Amherstdale
Henlawson
Logan
Clothier

Created by
Friends of Blair Mountain
www.friendsofblairmountain.org
July 24, 2010

0   100   200      400      600

**P072900**

**THREAT LEVEL: Medium**

**PERMIT STATUS: Granted, Not Yet Active**

**SITES AFFECTED: 46LG205, North Crest 1a, North Crest 1b**

Permit P072900 is unnamed in the data from the WV DEP, but seems to both a haulroad and some sort of either surface mine, slurry pond, or other large construction. The permit is relatively irregular in shape, starting as a large area to the northeast of the battlefield at Montclo near the Left Fork of Beech Creek. As it moves south, it narrows into a road or vector for movement of material. It travels roughly 3.9 kilometers until it runs into the Blair Mountain Battlefield. It enters near the northernmost part of the Blair Gap area, and runs through some of the most significant sites of the battlefield, including three documented and recorded sites on file at the WV SHPO.

The first site is the knoll recorded as 46LG205, and the second two are sites located during Dr. Harvard Ayer's 2006 survey, known as North Crest 1a and 1b (trinomial designation unknown).  The North Crest area, as one of the main defensive sites, is a major location within the battlefield. In addition, site 46LG205, as a previous report by Friends of Blair Mountain details (Report on Disturbance at Blair Mountain, 2010), was the scene of heavy fighting in the Blair Gap area, and its position at the head of White Trace Branch (a main approach of the miners) places this as an extremely significant part of the battlefield.  Overall, this permit would damage some of the most historically significant sites in the battlefield.

This permit was first issued 1/18/1981, and has been renewed through 9/13/2012.  It is classified as an A4 site, meaning that its permit status is active, but with no coal removed as of yet.  The permit is for 181 acres, with a perimeter of 18,379 meters meters.  The permit is granted to The Mingo Logan Coal Company, with the designated operator Eagle Creek Mining LLC.  This site has had 48 total violations of its permit since it has been issued.

# P072900



P072900

MTR permits

boundary donut

Surface Mining Permits
C502990, O505692, P072900, S500189,

N

**LEGEND**

NAD 1983 datum
7.5 minute quadrangles
Amherstdale
Henlawson
Logan

Created by
Friends of Blair Mountain
www.friendsofblairmountain.org
July 24, 2010

0  500 1,000  2,000  3,000  4,000

# P072900



**S500189**
**THREAT LEVEL: Low**
**PERMIT STATUS: Granted, Mined, Reclaimed**

This is an older permit for what seems to be contour mining in the Beech Creek area, which is a historically documented route of the miners. But, whether or not more mining is planned for this area is till unclear. It is located in the hollow between the two extensions of the Blair Mountain battlefield that surround the Beech Creek Approach.  This permit does not directly border the Blair Mountain battlefield boundary, stopping at around the 1400-meter topographic line, but the actual surface mining as represented on the USGS 7.5 topographic maps shows operations were conducted outside the permit boundary up to the 1600-meter line that marks the battlefield boundary. This area could still be a potential area to locate artifacts from the battle, but with the heavy mining already undertaken at this location, it is likely that much has been disturbed or destroyed. A full archaeological investigation should be undertaken in this area to access the extent of damage and archaeological integrity.

This permit was first issued 9/21/1990, and expires 9/21/2010.  It is classified as an A3 site, meaning that its permit status is active, but is in the process of being reclaimed. In other words, it seems as if this site has been mined, but is still in the permit system because it is still being monitored for reclamation. The permit is for 234 acres, with a perimeter of 10,122 meters.  The permit is granted to The Mingo Logan Coal Company, with the designated operator Old Hickory Coal Co.  This site has had 5 total violations of its permit since it has been issued.

