## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

SIERRA CLUB, et al.                       )
                                          )
    Plaintiffs,                       )
                                          )
    v.                                )
                                          )    Civil Action No: 10-1513 (RBW)
                                          )
KEN SALAZAR,                              )
SECRETARY OF THE UNITED STATES            )
DEPARTMENT OF THE INTERIOR, et al.        )
                                          )
    Defendants.                       )
_____

## <u>MEMORANDUM OPINION</u>

The plaintiffs in this case—Sierra Club, Ohio Valley Environmental Coalition, Friends of

Blair Mountain, Inc., West Virginia Labor History Association, National Trust for Historic

Preservation in the United States, and West Virginia Highlands Conservancy—challenge the

decision by the Keeper of the National Register to remove the Blair Mountain Battlefield from

the National Register of Historic Places in violation of the Administrative Procedure Act, 5

U.S.C. § 706 (2006).  This matter is before the Court on the parties' cross-motions for summary

judgment.  <u>See</u> Pls.' Mot. for Summ. J. ("Pls.' Mot."); Defs.' Opp'n To Pls.' Mot. for Summ. J.

and Defs.' Cross-Mot. for Summ. J. ("Defs.' Mot.").   Upon careful consideration of the

submissions in this case,[1] the Court concludes that it must grant the defendants' motion for

summary judgment and deny the plaintiffs' motion for the reasons set forth below.

---

[1] In addition to the documents already referenced, the Court considered the following filings in resolving the parties'
cross-motions: (1) the Plaintiffs' Memorandum in Support of Motion for Summary Judgment ("Pls.' Mem."), (2) the
Plaintiffs' Summary Judgment Opposition and Reply ("Pls.' Opp'n"), (3) the Reply in Support of Defendants'
Cross-Motion for Summary Judgment ("Defs.' Reply"), (4) the <u>Amicus Curiae</u> Brief of United Mine Workers of
America in Support of Plaintiffs' Motion for Summary Judgment, and (5) the Brief of West Virginia Coal
Association, Inc. as <u>Amicus Curiae</u> in Support of Defendants' Brief in Opposition to Summary Judgment and Cross
Motion for Summary Judgment.

# I. STATUTORY AND REGULATORY BACKGROUND

## A.  National Historic Preservation Act

In 1966, Congress enacted the National Historic Preservation Act ("Preservation Act"), finding that the preservation of the nation's heritage "is in the public interest so that its vital legacy of cultural, educational, aesthetic, inspirational, economic, and energy benefits will be maintained and enriched for future generations of Americans."  16 U.S.C. § 470(b)(4) (2006). Under the Preservation Act, Congress authorized the Secretary of the Interior to create and maintain "a National Register of Historic Places composed of districts, sites, buildings, structures, and objects significant in American history, architecture, archeology, engineering, and culture."  Id. § 470a(a)(1)(A).  A state with an approved State Historic Preservation Program may nominate properties that meet this criteria for inclusion on the National Register of Historic Places ("National Register").  Id. § 470a(a)(3).  Before a property may be included on the National Register, the owner or owners of the property, or a majority of the owners of the properties within a historic district, must be given an opportunity to object to the property or district's nomination to the National Register.  Id. § 470a(a)(6).  If a majority of owners of properties within a historic district object to the property's inclusion on the National Register, "such property shall not be included on the National Register . . . until such objection is withdrawn."  Id.

## B.  Nomination, listing, and removal of a property from the National Register

Pursuant to the provisions in the Preservation Act, the Secretary of the Interior promulgated regulations governing the process for nomination of a property to the National Register.  36 C.F.R. § 60.1(a) (2012).  If a state has an approved State Historic Preservation

program, it is the responsibility of the State Historic Preservation Officer ("Preservation

Officer") to identify and nominate eligible properties for inclusion in the National Register.  Id. §

60.6(a).  In order to nominate a property, the Preservation Officer must submit the proposed

nomination to the State Review Board, which "shall determine whether or not the property meets

the National Register criteria for evaluation and make a recommendation to the State Historic

Preservation Officer to approve or disapprove the nomination."  Id. § 60.6(j).  "At least 30 but

not more than 75 days before the State Review Board meeting," the Preservation Officer must

provide notice of the intent to nominate the property to the owner or owners of the property and

"shall give the owner(s) at least 30 but not more than 75 days to submit written comments and

concur in or object in writing to the nomination of such property."  Id. § 60.6(c).  If a property

has more than fifty owners, the Preservation Officer may provide notice to the owners by

publication in at least one newspaper of general circulation in the area.  Id. § 60.6(d).  The list of

property owners required to receive notice "shall be obtained from either official land

recordation records or tax records, whichever is more appropriate, within 90 days prior to the

notification of intent to nominate."  Id. § 60.6(c).

An owner of the property who wants to object to the nomination of the property to the

National Register "shall submit to the State Historic Preservation Officer a notarized statement

certifying that the party is the sole or partial owner of the private property, as appropriate, and

objects to the listing."  Id. § 60.6(g).  In the case of an individual who submits an objection but

whose name does not appear on the Preservation Officer's previously compiled list of owners,

"such owner shall be counted by the State Historic Preservation Officer in determining whether a

majority of owners has objected" if the owner "certifies in a written notarized statement that the

party is the sole or partial owner of a nominated private property." Id.  In accordance with §
470a(a)(6), a property will not be listed in the National Register if a majority of owners of the
property object to such listing.  Id.  The Preservation Officer is responsible for determining if a
majority of property owners object to listing the property in the National Register.  Id.

