# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

|  |  |  |
|---|---|---|
| SIERRA CLUB, <u>et al.</u>, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 10-1513 (RBW) |
| | ) | |
| KEN SALAZAR, <u>et al.</u>, | ) | |
| | ) | |
| Defendants. | ) | |

_____

## MEMORANDUM OPINION

The legal battle in this case traces its roots to a historical battle over organized labor.[1]  In late August and early September 1921, Blair Mountain, located in Logan County, West Virginia, played host to an armed conflict between coal miners and strikebreakers.  This battle, known as the Battle of Blair Mountain, is the largest armed labor conflict in United States history.  The Battle of Blair Mountain was the culmination of a labor union's unsuccessful years-long struggle to unionize miners in southwestern West Virginia coalfields, as well as to liberate miners living under martial law.  As the miners marched toward Mingo County, they encountered 3,000 strikebreakers forming a miles-long defensive front across Spruce Fork Ridge on Blair Mountain.  The strikebreakers entrenched themselves, dropped homemade bombs, and opened fire from mounted machineguns.  The miners returned fire and the battle raged on for several days, causing numerous casualties.  The miners surrendered upon the arrival of federal troops.  The site of the battle is known as Blair Mountain Battlefield ("Blair Mountain").

---

[1]  The historical backdrop of this case as set forth below is principally derived from the District of Columbia Circuit's earlier opinion in this case.  <u>Sierra Club v. Jewell</u>, 764 F.3d 1, 3 (D.C. Cir. 2014).

The legal battle before the Court arises from the efforts of various environmental and historical preservation organizations ("Organizations") to preserve Blair Mountain, including protecting it from surface coal mining.  After decades of setbacks, their efforts recently paid dividends; the Keeper of the National Register of Historic Places ("Keeper") listed Blair Mountain on the National Register of Historic Places ("National Register").  But the Organizations' success was short-lived.  At the urging of coal companies owning land on Blair Mountain, the Keeper delisted Blair Mountain from the National Register.

Thereafter, the Organizations instituted this lawsuit to challenge the Keeper's decision to delist Blair Mountain.  The Organizations are: Sierra Club; Ohio Valley Environmental Coalition; Friends of Blair Mountain, Inc.; West Virginia Labor History Association; National Trust for Historic Preservation in the United States; and West Virginia Highlands Conservancy. The Court refers to these Organizations collectively as "the plaintiffs."  The plaintiffs assert a claim under the Administrative Procedure Act ("APA"), alleging that the Keeper's decision "was arbitrary, capricious, [and] an abuse of discretion."  Am. Compl. ¶ 1, ECF No. 11; see also 5 U.S.C. § 706(2)(a) (2012).  In support of their APA claim, the plaintiffs allege that the Keeper's delisting decision was "contrary to the regulations" that implement the National Historic Preservation Act ("Preservation Act"), 16 U.S.C. § 470 et seq. (2006).[2]

The plaintiffs named the following parties as defendants: Ken Salazar, in his official capacity as Secretary of the United States Department of the Interior; the United States Department of the Interior; Jon Jarvis, in his official capacity as Director of the National Park Service; and Carol Shull, in her official capacity as Keeper of the National Register of Historic

---

[2]  The Court cites the 2006 version of the Preservation Act because this version was in effect during the relevant time and has since been repealed.  Pub. L. No. 113–287, § 7, 128 Stat. 3094 (2014).  The Preservation Act was later recodified, as modified.  Pub. L. No. 113–287, § 3, 128. Stat. 3094 (2014) (codified in scattered sections of 54 U.S.C.).

Places. Unless otherwise noted, the Court refers to the defendants hereafter collectively as "the Keeper."

Pending before the Court are the plaintiffs' Motion for Summary Judgment ("Pls.' Mot. for Summ. J."), ECF No. 24-1, and the Keeper's Cross-Motion for Summary Judgment ("Defs.' Cross-Mot. for Summ. J."), ECF No. 28. Upon careful consideration of the parties' submissions and the entire record in this case, the Court concludes that it must grant the plaintiffs' Motion for Summary Judgment and deny the Keeper's Cross-Motion for Summary Judgment.[3]

# I.    BACKGROUND

## A.    Statutory and Regulatory Framework

The Preservation Act authorizes the Secretary of the Interior ("Secretary") "to expand and maintain a [National Register] composed of districts, sites, buildings, structures, and objects significant in American history, architecture, archeology, engineering, and culture." 16 U.S.C. § 470a(a)(1)(A) (2006). To this end, the Preservation Act directs the Secretary to

establish . . . criteria for properties to be included on the National Register and . . . [to] promulgate regulations as may be necessary for [the following pertinent purposes]—

> (A) nominating properties for inclusion in, and removal from, the [Register] and the recommendation of properties by certified local governments; . . .
>
> (C) considering appeals from such recommendations, nominations, removals, and designations (or any failure or refusal by a nominating authority to nominate or designate); . . .

---

[3]   In addition to the documents previously referenced, the Court considered the following submissions in reaching its decision: (1) the Administrative Record ("A.R."); (2) the plaintiffs' Statement of Material Facts in Support of Motion for Summary Judgment ("Pls.' State. of Mat. Facts"); (3) the plaintiffs' Summary Judgment Opposition and Reply ("Pls.' Reply Br."); (4) the Keeper's Reply in Support of Defendants' Cross-Motion for Summary Judgment ("Defs.' Reply Br."); (5) Brief of West Virginia Coal Association, Inc. as Amicus Curiae in Support of Defendants' Brief in Opposition to Summary Judgment and Cross Motion for Summary Judgment ("Amicus Br."); and (6) the plaintiffs' Response to Amicus Curiae Brief Filed by the West Virginia Coal Association ("Pls.' Resp. to Amicus Br.").

> (F) notifying the owner of a property, . . . and the general public, when the property is being considered for inclusion on the National Register, for designation as a National Historic Landmark . . . .

Id. § 470a(a)(2).

Additionally, the Preservation Act requires the Secretary to promulgate regulations allowing property owners in a district that may be included on the Register to concur in, or object to, the inclusion.  Specifically, the Preservation Act provides:

> [B]efore any property or district may be included on the National Register or designated as a National Historic Landmark, the owner or owners of such property, or a majority of the owners of the properties within the district in the case of [a] historic district, shall be given the opportunity . . . to concur in, or object to, the nomination of the property or district for such inclusion or designation.

Id. § 470a(a)(6).

Generally, the Preservation Act prohibits the inclusion of the district on the Register if a majority of the owners within the district object to the inclusion.  More specifically, the Act states:

> If the owner or owners of any privately owned property, or a majority of the owners of such properties within the district in the case of [a] historic district, object to such inclusion or designation, such property shall not be included on the National Register or designated as a National Historic Landmark until such objection is withdrawn.

Id.

The Preservation Act also contemplates a role for states in carrying out its objectives. Pertinently, the Act directs the Secretary to promulgate regulations providing for the "designation and appointment . . . of a 'State Historic Preservation Officer.'"  Id. § 470a(b)(1)(A).  Under the Preservation Act, the State Historic Preservation Officer ("State Agency") has the "responsibility" to "identify and nominate eligible properties to the National

Register and otherwise administer applications for listing historic properties on the National Register." Id. § 470a(b)(3)(B).

In turn, the Preservation Act authorizes states to delegate responsibility to local governments to help determine whether inclusion in the National Register is appropriate. Under § 470a(c)(1), the State Agency "shall provide a mechanism for the certification . . . of local governments to carry out the purposes [of the Preservation Act]."

"The regulations governing the procedures for [including] properties on the National Register are set forth at 36 C.F.R. pt. 60." Moody Hill Farms Ltd. P'ship v. U.S. Dep't of Interior, 205 F.3d 554, 556 (2d Cir. 1999).[4] Generally, the regulations divide the inclusion process into two stages: nomination and listing. As further explained below, nomination is the process by which the State Agency selects property for potential inclusion in the National Register. See 16 U.S.C. § 470a(a)(2)(A) (2006). Listing, by contrast, refers to the addition of "[n]ominations . . . submitted by the [State Agency] and approved by the [Keeper]" for inclusion in the National Register. See 36 C.F.R. § 60.1(b)(3) (2015).

Regarding the nomination component of the statute, the State Agency "is responsible for identifying and nominating eligible properties to the National Register." Id. § 60.6(a). The State Agency "shall consult with local authorities in the nomination process." Id. § 60.6(b). Such consultation includes providing "notice of the intent to nominate a property and [soliciting] written comments especially on the significance of the property and whether or not it meets the National Register criteria for evaluation." Id.

The regulations implement a scheme of notice regarding the nomination. Under 36 C.F.R. § 60.6(c), "[a]s part of the nomination process, [the State Agency] is required to notify in

---

[4] The Court refers to the Preservation Act's implementing regulations as "the regulations."

writing the property owner(s) . . . of the [State Agency's] intent to bring the nomination before the State Review Board." 36 C.F.R. § 60.6(c) (2015). "The list of owners shall be obtained from either official land recordation records or tax records, whichever is more appropriate, within [ninety] days prior to the notification of intent to nominate." Id. "For a nomination with more than [fifty] property owners, . . . [the State Agency] shall provide general notice to property owners concerning the [State Agency's] intent to nominate." Id. § 60.6(d). "The general notice shall be published at least [thirty] days but not more than [seventy-five] days before the State Review Board meeting . . . ." Id. Further, the general notice must "provide an opportunity for the submission of written comments and provide [a majority of owners] of private property . . . an opportunity to concur in or object in writing to the nomination." Id.

In addition, the regulations provide a process for objecting to the nomination. Under 36 C.F.R. § 60.6(g), "[u]pon notification, any owner or owners of a private property who wish to object shall submit to the [State Agency] a notarized statement certifying that the party is the sole or partial owner of the private property . . . and objects to the listing." "In nominations with multiple ownership . . . of districts, the property will not be listed if a majority of the owners object to [the] listing." Id.

Generally, the regulations require the State Agency to determine whether a majority of owners have objected to the nomination. Under 36 C.F.R. § 60.6(g), "[u]pon receipt of notarized objections respecting a district . . . with multiple owners, it is the responsibility of the [State Agency] to ascertain whether a majority of owners of private property have objected." "If an owner whose name did not appear on the list certifies in a written notarized statement that the party is the sole or partial owner of a nominated private property[,] such owner shall be counted by the [State Agency] in determining whether a majority of owners [have] objected." Id. "If the

. . . majority of [private property] owners for a district . . . have objected to the nomination prior

to the submittal of a nomination, the [State Agency] shall submit the nomination to the Keeper

only for a determination of <u>eligibility</u> . . . ." <u>Id.</u> § 60.6(n) (emphasis added).[5]

      Further, the regulations govern the approval of a nomination by the State Agency and

State Review Board ("Board").  Pursuant to 36 C.F.R. § 60.6(j), "[c]ompleted nomination forms

. . . and comments concerning the significance of a property and its eligibility for the National

Register are submitted to the [Board]."  Upon receipt of these documents, "[t]he [Board] shall

determine whether or not the property meets the National Register criteria for evaluation and

make a recommendation to the [State Agency] to approve or disapprove the nomination." <u>Id.</u>

The regulations also provide that "[n]ominations approved by the [Board] and comments

received are then reviewed by the [State Agency] . . . ." <u>Id.</u> § 60.6(k).  If the State Agency "finds

the nominations to be adequately documented and . . . procedurally correct . . . , the nominations

are submitted to the [Keeper]." <u>Id.</u>  "Notice will [then] be provided in the F[ederal] R[egister]

that the nominated property is being considered for listing in the [National Register] . . . ." <u>Id.</u> §

60.6(q).