# S500189



S500189

MTR permits

boundary donut

Surface Mining Permits
O502990, O505692, P072900, S500189,

N

**LEGEND**

NAD 1983 datum
7.5 minute quadrangles
Amherstdale
Henlawson
Logan

Created by
Friends of Blair Mountain
www.friendsofblairmountain.org
July 24, 2010

0   500 1,000   2,000   3,000   4,000

**S500503 Adkins Fork Surface Mine**
**THREAT LEVEL: Very High**
**PERMIT STATUS: Granted, Not Yet Active**
**SITES AFFECTED: 46LG201, 46LG202, 46LG203, 46LG204, 46LG206,**
**WTR1a, WTR1b, WTR1c, WTB1a, WTB1b, 46LG221a, 46LG221b**

This permit is located on the southern edge of the battlefield, along the White Trace Branch and White Trace Ridge areas of the BG section. It would destroy all of White Trace Ridge, where 8 known sites have been located and documented (46LG201, 46LG202, 46LG203, 46LG204, 46LG206, WTR1a, WTR1b, WTR1c). Although more research is needed, initial analysis suggests that the miners, who were firing on the defenders at the South Crest of Blair Mountain, occupied this area. In addition, a small piece of the permits breaks off and runs through White Trace Branch.  WTB was an approach of the miners, and evidence of the battle has been found through the hollow.  Two recorded sites (WTB1a, WTB1b) have been located and documented along the small access or egress route in the permit. To add even more to the destruction of this area, another small egress route connects on the western side to Route 119/7.  This access/egress route runs within 30 meters of site 46LG221a and 128 meters of 46LG221b, also known as South Crest 1a and South Crest 1b respectively.

Overall, this permit would affect 12 major sites in the battlefield. Both WTR and WTB is some of the most historically significant areas in the whole Blair Mountain battlefield due to these areas being the only places found as of yet that contains material artifacts from the miners' army.  Along with South Crest and North Crest, this is some of the only known part of the battlefield with superb archaeological integrity of material culture from both sides of the participants in the battle (although more investigations at other areas which have undergone substantially less systematic survey may result in the discovery of more areas of significance) .

18

The S500503 permit is a new permit, issued 9/25/2007 and expiring on 9/25/2012. It is classified as NS, or not started. The permit is for 332.9 acres, with a perimeter of 12919 meters. The permittee is Mingo Logan Coal Company with no designated operator as of yet.

# S500503
# Adkins Fork Surface Mine



| S500503 | **LEGEND** | Created by |
| MTR permits | NAD 1983 datum | Friends of Blair Mountain |
| boundary donut | 7.5 minute quadrangles | www.friendsofblairmountain.org |

N

Surface Mining Permits
C502990, O505692, P072900, S500189,
S500503, S500504, S501188, S501300

Amherstdale
Henlawson
Logan

0   5001,000   2,000   3,000   4,000

**S500591**

**THREAT LEVEL: None**

**PERMIT STATUS: Mined Already, Reclamation phase**

This permit is located in the northeast area of the battlefield, along the second extension in the Beech Creek/ Crooked Creek Area. It is adjacent to and part of the surface mining operation under permit S501188. Permit S500591 (as well as S501188) has already been mined, and are in the reclamation phase. The area that was impacted has not had any systematic archaeological survey as of yet, and so no known archaeological sites are within its area. But, the part of the battlefield where it is located, on the ridge separating Hewitt Creek from Beech Creek, is a potentially significant site due to its position overlooking two important approaches that according to historical sources the attacking miners are said to have taken.

This permit was first issued 6/28/1991, and expired 6/28/2001.  It is classified as a P2 site, meaning that it is Phase 2 released. In other words, it seems as if this site has been mined, but is still in the permit system because it is still being monitored for reclamation. The permit is for 186.93 acres, with a perimeter of 20,139 meters.  The permit is granted to The Mingo Logan Coal Company, with the designated operator Old Hickory Coal Co.  This site has had 13 total violations of its permit since it has been issued.