      Following approval of a nomination by the State Review Board, the nomination and any
comments on the nomination are reviewed by the Preservation Officer, and if the Preservation
Officer "finds the nominations to be adequately documented and technically, professionally, and
procedurally correct and sufficient and in conformance with National Register criteria for
evaluation," the Preservation Officer forwards the nomination, any comments, and all notarized
statements of objection to the Keeper of the National Register of Historic Places ("the Keeper").
Id. § 60.6(k).  Upon the Keeper's receipt of the nomination, notice of the nomination is published
in the Federal Register.  Id. § 60.6(q).  Individuals or organizations who support or oppose a
nomination may submit comments to the Keeper regarding the nomination.  Id. § 60.6(t).  The
property will be listed in the National Register "within 45 days of receipt by the Keeper or
designee unless the Keeper disapproves a nomination, an appeal is filed, or the owner of private
property (or the majority of such owners for a district or single property with multiple owners)
objects by notarized statements received by the Keeper prior to listing."  Id. § 60.6(r).

      The Secretary of the Interior's regulations also set forth a procedure for removing
properties from the National Register.  Grounds for removal of a property from the National
Register include "[p]rejudicial procedural error in the nomination or listing process."  36 C.F.R.
§ 60.15(a)(4) (2012).  The Keeper may remove a property from the National Register upon its
own motion based upon prejudicial procedural error.  Id. § 60.15(k).  If the Keeper initiates the

removal of a property, "the Keeper will notify the nominating authority, the affected owner(s) and the applicable chief elected local official and provide them an opportunity to comment." Id. Properties that are removed pursuant to prejudicial procedural error "shall automatically be considered eligible for inclusion in the National Register without further action and will be published as such in the Federal Register." Id. § 60.15(a)(4).

### C.  Effects of listing property in the National Register

Listing of a privately-owned property in the National Register "does not prohibit under Federal law or regulation any actions which may otherwise be taken by the property owner with respect to the property." Id. § 60.2.  However, listing a property in the National Register does have several consequences, only one of which is at issue in this litigation.  Under the Surface Mining Control and Reclamation Act of 1977, listing in the National Register "require[s] consideration of a property's historic values in the determination on issuance of a surface coal mining permit." Id. § 60.2(d).  Specifically, the Act prohibits surface mining coal operations "which will adversely affect any publicly owned park or places included in the National Register of Historic Sites unless approved jointly by the regulatory authority and the Federal, State, or local agency with jurisdiction over the park or the historic site." 30 U.S.C. § 1272(e)(3) (2006). The statute provides that the prohibition is "subject to valid existing rights" and further exempts coal mining operations in existence on August 3, 1977.  Id. § 1272(e).

## II. FACTUAL BACKGROUND[2]

This litigation is the culmination of a lengthy controversy surrounding the nomination of a portion of Blair Mountain, in Logan County, West Virginia, to the National Register.  Spruce Fork Ridge, located on Blair Mountain, was "the site of the 1921 Battle of Blair Mountain that

---

[2] The relevant facts are taken from the administrative record unless otherwise noted.

ended an unsuccessful three-year struggle to unionize the coal miners of Logan, Mingo,

McDowell, and Mercer counties."  Administrative Record ("A.R.") at 00193.  The confrontation

between union and non-union forces was the "largest organized armed uprising in American

labor history," id., ending only when federal troops intervened, id. at 00218.

This case concerns the nomination of the Blair Mountain Battlefield to the National

Register by the West Virginia Preservation Officer in 2009.  First Am. Compl. ("Am. Compl.")

¶¶ 70, 72.  The WV Preservation Officer had previously nominated the Blair Mountain

Battlefield to the National Register in 2005 and 2008, A.R. at 00001–40, 00124–66, but was

unsuccessful in both efforts, id. at 00115 (indicating that 2005 nomination was returned by the

National Register staff for deficiencies in the nomination materials), id. at 00175 (withdrawing

2008 nomination from Keeper's consideration).

The WV Preservation Officer submitted the third nomination of the Blair Mountain

Battlefield to the Keeper on January 13, 2009.  Id. at 00182–224.  In preparation for the

nomination, on October 24, 2008, at the request of the WV State Historical Preservation Office

("WV Preservation Office"), a Senior Assistant Attorney General of the West Virginia Attorney

General's Office conducted research using the Logan County tax records to ascertain the owners

of any property included in the proposed historic district.  Id. at 00180.  The research performed

by the Assistant Attorney General yielded a count of 66 owners of property within the proposed

historic district.  Id. at 00181.  On November 24, 2008, the WV Preservation Office placed a

legal notice in a local newspaper advising property owners in the proposed district of the WV

Preservation Officer's intent to nominate the Blair Mountain Battlefield to the National Register

and soliciting comments and/or objections to the nomination.  Id. at 00869.  The notice stated the

following: "Any owner or partial owner who objects to listing should submit a notarized statement (certifying ownership and objection to listing) by December 29, 2008" to the WV Preservation Office.  Id.  The notice also stated: "Any notarized letters received by the State Historic Preservation Officer or the Keeper of the National Register objection [sic] to the earlier nominations will be considered by the Keeper of the National Register if the current property owners for that parcel are the same and the parcel remains in the current boundary."  Id.