      Nominations so received by the Keeper are "included in the National Register within

[forty-five] days of receipt by the Keeper" unless otherwise prohibited. <u>Id.</u> § 60.6(r).

Specifically, such nominations are not included in the National Register if "the Keeper

disapproves a nomination, an appeal is filed, or . . . the majority of [private property] owners . . .

object[] by notarized statements received by the Keeper prior to [the] listing." <u>Id.</u>

---

[5] "Properties that are determined eligible for the National Register are given consideration in planning for Federal projects, Federally funded projects, and Federally licensed projects."  Defs.' Cross-Mot. for Summ. J. at 14 (citation omitted).

Parties may appeal the State Agency's nomination of private property to the Keeper. Pursuant to the regulations, prior to a listing in the National Register, "[a]ny person or organization which supports or opposes the nomination . . . may petition the Keeper during the nomination process either to accept or reject a nomination." Id. § 60.6(t). "Such petitions received by the Keeper prior to the listing of a property . . . will be considered by the Keeper and the nomination will be substantively reviewed." Id.

Parties may also appeal the listing of a property in the National Register. Pursuant to 36 C.F.R. § 60.15(c), "[a]ny person or organization may petition in writing for removal of a property from the National Register by setting forth the reasons the property should be removed on the grounds established in paragraph (a) of this section." Importantly, paragraph (a) provides that properties may be removed from the National Register for "[p]rejudicial error in the nomination or listing process." Id. § 60.15(a)(4). "Properties removed from the National Register for procedural error shall be considered for listing by the Keeper after correction of the error or errors by the [State Agency], . . . or by the Keeper, as appropriate." Id. "The procedures set forth for nominations shall be followed in such reconsiderations." Id.

B.      **Factual and Procedural History**

The State Agency "nominated Blair Mountain  . . . for listing in the National Register [several] times from 1980 to 2008." Defs.' Cross-Mot. for Summ. J. at 7; see Pls.' State. of Mat. Facts ¶ 11. For reasons not specified in the record, these efforts were unsuccessful. See Pls.' State. of Mat. Facts ¶¶ 11–18.

The tide turned when, on January 13, 2009, Susan Pierce, on behalf of the State Agency, wrote a letter to the Keeper, A.R. at 180–81, stating that "[t]he enclosed nomination has been reprocessed in accordance with [the Preservation Act's implementing regulations]," A.R. at 180.

Additionally, Pierce stated that "John Dalporto, Senior Assistant Attorney General of the West

Virginia Attorney General's Office, conducted property owner research in the tax records at the

Logan County courthouse on October 24, 2008."  Id.  Pierce further stated that "[a] legal notice

was . . . placed in the local newspaper, the Logan Banner, on November 24, 2008[,] notifying the

property owners of their right to object to [the] listing and/or comment on the nomination."  Id.

Pierce also stated that "[t]he legal notice . . . notified property owners that any objections filed to

previous submissions of 2005 and 2008 nominations would be considered for this nomination if

the current property owners for that parcel remained the same and if the parcel remained within

the current boundary."  Id.

In the same letter, Pierce discussed how the State Agency calculated the number of

property owners and objectors in the district at issue in Logan County.  Pierce wrote that if "we

count only property owners that appear on the current [] list [of Dalporto], there are a total of

[sixty-six] property owners with [twenty-five] objections filed with our office."  A.R. at 181; see

also A.R. at 180.  Pierce also referenced "2005 or 2007-generated property owner lists" and a

"list of [thirty-nine] objections with attached notarized affidavits" submitted by

"Jackson[]Kelly."[6]  A.R. at 180.  Pierce stated that, although "[a] number of the property owners

included on Jackson[]Kelly's List no longer appear on [Dalporto's] list," the State Agency

"counted them as property owners and have counted their objections."  A.R. at 181.  According

to Pierce, "[b]ased on this scenario, there are a total of [seventy-five] property owners and

[thirty-three] property owners who have filed objections."  Id.  Pierce added that, "in both

instances, [the State Agency] has determined that a majority of property owners have not filed

---

[6]  Jackson Kelly, according to the plaintiffs, is "a law firm representing several mining companies that own land within the [district] . . . ."  Pls.' State. of Mat. Facts ¶ 20.  The Keeper has not disputed this characterization.

objections." Id.  Therefore, Pierce stated that "this current nomination [was] being forwarded to [the Keeper] for [its] review and consideration."  Id.

On February 27, 2009, Blair M. Gardner, an attorney with Jackson Kelly, filed a petition with the Keeper appealing the nomination.  A.R. at 236–42.  In pertinent part, Jackson Kelly objected to the nomination on the ground that "a majority of the property owners within what the [State Agency] now describes as the boundary proposed for the district object to the listing."  A.R. at 236.  Gardner represented that an entity named "Arch Coal . . . digitally recreated the boundary drawing provided by the [State Agency] on a [U.S. Geological Survey] topographical map."  A.R. at 238.  Gardner further stated that, "[b]ased upon the map prepared by Arch, we identified a list of tracts, in Tax Map and Parcel number format, found in the proposed historic District boundary."  Id.  According to Gardner, based on this information, Jackson Kelly "determined the individuals who are currently listed as the owners of those various parcels."  Id.  Gardner added that, "[b]ased on this identification[,] we prepared our own owners' list . . . ."  Id.

Based on the foregoing research, Gardner stated that Jackson Kelly "found three types of errors with the [State Agency's April 2008] List."[7]  A.R. at 238.  According to Gardner, these errors were the following: (1) "some of the tax parcels claimed by the [State Agency] as being affected by the proposed historic District actually fell outside the boundary of the proposed historic District . . . , which led to a change in net ownership"; (2) "various tax parcels fell inside the boundary of the proposed historic District which the [State Agency] had not recognized as being part of the proposed historic District . . . , which led to a change in net ownership"; and (3) "some of the owners on the [State Agency] List were not the actual owners of the corresponding tax parcels."  A.R. at 238–39.

---

[7] Gardner's letter does not explain why he discussed an April 2008 list rather than Dalporto's October 2008 list of sixty-six owners.

Gardner "enclosed [a] color-coded spreadsheet" with his February 27, 2009 letter.  A.R. at 239, 1231–35.  The spreadsheet delineated the parcels at issue in "yellow," "green," and "red." A.R. at 239.  In general, these colors purport to correspond to the alleged three errors enumerated above.  See A.R. at 239, 1231–35.  Based on the calculations set forth in the spreadsheet, Gardner represented that there are "[sixty-four] owners" and that "[thirty-four] of those owners have noted their objection."  A.R. at 240.  Alternatively, Gardner added, "[i]f the [State Agency] List containing [sixty-eight] owners is accepted as correct, [thirty-eight] of the owners object to the proposed designation."[8]  Id.

Gardner went on to explain what he considered to be the "problem in the methodology that the [State Agency] has followed" in calculating "its October 2008 list [of] . . . [seventy-five] property owners."[9]  Id. at 239.  According to Gardner, "[t]he process of determining property ownership is two-fold."  Id.  On this point, Gardner asserted that "[o]ne first must ascertain what parcels fall within, completely or partially, the boundary set by the nomination."  Id.  Gardner wrote that the State Agency "has chosen to rely entirely upon the use of tax parcel maps for the purpose of identifying discrete parcels."  Id.  Gardner added that "[t]he use of tax maps for this step is appropriate."  Id.  "Second," Gardner stated, "once the parcels are established, who owns the parcels must be determined."  Id.  Gardner represented that the State Agency "assumed, without justification, that the tax records may be used to validate ownership."  Id.  "This is

---

[8]  Gardner does not explain why he referenced a State Agency list of sixty-eight owners when, according to Pierce, Dalporto's October 2008 list contains sixty-six owners.

[9]  Gardner did not explain why he attributed the "October 2008" list of seventy-five owners to the State Agency.  As already indicated, based on Dalporto's research, the State Agency initially calculated the list of owners as sixty-six.  Granted, in the alternative, the State Agency calculated a list of seventy-five owners.  However, based on the January 13, 2009 letter's plain language, the State Agency based this list on the "2007-generated property owner list[]," as well as the March 2008 "list of [thirty-nine] objections" submitted by Jackson Kelly, not on any "October 2008" list.

wholly incorrect," according to Gardner.  From Gardner's perspective, "[o]nly land records can be used to validate property ownership."  Id.

On March 13, 2009, Barbara Wyatt, a historian at the Keeper, emailed the State Agency.  A.R. at 270.  In light of the information provided by Gardner, Wyatt stated that the Keeper's "Paul Loether requests that . . . Pierce send a signed letter to him confirming that the boundaries and property owners list [are] reconciled and accurate."  Id.

On March 26, 2009, Pierce responded to Loether by letter.  A.R. at 282–83.  Pierce stated that the State Agency "reviewed the boundary overlay."  Id. at 282.  Further, Pierce stated that the State Agency's geographic information system coordinator, Tami Koontz, "digitized the boundary in July 2008 and overlaid the boundary shapefile on to tax maps received electronically from . . . the West Virginia State Tax Department."  Id.  According to Pierce, "[t]o verify that the overlay was projected correctly, Ms. Koontz recently forwarded the information to Jennings Starcher, [geographic information system] Manager at the West Virginia Office of Emergency Service and President of the WV Association of Geospatial Professionals."  Id.  "Mr. Jennings," Pierce continued, "concurs with Ms. Koontz' boundary overlay."  Id.

Furthermore, Pierce questioned of the accuracy of the list of property owners that Jackson Kelly submitted with its February 27, 2009 letter.  Pierce stated that "they appear to have compared their research with an outdated property owner list (perhaps that compiled in December 2007), rather than the most recent list prepared in October 2008 by . . . Dalporto."  Id.  Therefore, Pierce characterizes "the discrepancies they outline . . . [as] inaccurate."  Id.  Further, Pierce questioned the accuracy of Jackson Kelly's boundary map.  Id.  "Such errors," according to Pierce, "may account for the difference in number of acres, as well as additional parcels."  Id.

Despite the alleged inaccuracies in Jackson Kelly's calculations, the State Agency recalculated the property owner list.  "Based on the property owner list provided to us by . . . Dalporto in October 2008," Pierce stated, "we have determined that less than fifty percent of the property owners have objected . . . ."  Id.  Pierce added that, "[s]ince some property may have indeed changed owners in recent months[,] we recalculated the numbers using Jackson[]Kelly's 'yellow' list . . . and still arrived at less than fifty percent of objections (57/22 . . .)."  A.R. at 282–83.

Pierce's March 26, 2009 letter included a chart that purports to explain its recalculation of the list of property owners.  The chart reflects the following:

|  | #s include 10/08 research and valid objections (a list of all objectors was received from Jackson[]Kelly in March 2008).  **Excludes** property owners that submitted prior objections but do not appear on current 10/08 list. | #s include 10/08 research and valid objections (a list of all objectors was received from Jackson[]Kelly in March 2008).  **Includes** all property owners that submitted prior objections but do not appear on current 10/08 list. |
| --- | --- | --- |
| Calculated January 13, 2009 | 66 property owners 25 objections | 75 property owners 33 objections |
| Calculated March 26, 2009 (recalculated using "yellow" list) | 57 property owners 22 objections | 59 property owners 26 objections (using "yellow" list - some of the property owners mentioned had to be deleted) |

A.R. at 284.