# S500591



S500591

MTR permits

boundary donut

Surface Mining Permits
O502990, O505692, P072900, S500189,
S500593, S500591, S501188, S501390

N

**LEGEND**

NAD 1983 datum
7.5 minute quadrangles
Amherstdale
Henlawson
Logan

Created by
Friends of Blair Mountain
www.friendsofblairmountain.org
July 24, 2010

0   5001,000   2,000   3,000   4,000

**S501188**

**THREAT LEVEL: None**

**PERMIT STATUS: Mined Already, Reclamation phase**

This permit is located on the northern extension, and is bordered by the previous permit discussed, S500591. This permit has already been mined, and is in reclamation stage. Only a portion of the permit is within the limits of the battlefield, but this area has not had any systematic survey undertaken at it as of yet. The ridgeline that makes up the extension is the ridge between Crooked Creek and Beech Creek. This is an area that is significant due to its mention in historical sources as an area where miners were attempting to approach the Spruce Fork Ridgeline that runs north to south through the battlefield.

This permit was first issued 7/29/1988, and expired 7/29/2008.  It is classified as a PV site, meaning that it is Phase 1 release with 60 percent revegetation. In other words this site has been mined, but is still in the permit system because it is still being monitored for reclamation. The original permit was for 254 acres, the current permit is for 285.18 acres, with a perimeter of 5811.331 meters.  The permit is granted to the Mingo Logan Coal Company, with the designated operator Old Hickory Coal Co.  This site has had 18 total violations of its permit since it has been issued.  In all, 262.15 acres were disturbed, with 182.1 acres reclaimed.

24

# S501188



LEGEND

S501188

MTR permits

boundary donut

Surface Mining Permits
O502990, O505692, P072900, S500189,
S500503, S500591, S501188, S501390

N

NAD 1983 datum
7.5 minute quadrangles
Amherstdale
Henlawson
Logan

Created by
Friends of Blair Mountain
www.friendsofblairmountain.org
July 24, 2010

0    500 1,000    2,000    3,000    4,000

25

# S501188



**LEGEND**

S501188

MTR permits

boundary donut

Surface Mining Permits
O502990, O505692, P072900, S500189,
S500503, S500591, S501188, S501300

N

NAD 1983 datum
7.5 minute quadrangles
Amherstdale
Henlawson
Logan

Created by
Friends of Blair Mountain
www.friendsofblairmountain.org
July 24, 2010

0   125 250      500      750      1,000

26

**S501390 – Camp Branch**
**THREAT LEVEL: EXTREMELY HIGH**
**PERMIT STATUS: Active, Moving Coal**

This permit is located to the north and west of the Blair Gap area, and is an active site. The permit intrudes into the area of the battlefield, and if surface mining is allowed in this area, the southern end of the battlefield will be completely cut off from the northern part. In addition, there are two known but as of yet unrecorded sites within this area. Both sites contain physical features such as trenches that remain from the battlefield. These sites both need a systematic survey to be undertaken, as these are possibly highly significant sites. A major branch of the head of Left Fork of Beech Creek leads directly to these sites, and would have most likely been an important part of the defense. It is also in this area that historical documents suggest a notable event from the battle occurred – the shooting of New York Tribune reporter Boyden Sparks (Charleston Daily Mail, Sept. 4, 1921, page 1)

Currently the western part of the permit area is being mined, and is moving eastward toward the battlefield. Mining is roughly 800-1200 meters away from the battlefield perimeter (will have more precise measurements soon, this is just a very rough estimate). This area needs substantial monitoring, and a mitigation plan if mining seems to be imminent.

This permit was first issued 7/29/1991, and expires 7/29/2011.  It is classified as an AM site, meaning that it is "active, moving coal". The original permit was for 912.1 acres, the current permit is for 1123.14 acres, with a perimeter of 32,279.53 meters.  The permit is granted to the Aracoma Coal Company, Inc, with the designated operator being Rum Creek Coal Sales, Inc.  This site has had 22 total violations of its permit since it has been issued.  In all, 150 acres have been destroyed as of 11/03/2009.