In a letter to the Keeper accompanying the 2009 nomination, the WV Preservation Office indicated that it had received "[a] list of 39 objections with attached notarized affidavits" from the law firm of Jackson Kelly, PLLC[3] in March 2008, in response to an earlier nomination of the Blair Mountain Battlefield, which included objections from individuals who were not included in the lists of owners compiled for the 2005 or 2008 nominations, as well as individuals who appeared as owners on previous lists but were no longer included in the list compiled in October 2008.  Id. at 00180–81.  The WV Preservation Office indicated that it considered all of the objections because "signed affidavits swore that they were partial property owners of parcels within the boundary," yielding a total of 75 owners and 33 objections.  Id.  However, the WV Preservation Office concluded "in both instances . . . a majority of property owners have not filed objections in accordance with the Code of Federal Regulations."  Id.

On February 27, 2009, Jackson Kelly filed a petition with the Keeper pursuant to 36 C.F.R. § 60.6(t) objecting to the nomination of the Blair Mountain Battlefield.  Id. at 00228–35. The petition was filed on behalf of Natural Resource Partners, LP, Arch Coal, Inc., and Massey Energy Company, each of which "owns or leases minerals, particularly coal, with the expectation

---

[3] This law firm is variously referred to in the Administrative Record as Jackson Kelly and JacksonKelly.  The Court will use "Jackson Kelly," the spelling that appears in the amicus brief filed by counsel from Jackson Kelly on behalf of the West Virginia Coal Association.

of developing them in the nomination area." Id. at 00230. These three companies collectively "own the vast majority of the surface and minerals in the nomination area." Id.

As an attachment to its petition, Jackson Kelly included a copy of the list of owners compiled in October 2008 with notations reflecting Jackson Kelly's research on the property owners in the proposed historic district, yielding a total of 64 property owners. Id. at 00231. The petition also included 38 objections to the nomination of the Blair Mountain Battlefield, resulting in a count of 38 objections from individuals on the October 2008 list of 68 owners and 34 objections from individuals on the revised list of 64 owners. Id. at 00232. Thus, Jackson Kelly argued, "[r]egardless of which list, the April [Preservation Office] List, the October [Preservation Office] List or the Petitioners' List, your office deems correct, we have acquired objections to the proposed historic District from a simple majority of the owners in all cases." Id.

At the request of the National Register staff, the WV Preservation Office reviewed its list of property owners in comparison to the list provided by Jackson Kelly. Id. at 00279. The WV Preservation Office asserted that "a number of the discrepancies [Jackson Kelly] outline[s] . . . are inaccurate" because Jackson Kelly appeared to have compared its research with a list of owners compiled for a previous nomination. Id. The WV Preservation Office determined that it was appropriate to recalculate the total number of owners and objections using information from the list submitted by Jackson Kelly "[s]ince some of the property may have indeed changed owners in recent months." Id. at 00279–80. However, even using this revised list, the WV Preservation Office stated that it had received objections from less than half of the owners. Id. at 00280.

Jackson Kelly continued to submit owner objections to the Keeper following the nomination of the Battlefield by the WV Preservation Officer.  Id. at 00334–35.  In a communication with the National Register staff on March 30, 2009, the WV Preservation Office confirmed that, at that point, it had a list of 57 owners with 24 valid objections.  Id. at 00335.  On March 30, 2009, the Blair Mountain Battlefield was listed on the National Register.  Id. at 00336.

Shortly following the listing of the Blair Mountain Battlefield, however, on April 6, 2009, the WV Preservation Office sent a letter to the National Register staff indicating that it has "noted additional objections that were unintentionally overlooked" in its earlier count of objections to the nomination of the Battlefield.  Id. at 00351.  With the inclusion of these additional objections, the WV Preservation Office informed the National Register staff that "[t]he total number of objections increases from 22 to 30" while "[t]he total number of property owners remains at 57."  Id.  Due to this change in the number of objections, the WV Preservation Office then stated "we request that the Keeper consider Blair Mountain Battlefield as determined eligible for, rather than listed in, the National Register of Historic Places."  Id.  Following the submission of this letter, the WV Preservation Office compiled another list of owners and objections on May 21, 2009, which yielded a total of 57 owners and 30 objections to the nomination.  Id. at 00464.

In a letter dated July 22, 2009, the National Register staff informed the WV Preservation Office that they "consider[ed] the erroneous counting to constitute a procedural error," and that the Keeper intended to remove the Blair Mountain Battlefield from the National Register.  Id. at 00502.  The Chief of the National Register Program explained that National Register staff "concur with [the WV Preservation Office's] determination that more than 50% of the owners

objected to the National Register listing" based on information provided by the WV Preservation Office, "particularly the property owners and objections list dated May 21, 2009." Id. at 00502.

Following publication of the Keeper's notice of its intent to remove the Blair Mountain Battlefield in the local newspaper, id. at 00519, in September 2009, Dr. Harvard Ayers, a supporter of the nomination of the Blair Mountain Battlefield to the National Register, submitted research on property owners in the historic district compiled by an attorney he retained for this purpose, id. at 00521–28.  This research yielded a total number of 61 owners with 25 objections. Id. at 00522.

On December 30, 2009, the Keeper removed the Blair Mountain Battlefield from the National Register.  Id. at 00691.  In a January 6, 2010 letter to the WV Preservation Office, the Chief of the National Register program indicated that the Battlefield was removed "on the motion of the Keeper on the basis of the procedural error [the WV Preservation Office] explained in [its] letter of April 6, 2009," but that the Battlefield was automatically considered eligible for inclusion upon its removal from the National Register pursuant to 36 C.F.R. § 60.15(a)(4).  Id.  On July 6, 2010, Sierra Club, the Ohio Valley Environmental Coalition,[4] and the National Trust for Historic Preservation in the United States submitted a petition to the Keeper requesting reconsideration of its decision to remove the Blair Mountain Battlefield from the National Register.  Id. at 00736.  On July 29, 2010, the Keeper informed the petitioners that she would not consider their petition because "the Petition does not present a basis for the

---

[4] The petition submitted to the Keeper requesting reconsideration of the decision to remove the Blair Mountain Battlefield from the National Register was submitted by Sierra Club, the National Trust for Historic Preservation in the United States, and an organization entitled the "Ohio Valley Environmental Council."  A.R. at 00736.  However, the plaintiffs indicate that the petition was submitted by one of the plaintiff organizations, the Ohio Valley Environmental Coalition.  See Pls.' Mem. 25.  Therefore, the Court will treat the use of the term "council" in the petition submitted to the Keeper as a typographical error and refer to the organization as the Ohio Valley Environmental Coalition.