On the day following the issuance of the March 26, 2009 letter, the Keeper asked the State Agency to "choose only one of the four lists."  A.R. at 321.  In response, in a March 30, 2009 letter from Pierce to Paul Loether, an employee of the Keeper, Pierce stated that "[o]ur office determined that the most logical choice was the list calculated on March 26, 2009 ([fifty-seven] owners/[twenty-two] objections)."  Id.  Pierce reasoned that "[t]his list excludes all

previous objectors that do not appear on the most recently researched property owned list
(October 2008)." Id.  Further, Pierce wrote that "[i]t includes, however, the property owners that
appear on Jackson[]Kelly's 'yellow list' . . . ." Id.

In the same letter, Pierce informed the Keeper of the State Agency's decision to increase
the number of objectors.  Id.  Pierce wrote that an archaeologist for the Keeper "requested that
we recalculate that list considering an additional eight objections that [they] received since
Friday, March 27, 2009."  Id.  Of these eight objections, the State Agency "added three
objections to the property owner list[,] including those from Bonnie Craddock, Samuel E.
Craddock, and NRP (Operating) LLC."  Id.  The State Agency excluded the other five because,
in its words, "they do not appear as owners on the most recently researched property owner list
(October 2008) and were not included in Jackson[]Kelly's 'yellow list.'"  A.R. at 322.
Additionally, Pierce stated that "[s]ince each of these three appear on the property owner list[,]
the total number of property owners does not change."  A.R. at 321–22.  However, Pierce further
stated that "the number of objections increases to [twenty-four] (NRP was already included in
the count as WPP LLC)."  A.R. at 322.  "Thus," Pierce concluded, "the total number of property
owners is [fifty-seven] and the total number of objections is [twenty-four]."  Id.  Subsequently,
on March 30, 2009, the Keeper listed Blair Mountain in the National Register.  See A.R. at 224;
Pls.' State. of Mat. Facts ¶ 50.

Evidently, on April 1, 2009, Gardner emailed the Keeper and the State Agency.  See A.R.
at 352.  In response to Gardner's email, the State Agency "re-reviewed the attachments to the
February 27, 2009 letter from Mr. Gardner . . . ."  Id.  On April 6, 2009, Randall Reid-Smith, the
actual West Virginia State Historic Preservation Officer, wrote Loether, stating that the State
Agency's "re-review" revealed "additional objections that were unintentionally overlooked in

our original count."  Id.  Nonetheless, he stated that "[t]he total number . . . remain[ed] at [fifty-seven][,] . . . . [t]he total number of objections increase[d] from [twenty-two] to [thirty]." "Therefore," Reid-Smith added, the State Agency requested "that the Keeper consider Blair Mountain . . . as determined eligible for, rather than listed in, the [Register]."  Id.

The Keeper asked the State Agency to justify its about-face.  See A.R. at 421.  More specifically, the Keeper requested "letters of objection that were not counted, in error, when Blair Mountain . . . was nominated to the National Register."  Id.  The Keeper added that, "[i]f we concur that there was a procedural error in the nomination process, the property will be removed from the National Register and determined eligible, as specified by the regulations." Id.

Pierce responded by letter on April 29, 2009, A.R. at 426–27,  stating that the State Agency failed to receive seven of the eight objection letters in question because they were attached to Jackson Kelly's February 27, 2009 letter, which the State Agency allegedly did not receive, A.R. at 426.  Pierce further stated that the State Agency received the eighth letter on March 7, 2008.  Id.  Then, on May 21, 2009, the State Agency sent the Keeper a spreadsheet itemizing "property owners and objections," which listed fifty-seven owners and thirty objections.  A.R. at 464.

On June 12, 2009, Barbara Wyatt, an employee of the Keeper, emailed the State Agency, asking for help "reconciling" apparent discrepancies between the list of owners and objections. A.R. at 487.  For instance, Wyatt noted that "Nellie Craddock ha[d] signed a letter for Corbet Craddock."  Id.  Then Wyatt asked, "Do you have a copy of the power of attorney?"  Id.  On June 15, 2009, Erin Riebe, also an employee of the Keeper, responded by email, answering "No."  Id.  Wyatt followed up with an email to Riebe on June 16, 2009, asking among other

questions she posed: "Why do you believe the letter of objection signed by Dollie Jeffrey is the owner by the name of Dessie Jeffrey?"  A.R. at 491.  Riebe responded that they "considered [it] on face value based on [the] representation by Jackson[]Kelly" on a chart attached to a March 7, 2008 letter.  Id.  Riebe added that they "assume[d] the notary confirmed the correct identification."  Id.

On July 3, 2009, Loether responded to Reid-Smith's April 6, 2009 letter concerning uncounted objections.  A.R. at 502–03.  Loether stated that, "[b]ased on the information you provided, particularly the property owners and objections list dated May 21, 2009, we concur with your determination that more than [fifty percent] of the owners objected to the National Register listing and, therefore, the property should be 'considered eligible' for listing in the National Register [] rather than listed in the National Register."  A.R. at 502.  However, Loether declared that "the objection submitted by Loretta White cannot be counted, because she has a life estate in a property, rather than fee simple ownership."  Id.  "Nevertheless," Loether continued, "[twenty-nine] objections constitute more than [fifty percent] of the [fifty-seven] owners . . . ." Id.  Loether added, "[w]e consider the erroneous counting to constitute a procedural error, as discussed in" 36 C.F.R. § 60.15(a)(4).  Id.

On July 9, 2009, the Keeper published a notice in the Logan Banner newspaper, see A.R. at 499, which stated that "Blair Mountain . . . [would] be removed from the National Register by the Keeper . . . , due to a procedural error in the counting of property owners who objected to the . . . listing . . . ," Defs.' Cross-Mot. for Summ. J. at 14 (citing A.R. at 499).  The notice further indicated that Blair Mountain would "automatically be determined eligible for listing in the National Register."  Id.  Additionally, the Keeper asserted that the notice authorized the submission of comments "on the removal of . . . Blair Mountain" for "thirty (30) days from the

publication date of [the] notice." Id. However, the Keeper postponed the deadline for submitting comments until October 14, 2009, A.R. at 638, so that one or more parties challenging the delisting could comment, A.R. at 628, 630.

On September 9, 2009, Harvard Ayers of Friends of Blair Mountain submitted a petition challenging the Keeper's decision to delist Blair Mountain. A.R. at 521–22. Ayers' petition relied extensively on the title research of John Kennedy Bailey, a West Virginia attorney. See A.R. at 523–28. According to Ayers, using the May 21, 2009 list of fifty-seven owners as the baseline, Bailey's research showed that "[t]he number of owners increased to at least [sixty-one]." A.R. at 522. However, according to Ayers, "it appear[ed] that five of the [thirty] signed objectors might be removed from the list, leaving [twenty-five] objectors." Id. Notably, Bailey stated that his research showed that owner/objector Corbet Craddock conveyed Parcel 154-2-8 "by deed dated July 18, 1980" and "died on January 6, 1983." A.R. at 524. Bailey also stated that owner/objector August Phillips "died on December 21, 2008." A.R. at 527.

On September 24, 2009, Pierce wrote a letter to Loether stating that an organization had requested that the comment period be extended so that the State Agency could "review information directly provided to the [Keeper] from . . . Ayers on September [9], 2009." A.R. at 637. Pierce further stated that "[w]e are not currently reviewing this information." Id. Pierce asked the Keeper to "clarify the role" it believed the State Agency "ha[d] in the instant matter since our reading of the regulations does not have [the State Agency] receiving or reviewing any comments or having a role at this point in the process," citing 36 C.F.R. § 60.15(k) as support for this position. Id.

On November 10, 2009, Loether responded to Pierce's letter. A.R. at 682. In this response, Loether noted that the Keeper received "comments" regarding its notice of the

delisting of Blair Mountain and "strongly recommend[ed] that they receive [the State Agency's] full consideration."  Id.  Further, Loether stated that the State Agency "may be particularly interested in the enclosed letter and materials . . . received from Harvard Ayers, who is challenging the accuracy of your office's determination of property owners and, thus, the validity of this nomination's owner objection count."  Id.  Loether added that "[f]ederal regulations specify that 'it is the responsibility of the [State Agency] to ascertain whether a majority of owners of private property have objected.'"  Id. (quoting 36 C.F.R. § 60.6(g)).

Pierce replied to Loether's letter on December 8, 2009.  A.R. at 686–88.  At the letter's outset, Pierce stated that "[w]e have reviewed the comments . . . even though . . . [36 C.F.R. § 60.15(k)] does not indicate our office having a role in the review of comments regarding the removal of a resource on the Keeper's 'own motion.'"  A.R. at 686.  Pierce also wrote that the State Agency "forwarded Dr. Ayers' comments . . . . to . . . Dalporto" and noted that they "included . . . research conducted by . . . Bailey."  Id.  Regarding Ayers' comments, Pierce opined that "it appears that Mr. Bailey did not take into consideration that some of the property owners he added to the list had submitted letters of objection to our office prior to [the] listing in the National Register."  A.R. at 687.  "In some instances," Pierce continued, "Mr. Bailey references deed books without citing the dates of property transfer; therefore, we cannot be certain if property ownership existed within the appropriate time period."  Id.

Dalporto, on the other hand, seemed less critical of Bailey's research.  In an attachment to Pierce's December 8, 2009 letter, Dalporto wrote that he neither "agree[d] nor disagree[d]" "with his conclusions."  A.R. at 689.  Dalporto noted that Bailey used "tax maps and map cards associated therewith as the basis upon which to establish a list of 'owners[.]'"  Id.  Further, Dalporto stated that "[a]pparently Mr. Bailey used our research and supplemented it as to certain

parcels . . . by researching the Tax Tickets . . . ."  Id.  "When disparities were discovered,"
Dalporto continued, "[Bailey] then delved into the records contained in the office of the County
Clerk of Logan County."  A.R. at 689–90.  Dalporto added that "Mr. Bailey's efforts are
welcomed" because his office "knew that the tax maps and associated map cards had as their
basic purpose the collection of real estate taxes, with the actual, precise ownership relegated to
secondary importance."  A.R. at 690.  In conclusion, Dalporto wrote that "[w]hile I have not
reviewed Mr. Bailey's work in any depth, I have no reason to doubt the accuracy of his
conclusions, insofar as they go."  Id.

In the December 8, 2009 letter, Pierce also discusses the State Agency's role, or lack
thereof, in ascertaining whether a majority of property owners have objected.  Based on her
reading of the regulations, Pierce expressed skepticism about whether the State Agency had "a
direct role in reviewing or considering comments made to the Keeper regarding the removal of a
resource from listing."  A.R. at 687.  Further, Pierce asserted that, with the exception of Ayers'
comments, the comments sent to the State Agency in connection with Loether's November 10,
2009 letter "discuss[ed] issues . . . not associated with the dispute of [the] property
ownership/objection count."  A.R. at 688.  Therefore, Pierce wrote that the State Agency
"believe[d] that [it had] fulfilled [its] obligation under 36 [C.F.R. §] 60.6(g)."  Id.  Consequently,
Pierce concluded that:

> [the State Agency] cannot make a re-determination as to the count for the following
> reasons: the recalculation would occur outside the appropriate time frame; Mr.
> Bailey's work does not provide enough information to provide an accurate
> assessment; and it is not our office's role in the de-listing process as outlined in the
> federal regulations.

Id.

Subsequently, on December 8, 2009, the Keeper removed Blair Mountain from the National Register.  A.R. at 695.  "Upon its removal, it was automatically 'considered eligible for inclusion in the National Register.'"  A.R. at 691 (quoting 36 C.F.R. § 60.15(a)(4)).