# S501390



**S501390**
**MTR permits**
**boundary donut**

Surface Mining Permits
O502990, O505692, P072900, S500189,

N

## LEGEND

NAD 1983 datum
7.5 minute quadrangles
Amherstdale
Henlawson
Logan

Created by
Friends of Blair Mountain
www.friendsofblairmountain.org
July 24, 2010

0   500 1,000   2,000   3,000   4,000

28

**S504991 Bumbo No. 2 Mine**
**THREAT LEVEL: HIGH**
**PERMIT STATUS: Active, No Coal Removed**

This large permit is located along a long stretch of Spruce fork Ridge, from the southern extension to the northern extension. In other words, the permit encompasses the whole of the Beech Creek Hollow area of Spruce Fork Ridge. One known site has been recorded in this area, this is a rock outcrop that was a defensive position for the Logan forces. This site was documented in the 2006 survey undertaken by Ayers and King (Ayers *et al*. 2007). In addition, one undocumented site that is highly significant is known to be in this area. This undocumented site is near the Left Fork area and involves the horsetrail that Captain Brockus travelled over into union territory. This foray was the spark that started the battle. The background is that there was a truce that had just been agreed upon before the fighting, and the miners were going home. But Brockus' excursion angered the miners and the march was back on. In addition, signs of fighting have been discovered at this pass, and this seems to be a major battle area that has previously gone undocumented. This area especially needs significant further study, such as a full pedestrian survey. In all, the whole area encompassed by permit S504991 needs to be surveyed, as only very preliminary surveys have been done in this area, and only a very small percentage (less than 1 percent) at that.

This permit was first issued 2/24/1995, and expires 2/24/2010.  It's Pstatus (see appendix 1 for meaning) classified it as an IN site, meaning that it is "inactive". The Mstatus states that it is A4, meaning "active, no coal removed". This permits deserves a close-watch. The original permit was for 1511.49 acres, the current permit is for 1561.24 acres, with a perimeter of 23153.78 meters.  The permit is granted to the Mingo Logan Coal Company, with the designated operator being Old Hickory Coal Co.  This site has had 1 total violations of its permit since it has been issued.  The metadata for this permit states that 305.67 acres have been disturbed, which is interesting. This nature and status of this permit needs more in-

depth research.

# S504991
# Bumbo No. 2 Mine



## LEGEND

S504991

MTR permits

boundary donut

Surface Mining Permits
C502990, O505692, P072900, S500189,

N

NAD 1983 datum
7.5 minute quadrangles
Amherstdale
Henlawson
Logan

Created by
Friends of Blair Mountain
www.friendsofblairmountain.org
July 24, 2010

0   500 1,000   2,000   3,000   4,000

**S505236**

**THREAT LEVEL: Low**

**PERMIT STATUS:  Completely Released**

This permit is located to the north of the Blair Gap area, near the Beech Creek area. The permit does not actually intrude into the battlefield, but this area is part of the potentially significant section of the Beech Creek area.  No known sites are within this area, but there has been no systematic survey within the area.

This permit was first issued 9/05/1986, and expired 9/05/2006.  It is classified as a PV site for the Mstatus, meaning that it is "Phase 1 released, with 60 percent vegetation". For the Pstatus it is classified as 'RC', meaning it is completely released. The original permit was for 161.46 acres, with a perimeter of 868 meters. The permit was granted to the Mingo Logan Coal Company, with the designated operator being Eagle Creek Mining Company.  This permit has had 12 total violations of its permit since it has been issued.  In all, 161.46 acres have been disturbed as of 11/03/2009.

# S505286



**LEGEND**

NAD 1983 datum
7.5 minute quadrangles
Amherstdale
Henlawson
Logan

S505286
MTR permits
boundary donut

Surface Mining Permits
C502990, O505692, P072900, S500189,

N

Created by
Friends of Blair Mountain
www.friendsofblairmountain.org
July 24, 2010

0   500 1,000   2,000   3,000   4,000

34

**S508187**

**THREAT LEVEL: High**

**PERMIT STATUS:  Active, Moving Coal**

This permit is located to the north of the Blair Gap area, near the Left fork of the Beech Creek area. The permit intrudes into the battlefield somewhat, and the whole area is part of the potentially significant section of the Beech Creek area.  No known sites are within this area, but there has been no systematic survey within the permit area. To the best of the authors knowledge, the mining activity as stated by the Mstatus (active, moving coal) is not currently impacting the battlefield.