Keeper to reconsider listing Blair Mountain Battlefield pursuant to section 60.15(a)(4)." <u>Id.</u> at 00778.

On September 9, 2010, the plaintiffs brought this case alleging that (1) "[t]he Keeper's action in removing Blair Mountain Battlefield from the National Register was arbitrary, capricious, an abuse of discretion and otherwise not in accordance with the law" in violation of 5 U.S.C. § 706(2)(A), 16 U.S.C. § 470a(a)(6), and 36 C.F.R. § 60.6(c), Am. Compl. ¶ 70, and (2) "[t]he Keeper's conclusion that there was a prejudicial procedural error in the WV [Preservation Office]'s calculation of owner objections to the National Register nomination of Blair Mountain Battlefield was arbitrary and capricious, an abuse of discretion," and in violation of 5 U.S.C. § 706(2)(A), 16 U.S.C. § 470a(a)(6), and 36 C.F.R. Part 60, Am. Compl. ¶ 72.  On April 11, 2011, the plaintiffs moved for summary judgment on their claims.  <u>See</u> Pls.' Mot.   On May 23, 2011, the defendants filed a cross-motion for summary judgment on the basis that the plaintiffs lack standing to bring this lawsuit.  <u>See</u> Defs.' Mot.

### III. STANDARD OF REVIEW

Because Article III of the Constitution limits the jurisdiction of this Court to the resolution of cases and controversies, the Court must address first the plaintiffs' standing to bring this suit.  <u>Fla. Audubon Soc'y v. Bentsen</u>, 94 F.3d 658, 663 (D.C. Cir. 1996).  The party that invokes federal jurisdiction bears the burden of establishing the elements of standing "in the same way as any other matter on which the plaintiff bears the burden of proof."  <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 561 (1992).  At the summary judgment stage, "[b]are allegations are insufficient," <u>Sierra Club v. EPA</u>, 292 F.3d 895, 898 (D.C. Cir. 2002), and the plaintiff "must 'set forth' by affidavit or other evidence 'specific facts,' . . . which for purposes

of the summary judgment motion will be taken to be true, <u>Defenders of Wildlife</u>, 504 U.S. at

561.  When an administrative action is challenged, "the petitioner must either identify in [the

administrative] record evidence sufficient to support its standing to seek review or, if there is

none because standing was not an issue before the agency, submit additional evidence" to

establish that standing exists.  <u>Sierra Club</u>, 292 F.3d at 899.  When a plaintiff is not itself the

object of the challenged administrative action and standing depends on the actions of individuals

or organizations not before the court, "it becomes the burden of the plaintiff to adduce facts

showing that those choices have been or will be made in such manner as to produce causation

and permit redressability of injury."  <u>Defenders of Wildlife</u>, 504 U.S. at 561–62.  In such a case,

"standing is not precluded, but it is ordinarily 'substantially more difficult' to establish."  <u>Id.</u> at

562.

    A motion for summary judgment will be granted "if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law."  Fed. R. Civ. P. 56(a).[5]  In evaluating a motion for summary judgment, the court must view

the evidence "in the light most favorable to the nonmoving party" and must "draw all reasonable

inferences in favor of the nonmoving party."  <u>Talavera v. Shah</u>, 638 F.3d 303, 308 (D.C. Cir.

2011) (citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986)).  Summary judgment

is appropriate if the non-moving party "fails to make a showing sufficient to establish the

---

[5] Courts do not generally apply the standard of review for summary judgment set forth in Federal Rule of Civil
Procedure 56(a) in a case seeking review of agency action under the Administrative Procedure Act because the court
is limited to determining "whether the agency action is supported by the administrative record and [is] otherwise
consistent with the [Administrative Procedure Act] standard of review."  <u>See, e.g.</u>, <u>Nat'l Mining Assoc. v. Jackson</u>,
816 F. Supp. 2d 37, 41–42 (D.D.C. 2011).  Here, however, the Court applies the normal standard under Rule 56 in
determining whether the plaintiffs have demonstrated Article III standing, which often involves consideration of
information outside of the administrative record.  <u>See Sierra Club</u>, 292 F.3d at 899 (holding that appellants before
the District of Columbia Circuit must submit additional evidence if their standing is not apparent from the
administrative record, as would be necessary at the summary judgment stage in the trial court).  Since the Court does
not reach the merits of the plaintiffs' claims, the Court need not address the standard applicable to a motion seeking
summary judgment on claims made under the Administrative Procedure Act.

existence of an element essential to that party's case," on which the party bears the burden of

proof.  Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986).  "The mere existence of a scintilla

of evidence in support of the [non-moving party's] position will be insufficient; there must be

evidence on which the jury could reasonably find for the [non-moving party]."  Anderson, 477

U.S. at 252.