On January 6, 2010, Loether wrote Reid-Smith to notify him that the Keeper had removed Blair Mountain from the National Register.  A.R. at 691.  As to Pierce's statement in the December 8, 2009 letter that the State Agency could not "make a re-determination as to the count," Loether stated that "[i]t is our understand[ing] that she is referring to a re-determination of the corrections you explained in your letter of January 8, 2010."[10]  Id.  Loether also stated that, "[a]ccording to 36 [C.F.R. §] 60.6(g), it is the 'responsibility of the [State Agency] to ascertain whether a majority of owners of private property have objected.'"  Id.  Further, Loether stated that "[y]ou have confirmed that the count of owners and objections yields an objection rate of more than [fifty percent]."  Id.  Loether then acknowledged, "[w]e accept your determination" and, therefore, "Blair Mountain  . . . has been removed from the National Register and it has been determined eligible."  Id.  In closing, Loether stated, "[a]lthough we regret its removal from the National Register, we are satisfied that the Federal regulations have been accurately followed . . . ."  A.R. at 691–92.

On July 6, 2010, Andrea Ferster, counsel for the plaintiffs, submitted a petition for reconsideration with the Keeper and the State Agency.  A.R. at 747–57.  On July 29, 2010, Carol Shull, an employee of the Keeper, wrote Ferster a letter "denying the Petition."  A.R. at 778.  Shull concluded that Ferster lacked regulatory standing under 36 C.F.R. § 60.15(a)(4) to petition

---

[10]  There is no letter dated January 8, 2010 from Reid-Smith in the record.  Indeed, this date comes two days after the date on which Loether wrote the January 6 letter.  Therefore, unless Reid-Smith is mistaken as to the date, the letter can not exist.  Counsel for the Keeper asserts that the date "appears to be an error" and that it "was likely meant to reference the . . . letter of Apr. 29, 2009."  Defs.' Cross-Mot. for Summ. J. at 17 n.6.  However, the Court has reviewed the April 29, 2009 letter and for several reasons it is not clear that Loether is referring to this letter.  For one thing, Pierce purportedly wrote the letter, not Reid-Smith.  Furthermore, the April 29 letter does not seem to discuss any "corrections."  See A.R. at 426.

for reconsideration.  As support for this conclusion, Shull asserted that section 60.15(a)(4) "does not state that properties removed from the National Register for procedural error shall be reconsidered for listing upon the assertion and belief that the Keeper erred in making a removal."  Id.

Following Shull's denial of the petition, the plaintiffs commenced this action on September 9, 2010.  The plaintiffs "claimed that the Keeper's decision to delist [Blair Mountain] was arbitrary and capricious, and sought vacatur of the decision and relisting of the Battlefield as of March 30, 2009."  Sierra Club v. Jewell, 764 F.3d 1, 4 (D.C. Cir. 2014).  This Court "granted summary judgment to the [Keeper], holding that the [plaintiffs] failed to establish standing to bring the action."  Id. (citation omitted).  This Court's ruling was based on the conclusion that the plaintiffs "could not demonstrate any of the three components of standing: injury in fact, causation, or redressability."  Id.

The plaintiffs appealed and, on August 26, 2014, the District of Columbia Circuit ("Circuit") reversed this Court's decision granting summary judgment to the Keeper.  See generally 764 F.3d 1.  The Circuit held that the plaintiffs satisfied each prong of the test for standing.  Id. at 5, 8.

The Circuit remanded the case to this Court "for further proceedings."  Id. at 15.  In their cross-motions for summary judgment, the parties address whether the Keeper's decision to delist Blair Mountain violated the APA.  The Court will now address these arguments.[11]

---

[11]  In connection with the parties' cross-motions for summary judgment, West Virginia Coal Association, Inc. ("Coal Group") filed an amicus brief.  In addition to arguing that the plaintiffs lacked standing, the Coal Group argued that the plaintiffs' claims were "effectively moot."  Amicus Br. at 10.  The plaintiffs contest this argument in their Response to Amicus Curiae Brief Filed by the West Virginia Coal Association.  Pls.' Resp. to Amicus Br.  However, the Keeper has not addressed the mootness argument in any of its papers, and the plaintiffs also did not further address it in any other papers.  Under these circumstances, the Court declines to address this argument.  See Solis v. Summit Contractors, Inc., 558 F.3d 815, 826 n.6 (8th Cir. 2009) (citing cases) ("[W]e decline to consider
(continued . . . )

## II.      STANDARD OF REVIEW

In a case involving review of final administrative action, the summary judgment standard of review set forth in Federal Rule of Civil Procedure 56 does not apply.  E.g., Se. Conference v. Vilsack, 684 F. Supp. 2d 135, 142 (D.D.C. 2010).  Rather, a court must "decid[e], as a matter of law, whether an agency action is supported by the administrative record and consistent with the . . . [arbitrary and capricious] standard of review [under the APA]."  Loma Linda Univ. Med. Ctr. v. Sebelius, 684 F. Supp. 2d 42, 52 (D.D.C. 2010) (citation omitted); see also Richards v. INS, 554 F.2d 1173, 1177 & n.28 (D.C. Cir. 1977).  In making this determination, a "district . . . [court] sits as an appellate tribunal," and "[t]he 'entire case' on review is a question of law." Am. Bioscience, Inc. v. Thompson, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (citations omitted).

"[A]rbitrary and capricious" review is "highly deferential" and "presumes the agency's action to be valid."  Envtl. Def. Fund, Inc. v. Costle, 657 F.2d 275, 283 (D.C. Cir. 1981).  "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency."  Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).  Rather, "[c]ourt[s] consider[ ] whether the agency acted within the scope of its legal authority, whether the agency has explained its decision, whether the facts on which the agency purports to have relied have some basis in the record, and whether the agency considered the relevant factors."  Fund for Animals v. Babbitt, 903 F. Supp. 96, 105 (D.D.C. 1995) (citing Marsh v. Or. Nat. Res. Council, 490 U.S. 360, 378 (1989)).

---

( . . . continued)

this issue because it was raised to this court by the amici and not by the parties."); Tyler v. City of Manhattan, 118 F.3d 1400, 1403 (10th Cir. 1997) (citing cases) ("We choose not to address this argument because it was not raised by a party to this appeal.  It is instead an attempt by amicus to frame the issues on appeal, a prerogative more appropriately restricted to the litigants."); Michel v. Anderson, 14 F.3d 623, 625 (D.C. Cir. 1994) (stating that courts "[o]rdinarily . . . would not entertain an amicus' argument if not presented by a party").  The Court also declines to consider the Coal Group's mootness argument because it is likewise "not adequately briefed."  In re HECI Exploration Co., Inc., 862 F.2d 513, 525 (5th Cir. 1988).

### III.    LEGAL ANALYSIS

**A.    The Parties' Arguments**

The plaintiffs' overarching argument is that the defendants' decision to delist Blair Mountain violated the APA because it "[w]as [a]rbitrary, [c]apricious[,] an [a]buse of [d]iscretion, and [c]ontrary to the [Keeper's] [o]wn [r]egulations."  Pls.' Mot. for Summ. J. at 14. The Court distills two main arguments from the plaintiffs' extensive arguments in support of this position.

First, the plaintiffs contend that the Keeper's use of the recalculated list of fifty-seven owners instead of the original list of sixty-five owners constituted a per se violation of the APA. More specifically, the plaintiffs assert that the delisting contravened 36 C.F.R. § 60.6(c), see Pls.'s Mot. for Summ. J. at 14–16, which provides that the State Agency must compile a baseline list of owners "within [ninety] days prior to the notification of intent to nominate [a property]," 36 C.F.R. § 60.6(c) (2015).  According to the plaintiffs, if the Keeper were allowed to use lists calculated outside this window, "the calculation of owner objections would be vulnerable to manipulation, through the acquisition and consolidation of property interests, which would alter the relative weight of each objection."  Pls.' Mot. for Summ. J. at 16.  The plaintiffs, therefore, construe section 60.6(c) to bar the Keeper from "relying on a list of owners that [is] recalculated after the nomination was submitted to the Keeper."  Pls.' Reply Br. at 7.  And the plaintiffs point out that the "[October] 2008 . . . List of [sixty-five] Owners is the only list of owners that was compiled within [ninety] days prior to the notification of intent to nominate, as required by 36 C.F.R. § 60.6(c)."[12]  Pls.' Mot. for Summ. J. at 3.  Accordingly, the plaintiffs conclude that the

---

[12]  The plaintiffs do not explain why they assert that the October 2008 list has sixty-five owners when the record evidence cited above indicates that the number is actually sixty-six.  This discrepancy is immaterial, however, because the Court is considering the propriety of the Keeper's actions under the APA.  The parties can seek to reconcile this discrepancy on remand.

Keeper's use of the recalculated list of fifty-seven owners was a per se violation of the APA.  Id. at 19.

The plaintiffs' second argument is that the Keeper acted arbitrarily and capriciously in delisting Blair Mountain for two particular reasons.  One, the plaintiffs contend that the Keeper's "decision that more than [fifty percent] of owners objected counted objections that the [Keeper] acknowledged were questionable."  Id. at 19.  Two, the plaintiffs maintain that the Keeper failed "to engage in a meaningful review of the [State Agency's] May 21, 2009 re-calculated list of [fifty-seven] owners and [thirty] objections."  Pls.' Reply Br. at 9–10.

Elaborating on their second argument, the plaintiffs assert that the defendants acted improperly by mindlessly accepting Jackson Kelly's "'corrections' to the 2008 Official List of [sixty-five] Owners."  Pls.' Mot. for Summ. J. at 16.  According to the plaintiffs, in paring the official list down to fifty-seven owners, the State Agency and the Keeper[13] made "[n]o effort whatsoever . . . to verify and update the ownership of each of the parcels of land within the Blair Mountain Battlefield."  Id. at 17.  Similarly, the plaintiffs contend that Jackson Kelly "made 'corrections' to the list of objectors in order to include objectors who had objected to the prior nominations but whose names were not included on the 2008 Official List of [sixty-five] Owners."  Id.  In the plaintiffs' estimation, this was improper because "[n]o updated 'affidavits of ownership' were submitted by [Jackson Kelly] along with these corrections."  Id.  The plaintiffs conclude that these actions operated "to retain prior objectors while decreasing the total number of owners on the baseline list, thereby increasing the weight of each objection."  Id.

The plaintiffs challenge the propriety of the decrease of the list of owners from sixty-five to fifty-seven, asserting that the State Agency's "May 21, 2009 List of [fifty-seven] Owners

---

[13]  Hereinafter, when the Court references the Keeper and the State Agency collectively, it will use the designation "the Agencies."

eliminated eight owners" from the "October 2008 List of [sixty-five] Owners."  Pls.' Reply Br. at

13.  Specifically, the plaintiffs assert that the revised list "substituted Keith Allan Bryant as the

sole owner of the parcel previously shown on the October 2008 List of [sixty-five] Owners as

being co-owned by Charles Carpenter, Cinda O Ball, Carolyn A. Ball, and Robert N.