This permit was first issued 3/09/1988, and expires 3/09/2013.  It is classified as a AM site for the Mstatus, meaning that it is "active, moving coal". For the Pstatus it is classified as 'RN', meaning it has been renewed. The original permit was for 1589 acres, with a current permit for 1258 acres, with a perimeter of 16673 meters.  The permit was granted to the Mingo Logan Coal Company, with the designated operator being Eagle Creek Mining Company.  This permit has had 44 total violations of its permit since it has been issued.  In all, 161.46 acres have been disturbed as of 11/03/2009.

# S508187



S508187

MTR permits

boundary donut

Surface Mining Permits
C502990, O505692, P072900, S500189,

N

## LEGEND

NAD 1983 datum
7.5 minute quadrangles
Amherstdale
Henlawson
Logan

Created by
Friends of Blair Mountain
www.friendsofblairmountain.org
July 24, 2010

0   500 1,000   2,000   3,000   4,000

**Conclusion**

The Blair Mountain battlefield currently has 11 surface mining permits that have been issued for areas within or directly adjacent to the battlefield boundaries. With the majority of the battlefield having had no systematic archaeological survey undertaken at it as of yet, these permits present several threats to the battlefield. Currently, there are six permits that are of serious threat to the battlefield – O505692, P072900, S500503, S501390, S504991, and S508187. The status of the permits should be monitored, and areas within these permits need extensive archaeological survey performed.

**Work Cited**

Ayers, H., Rothrock, Z. and King, K.
  2007 *Archaeological Investigations of the Battle of Blair Mountain: May 13 to November 19, 2006*, on
      file (unpublished), West Virginia State Historic Preservation Office.

Charleston Daily Mail
  1921   Scribes Mistaken for Rednecks by State Troopers on Mountain. Sept 4, Sunday
morning, page 1.,
      from West Virginia State Archives, accessed Aug. 7, 2010.

Meador, M.
  1991   The Redneck War of 1921: the Miner's March and the Battle of Blair
Mountain, in *The*
      *Goldenseal Book of the West Virginia Mine Wars*, edited by K. Sullivan,
Charleston, WV:
      Quarrier Press.

Transcripts
  1922   William C. Blizzard trial transcripts, WV State Archives. Accessed August 7,
2010.

**Appendix 1**
Explanation of metadata that accompanied download of mining permit GIS data, from
http://gis.dep.wv.gov/data/omr.html, accessed November 2009.

| PERMIT_ID | Unique permit identifier. First letter usually is indicative of mine type, e.g. u—underground, s—surface, q—quarry, h—haulroad, etc. For permits issued since the early 1990s, the second position indicates the DEP region (1-5), positions 3-5 are a sequential number indicating the $n^{th}$ permit received in a particular year, and positions 6-7 indicate the year. |
|---|---|
| MAPDATE | Date of the source map used to create the feature. The notary date is used for certified maps signed by a professional engineer. The latest revision date is used if the map has not been signed. Otherwise any apparent date is used. Dates that do not indicate a particular day (e.g. May, 1998) revert to the first day of the month. |
| APPTYPE | Permit activity associated with the source map<br><br>ibr    incidental boundary revision<br>ina    inactive status<br>sma   surface mining application (new permit)<br>ren    permit renewal<br>rel    final release<br>rev    revision<br>oth    other/unknown |
| MAPTYPE | Type of map used to create the boundary<br><br>pr    proposal map<br>pd    proposal drainage map<br>rp    renewal progress map<br>fi    final map<br>is    inactive status map<br>sc    subsidence control plan<br>dr    drainage map<br>ge    geologic map<br>ot    other |
| SHEETNO | Map sheet. Some permits are represented on more than one map |
| MF_TYPE | Feature type, used by internal DEP applications, always has a value of PERBD |
| ACTIVE_VIO | Active violations, at the time the data was created |
| TOTAL_VIO | Total violations, at the time the data was created |
| FACILITY_N | Facility name |
| ACRES_ORIG | Acres permitted originally |
| ACRES_CURR | Acres permitted currently |
| ACRES_DIST | Acres disturbed |
| ACRES_RECL | Acres reclaimed |
| EPERMIT_ID | Foreign key for faster joins to external databases, information is the same as PERMIT_ID |