## IV. ANALYSIS

An association has standing to bring suit on behalf of its members if (1) the association's

members would have standing to bring suit in their own right, (2) the interests at stake in the

litigation are germane to the association's purpose, and (3) neither the claim asserted nor the

relief requested requires the participation of individual members of the association in the

litigation.  Sierra Club, 292 F.3d at 898 (citing Hunt v. Wash. State Apple Adver. Comm'n, 432

U.S. 333, 342–43 (1977)).  To demonstrate that at least one of its members has standing an

organization must show that "(1) it has suffered an 'injury in fact' that is (a) concrete and

particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly

traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely

speculative, that the injury will be redressed by a favorable decision."  Friends of the Earth, Inc.

v. Laidlaw Envtl. Servs., Inc., 528 U.S. 167, 180–81 (2000) (citing Defenders of Wildlife, 504

U.S. at 560–61).

The plaintiffs characterize their claim as a "procedural injury," arguing that the

defendants' failure to follow the Preservation Act and the regulations governing the nomination

of properties to the National Register, resulting in the removal of the Blair Mountain Battlefield

from the National Register, deprives the Battlefield of the heightened protection from surface

mining that it would enjoy under the Surface Mining Control and Reclamation Act if the Battlefield was a listed property.  Pls.' Opp'n 1–2, 5–6.  The plaintiffs contend that in light of this vulnerability, if surface mining takes place at the Battlefield site, topographical features of the Battlefield and artifacts buried in the soil will be destroyed.  Pls.' Opp'n 5.  According to the plaintiffs, individual members of the plaintiff organizations will thus be harmed because they will be unable to enjoy the Battlefield as a historical resource.  <u>See</u> Pls.' Opp'n 3–4; Pls.' Mem. Ex. 1, ¶ 14; Pls.' Mem. Ex. 2, ¶¶ 10–11; Pls.' Mem. Ex. 3, at 2; Pls.' Mem. Ex. 4, ¶¶ 7, 10; Pls.' Mem. Ex. 5, ¶¶ 6, 7, 9; Pls.' Mem. Ex. 6, ¶¶ 4, 6, 7, 10.  The Court agrees with the defendants that these allegations are insufficient to establish Article III standing.

Before considering the plaintiffs' evidence and arguments regarding the three requirements for standing, the Court notes that the plaintiffs' characterization of the instant case as following the "procedural rights" line of case authority is incorrect.  In a "procedural rights" case, "plaintiffs allege injury resulting from the violation of a <u>procedural</u> right afforded to them by statute and designed to protect their threatened concrete interest."  <u>Ctr. for Law & Educ. v. Dep't of Educ.</u>, 396 F.3d 1152, 1157 (D.C. Cir. 2005); <u>see also</u> <u>Defenders of Wildlife</u>, 504 U.S. at 572 n.7 (defining a "procedural rights" case as one in which "[t]he person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy").  The type of injuries included within the "procedural rights" line of case authority is exemplified by the Supreme Court's example in <u>Defenders of Wildlife</u>: "an agency's failure to prepare a statutorily required environmental impact statement before taking action with potential adverse consequences to the environment."  <u>Nat'l Parks Conservation Ass'n v. Manson</u>, 414 F.3d 1, 5 (D.C. Cir. 2005).  Due to the nature of

the injury in a procedural rights case, "the courts relax-while not wholly eliminating-the issues of imminence and redressability, but not the issues of injury in fact or causation. Ctr. for Law & Educ., 396 F.3d at 1157; see also Fla. Audubon Soc'y, 94 F.3d at 664 (in procedural rights case, "the primary focus of the standing inquiry is not the imminence or redressability of the injury to the plaintiff, but whether a plaintiff who has suffered personal and particularized injury has sued a defendant who caused that injury").

This case does not fall within these parameters.  Unlike the example provided in Defenders of Wildlife, the plaintiffs' allegation here is not that the Preservation Act accorded them a procedural right that the Keeper violated and that the plaintiffs now seek to enforce; rather, the plaintiffs allege that the Keeper's decision to remove the Blair Mountain Battlefield from the National Register was arbitrary and capricious and an abuse of discretion because it resulted from the Keeper's failure to follow the applicable regulations.  See Am. Compl. ¶¶ 70, 72.  The plaintiffs' allegations relate to the Keeper's adherence to the governing regulations, but nowhere do the plaintiffs allege that the Keeper failed to comply with a procedural right that was accorded to the plaintiffs under any statute or regulation.  Since the plaintiffs' injury does not "result[] from the violation of a procedural right afforded to them by statute and designed to protect their threatened concrete interest," Ctr. for Law & Educ., 396 F.3d at 1157, this case does not fall within the "procedural rights" line of case law and must therefore meet the normal standards for redressability and imminence.

### A.  Injury-in-fact

The "mere violation of a procedural requirement," standing alone, is not sufficient to confer Article III standing.  See Fla. Audubon Soc'y, 94 F.3d at 664.  A plaintiff "raising only a generally available grievance about government-claiming only harm to his and every citizen's

interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large," does not meet the requirements for standing under Article III.  Defenders of Wildlife, 504 U.S. at 573–74.  The requirement of an injury-in-fact, an "actual or imminent, not conjectural or hypothetical" injury, id. at 560 (internal quotation marks omitted), is "a hard floor of Article III jurisdiction that cannot be removed by statute," Summers v. Earth Island Inst., 555 U.S. 488, 497 (2009).  The plaintiffs must therefore allege an actual or imminent injury beyond the Keeper's violation of the law by removing the Blair Mountain Battlefield from the National Register that is personal and particularized to at least one member of the plaintiff organizations.