Yarrington."  Id.  Likewise, the plaintiffs assert that the revised list "substituted Seldom Seen

Acres LLC as the sole owner of the parcel that was shown on the October 2008 List of [sixty-

five] Owners as being owned by Carolyn Jean Seibert, Jane B. Springer, Linda I. Larner, and

Wendy A. Adams."  Id.; compare A.R. at 464, with A.R. at 1236.  Yet, the plaintiffs contend that

"[n]one of these 'corrections' . . .  were accompanied by affidavits of ownership by any of these

persons attesting that they were no longer owners of property within the Blair Mountain

Battlefield . . . ."  Pls.' Reply Br. at 13.  Further, the plaintiffs assert that the "record contains no

affidavit of ownership from Seldom Seem Acres attesting that it was the sole owner of that

parcel, or from Keith Allen Bryant attesting to his acquisition of the interests of Charles

Carpenter, Cinda O Ball, Carolyn A. Ball, and Robert N. Yarrington."  Id.

  The plaintiffs also challenge the propriety of the Keeper's decision to increase the "total

number of objections . . . from [twenty-two] to [thirty]."  A.R. at 351.  To sustain this challenge,

the plaintiffs assert that the Keeper improperly accepted "objections from persons . . . who failed

to certify 'in a [current] written notarized statement that the party is the sole or partial owner of a

nominated private property.'"  Pls.' Reply Br. at 7–8 (quoting 36 C.F.R. § 60.6(g)).  In so

arguing, the plaintiffs focus on the objections of the following individuals: August Phillips, Eula

Blankenship, Eula Ball, Dollie Jeffrey, and Corbet Craddock.

  The plaintiffs attack the validity of the objections of Phillips and Blankenship on the

following ground: they were "noted on the May 21, 2009 recalculated list of [fifty-seven]

owners/[thirty] objectors and accepted by the [Keeper] at 'face value[]' even [though] these objectors were not on the Official 2008 List of [sixty-five] Owners and no updated objections attesting to ownership were submitted by these individuals."  Pls.' Mot. for Summ. J. at 21.  To support this contention, the plaintiffs note that these two objections date back to September 2005.  A.R. at 872; id. at 939.  By contrast, the plaintiffs challenge Eula Ball's declaration on the basis that the defendants added her to the revised list even though she was "not on the 2008 Official List of [sixty-five] Owners, and even though no updated affidavit[] of ownership w[as] submitted by [her] prior to March [25], 2009."  See Pls.' Mot. for Summ. J. at 17; A.R. at 469.[14]

The plaintiffs challenge the objections of Dollie Jeffrey and Corbet Craddock on more particularized grounds.  In the plaintiffs' estimation, Jeffrey's objection is invalid because "there was no owner identified on the Recalculated 2009 list [fifty-seven] owners as 'Dollie Jeffry.'"  Pls.' Mot. for Summ. J. at 20.  The plaintiffs acknowledge that the original list of sixty-five owners included "Dessie Jeffrey."  Id. (internal quotation marks omitted).  However, the plaintiffs contend that it is improper to "simply attribute[] the objection of 'Dollie Jeffrey' to . . . 'Dessie Jeffry'" absent an "updated notarized objection . . . submitted by Dollie Jeffrey . . . averring that she is the owner of land within the boundaries of Blair Mountain Battlefield."  Id.  The plaintiffs further note that Dollie Jeffrey's objection "provides no locational information that identifies which parcel she owned within the proposed boundaries, or establishing whether she

---

[14]  The plaintiffs also seem to contest the objections of Edna Green and Janice Ball.  Specifically, the plaintiffs suggest that Edna Green and Janice Ball appear on the revised list but not on the original list.  Pls.' State. of Mat. Facts ¶ 83.  Because Edna Green and Janice Ball submitted objections in 2005, A.R. at 1296, 1303, the plaintiffs assert that "[t]hese objectors were [improperly] included [on] the [revised list] based on objections and affidavits submitted in 2005."  Pls.' State. of Mat. Facts ¶ 83.  However, the record does not reflect that Edna Green appears on either the original list or the revised list.  Compare A.R. at 1236–37, with A.R. at 464.  Furthermore, the record reflects that Janice Ball appears on both the original and the revised list.  Compare A.R. at 1236, with A.R. at 464.  Accordingly, taken at face value, the plaintiffs' arguments regarding the Keeper's allegedly arbitrary and capricious conduct do not apply to these two individuals.  This is not, however, to suggest that the Keeper cannot entertain such arguments upon remand.

and 'Dessie Jeffry[]' . . . are one and the same person, as the [Keeper] . . . stated should have been provided in order to accept this objection." <u>Id</u>.  Regarding Corbet Craddock's objection, the plaintiffs note that it is signed "by 'Nellie Craddock For Corbet Craddock.'" <u>Id.</u> at 19.  The plaintiffs assert that the decision to count this objection contravened the Keeper's nonbinding guidance that "a notarized objection that is submitted by someone other than the property owner should only be counted 'if the person signing is the agent for an individual who has appointed the signatory as his attorney-in-fact.'" <u>Id.</u> (quoting A.R. at 787).  This is because, according to the plaintiffs, "there was no evidence in the record that Nellie Craddock had . . . power of attorney for Corbet Craddock or was otherwise authorized to serve as his agent or attorney-in-fact." <u>Id.</u>

Additionally, the plaintiffs accuse the Keeper of arbitrarily and capriciously failing to independently verify the accuracy of the list.  In essence, the plaintiffs assert that the Keeper rubber-stamped the revised list of fifty-seven owners that the State Agency compiled.  To support this argument, the plaintiffs point to a series of communications between the Keeper and the State Agency debating which one had the responsibility to ensure the accuracy of the list. For instance, in the September 24, 2009 letter, Pierce wrote that the State Agency "is not currently reviewing . . . information" from the Keeper "[b]ased upon [its] . . . understanding of 36 C.F.R. 60.15(k)."  A.R. at 637.  Then, in the November 10, 2009 letter, Loether responded that "'it is the responsibility of the [State Agency] to ascertain whether a majority of owners of private property have objected.'"  A.R. at 682 (quoting 36 C.F.R. § 60.6(g)).

The Keeper disputes the notion that it committed a <u>per se</u> violation of the APA by using the revised list instead of the original list.  The Keeper acknowledges that "36 C.F.R. § 60.6(c) directs that, within [ninety] days prior to the notification of an intent to nominate, [the State

Agency] must create a baseline listing of current owners of the property by using either 'official land recordation records or tax records, whichever is more appropriate.'" Defs.' Cross-Mot. for Summ. J. at 23–24.  However, the Keeper asserts that "nothing in 36 C.F.R. pt. 60 [] states that [this] list is the immutable list from which [the Keeper] is to determine both (i) the baseline of property owners, and (ii) whether a majority of the private property owners object to having the nominated property included in the National Register." Id. at 24.

The Keeper also disputes the idea that it improperly calculated the number of owners and objectors.  The Keeper accuses the plaintiffs of ignoring "[the Keeper's] careful consideration of the record before the agency, which ultimately led [the Keeper] to conclude that there had been procedural error in [the Agencies'] original conclusions that fewer than a majority of owners objected to [the] listing." Id. at 24–25.  More specifically, the Keeper characterizes the plaintiffs' challenges to the objections of Phillips, Blankenship, Eula Ball, Dollie Jeffrey, and Corbet Craddock as an "attempt to flyspeck [the Keeper's] acceptance of specific objections by focusing on the validity of individual objections." Id. at 25.  Regarding Corbet Craddock, the Keeper asserts that the plaintiffs' own evidence shows that he was an owner "as of July 18, 1980 . . . and therefore had a right to object." Id.  As for Dollie Jeffrey, the Keeper contends that the regulations do not require an objection to be "accompanied by address, parcel, or other acceptable location information." Id. (internal quotation marks omitted).  The Keeper accuses the plaintiffs of attempting "to manufacture this requirement from [the Keeper's] non-binding statement to the [State Agency] that 'it is reasonable to expect' an objecting owner to provide such information." Id. at 25–26.  Concerning Phillips, Blankenship, and Eula Ball, the Keeper notes that "these owners did make their objections known through affidavits submitted during a prior effort to list Blair Mountain . . . ." Id. at 26.  The Keeper adds that "[w]ithout any evidence

that the owners had rescinded their objections or that they were no longer owners, it was reasonable for [it] to continue to count their objections to [the] listing." Id. (citing 36 C.F.R. § 60.6(s)).

The Keeper also rejects the assertion that it failed to independently verify the accuracy of the revised list. The Keeper concedes that it had a responsibility to "undertake an independent review" of the entire record in the context of "a removal action initiated by the Keeper on its own motion." Id. at 28. However, the Keeper disputes that it "simply deferred to the [State Agency's] findings without assessing for itself whether a rational connection exist[ed] between the facts before the [Keeper] and the conclusion reached[.]" Id. Rather, the Keeper asserts that it, "after deliberation, reasonably adopted the [State Agency's] conclusion as its own." Id. In so asserting, the Keeper posits that "it was reasonable for [it], after listing had occurred, to continue to look to the [State Agency] for its expertise in determining whether a majority of property owners timely objected to [the] listing." Id. at 31. This, from the Keeper's perspective, "is particularly true when a determination of whether the list that [is] being used . . . turns on an interpretation of state real property law." Id. In the Keeper's view, "the more complex, technical, and difficult a fact is to determine . . . , the more likely a court is to defer to agency fact finding." Id. (citation omitted).

## B.    Discussion

"To survive review under the arbitrary and capricious standard, an agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." Tripoli Rocketry Ass'n v. ATF, 437 F.3d 75, 81 (D.C. Cir. 2006) (citation and internal quotation marks omitted). In other words, arbitrary and capricious review "establishes a scheme of reasoned decisionmaking." Nat'l Fuel

Gas Supply Corp. v. FERC, 468 F.3d 831, 839 (D.C. Cir. 2006) (internal quotation marks omitted) (citing Allentown Mack Sales & Serv., Inc. v. NLRB, 522 U.S. 359, 374 (1998)); see also Int'l Ladies' Garment Workers' Union v. Donovan, 722 F.2d 795, 815 (D.C. Cir. 1983) (footnote, citation, and internal quotation marks omitted) (stating that, under arbitrary and capricious review, courts must "engage in a searching and careful inquiry, the keystone of which is to ensure that the [agency] engaged in reasoned decisionmaking").  Showing that reasoned decisionmaking supports an agency's action "depends on the specific facts of a particular case." See Dist. Hosp. Partners, L.P. v. Burwell, 786 F.3d 46, 57 (D.C. Cir. 2015).  This is because "arbitrary and capricious review defies generalized application and must be contextually tailored."  Maggard v. O'Connell, 671 F.2d 568, 571 (D.C. Cir. 1982) (citation and internal quotation marks omitted).

Although there is no formula for what constitutes reasoned decisionmaking, this Circuit has identified principles to guide this inquiry.  This Court categorizes these principles as follows: deliberation, transparency, rationality, and evidentiary propriety.  Regarding deliberation, the agency must "engage the arguments raised before it."  Del. Dep't of Nat. Res. & Envtl. Control v. EPA, 785 F.3d 1, 11 (D.C. Cir. 2015) (citation and internal quotation marks omitted).  Such engagement requires the agency to consider "important aspect[s] of the problem," Dist. Hosp., 786 F.3d at 57 (citation and internal quotation marks omitted), as well as "significant alternatives to the course it ultimately chooses," Del. Dep't of Nat. Res., 785 F.3d at 11 (citation and internal quotation marks omitted).  It follows that an agency's decision is not deliberative if it fails to "respond meaningfully to objections raised by a party."  BNSF Ry. Co. v. Surface Transp. Bd., 741 F.3d 163, 168 (D.C. Cir. 2014) (emphasis added) (citation and internal quotation marks omitted); see also Mich. Wis. Pipe Line Co. v. Fed. Power Comm'n, 520 F.2d 84, 89 (D.C. Cir.