| MSTATUS | Inspection status |  |
|---|---|---|
|  | A1 | A1-Active, Moving Coal Possible |
|  | A2 | A2-Active, Reclamation only |
|  | A3 | A3-Active, Reclaimed |
|  | A4 | A4-Active, No coal removed |
|  | AM | AM-Active, Moving Coal |
|  | AQ | AQ-Active Quarry |
|  | IA | IA-Approved inactive Status |
|  | UK | UK-Unknown |
|  | NS | NS-Not Started |
|  | P1 | P1-Phase 1 release (backfill/grading) |
|  | P2 | P2-Phase 2 release, revegetated |
|  | PG | PG-Prospecting > 250 tons |
|  | PR | PR-Prospecting < 250 tons |
|  | PV | PV-Phase1 release(60%revegetation or MR-1 |
|  | RC | RC-Reclaimed, but Chemical treatment of w |
|  | NONE | None Available—this option is used when the inspection date (MDATE) is older than one year. |
| MDATE | Date of last inspection.  Inspections typically occur quarterly. |  |
| ISSUE_DATE | Permit issue date |  |
| EXPIRE_DAT | Permit expire date |  |
| PSTATUS | Permit status |  |
|  | ACT | Active |
|  | IN | Inactive |
|  | IPH1 | Incremental Phase 1 Release |
|  | IPH2 | Incremental Phase 2 Release |
|  | IPH3 | Incremental Phase 3 Release |
|  | NW | New |
|  | P1 | Phase 1 Released |
|  | P2 | Phase 2 Released |
|  | RC | Completely Released |
|  | RI | Reinstated |
|  | RN | Renewed |
|  | RS | Rescinded |
|  | RV | Revoked |
|  | TERM | Terminated |
| PERMITTEE | Permit granted to |  |
| OPERATOR | Operator name |  |
| UPDATE_DAT | Date the feature was added to/modified in the geodatabase |  |
| SHAPE_AREA | area of feature, $m^2$ |  |
| SHAPE_LEN | perimeter, in meters |  |