The plaintiffs seek to show such an injury by arguing that the failure to list the Blair Mountain Battlefield in the National Register increases the risk to the property from "current and planned surface mining operations."[6]  Pls.' Opp'n 2.  The plaintiffs assert that surface mining will "assuredly destroy important topographical features of the Battlefield, such as the hilltops and promontories where guns were mounted, which define the battlefield site, as well as cultural resources that contribute to the historic significance of the site."  Id. at 5.  To demonstrate the harm to the property posed by surface mining, the plaintiffs attached a petition submitted by several of the plaintiffs to the West Virginia Department of Environmental Protection seeking the designation of the Blair Mountain Battlefield as "lands unsuitable for surface coal mining" pursuant to W. Va. Code § 22-3-22(b), id., Ex. B, and a 2010 report prepared by one of the

---

[6] The plaintiffs cast their injury exclusively as one of imminent injury and do not contend that evidence in the administrative record or the plaintiffs' submissions demonstrates that the plaintiffs have already suffered an injury-in-fact due to prior mining operations in the historic district, perhaps because to do so would contradict their position that the property retains the historical integrity required for inclusion in the National Register.  See Pl.'s Opp'n 2.  Since the plaintiffs premise their claim of standing on the "concrete and immediate" risk of future harm to the property, the Court will confine its standing inquiry to the consideration of the sufficiency of the evidence in the administrative record and the plaintiffs' submissions seeking to demonstrate a risk of imminent future injury to the Battlefield from surface mining.

plaintiffs, the Friends of Blair Mountain, detailing threats to the Battleground in areas covered by an existing permit for surface mining, id., Ex. L.  The plaintiffs attached affidavits from one member of each organization explaining how harm to the Battlefield from surface mining will impact the affiant in a personal and particularized manner.  See Pls.' Mem., Exs. 1–6.

The plaintiffs fail, however, to identify sufficient support in the administrative record for the proposition that the potential harm from surface mining is "actual or imminent," rather than "conjectural or hypothetical."[7]  In support of their contention that the "the risk of serious harm to Blair Mountain Battlefield as a result of current and planned surface mining operations is both concrete and immediate," the plaintiffs note that coal mining companies own property within the historic district, citing to letters in the administrative record raising objections to the National Register nomination submitted by Energy Corporation of America, Jackson Resources Company, and Robin Land Company, LLC.  Pls.' Opp'n 2 (citing to A.R. 00300, 00304, and 00306).  As proof that these companies "fully intend to exploit their interests in the immediate future as well as in the present," the plaintiffs point to a statement in the February 27, 2009 letter from Jackson Kelly in opposition to the Battlefield's nomination indicating that "each Petitioner owns or leases minerals, particularly coal, with the expectation of developing them in the nomination area."  Id. at 2–3 (citing to A.R. 01225).  As further proof of the imminence of the harm to the Battlefield, the plaintiffs cite to references in the record to surface mining permits that have already been issued for areas within the historic district.  Id. at 3 (citing to A.R. 01344–45, 01473, 01499, 01471).

---

[7] Because the Court has determined that the plaintiffs' case is not a "procedural rights" case, they cannot benefit from the relaxation of normal standards of imminence.  For example, in Wyoming Outdoor Council v. United States Forest Service, the court found that the plaintiff had demonstrated sufficient imminence of injury because it could show that the agency's procedural violation removed the barrier to oil and gas drilling on parcels of land within the Shoshone National Forest despite the fact that "there is no certainty that drilling will commence on the disputed lands."  165 F.3d 43, 51 (D.C. Cir. 1999).  In holding that the plaintiffs had standing to bring the claim, the court noted that the "necessary showing" to support standing is reduced in "procedural rights" cases.  Id.

Although the plaintiffs argue that these references in the administrative record and the affidavits submitted by members of the plaintiff organizations establish that the risk to the Blair Mountain Battlefield from surface mining is "both concrete and immediate," id. at 2, the administrative record and the plaintiffs' submissions actually tend to show the opposite—that surface mining may or may not take place on the Battlefield at some undetermined time in the future.  Although a considerable amount of the Battlefield is, indeed, currently subject to surface mining permits, the administrative record shows that the companies in possession of the permits have thus far declined to exercise the rights afforded to them by the permits.  In the same February 27, 2009 letter from Jackson Kelly cited by the plaintiffs, counsel indicates that Arch Coal has had a surface mining permit for a portion of the Battlefield since 1995 which "has been dormant for economic reasons."  A.R. at 00233.  Similarly, in an April 9, 2009 letter from Jackson Kelly to the Keeper, counsel notes that portions of the historic district have been subject to surface mining permits since 1992.  Id. at 00364.

The most significant evidence of the lack of imminence of mining at the Blair Mountain Battlefield is contained in the report prepared by the Friends of Blair Mountain, attached to the plaintiffs' opposition as Exhibit L.  This report, dated September 8, 2010, details the threat from surface mining permits that have already been issued for portions of the Blair Mountain Battlefield or areas adjacent to the Battlefield.  Pls.' Opp'n Ex. L 1.  Out of the eleven permits that are discussed, active mining is occurring at only two sites, both of which are adjacent to the historic district.  See id. at 27, 35.  Of the remaining permits discussed in the report, two permits have expired, id. at 4, 33, three are "active, but with no coal removed as of yet," id. at 8, 12, 30, three cover an area that has already been mined and is in the process of reclamation, id. at 15, 22,

24, and one is unexpired but not active, id. at 19. The information contained in this report belies the plaintiffs' assertion that the issuance of surface mining permits demonstrates that mining is imminent. For example, no coal has been removed pursuant to Permit No. P072900, despite the permit's existence since 1981. Id. at 12. Similarly, Permit No. O505692 was issued in 1993, Permit No. S500503 was issued in 2007, and Permit No. S504991 was issued in 1995, but no action pursuant to these permits has been taken. See id. at 8, 18–19, 30. It therefore strains credulity to conclude that the issuance of a surface mining permit alone establishes that mining is imminent, when several of the permits that were issued more than a decade ago have resulted in no harm whatsoever to the Battlefield.