1975) (citations omitted) (stating that an agency's "bare application [of a rule] . . . without even so much as a passing comment upon the uncontradicted record evidence . . . simply is not reasoned decision-making").

As to transparency, the agency "must, of course, reveal the reasoning that underlies its conclusion. Transcon. Gas Pipe Line Corp. v. FERC, 54 F.3d 893, 898 (D.C. Cir. 1995) (citation omitted). Under this standard, "[a]n agency cannot . . . merely . . . insist[] that its conclusions are rational and supported by the record." San Luis Obispo Mothers for Peace v. U.S. Nuclear Reg. Comm'n, 789 F.2d 26, 48 (D.C. Cir. 1986). "Instead, it must give the court the rationale underlying the importance of factual distinctions as well as the factual distinctions themselves." Id. (citation and internal quotation marks omitted). In so doing, the agency must ensure that its "findings and rationales" are "understandable." Associated Gas Distribs. v. FERC, 893 F.2d 349, 361 (D.C. Cir. 1989) (citation and internal quotation marks omitted). The corollary of this requirement is that "unclear or contradictory" findings and rationales fail to command deference. See id. Consistent with these principles, "[w]hen an agency fails to state the reasons for its decision, then courts should remand the case to the agency for further explanation." Campbell Sixty-Six Express, Inc. v. ICC, 603 F.2d 1012, 1014 (D.C. Cir. 1979) (citations omitted).

The rationality assessment pertains to the nature and substance of the agency's reasoning. "One of the core tenets of reasoned decision-making is that 'an agency [when] changing its course . . . is obligated to supply a reasoned analysis for the change.'" Republic Airline Inc. v. U.S. Dep't of Transp., 669 F.3d 296, 299 (D.C. Cir. 2012) (quoting State Farm, 463 U.S. at 42). Thus, "if an agency's interpretation of a regulation shifts such that the agency is treating like situations differently without sufficient reason, the court may reject the agency's interpretation as

arbitrary." Kaiser Found. Hosp. v. Sebelius, 828 F. Supp. 2d 193, 199 (D.D.C. 2011).[15]

Moreover, the agency must base its decision on more than wishful or whimsical thinking.

Therefore, an agency's reasoning is deficient if it is: (1) "based on speculation," Del. Dep't of

Nat. Res., 785 F.3d at 11 (citation and internal quotation marks omitted); (2) "mere conjecture

and abstract theorizing offered in a vacuum," Kan. Gas & Elec. Co. v. FERC, 758 F.2d 713, 721

(D.C. Cir. 1985) (citation omitted); (3) "conclusory," Jurewicz v. U.S. Dep't of Agric., 741 F.3d

1326, 1331 (D.C. Cir. 2014) (citation and internal quotation marks omitted); or (4) "'so

implausible that it could not be ascribed to a difference in view or the product of agency

expertise,'" United Mine Workers of Am. v. Mine Safety & Health Admin., 626 F.3d 84, 90

(D.C. Cir. 2010) (quoting State Farm, 463 U.S. at 43).

     The final perspective encompasses evidentiary considerations.  Where, as here, the case

requires the arbitrary and capricious review of a "record consisting of arguments and evidence

submitted by opposing sides," Aircraft Owners & Pilots Ass'n v. FAA, 600 F.2d 965, 972 (D.C.

Cir. 1979), courts must "set aside agency findings that are unsupported by substantial evidence,"

Midtec Paper Corp. v. United States, 857 F.2d 1487, 1497 (D.C. Cir. 1988) (citation and internal

quotation marks omitted).[16]  Beyond this threshold requirement, reasoned decisionmaking

requires the agency to "'examine the relevant data.'"  Dist. Hosp. Partners, 786 F.3d at 56

---

[15]  See also W. Deptford Energy, LLC v. FERC, 766 F.3d 10, 17 (D.C. Cir. 2014) (citation and internal quotation marks omitted) (stating that the agency "cannot depart from [prior] rulings without provid[ing] a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored"); Wis. Valley Improvement v. FERC, 236 F.3d 738, 748 (D.C. Cir. 2001) (stating that "an agency acts arbitrarily and capriciously when it abruptly departs from a position it previously held without satisfactorily explaining its reason for doing so"); Akzo Nobel Salt, Inc. v. Fed. Mine Safety & Health Review Comm'n, 212 F.3d 1301, 1304–05 (D.C. Cir. 2000) (stating that "the flip-flops here . . . [are] the sort of 'post hoc rationalizations' to which courts will not defer" (quoting Martin v. Occu. Safety & Health Review Comm'n, 499 U.S. 144, 156 (1991))); Jicarilla Apache Nation v. U.S. Dep't of Interior, 892 F. Supp. 2d 285, 290 (D.D.C. 2012) (citation omitted) (stating that "a court will not defer to an agency's post hoc rationalizations, as indicated by an agency's prior conflicting interpretations of its regulations), aff'd sub nom. Nation v. U.S. Dep't of Interior, 559 F. App'x 2 (D.C. Cir. 2014).

[16]  See also Kisser v. Cisneros, 14 F.3d 615, 619 (D.C. Cir. 1994) (citation omitted); Ass'n of Data Processing Serv. Orgs. v. Bd. of Governors of Fed. Reserve Sys., 745 F.2d 677, 683–84, 686 (D.C. Cir. 1984).

(quoting State Farm, 463 U.S. at 43).  Reasoned decisionmaking also precludes the agency from

offering "'an explanation . . . that runs counter to the evidence before the agency.'"  Nat'l Fuel,

468 F.3d at 839 (quoting State Farm, 463 U.S. at 43).

 In appropriate cases, agencies are entitled to a special category of deference called "Auer

deference."  See generally Auer v. Robbins, 519 U.S. 452 (1997).  Under Auer, "[a]n agency's

[reasonable] interpretation of its own ambiguous regulations" is generally controlling.

MarkWest Mich. Pipeline Co. v. FERC, 646 F.3d 30, 36 (D.C. Cir. 2011) (citing Auer, 519 U.S.

at 461).  However, "[a]lthough Auer ordinarily calls for deference to an agency's interpretation

of its own ambiguous regulation, . . . this general rule does not apply in all cases."  Christopher

v. SmithKline Beecham Corp., ___ U.S. ____, ____, 132 S. Ct. 2156, 2166 (2012) (citations

omitted).  Thus, "Auer deference is warranted only when the language of the regulation is

ambiguous."  Christensen v. Harris Cty., 529 U.S. 576, 588 (2000) (emphasis added); see also

MarkWest, 646 F.3d at 36.  However, "[d]eference is undoubtedly inappropriate, for example,

when the agency's interpretation is plainly erroneous or inconsistent with the regulation."

Christopher, ____ U.S. at ____, 132 S. Ct. at 2166 (citation and internal quotation marks

omitted).  "And deference is likewise unwarranted when there is reason to suspect that the

agency's interpretation 'does not reflect the agency's fair and considered judgment on the matter

in question.'"  Id. (quoting Auer, 519 U.S. at 461).  "This might occur when the agency's

interpretation conflicts with a prior interpretation, or when it appears that the interpretation is

nothing more than a convenient litigating position, or a post hoc rationalizatio[n] advanced by an

agency seeking to defend past agency action against attack."  Id. (alteration in original) (citations

and internal quotation marks omitted).  Where Auer deference is unwarranted, courts accord an

agency's "interpretation a measure of deference proportional to the thoroughness evident in its

consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade." Christopher, ____ U.S. at ____, 132 S. Ct. at 2168–69 (citations and internal quotation marks omitted).

Application of the foregoing factors leads the Court to the conclusion that the Keeper's decision to delist Blair Mountain violated the APA for a number of reasons. In part, this conclusion results from the Keeper's arbitrary and capricious decision to use the list of fifty-seven owners. Pierce seemed to base the State Agency's adoption of Jackson Kelly's "yellow list" on Gardner's research. However, Gardner's description of his research is generalized and somewhat conclusory, and the "yellow list" attached to his February 27, 2009 letter is merely a summary of this description. Gardner's report also raises questions because it does not reference Dalporto's October 2008 list of sixty-six owners referenced in the State Agency's correspondence.[17] Instead, Gardner discusses a State Agency-created list of sixty-eight owners, as well as an "October 2008 list" of seventy-five owners. Therefore, it is unclear whether Gardner analyzed the same data used by the State Agency as the basis for its decision to adopt Dalporto's list of sixty-six owners. Indeed, in the March 26, 2009 letter, Pierce questioned the accuracy of Jackson Kelly's property owner lists. As noted above, Pierce wrote that Jackson Kelly appeared to compare its research with the property owner list compiled in December 2007 instead of Dalporto's October 2008 list. Furthermore, Pierce questioned the accuracy of Jackson

---

[17] As stated above, the plaintiffs state that Dalporto's October 2008 list shows sixty-five owners. The record does not clearly reflect how many owners this list contains. However, the fact that the plaintiffs' count does not agree with Dalporto's does not affect the validity of their position that the Keeper's decision to delist Blair Mountain was arbitrary and capricious. The key issue on this point is whether the Agencies had a reasoned basis to choose Jackson Kelly's "yellow list." As explained more fully below, the record shows that they did not. Furthermore, although the plaintiffs request both vacatur of the decision to delist Blair Mountain and the relisting of Blair Mountain as of March 30, 2009, the Court will only vacate the Keeper's decision. This opinion does not state or imply that the Keeper cannot ultimately justify its decision to use the fifty-seven owner list or demonstrate that its decision to delist Blair Mountain was reasonable. On remand, the Keeper is free to reconsider how many owners the October 2008 list contains, as well as reassess any other relevant considerations.

Kelly's boundary map.  In sum, Pierce characterized Gardner's report as containing "discrepancies" and declared that "such errors" could account for the different numbers that Jackson Kelly calculated.

The State Agency's decision to recalculate the property owner list does not render the Keeper's adoption of the list of fifty-seven owners any less arbitrary and capricious.  In the March 26, 2009 letter, Pierce failed to explain why the State Agency decided to recalculate the list of owners using the "yellow list."  Rather, Pierce simply supplied a conclusory chart showing the State Agency's four different calculations of owners and objectors.  Unsurprisingly, the Keeper asked the State Agency to choose one of the four lists.  Although Pierce responded that the list of fifty-seven owners and twenty-two objectors was the "most logical" choice, she provided no rationale for this decision.  Likewise, just four days later, the Keeper listed Blair Mountain without explaining why the fifty-seven owner list was valid.

 The Keeper's decision to certify the recalculated list of fifty-seven owners and thirty objectors was similarly arbitrary and capricious.  Although the State Agency purportedly re-reviewed Gardner's materials and recommended increasing the number of objectors to thirty, it vaguely and without any explanation stated that additional objections were "unintentionally overlooked."  Although the State Agency later stated that it failed to receive seven of the eight allegedly overlooked objections, on June 12, 2009, the Keeper asked the State Agency for help reconciling apparent discrepancies in the May 21, 2009 list of fifty-seven owners and thirty objectors.  In response, the State Agency admitted that it did not have power of attorney from Nellie Craddock for Corbet Craddock.  The Keeper's subsequent decision to retain this objection contradicts nonbinding guidance provided to the State Agency.  Likewise, on June 16, 2009, the Keeper asked the State Agency why it counted the objection of Dollie Jeffrey for the purported

owner named Dessie Jeffrey.  Without providing any substantive explanation, the State Agency

merely responded that it took it "on face value" based on a chart prepared by Jackson Kelly.

Further, the State Agency stated that it "assumed" that the notary made the correct identification.