41

## Appendix 2
Raw data from WV DEP files, downloaded from http://gis.dep.wv.gov/data/omr.html, accessed November 2009.

| PERMIT_ID | O502990 | O505692 | P072900 | S500189 | S500503 | S500591 |
|---|---|---|---|---|---|---|
| MAPDATE | 19900817 | 19971125 | 20020301 | 19991110 | 20030501 | 19960101 |
| APPTYPE | oth | ren | ren | ren | na | rel |
| MAPTYPE | pr | pd | rp | rp | pd | pd |
| SHEETNO | 02 | 01 | 01 | 01 | 01 | 01 |
| MF_TYPE | PERBD | PERBD | PERBD | PERBD | | PERBD |
| ACTIVE_VIO | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL_VIO | 0 | 13 | 48 | 5 | 0 | 16 |
| FACILITY_N | PINEY FORK SLURRY IMPOUNDMENT | ADKINS FORK HAULROA & CONVEYO | | | Adkins Fork Surface Mine | |
| ACRES_ORIG | 332.0 | 80.0 | 181.0 | 234.0 | 332.90 | 186.930 |
| ACRES_CURR | 332.0 | 102.940 | 181.0 | 234.0 | 332.90 | 186.930 |
| ACRES_DIST | 0.0 | 56.950 | 181.0 | 37.360 | 0.0 | 173.750 |
| ACRES_RECL | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 110.260 |
| MSTATUS | NONE | A4 | A4 | A3 | NS | P2 |
| MDATE | 3/6/08 | 10/29/13 | 10/28/13 | 10/28/13 | 9/4/13 | 9/2/13 |
| ISSUE_DATE | 5/13/94 | 7/7/97 | 1/19/85 | 9/22/94 | 9/26/11 | 6/29/95 |
| EXPIRE_DAT | 5/13/09 | 7/7/17 | 9/14/16 | 9/22/14 | 9/26/16 | 6/29/05 |
| PSTATUS | RC | RN | RN | RN | NW | P2 |
| PERMITTEE | ARACOMA COAL COMPANY INC | MINGO LOGAN COAL COMPANY | MINGO LOGAN COAL COMPANY | MINGO LOGAN COAL COMPANY | MINGO LOGAN COAL COMPANY | MINGO LOGAN COAL COMPANY |
| OPERATOR | | | EAGLE CREEK MINING LLC | OLD HICKORY COAL CO | | OLD HICKORY COAL CO |
| LAST_UPDAT | | | | | | |
| COMMENTS | | | | | | |
| SHAPE_AREA | 1307159.04785 | 378296.84995 | 761832.58795 | 856007.98050 | 1361349.13880 | 760131.89145 |
| SHAPE_LEN | 9208.65354 | 30995.76909 | 18379.70304 | 10122.46320 | 12919.49576 | 20139.09550 |

42

| PERMIT_ID | S501188 | S501390 | S504991 | S505286 | S508187 |
|---|---|---|---|---|---|
| MAPDATE | 19980501 | 20021113 | 19971101 | 19981102 | 19990309 |
| APPTYPE | ren | na | ren | ibr | ibr |
| MAPTYPE | rp | pd | dr | pr | pr |
| SHEETNO | 01 | 01 | 01 | 01 | 01 |
| MF_TYPE | PERBD | | PERBD | PERBD | PERBD |
| ACTIVE_VIO | 0 | 0 | 0 | 0 | 0 |
| TOTAL_VIO | 18 | 22 | 1 | 12 | 44 |
| FACILITY_N | | | BUMBO NO. 2 MINE | | |
| ACRES_ORIG | 254.0 | 912.10 | 1511.490 | 161.460 | 1589.210 |
| ACRES_CURR | 285.180 | 1123.140 | 1561.240 | 161.460 | 1258.250 |
| ACRES_DIST | 262.150 | 150.0 | 305.670 | 161.460 | 735.650 |
| ACRES_RECL | 182.10 | 0.0 | 0.0 | 0.0 | 0.0 |
| MSTATUS | PV | AM | A4 | PV | AM |
| MDATE | 8/19/13 | 11/4/13 | 10/28/13 | 7/15/13 | 10/17/13 |
| ISSUE_DATE | 7/30/92 | 7/30/95 | 2/25/99 | 9/6/90 | 3/10/92 |
| EXPIRE_DAT | 7/30/12 | 7/30/15 | 2/25/14 | 9/6/10 | 3/10/17 |
| PSTATUS | P1 | RN | IN | RC | RN |
| PERMITTEE | MINGO LOGAN COAL COMPANY | ARACOMA COAL COMPANY INC | MINGO LOGAN COAL COMPANY | MINGO LOGAN COAL COMPANY | MINGO LOGAN COAL COMPANY |
| OPERATOR | OLD HICKORY COAL CO | RUM CREEK COAL SALES INC | OLD HICKORY COAL CO | EAGLE CREEK MINING LLC | EAGLE CREEK MINING LLC |
| LAST_UPDAT | | | | | |
| COMMENTS | | | | | |
| SHAPE_AREA | 1054172.17920 | 4537546.66525 | 6040821.57320 | 23555.86090 | 3862066.30760 |
| SHAPE_LEN | 5811.33177 | 32279.53095 | 23153.78515 | 868.54337 | 16673.24180 |