　　The real problem that the plaintiffs face is that the occurrence of their alleged injury depends entirely on the future actions of third parties, the coal mining companies. Demonstrating a sufficient injury-in-fact to confer standing thus requires that the plaintiffs produce evidence from which the future actions of the coal mining companies can be predicted with some degree of certainty, information that is, for the most part, outside of the plaintiffs' personal knowledge. See Defenders of Wildlife, 504 U.S. at 561–62. The inherent obstacles arising from this requirement prompted the Supreme Court to note that in such situations, "standing is not precluded, but it is ordinarily 'substantially more difficult' to establish." Id. at 562. And for this reason, standing in such situations is often found to be lacking. For example, in Grassroots Recycling Network v. EPA, the court rejected a claim of standing premised on the assertions of two members of the plaintiff organization that they "would not have" or "might not have" purchased a home near a Wisconsin landfill had they known that the landfill could deviate from certain standards pursuant to the newly-issued EPA rule challenged in the litigation. 429

F.3d 1109, 1112 (D.C. Cir. 2005).  The court held that the alleged injury "depends upon whether third parties take several specific steps," and "instances events that, although by no means impossible, are at this time neither actual nor imminent but wholly conjectural."  Id.  The court in Louisiana Environmental Action Network v. Browner similarly dismissed an asserted injury-in-fact as "multi-tiered speculation" where the occurrence of the alleged injury depended on a series of acts that would have to be taken by a state and the Environmental Protection Agency.  87 F.3d 1379, 1383 (D.C. Cir. 1996).

Even if this case were properly considered a "procedural rights" case, the plaintiffs have not alleged a sufficient injury-in-fact for Article III standing.  In one of the seminal procedural rights cases in this Circuit, Florida Audubon Society, the court held that the plaintiffs in a procedural rights case had failed to show a sufficient injury-in-fact where the plaintiffs sought to show that a tax credit for the use of a particular fuel additive would cause an "increased risk of injury to particular wildlife areas" because the credit would "encourag[e] farmers throughout the United States, and thus, by implication, farmers near the wildlife areas [plaintiffs] visit, to increase production in a manner that will increase agricultural pollution that, in turn, will damage the wildlife areas."  94 F.3d at 667–68.  The court dismissed this reasoning as proof of the plaintiffs' injury-in-fact as "speculation."  Id. at 668.  In considering causation, the court further noted "the improbability of establishing the necessary likelihood of some result when that result depends on predicting the acts of even a single 'interest group' who is unrepresented in the instant litigation, especially when that group . . . is actually composed of dozens of individual actors, each of whom must react to other market or regulatory inputs."  Id. at 670.

20

The Court must similarly reject the injury-in-fact alleged here.  The plaintiffs have failed to meet their burden to identify evidence in the administrative record or their own submissions, that the allegedly improper decision to remove the Blair Mountain Battlefield from the National Register will cause an imminent injury to the plaintiffs by increasing the risk of surface mining within the historic district, which will in turn harm the Battlefield.  The plaintiffs note that the court "must assume 'the truth' of Plaintiffs [sic] factual allegations" in evaluating the plaintiffs' arguments regarding standing.  Pls.' Opp'n 2.  The issue, however, does not turn on the truth of the facts alleged by the plaintiffs, but whether those facts constitute an injury that is sufficiently imminent to confer standing on the plaintiffs.  Indeed, a court evaluating a motion for summary judgment must "draw all <u>reasonable</u> inferences" in favor of the non-moving party, <u>Talavera</u>, 638 F.3d at 308 (emphasis added); the Court is not, however, required to disregard the lack of support in the administrative record and the plaintiffs' submissions in assessing whether the inference that the plaintiff is asking the Court to reach is permissible.

As discussed above, the administrative record and the plaintiffs' own submissions indicate that the likelihood that removing the property from the National Register will increase the risk of surface mining in the near future, thereby harming the Battlefield, is uncertain at best. In light of ample evidence in the administrative record and the plaintiffs' submissions showing that numerous surface mining permits have previously been issued for areas within the Battlefield—some in existence for decades—without any mining activity occurring subject to those permits, the Court must find that the plaintiffs' alleged injury caused by the increased risk of surface mining is not actual or imminent, but purely conjectural.  Although it is possible that the coal mining companies, despite not having done so before, will begin mining operations on

the Blair Mountain Battlefield in the near future, it is also possible that the coal mining companies who own interests in the Battlefield will decide not to engage in surface mining for any number of reasons.  The plaintiffs' purported injury depends wholly on "predicting the acts" of third parties who are not before the Court, who themselves will presumably "react to other market or regulatory inputs."  See Fla. Audubon Soc'y, 94 F.3d at 670.  The mere possibility that the coal mining companies will engage in surface mining on the Battlefield due to removal of the property from the National Register is not sufficient to show that the plaintiffs will suffer an imminent injury as required for this Court to exercise jurisdiction in this case.[8]