But this rationale seems inconsistent with the Keeper's nonbinding guidance, which states that

one of the following conditions would have to be met for the objection of "Dollie Smith" to

count for "Dessie Smith":

> Dollie Smith would either need to establish (a) that she and Dessie Smith are one
> in the same, or (b) that she is a property owner whose name did not appear on the
> list and that her objection is being made not as Dessie Smith . . . , but entirely as
> Dollie Smith.

A.R. at 787 ¶ 13.

The objections of Corbet Craddock, Phillips, and Blankenship raise additional questions.

According to the research Bailey submitted with Ayers' September 9, 2009 comments, Corbet

Craddock conveyed the parcel he allegedly owned in 1980 and died in 1983.  Bailey further

asserted that Phillips died in December 2008, which was before the Agencies' adoption of both

the fifty-seven/twenty-two and fifty-seven/thirty lists.  Although again the Court does not take a

position on the accuracy of Bailey's conclusions, the record does not reflect that the Agencies

meaningfully responded to these contentions.  Moreover, the State Agency added Phillips and

Blankenship to the May 21, 2009 fifty-seven/thirty list as owners and objectors even though their

objections date back to September 2005.  This action seems to contradict the Keeper's

nonbinding guidance, which interprets the regulations as follows:

> If an owner whose name does not appear on the list that the State Agency compiles
> under 36 C.F.R. § 60.6(c) "<u>later</u> certifies in a written statement that he is . . . the
> owner of a nominated . . . property, then such owner shall be counted . . . in
> determining whether a majority of owners has objected."

See A.R. at 786 ¶ 6a (emphasis added).[18]

To compound matters, counsel for the Keeper failed to respond to the plaintiffs'

argument regarding owner-objectors Bryant and Seldom Seen Acres LLC.  See generally Defs.'

Reply Br.  As stated above, the plaintiffs contend that the fifty-seven owner list improperly

eliminated eight owners.  For instance, the plaintiffs assert that the revised list substituted Bryant

as the sole owner of the parcel that Carpenter, Cinda Ball, Carolyn Ball, and Yarrington were

identified as the owners of on the original list.  The Keeper has not identified a deed, affidavit,

tax record or other evidence purporting to show that Bryant acquired sole ownership of this

parcel.  Quite to the contrary, the record contains a deed purporting to show that Carpenter

became the owner of the parcel in June 2006, A.R. at 367–71, as well as an objection from

Carpenter dated March 25, 2009, A.R. at 309.  While this evidence may suggest that Cinda Ball,

Carolyn Ball, and Yarrington are not owners, it does not support the deduction that Bryant was

the sole owner of the parcel.  Nor has the Keeper identified any evidence indicating that Seldom

Seen Acres acquired parcel 153-2-31.

The Keeper's actions immediately prior to issuing the July 9, 2009 notice of the planned

delisting also exhibited arbitrariness and capriciousness.  In the July 3, 2009 letter, Loether

conclusorily stated that the Keeper concurred with the State Agency's determination that more

than fifty percent of the owners objected to the listing.  Admittedly, Loether stated that Loretta

White's objection could not be counted because she had a life estate.  And the Keeper asserts that

this shows the "independent, deliberative nature of the [Keeper's] assessment."  Defs.' Cross-

Mot. for Summ. J. at 30.  However, this determination regarding White would appear to be

---

[18]  The plaintiffs also challenge the validity of Eula Ball's objection.  However, Eula Ball submitted an updated objection on March 25, 2009, which is before the Agencies endorsed the fifty-seven/thirty list.  Therefore, the plaintiffs' arguments regarding the validity of certain objections do not appear to apply to Eula Ball.

nothing more than a straightforward reading of 36 C.F.R. § 60.3(k), which provides that "[t]he

term owner . . . means . . . individuals . . . holding <u>fee</u> <u>simple</u> title to property." (emphasis added).

The Agencies' handling of Ayers' objection also displays arbitrary and capricious

conduct.  Initially, as reflected by the September 24, 2009 letter, Pierce disclaimed any duty to

review the information.  Granted, at the Keeper's urging, the State Agency later purported to

review Ayers' comments.  It is also true that the State Agency critiqued Bailey's research.  But

Pierce's critique is superficial and vague.  Furthermore, while Dalporto's analysis is somewhat

more robust, he is less critical than Pierce.  Although Dalporto equivocates and states that he did

not review Bailey's research "in depth," he also states that he has "no reason to doubt the

accuracy" of Bailey's conclusions.  Additionally, in the December 8, 2009 letter, Pierce disputes

that the State Agency has a "direct role" in reviewing comments that the Keeper receives in

connection with a petition challenging a delisting and expressly declines to make a "re-

determination as to the count."  Thereafter, the Keeper removed Blair Mountain from the

Register.

Loether's January 6, 2010 letter reflects that the Keeper essentially rubber-stamped these

arbitrary and capricious actions.  Loether noted that Pierce stated that the State Agency could not

redetermine the count.  But Loether responded that it was the Keeper's "understanding" that

Pierce was referring to a redetermination of the corrections allegedly explained in a seemingly

nonexistent letter.  Then, Loether cited 36 C.F.R. § 60.6(g) for the proposition that the State

Agency bore the responsibility of determining the owner/objector count, opined that the State

Agency "confirmed" that a majority of the owners objected, and conclusorily stated that "[w]e

accept your determination."  In a similarly conclusory fashion, Loether added that the Keeper

was "satisfied" that the regulations had been "accurately followed."

38

All the above-mentioned actions contain very little, if any, indicia of reasoned decisionmaking.  In terms of deliberation, the Agencies did not adequately scrutinize Bailey's research.  This inadequacy included failing to meaningfully address his assertion that Phillips and Craddock had died.  Furthermore, the State Agency used Dalporto's assessment of Bailey's research to bolster its position that the fifty-seven/thirty list was accurate.  However, Dalporto's assessment was, at best, noncommittal.  Therefore, the State Agency failed to consider an important aspect of the problem and/or failed to consider significant alternatives.

The Agencies' decisionmaking also lacked transparency.  The Keeper's decision to certify the fifty-seven owner list particularly runs afoul of the requirements of transparency and evidentiary propriety.  In terms of transparency, in Pierce's March 30, 2009 letter, she completely failed to state the reasons that the State Agency was adopting the fifty-seven owner list.  Likewise, the Keeper repeatedly failed to state why it was adopting the State Agency's recommendations.  For instance, when Pierce arbitrarily chose the fifty-seven owner list on March 30, 2009, the Keeper listed Blair Mountain on the same day, thereby hastily endorsing this arbitrary action.  Then, in the July 3, 2009 letter, Loether stated, without explanation, that the Keeper agreed with the State Agency's determination that a majority of the owners objected.  Likewise, in the January 6, 2010 letter, Loether merely rubber-stamped a series of arbitrary and capricious actions.  Moreover, if the Keeper did try to explain its reasoning, it was not always understandable.  For example, in the January 6, 2010 letter, in an apparent attempt to justify his decision to certify the State Agency's count, Loether confusingly referenced a redetermination that the State Agency supposedly made in a nonexistent letter.

For similar reasons, the Agencies' actions are short on rationality.  The Agencies counted the objections of Corbet Craddock, Jeffrey, Phillips, and Blankenship under circumstances that

appear to conflict with the Keeper's own guidance.  Although the guidance is nonbinding, cf. Friends of Blackwater v. Salazar, 691 F.3d 428, 435 (D.C. Cir. 2012) (citations omitted) ("Whether an agency must account for a departure from a prior non-binding statement of intent is not entirely clear."), the Keeper's decision to disregard its own guidance is tantamount to the inconsistent treatment of similar situations.  Simply put, the Keeper's nonbinding guidelines state one thing, while the Keeper is doing another.  Moreover, the Agencies consistently relied on conclusory reasoning to support the decision to delist Blair Mountain.  And counting Dollie Jeffery's objection based on the assumption that the notary assumed the correct identification is somewhat speculative.

Regarding evidentiary issues, when the Keeper initially certified the fifty-seven owner list, the record does not reflect that it had examined any of the information on which the State Agency based its decision to select this list.  Furthermore, the Keeper's conclusory reasoning casts doubt on whether it reviewed the relevant data, including: Dalporto's October 2008 list; Jackson Kelly's February 27, 2009 petition; the objections of Blankenship, Carpenter, Corbet Craddock, Jeffrey, and Phillips; and Bailey's research.  Moreover, based on the current record, the Keeper's decision to certify the objections of these individuals appears to conflict with the evidence.  This observation is not without consequence.  Now that the parties seemingly agree that White is not an owner and that her objection does not count, the Agencies' fifty-seven/thirty list may contain only fifty-six owners and twenty-nine objectors.[19]  A majority of fifty-six is twenty-eight.  Yet, if the Keeper declared only two of the abovementioned objections invalid, a majority would not exist.  This is not to suggest that a re-evaluation of the record would not support a determination that a majority of the owners have objected.  It does indicate, however,

---

[19]  The Court is not implying that this is an accurate count of owners and objectors.

that the Keeper failed to fulfill its duty to examine the relevant evidence and draw reasoned

conclusions from it.[20]

The Court also agrees that the Keeper failed to independently verify the accuracy of the

list.  The plaintiffs assert, and the Keeper concedes, that the Keeper has a duty to independently

verify the accuracy of the list.  The Keeper's concession is consistent with the governing law.[21]

The preceding discussion shows that the Keeper and State Agency were locked in a back-and-

forth during which the Keeper wanted the State Agency to make an authoritative determination

as to the count, but the State Agency disavowed any such responsibility.  The Keeper then broke

the deadlock by indiscriminately deferring to the State Agency's insufficiently supported

conclusions.  Such capitulation does not comport with the APA.  City of Vernon v. FERC, 845

F.2d 1042, 1048 (D.C. Cir. 1988) (citation omitted) (stating that, under the APA, the "court's

review must not merely rubberstamp the agency's decision").

The Court disagrees, however, with the plaintiffs' argument that the Keeper's decision to

delist Blair Mountain amounted to a per se violation of the APA.  The plaintiffs predicate this

argument on the theory that the delisting was inconsistent with 36 C.F.R. § 60.6(c), which

provides that the State Agency must compile a baseline list of owners "within [ninety] days prior

---

[20]  The record contains objections for Bonnie Craddock (A.R. at 1278) and Samuel Craddock (A.R. at 1279).  Only
Bonnie Craddock, however, signed her objection.  On the other hand, Samuel Craddock and Bonnie Craddock signed
Samuel Craddock's objection.  To the non-expert eye, the signatures of Samuel Craddock and Bonnie
Craddock look very similar.  The Court expresses no view, however, as to whether the Keeper should consider this
issue on remand.

[21]  See 36 C.F.R. § 60.6(r) (2015) ("Nominations will be included in the National Register within [forty-five] days of
receipt by the Keeper or designee unless the Keeper disapproves a nomination . . . ."); id. § 60.6(t) ("Any person or
organization which supports or opposes the nomination . . . may petition the Keeper during the nomination process
either to accept or reject a nomination . . . .  Such petitions received by the Keeper prior to the listing of a property
. . . will be considered by the Keeper and the nomination will be substantively reviewed."); id. § 60.15(a)(4)
("Properties removed from the National Register for procedural error shall be reconsidered for listing by the Keeper
after correction of the error or errors by . . . the Keeper, as appropriate."); Friends of the Atglen-Susquehanna Trail,
Inc. v. Surface Transp. Bd., 252 F.3d 246, 253 (3d Cir. 2001) (citations omitted); Moody Hill, 205 F.3d at 558
(holding that the Keeper has "independent authority to determine whether properties are eligible for listing on the
National Register and to name them to the National Register without the agreement" of state agencies).

to the notification of intent to nominate [a property]."  The plaintiffs construe section 60.6(c) to

bar the Keeper from "relying on a list of owners that [is] recalculated after the nomination was

submitted to the Keeper."  Pls.' Reply Br. at 7.