**B.  Causation**

The plaintiffs cannot satisfy the second prong of the standing inquiry, causation, for similar reasons.  In order to establish causation that is sufficient for standing, a plaintiff must show that the alleged injury is "fairly traceable to the challenged action of the defendant," Friends of the Earth, 528 U.S. at 180, and "not injury that results from the independent action of some third party not before the court," Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26, 41–42 (1976).  Sufficient causation will be difficult, if not impossible, to demonstrate when the links in the chain of causation "depend on some allegation that cannot be easily described as true or false," or when the occurrence of the plaintiff's injury depends on the actions of other individuals or entities not before the court.  Fla. Audubon Soc'y, 94 F.3d at 670; see also Gettman v. DEA, 290 F.3d 430, 435 (D.C. Cir. 2002) (rejecting plaintiff's claim that agency's refusal to remove marijuana from schedule of controlled substances caused decreased interest in marijuana

---

[8] Because the Court has determined that the plaintiffs do not allege a sufficient injury-in-fact due to their inability to show that their alleged injury is imminent, the Court does not reach the other requirement of the injury-in-fact prong—that a plaintiff's injury be particularized to the plaintiff itself—and the defendants' related argument that the members of the plaintiff organizations cannot make this showing because the Blair Mountain Battlefield is located on private property and so individuals who do not own the property are not free to use and enjoy it as they please. See Defs.' Reply 4–5.

research from general public because claim was too speculative and depended on the actions of third parties not before the court).

As discussed in detail in the Court's analysis of the plaintiffs' alleged injury, the plaintiffs' injury—harm to the Battlefield due to potential surface mining—consists of "injury that results from the independent action of some third party not before the court." Simon, 426 U.S. at 41–42. The occurrence of the plaintiffs' injury depends on the plaintiffs' speculative predictions about the actions of third parties, the coal mining companies, as a result of the Keeper's decision to remove the Blair Mountain Battlefield from the National Register. The plaintiffs have failed to identify any evidence indicating that any future surface mining is "fairly traceable" to the defendants' actions; the evidence the plaintiffs point to regarding their injury focuses primarily on the plaintiffs' conjectures about future actions of the coal mining companies, which would be the actual cause of the plaintiffs' alleged injury. The plaintiffs, therefore, have not made a sufficient showing of causation to confer standing to bring this action.

### C. Redressability

In line with the hurdles that the plaintiffs have faced in meeting their burden under the first two prongs of the standing inquiry, the plaintiffs have failed to demonstrate under the third prong that "it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Friends of the Earth, 528 U.S. at 181. In their motion for summary judgment, the defendants correctly point out that surface mining may be authorized on a property that is listed in the National Register if "the regulatory authority and the Federal, State, or local agency with jurisdiction over the property jointly approve of the mining operation." Defs.' Mot. 22; see 30 U.S.C. § 1272(e)(3). In response, the plaintiffs rely on the characterization of their

case as a "procedural rights" case and argue that they are not held to the same standards of redressability since they are alleging a "procedural injury."  Pls.' Opp'n 6.

As discussed earlier, the plaintiffs' characterization of this case as a procedural rights case is incorrect and the plaintiffs must be held to the same standards of redressability as any other litigant.  However, even if the plaintiffs' case were properly characterized as a "procedural rights" case, the lowered standard for redressability would be inapplicable nonetheless because "that rule applies only when a party challenging an agency's procedural failure cannot 'establish with any certainty' that the <u>agency</u> would reach a different decision."  <u>St. John's United Church of Christ v. FAA</u>, 520 F.3d 460, 463 (D.C. Cir. 2008) (requiring the plaintiffs to meet the normal standard for redressability because the issue was uncertainty as to what a third party who was not involved in the litigation would do in response to the court's order, not the defendant agency).

Without a lowered standard for redressability, the plaintiffs cannot meet their burden of demonstrating that it is "likely, as opposed to merely speculative," that a decision from this Court restoring the Blair Mountain Battlefield to the National Register would redress the plaintiffs' alleged injury.  As the defendants note, an exception to the prohibition on mining on property listed in the National Register may allow mining to proceed despite a court order directing the Keeper to place the Blair Mountain Battlefield on the National Register.  <u>See</u> 30 U.S.C. § 1272(e)(3).  Perhaps more importantly, however, is the statute's exemption of "valid existing rights" from the prohibition on mining.  <u>See id.</u>  Under the regulations implementing the Surface Mining Control and Reclamation Act for the state of West Virginia, "[v]alid existing rights shall also be found for an area where a person can demonstrate that an [Surface Mining Application] number had been issued prior to the time when the structure, road, cemetery or

other entity came into existence." W. Va. Code R. § 38-2-2. It is likely, therefore, that surface mining would be permitted on the Blair Mountain Battlefield as a result of permits that were acquired prior to the historic district's inclusion on the National Register. An order from this Court restoring the Blair Mountain Battlefield to the National Register, therefore, will not prevent mining from occurring should the coal mining companies who own existing permits choose to exercise their rights afforded by the permits. The Court having only a limited ability to redress the plaintiffs' asserted injuries, the plaintiffs have failed to meet their burden under the final prong of the standing inquiry.

## V. CONCLUSION

The plaintiffs have failed to meet their burden as to each prong of the standing inquiry. In the absence of a plaintiff that has standing to bring this suit, this Court is not permitted under Article III of the Constitution to exercise jurisdiction over the plaintiffs' claims. Accordingly, the defendants' motion for summary judgment must be granted, and the plaintiffs' claims must be dismissed.

**SO ORDERED** this 2nd day of October, 2012.[9]

REGGIE B. WALTON
United States District Judge

---

[9] The Court will contemporaneously issue an Order consistent with this Memorandum Opinion.