The plaintiffs argue that policy supports this interpretation.  The plaintiffs posit that a

party could manipulate the owner/objection count through post-listing transactions.  "Indeed,"

the plaintiffs continue, "to allow changes to the list of owners after the Keeper has made a final

decision . . . would be fundamentally unworkable, since there would be no finality . . . to the . . .

listing decision."  Pls.' Reply Br. at 21.

Assuming that the plaintiffs' interpretation is reasonable, it is not the only reasonable

interpretation.  While section 60.6(c) requires the State Agency to compile a list of property

owners within ninety days before the notification of intent to nominate, it does not prohibit the

Keeper from recalculating this list outside of the ninety-day window.  Furthermore, 36 C.F.R. §

60.15(a) is written broadly, authorizing the Keeper to remove a property from the National

Register for "[p]rejudicial procedural error in the nomination or listing process." (emphasis

added).  Section 60.15(a)(4) also provides that properties so removed "shall be reconsidered for

listing by the Keeper after correction of the error or errors . . . by the Keeper . . . ."  Additionally,

section 60.15(a)(4) prescribes that "[t]he procedures set forth for nominations shall be followed

in such reconsiderations."  Therefore, a reasonable interpretation of section 60.15(a)(4) is that the

Keeper has authority to correct errors in the nomination process and may use the procedures that

apply to nominations for that purpose.  One such procedure requires that owners be added to the

original list when they certify "in a written notarized statement" that they own a nominated

property and counted "in determining whether a majority of owners ha[ve] objected."  Id. §

60.6(g).  Accordingly, based on such a reading, the regulations authorize the Keeper to recalculate lists of owners/objectors after receiving a nomination.

The plaintiffs' policy argument, although thought-provoking, is not ultimately convincing.  One can easily imagine scenarios in which parties might realize property transactions after a property is listed to circumvent the listing decision.  But one can equally imagine that parties would avoid such a strategy due to any number of reasons (e.g., integrity, cost, unlikelihood of success).  Furthermore, the regulations do not indicate that the Keeper could not take a party's machinations into account when determining whether there has been reversible procedural error in the nomination or listing process.  Moreover, interpreting the regulations to allow the Keeper to recalculate the owner/objector list after listing does not portend an endless administrative process.  Nothing in the regulations indicates that the Keeper could not consider the timeliness, or lack thereof, of an appeal in deciding whether it is appropriate to recalculate the list.  Similarly, there is no indication that the Keeper could not consider the dates of the relevant property transactions.  Cf. Friends of the River v. FERC, 720 F.2d 93, 109 (D.C. Cir. 1983) ("Were we to order the Commission to reassess its decisions every time new forecasts were released, we would risk immobilizing the agency.").  For these reasons, the plaintiffs' policy argument does not change the Court's analysis.

The Keeper agrees that the regulations "clearly anticipate that a list compiled in accordance with 36 C.F.R. § 60.6(c) is mutable . . . ."  Defs.' Cross-Mot. for Summ. J. at 24 (emphasis added) (citation omitted).  As just explained, the Keeper's construction is reasonable.  Therefore, because the plaintiffs have failed to show that the Keeper's construction is plainly erroneous or inconsistent with the Preservation Act or its regulations, its construction is entitled

to Auer deference.  As a result, the Keeper's decision to use a list of owners recalculated after

listing was not inconsistent with 36 C.F.R. § 60.6(c) and did not violate the APA per se.[22, 23]

Except as specified in the preceding paragraphs, the Keeper's counterarguments lack

merit.  Although the Keeper asserts that it carefully considered the record and concluded that

there was procedural error, the preceding analysis belies this assertion.

Regarding Corbet Craddock, the Keeper asserts that the plaintiffs' own evidence showed

that he was an owner as of July 18, 1980.  The Keeper seemingly misunderstands the plaintiffs'

evidence.  Bailey's research purports to show that Corbet Craddock transferred the parcel in

question in 1980.  But, even if the evidence showed that Corbet Craddock owned the parcel in

1980, the Keeper's argument would still miss the mark.  After all, Bailey's research suggests that

Corbet Craddock died in 1983.  Moreover, the Keeper's argument ignores the plaintiffs'

contention that Nellie Craddock lacked authorization to object for Corbet Craddock.  Thus, from

the same discrete source, the Keeper cites (allegedly) favorable evidence and disregards

unfavorable evidence.  Such cherry-picking embodies arbitrary and capricious conduct.  See Am.

Radio Relay League, Inc. v. FCC, 524 F.3d 227, 237 (D.C. Cir. 2008) (citations omitted)

(indicating that "there is no APA precedent allowing an agency to cherry-pick a study on which

it has chosen to rely"); cf. Shaw v. AT&T Umbrella Ben. Plan No. 1, 795 F.3d 538, 541, 546–47

---

[22]  This conclusion does not alter the fact that the Keeper acted arbitrarily and capriciously in delisting Blair
Mountain, thereby violating the APA.

[23]  The plaintiffs also argued in their Motion for Summary Judgment that the Keeper erred by failing to consider
their petition for reconsideration. Pls.' Mot. for Summ. J. at 25–26.  In its Cross-Motion for Summary Judgment,
the Keeper countered that the plaintiffs lacked regulatory standing to petition for reconsideration. Defs.' Cross-Mot.
for Summ. J. at 31–32.  In their Reply, the plaintiffs failed to respond to the Keeper's arguments. See generally Pls.'
Reply Br.  Therefore, it appears that the plaintiffs have abandoned this argument.  The Court need not decide,
however, whether the plaintiffs have officially abandoned this argument.  Having concluded that the Keeper's
delisting decision must be vacated and the case remanded for further proceedings, the Keeper will necessarily have
to reconsider the delisting decision.  Therefore, the plaintiffs have received effectively the same relief as a result of
the remand.

(6th Cir. 2015) (holding that, under ERISA, a plan administrator's decision to deny an employee long-term disability benefits is arbitrary and capricious if the administrator "ignore[s] favorable evidence . . . [and] selectively review[s] the evidence it [does] consider").  Consequently, this argument fails.

The Keeper also argues that Dollie Jeffery's objection was valid.  Although the Keeper contends that the regulations do not require address, parcel, or other acceptable location information to accompany an objection, the Keeper's decision to count it nevertheless must be reasonable.  Dollie Jeffery's objection dates to 2005 and states that she resides in "Hewett, WV." A.R. at 1285.  But, according to Dalporto's October 2008 list, Dessie Jeffrey resides in Dearborn, Michigan, and may actually be named "Jeffrey McDonald Dessi."  A.R. at 1237. Moreover, as explained above, the decision to count Dollie Jeffrey's objection for Dessie Jeffrey seems inconsistent with the Keeper's own nonbinding guidance.  Accordingly, this argument lacks merit.

The Keeper raises similarly unavailing arguments as to the objections of Phillips and Blankenship.  Essentially, the Keeper argues that their objections are valid because they made them known in 2005 and there was no evidence that they were no longer owners.  However, neither Phillips nor Blankenship appears on Dalporto's October 2008 list of sixty-six objectors. Therefore, considering that their objections dated back to 2005, the evidence suggests that they were no longer owners.  Furthermore, the decision to add them to the list of fifty-seven owners and thirty objectors appeared again to contradict the Keeper's nonbinding guidance.  As a result, this argument is unsound.

The Keeper also contends that it independently verified the accuracy of the fifty-seven/thirty list.  The Keeper asserts that, even after listing, it was reasonable for it to look to the

State Agency for its expertise in determining whether a majority of the owners objected.  This is especially true because, in the Keeper's opinion, this case involves intricacies of West Virginia property law.  Despite the State Agency's arguments to the contrary, the Court generally agrees that the regulations give the Keeper leeway to consult the State Agency for assistance in making this determination.[24]  However, contrary to the Keeper's assertion, the above analysis refutes the idea that the Keeper "reasonably adopted" the State Agency's conclusions as its own.  Rather, the record compels the conclusion that the Keeper acted essentially as a rubber stamp.  Accordingly, this argument is unconvincing.

The preceding discussion demonstrates that the Keeper's decision to delist Blair Mountain was arbitrary and capricious in violation of the APA.  As a result, the Court remands the case to the Keeper for "the exercise of reasoned decisionmaking."  Am. Trucking Ass'ns v. EPA, 600 F.3d 624, 631 (D.C. Cir. 2010) (citation omitted).  The Keeper "is directed to address any issues raised [in this opinion], and any other arguments that may be advanced [on remand], and to provide a rational and reasoned explanation for the ultimate disposition of this issue."  Wis. Gas Co. v. FERC, 770 F.2d 1144, 1165 (D.C. Cir. 1985).  The Court expresses no opinion on whether the Keeper will ultimately be able "remedy[] the defects that vitiated the original

---

[24]  See 36 C.F.R. § 60.15(a)(4) (2015) ("Properties removed from the National Register . . .  shall be reconsidered for listing by the Keeper after correction of the error . . . by the State [Agency], . . . as appropriate."); id. § 60.15(e) ("The State [Agency] . . . shall respond in writing within [forty-five] days of receipt to petitions for removal of property from the National Register.  The response shall advise the petitioner of the State [Agency's] . . . views on the petition."); cf. Antilles Cement Corp. v. Acevedo Vila, 408 F.3d 41, 51 (1st Cir. 2005) (stating that "deference is owed to state agency's interpretation of state law"); Perry v. Dowling, 95 F.3d 231, 237 (2d Cir. 1996) (citations omitted) ("[Where] the state has received prior federal-agency approval to implement its plan, the federal agency expressly concurs in the state's interpretation of the statute, and the interpretation is a permissible construction of the statute, that interpretation warrants deference.").

action." <u>N.E. Coal. on Nuclear Pollution v. Nuclear Reg. Comm'n</u>, 727 F.2d 1127, 1131 (D.C. Cir. 1984).[25]

## IV.   CONCLUSION

For the foregoing reasons, the Court (1) grants the plaintiffs' Motion for Summary Judgment and (2) denies the Keeper's Cross-Motion for Summary Judgment.

**SO ORDERED** this 11th day of April, 2016.[26]

REGGIE B. WALTON
United States District Judge

---

[25]  The Keeper did not argue that it deserved <u>Auer</u> deference.  Even if the Keeper had taken this position, the argument would have failed.  This case does not turn on the Keeper's interpretation of an allegedly ambiguous regulation.  Rather, the pivotal issue is whether the decision-making process that the Keeper employed in delisting Blair Mountain was arbitrary and capricious, which it unquestionably was.  Moreover, even if the Keeper's arbitrary and capricious decisionmaking somehow constituted an interpretation of an ambiguous regulation, <u>Auer</u> deference would not be in order.  This is because, based on the preceding discussion, "there is reason to suspect that the [Keeper's decision] 'does not reflect [its] fair and considered judgment on the matter in question.'"  <u>Christopher</u>, ____ U.S. at ____, 132 S. Ct. at 2166 (citation and internal quotation marks omitted) (quoting <u>Auer</u>, 519 U.S. at 461).

[26]  An Order consistent with this Memorandum Opinion shall be issued contemporaneously.